Jacob A. Walker (SBN 271217)
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jake@blockesq.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Houston Municipal Employees Pension System, individually and on behalf of all others similarly situated,

Plaintiff,

v.

Mattel, Inc. and Joseph J. Euteneuer

Defendants.

Case No. 2:19-cv-10860

**Class Action Complaint for Violation of the Federal Securities Laws**

Jury Trial Demanded

Plaintiff Houston Municipal Employees Pension System ("Plaintiff"), by and through its attorneys, alleges upon personal knowledge as to itself and upon information and belief as to all other matters, based upon the investigation conducted by and through its attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

## Nature and Summary of Action

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Mattel Inc.'s ("Mattel" or the "Company") common stock between October 26, 2017 and August 8, 2019, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. Mattel is an international toy manufacturing company which claims to be the owner of one of the strongest portfolios of toy brands with vast intellectual property potential. In addition, it is a Company which supposedly focuses on "unwavering integrity" with "solid standards of corporate governance."

3. Despite these noble goals, Mattel filed a false and misleading financial statement for the third quarter of 2017, understating its net loss by over $109 million. Defendants then conspired to hide this understatement from the investing public through an accounting sleight of hand in the next quarter. This effort at concealment involved a conspiracy of the upper echelons of the Company's financial department, as well as Mattel's outside auditors, and went on for almost two years before a whistleblower caused investors to learn the truth.

4. The scheme would begin to unravel on August 8, 2019, when Mattel shocked investors by abruptly cancelling a $250 million senior note offering due to a newly disclosed whistleblower letter detailing "accounting errors" in past quarters. The letter also questioned whether Mattel's outside auditor was sufficiently independent to oversee the Company's financial reporting. This news caused Mattel's common stock to drop $2.12 per share or almost 12% in a single day of trading, wiping out over $730 million in market capitalization. The subsequent internal investigation would confirm the majority of the whistleblower's allegations and would force the Company to restate its financials for the last two quarters of 2017 and admit that the Company's internal controls were deficient for those periods.

5. Defendants were motivated to and did conceal the true operational and financial condition of Mattel, and materially misrepresented and failed to disclose the conditions that were adversely affecting the Company throughout the Class Period. Doing so enabled Defendants to deceive the investing public regarding Mattel's business, operations, management and the intrinsic value of Mattel's common stock and artificially inflated the price of Mattel's common stock, causing Plaintiff and other members of the Class to purchase Mattel common stock at artificially

inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, defendants, jointly and individually took the actions set forth herein.

## Jurisdiction and Venue

6. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

8. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

10. In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## Parties

11. Plaintiff Houston Municipal Employees Pension System acquired and held shares of Mattel at artificially inflated prices during the class period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

12. Defendant Mattel is an American multinational toy manufacturing company organized in Delaware and with its principal place of business in El Segundo, California. The Company trades on the NASDAQ stock exchange under the ticker symbol "MAT." According to the Company's website, Mattel is a leading global children's entertainment company that specializes in the design and production of quality toys and consumer products.

13. Defendant Joseph J. Euteneuer ("Euteneuer") took the position of the Company's Chief Financial Officer ("CFO") in September 2017. On October 29, 2019, Mattel announced that Euteneuer would leave the Company after a 6-month transition period.

14. Euteneuer, because of his position at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. Euteneuer authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of his position with the Company and access to material non-public information available to him but not to the public, Euteneuer knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. Euteneuer is liable for the false statements pleaded herein.

## Substantive Allegations

15. Founded in 1945, Mattel designs, manufactures, and markets a range of toy products worldwide. Its portfolio of brands and products include such household names as Fisher-Price, Barbie, Hot Wheels, Matchbox, Masters of the Universe, American Girl and Thomas & Friends. The Company purports to be the owner of one of the strongest portfolios of toy brands in the world with vast intellectual property potential.

16. Mattel's fortunes of late have been on the downswing. In 2015, Mattel was overtaken as the world's leading toy brand by The Lego Group. Since then, the Company has suffered a string of setbacks resulting in repeated shakeups of its executive management. For example, in 2015, Mattel lost a $500 million battle over the licensing of Disney's animated princesses. Mattel had worked with Disney since 1955, when it became the first sponsor for the *Mickey Mouse Club*, and it's been the company's go-to dollmaker since 1996. According to Gene Del Vecchio, a former Ogilvy & Mather advertising executive who has worked with Mattel and

Disney in the past, "Disney Princess was probably the greatest coup that Hasbro has had in the last three decades."

17. As a result of losing the Disney Princess account, there was a wholesale shakeup in Mattel's executive management, with board member Christopher Sinclair being named new CEO and two-thirds of senior executives resigning or receiving layoffs. Much was expected of Sinclair when he took over the reins of Mattel. According to Michael J. Dolan, Mattel's Independent Lead Director,

> Chris has been extremely active inside the Company, developing with the Board and the Mattel management team a comprehensive plan to improve the Company's performance and make the most of our incredible brands and opportunities. He is moving with urgency and we are delighted that, with his agreement to sign on as CEO and continue to lead the effort personally, there will not be any delay in implementing the changes necessary to get Mattel back on track.

18. Sinclair's efforts to revitalize the Company failed, and he was fired within two years and replaced by Margaret Georgiadis, who kicked off a massive multi-year savings initiative designed to generate cost savings of $240 million and increase profitability. Despite these efforts, Mattel had a disappointing 2017 with large sales declines and Georgiadis was replaced just 14 months after her hiring by Ynon Kreiz in April 2018.

19. Unfortunately, Mattel's misfortunes continued, with the Company being forced to lay off 2,200 employees in 2018 due largely to the Toys-R-Us bankruptcy. In total, Mattel has lost two-thirds of its value since 2016 due to lagging sales.

**Materially False and Misleading Statements**

20. On October 26, 2017, Mattel filed its financial report for the third quarter of 2017 with the U.S. Securities and Exchange Commission ("SEC"). In this filing, the Company reported a net loss of $603.3 million. The Company also announced that it would suspend quarterly dividends beginning in the fourth quarter of 2017 in order to "increase financial flexibility, strengthen its balance sheet and facilitate strategic investments."

21.     The statements described above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. As discussed below, the Defendants misled investors by reporting a net loss of $603.3 million for the third quarter which was understated by $109 million due to inappropriately calculating its tax valuation allowance.

22.     Allegedly, the accounting error had to do with Mattel's ownership of "Thomas & Friends," an animated children's show, and was tied to a $562 million valuation allowance. Ultimately, the allowance was reduced by $109 million, which came from deferred tax liabilities related to Mattel's acquisition of HIT Entertainment in 2011. Reducing this allowance inappropriately lowered Mattel's loss during the quarter.

23.     In addition, the Company's quarterly report for Q3 2017 attested to the effectiveness of Mattel's disclosure controls and procedures, stating:

Evaluation of Disclosure Controls and Procedures

> As of September 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2018.

24. In addition, the third quarter 10-Q also contained certifications signed by Defendant Euteneuer attesting to the accuracy and completeness of the Company's financial and operational reports, which state:

Certification

1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of

financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

25. This certification was false and misled investors to believe that Mattel had adequate systems of internal disclosure and financial controls, when no such controls existed. As such, the Company's financial report for Q3 2017 was not accurate or reliable.

26. On February 27, 2018, Mattel filed its financial report for the fourth quarter and full year 2017 with the SEC. In this filing, Mattel instituted a change in accounting for intangible asset in order to surreptitiously correct the misstatement made in the Company's Q3 2017 financial report. This had the effect of artificially increasing the Company's net loss for Q4 2017 by $109 million – apparently to negate the misstatement of net loss in the previous quarter without informing investors.

27. The statements described in ¶ 26 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, the Company allowed the tax expense "mistake" in Q3 2017 to remain uncorrected and was therefore repeated in the Company's year-end financial report.

28. The Company's financial report for the full year and fourth quarter of 2017 was signed and Certified by Defendant Euteneuer and contained representations that attested to the purported effectiveness and sufficiency of the Company's controls and procedures—as well as the completeness and veracity of Mattel's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q3 2017, discussed supra at ¶¶ 23-24.

29. These certifications were false and misled investors by telling them that Mattel had adequate systems of internal disclosure and financial controls, when no such controls existed. As such, the Company's financial report for Q4 and year-end 2017 were not accurate or reliable.

30. On April 26, 2018, Mattel filed its financial report for the first quarter of 2018 with the SEC which was signed and certified by Defendant Euteneuer and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures – as well as the completeness and veracity of Mattel's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q3 2017, discussed supra at ¶¶ 23-24.

31. On July 25, 2018, Mattel filed its financial report for the second quarter of 2018 with the SEC which was signed and certified by Defendant Euteneuer and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and

procedures – as well as the completeness and veracity of Mattel's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q3 2017, discussed supra at ¶¶ 23-24.

32. On October 25, 2018, Mattel filed its financial report for the third quarter of 2018 with the SEC which was signed and certified by Defendant Euteneuer and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures – as well as the completeness and veracity of Mattel's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q3 2017, discussed supra at ¶¶ 23-24.

33. On February 22, 2019, Mattel filed its financial report for the fourth quarter and full year 2018 which was signed and certified by Defendant Euteneuer and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures – as well as the completeness and veracity of Mattel's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q3 2017, discussed supra at ¶¶ 23-24.

34. On April 26, 2019, Mattel filed its financial report for the first quarter of 2019 with the SEC which was signed and certified by Defendant Euteneuer and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures – as well as the completeness and veracity of Mattel's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q3 2018, discussed supra at ¶¶ 23-24.

35. On July 25, 2019, Mattel filed its financial report for the second quarter of 2019 with the SEC which was signed and certified by Defendant Euteneuer and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures – as well as the completeness and veracity of Mattel's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q3 2018, discussed supra at ¶¶ 23-24.

36. These statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants misled investors by falsely telling them that Mattel had adequate systems of internal disclosure and financial controls when, in fact, it was known among the Company's finance executives—including Defendant Euteneuer—that these systems were inadequate since at least third quarter 2017. As such, the annual and quarterly reports described above were not accurate or reliable.

## The Truth Emerges

37. On August 1, 2019, Mattel announced that it would offer $250 million of Senior Notes due 2027 (the "Note Offering"), The Company said that it would use the net proceeds from the sale of the Notes, plus cash on hand, to redeem and retire all of its 4.350% Senior Notes which would be due in 2020 and pay related prepayment premiums and transaction fees and expenses. The closing of the offering was expected to occur on August 8, 2019, subject to customary closing conditions.

38. Then, on August 8, 2019—the very day the Note Offering was expected to close—Mattel shocked investors when it announced that a whistleblower letter had been sent to the Company's outside auditors alleging accounting errors in past quarters and questioned whether Mattel's outside auditor was sufficiently independent. As a result, the Company announced that it was terminating the Senior Note Offering subject to the results of an internal investigation. This news caused Mattel's common stock to drop $2.12 per share or almost 12% in a single day of trading.

39. The next shoe would drop on October 29, 2019, when Mattel announced the Company had concluded its investigation into the whistleblower's claims, and that Defendant Euteneuer would depart the company. According to the Company, the investigation found, among other things, "errors" in Mattel's publicly filed financial statements for the last two quarters of 2017, and that these "errors" were not properly disclosed to the then CEO Georgiadis and the Company's Audit Committee once they became known. More specifically, the investigation found that:

- Mattel's previously reported net loss of $603.3 million for the third quarter ended September 30, 2017 was understated by $109 million due to an error in calculating its tax valuation allowance. The correct reported net loss for the quarter ended September 30, 2017 should have been a net loss of $712.3 million.

- A change in accounting for an intangible asset in the fourth quarter of 2017 resulted in an effective correction of the error for the 2017 annual results. However, the tax expense remained uncorrected in the Q3 2017 10-Q and was therefore overstated in the quarter ended December 31, 2017. As a result, Mattel's previously reported loss of $281.3 million for the quarter ended December 31, 2017 should have been reported as a net loss of $172.3 million.

40. In addition, the investigation found that there were "material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for those periods."

41. In an effort to get the matter behind them, the Company announced that it would amend the Company's 2018 Annual Report to: (1) restate the Company's financial results for the third and fourth quarters of 2017; and (2) identify material weaknesses in its internal control over financial reporting for the third and fourth quarters of 2017.

42. Then, on November 6, 2019, the *Wall Street Journal* published a scathing article entitled "Mattel, PWC Obscured Accounting Issues, Former Executive Says."[1] This article discussed information provided by Mattel's former director of tax reporting in the latter half of 2017, who confirmed that the Q3 2017 accounting "error" was intentionally hidden by the upper echelons of the Company's financial executives. According to the article, "My team was dumbfounded by [the coverup] … [but] "it was known within Mattel that if we took this approach, at worst we might get a slap on the wrist from the Securities and Exchange Commission …. But if

---

[1] Available at https://www.wsj.com/articles/mattel-pwc-obscured-accounting-issues-former-executive-says-11573036201 (last checked December 24, 2019).

CLASS ACTION COMPLAINT                                                                 12

the company disclosed a material weakness, a senior executive said to me it would be 'the kiss of death.'"

### Class Action Allegations

43. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Mattel common stock between October 26, 2017 and August 8, 2019, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

44. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

45. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a. Whether the Exchange Act was violated by Defendants;

    b. Whether Defendants omitted and/or misrepresented material facts;

    c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e. Whether the price of the Company's stock was artificially inflated; and

    f. The extent of damage sustained by Class members and the appropriate measure of damages.

46. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

47. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

48. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### Fraud on the Market

49. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
   b. The omissions and misrepresentations were material;
   c. The Company's common stock traded in efficient markets;
   d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and
   e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

50. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

### No Safe Harbor

51. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

52. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

### Loss Causation

53. On August 8, 2019, Mattel announced that a whistleblower letter was sent to the company's outside auditors alleging certain improprieties in accounting practices—resulting in the sudden termination of a scheduled Senior Note Offering. As a result, Mattel's common stock dropped $2.12 per share or almost 12% in a single day of trading. The revelation of the whistleblower letter and accounting improprieties contradicted statements made by Defendants during the Class Period and were a causal element of the concurrent decline in the Company's share price.

### Causes of Action

### Count One

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

54. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55. During the Class Period, Defendants Mattel and Euteneuer disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56. Defendants Mattel and Euteneuer violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

57. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## Count Two

### Violation of § 20(a) of the Exchange Act

### (Against Defendant Euteneuer)

58. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59. Defendant Euteneuer acted as a controlling person of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position at the Company, Euteneuer had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. Defendant Euteneuer was provided with or had unlimited access to the documents described above in ¶¶ 20-36 which contained statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

### Prayer for Relief

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)     awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

### Demand for Jury Trial

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

December 24, 2019                                   Respectfully submitted,

/s/ Jacob A. Walker
Jacob A. Walker (SBN 271217)
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jake@blockesq.com

*Counsel for Plaintiff and the Proposed Class*