Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448

*Lead Counsel for Lead Plaintiffs and the Class*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| *In re Mattel, Inc. Securities Litigation* | Case No. 19-CV-10860-AB (PLAx)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................2

II.     JURISDICTION AND VENUE....................................................................14

III.    THE PARTIES ..............................................................................................14

        1.      Lead Plaintiffs and the Additional Named Plaintiff ................14

        2.      Defendants ...............................................................................15

IV.     SUMMARY OF THE FRAUD .....................................................................19

        A.      Mattel's Business Faltered in 2017, Causing Investor Concern.........19

        B.      Mattel Was Riddled with Severe Deficiencies in Internal
                Controls that Contributed to a Material Misstatement of
                Financial Results and Enabled Mattel to Cover Up that
                Misstatement with PwC ....................................................................24

                1.      Brief Background on Internal Controls ....................................24

                2.      Unbeknownst to Investors, Mattel's Internal Controls
                        Were Severely Deficient...........................................................27

        C.      Mattel Materially Understated Its Losses for the Third Quarter
                2017 ...................................................................................................34

                1.      Mattel and PwC Initially Decide Not to Record A
                        Reserve Against Mattel's Deferred Tax Assets........................34

                2.      Mattel and PwC Abruptly Change Course Just Before
                        Mattel Publicly Issued Its Third Quarter 2017 Financial
                        Results......................................................................................39

                3.      Because of Mattel's Faulty Internal Controls, PwC Finds
                        a Critical Error in the Valuation Allowance Calculation
                        "Days Before" Financials Are Published...................................43

                4.      After Third Quarter 2017 Results are Published,
                        Whitaker Finds Another Material Error Requiring A
                        Restatement...............................................................................48

D.  After Mattel Concludes that a Restatement Is Required, Mattel and PwC Conspire to Cover Up the Material Misstatement of Mattel's Financial Results and Mattel's Severe Internal Control Deficiencies ...........................................................................51

E.  Mattel and PwC Are Forced to Disclose a Whistleblower Letter Concerning the Fraud ..........................................................67

V.  MATTEL'S POST CLASS PERIOD ADMISSIONS ...................................70

A.  Mattel Admits That Its Third and Fourth Quarter 2017 Financial Results Were Materially False When Issued, and Announces that the Company Will Issue A Restatement ...................70

B.  Mattel Files the Restatement ................................................77

C.  The SEC and SDNY Subpoena Mattel ...............................84

VI.  ADDITIONAL SCIENTER ALLEGATIONS .............................................85

VII.  MATTEL VIOLATED STATUTES, REGULATIONS, AND STANDARDS REQUIRING IT TO ESTABLISH EFFECTIVE INTERNAL CONTROLS, AND CERTIFY THEIR EFFECTIVENESS TO INVESTORS ..........................................................................95

A.  Laws and Regulations Governing Internal Controls..........................95

B.  Mattel Violated Statutes and Regulations Governing Internal Controls ..........................................................................102

VIII.  MATTEL VIOLATED GAAP..................................................................106

A.  GAAP Accounting for Deferred Tax Assets.....................................107

B.  GAAP Requires Correction of Material Errors in Previously-Issued Financial Statements Via Restatement...................................111

C.  Mattel Violated GAAP By Failing to Issue a Restatement Once It Identified A Material Misstatement in Its Financial Results.........112

IX.  PWC FALSELY CERTIFIED THAT IT HAD AUDITED MATTEL'S FINANCIAL STATEMENTS AND INTERNAL CONTROLS FOR

2017 AND 2018 IN ACCORDANCE WITH CONTROLLING
AUDITING STANDARDS..........................................................................116

A.  PCAOB Auditing Standards.................................................117

B.  PwC's Violations of the PCAOB Auditing Standards......................121

    1.  PwC Violated PCAOB Auditing Standards in Failing to
Report Material Weaknesses Beginning in the Second
Quarter 2017 .........................................................................122

    2.  PwC Knowingly Made Materially False and Misleading
Statements in Mattel's 2017 and 2018 Forms 10-K ..............125

    3.  PwC Violated PCAOB Auditing Standards When It Did
Not Require Mattel to Restate its Third Quarter 2017
Form 10-Q................................................................................129

    4.  In Conspiring to Cover Up A Material Misstatement,
PwC Also Violated PCAOB Standards of Independence
and Due Care...........................................................................131

C.  Mattel's Relationship with PwC Violated Auditor
Independence Requirements ..............................................134

X.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS AND OMISSIONS............................................................138

A.  Materially False And Misleading Statements And Omissions
Concerning The Second Quarter 2017.................................138

B.  Materially False And Misleading Statements And Omissions
Concerning The Third Quarter 2017....................................145

C.  Materially False And Misleading Statements And Omissions
Concerning The Fourth Quarter and Full Year 2017........................155

D.  Materially False And Misleading Statements And Omissions
Concerning The First Quarter 2018 ....................................174

E.  Materially False And Misleading Statements And Omissions
Concerning The Second Quarter 2018.................................181

F.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter 2018.................................................187

G.    Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter and Full Year 2018........................194

H.    Materially False And Misleading Statements And Omissions Concerning The First Quarter 2019 ..................................................206

I.    Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2019..............................................211

XI.    LOSS CAUSATION ....................................................................216

XII.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR......218

XIII.    THE PRESUMPTION OF RELIANCE........................................................219

XIV.    CLASS ACTION ALLEGATIONS............................................................220

XV.    CAUSES OF ACTION................................................................223

XVI.    PRAYER FOR RELIEF ...............................................................234

XVII.    JURY DEMAND..........................................................................234

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

1        Lead Plaintiffs DeKalb County Employees Retirement Plan ("DeKalb") and

2  New Orleans Employees' Retirement System ("New Orleans"), and additional

3  named plaintiff Houston Municipal Employees Pension System ("Houston

4  Municipal," together with DeKalb and New Orleans, "Plaintiffs") individually and

5  on behalf of a class of similarly situated persons and entities, by their undersigned

6  attorneys, allege the following against Mattel, Inc. ("Mattel" or the "Company") and

7  the other Defendants (defined below), upon personal knowledge as to themselves

8  and their own acts, and upon information and belief as to all other matters.

9        Plaintiffs' information and belief as to the allegations concerning matters

10  other than themselves and their own acts is based upon the investigation conducted

11  by and through counsel, which included, among other things, the review and analysis

12  of: (i) transcripts, press releases, news articles, and other public statements issued by

13  or concerning the Defendants; (ii) research reports issued by financial analysts

14  concerning the Company; (iii) reports and other documents filed publicly by Mattel

15  with the U.S. Securities and Exchange Commission ("SEC"); (iv) Mattel's corporate

16  website; (v) interviews with former Mattel employees; and (vi) other publicly

17  available information. Plaintiffs believe that substantial additional evidentiary

18  support will exist for the allegations set forth herein after a reasonable opportunity

19  for discovery.

20

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

1  Plaintiffs bring this federal securities class action on behalf of themselves and
2  a class consisting of all persons and entities who purchased, or otherwise acquired,
3  the common stock of Mattel from August 2, 2017 to August 8, 2019, inclusive (the
4  "Class Period"), subject to certain exclusions addressed in paragraph 445 below (the
5  "Class").   The Defendants in this action are: Mattel; Margaret H. Georgiadis,
6  Mattel's former Chief Executive Officer ("CEO"); Joseph J. Euteneuer, Mattel's
7  Chief  Financial  Officer  ("CFO");  Kevin  Farr,  Mattel's  former  CFO;
8  PricewaterhouseCoopers, Mattel's registered accounting firm; and Joshua
9  Abrahams, PwC's lead audit partner for Mattel.  Plaintiffs' and the Class's claims
10  arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934
11  ("Exchange Act") and Rule l0b-5 promulgated thereunder.

12  **I.   INTRODUCTION**

13  1.   This securities class action concerns a cover-up of known, material
14  misstatements in Mattel's financial results and known, severe weaknesses in its
15  internal controls.  The cover-up was orchestrated by senior Mattel executives and
16  the Company's auditor, PwC—who were responsible for ensuring that Mattel's
17  public statements to investors were accurate and complete.

18  2.   As detailed below, from the beginning of the Class Period, Mattel's tax,
19  accounting, and public reporting functions were rife with well-known, severe
20  deficiencies—called "material weaknesses in internal controls"—creating the

21

perfect conditions to enable Defendants' fraud. Among other things, Mattel kept the financial information used to generate its financial statements in boxes and binders of loose paper stacked about its offices, with no organization, making it extremely difficult to even find the pertinent back-up information for its financial results. When that information could be found, it often did not "tie out," or reconcile, with the Company's published financial statements. Mattel also lacked any formal process for determining and documenting the valuation allowance for its deferred tax assets—which was a critical deficiency because those assets were valued by Mattel at approximately $580 million and had a material impact on Mattel's financial results and balance sheet.

3.     Brett Whitaker, a senior Mattel tax executive during the Class Period whom Lead Counsel interviewed as part of its investigation, reported that the internal control deficiencies at Mattel were severe, open, obvious, and repeatedly discussed with Mattel executives. "If you just walked around the halls, you would know that this place was riddled with issues and alarms were going off everywhere," Whitaker reported.

4.     In October 2017, as Mattel was closing its books for the third quarter, it was attempting to calculate a potentially very significant allowance for its deferred tax assets. This calculation was highly material. The allowance represented the portion of the assets that no longer had value. The allowance would reduce the value

1
2
3
4
5

of Mattel's deferred tax assets and be charged against the Company's quarterly income, potentially reducing that income by hundreds of millions of dollars. The process of calculating this critical financial item occurred under the supervision of Mattel's Chief Financial Officer, Defendant Euteneuer, and PwC's former lead audit partner for Mattel, Defendant Abrahams.

6
7
8
9
10
11
12
13
14
15
16
17
18

5. The process of calculating this key allowance was open chaos. Initially, Mattel determined that it would not record an allowance against the value of its deferred tax assets. Then, with approximately one week left in the closing process, Mattel reversed its decision and determined that it was required to record an allowance against the assets, thus materially reducing their value. Whitaker's team was tasked with calculating a potential half-billion dollar allowance in less than a week. This critical tax and accounting determination would normally take several weeks to make, if not longer, yet Whitaker and his team were forced to do it in days—and do it without reliable documentation that was necessary to back-up the calculation, or any formal process for making and vetting the calculation. Nevertheless, Whitaker and his team worked around the clock and calculated a valuation allowance of approximately $175-200 million, meaning that the assets, and Mattel's net income, would have to be reduced by that amount.

19
20

6. Days before Mattel's financial statements were due to be published to investors, PwC audit partner John Brierley informed Whitaker and other Mattel

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 4 -

executives that he believed the allowance had been miscalculated.  The value of the deferred tax assets had been improperly reduced by several hundred million dollars, which, in turn, had the effect of improperly reducing the valuation allowance amount on those assets by a similar amount.  In accounting terms, PwC informed the Mattel team that they had incorrectly reduced the deferred tax assets by netting them against deferred tax liabilities arising from intellectual property assets that were classified as having an "indefinite life," which was not permitted under accounting rules.  The support provided for this conclusion was a single spreadsheet that listed the various assets at issue, which had been produced by another Mattel tax executive, Dermot Martin.

7.      Whitaker and other Mattel executives agreed that errors had been made that incorrectly lowered the allowance by significant amounts.  Accordingly, just days before Mattel's financial statements were set to be published to investors, Whitaker and his team were required to fully re-calculate the valuation allowance—again, without adequate time, supporting documentation, or any formal process for doing so.  This time, Mattel's calculation yielded a much higher allowance of $562 million, which reduced the value of Mattel's deferred tax assets—and reduced the Company's income—by hundreds of millions of dollars more.

8.      Throughout this entire process, Mattel was internally circulating draft financial statements to its senior executives, including Defendant Euteneuer.

Accordingly, Defendants were privy to the wild downward swings in the Company's third quarter income in the days before they were to be released—first when the Company reversed course and decided to record an allowance of approximately $175-200 million, and then when the Company decided to record an allowance of $562 million. Whitaker reported that the Company's numbers were simply unreliable: "We had no confidence in what we were using. Typically, there is a trail of documentation that supports what you are reporting, and that just did not exist."

9. Nevertheless, on October 26, 2017, Mattel published its 2017 third quarter financial results to investors in a Form 10-Q signed by Defendant Euteneuer, among others. In the Form 10-Q, Mattel reported a loss of $603 million, driven by its $562 million valuation allowance on the deferred tax assets. Defendant Euteneuer certified that these results were accurate and prepared in accordance with accounting rules, and that he had "designed . . . internal control over financial reporting . . . to provide reasonable assurance" that Mattel's financial statements were correct.

10. These statements were false. Unbeknownst to investors, Mattel's loss was materially understated by approximately $109 million—an amount equal to approximately 35% of Mattel's net income for all of 2016—and its internal controls were severely deficient.

1    11.    In January 2018, as part of the closing process for the Company's 2017

2  year-end results, Whitaker and Martin had a meeting to investigate the support for

3  the spreadsheet that was used to substantiate the allowance days before third quarter

4  results were published.  Whitaker described the meeting as "odd": "He [Martin] had

5  us lock ourselves into a conference room, which we never did, and he produced

6  several boxes and binders of loose paper to walk me through.  And I thought he was

7  going to say, 'Here is where the backup is.'  And instead, he said, 'I think the support

8  is somewhere in here.  Let's try to find it.'"  Whitaker reported, "this is how things

9  were done at Mattel."

10    12.    After hours of rummaging through boxes and binders of paper, with no

11  success, Whitaker eventually discovered a document that demonstrated that Mattel

12  had materially understated its valuation allowance for the third quarter of 2017 and,

13  in turn, the size of its reported loss.  The document showed that a $311 million

14  intellectual property asset (defined herein as the "HiT IP"), which had been treated

15  as a "finite lived" asset, was actually "indefinite lived."  Accordingly, the deferred

16  tax liability that resulted from the HiT IP, which had been used to reduce the

17  valuation allowance for the third quarter of 2017, should not have been used to

18  reduce the allowance.  The error amounted to approximately $109 million.  When

19  Whitaker explained the error to Martin, Martin remarked, "There goes my *****

20  job."

21

1    13.    On January 15, 2018, Whitaker met with Mattel's Senior Vice President

2  of Accounting, Joe Johnson ("Johnson"), Senior Vice President of Tax and Customs,

3  Clara Wong ("Wong"), and other Accounting and Internal Audit executives,

4  including Mattel's Vice President of Internal Audit.  They all agreed that the error

5  had been made and was material.  They also all agreed that the Company was

6  suffering from a material weakness in its internal controls.  There was "no conflict"

7  on these points, Whitaker reported.  Johnson, however, protested that, "We cannot

8  have a material weakness.  That would be the kiss of death."

9    14.    At this time, disclosure of misstated financial results and material

10  weaknesses by Mattel would have triggered a particularly severe negative market

11  reaction.  Mattel's stock had lost over half of its value in 2017 due to outsized losses,

12  and the Company was executing a strategic rebuild in an attempt to turn around its

13  business.  Investors were already questioning Mattel's future, and full disclosure of

14  the truth could have further harmed Mattel's stock price and decimated investor

15  confidence in the Company's ability to weather its troubled times.

16    15.    Whitaker, Johnson, and Wong then met Mattel's legal team, including

17  its head legal officer and its SEC counsel.  When asked what the conclusion reached

18  at the meeting was, Whitaker reported that there "was absolutely zero doubt in

19  anyone's mind that we had a material misstatement that would result in a restatement

20

21

1   of third quarter earnings."  The group decided to inform CFO Euteneuer of their

2   conclusion, and then speak with PwC.

3       16.     Wong met with Euteneuer and told him of the material error in the third

4   quarter financial statements, and the group's decision to restate those financial

5   statements and admit a material weakness in Mattel's internal controls.  Wong

6   reported to Whitaker that Euteneuer accepted the decision.

7       17.     The subsequent meeting with PwC included, among others, Johnson,

8   Wong, and Abrahams, the lead PwC audit partner.  Wong informed Whitaker that,

9   after the team communicated its conclusions to Abrahams, "Josh Abrahams'

10  immediate response, to everyone's surprise, was that we cannot have a material

11  weakness and we need to figure out a way for that not to be the result."  "The

12  mandate" from Abrahams "was for everyone to see what kind of a technical

13  argument we could make" to avoid a restatement and avoid reporting a material

14  weakness.

15      18.     Within days, PwC had concocted just such a plan.  The plan was to

16  change the classification of the HiT IP from an indefinite-lived asset to a finite-lived

17  asset retroactively as of the start of the fourth quarter, on October 1, 2017.  This

18  change in classification was an artificial device for Mattel to avoid a required

19  restatement of its third quarter financial statements.  This change would match the

20  classification of the HiT IP to the manner in which the Company had (incorrectly)

21

1    treated it when calculating the third quarter valuation allowance, thus purportedly

2    rendering the valuation allowance "correct" as of the fourth quarter.  When Whitaker

3    asked Wong how Mattel could make this retroactive change, Wong's response was

4    that "they would rather have a slap on their wrist from the SEC."

5        19.    According to Whitaker, Mattel believed that if the SEC discovered that

6    Mattel had retroactively re-classified the HiT IP, it would consider this issue, by

7    itself, far less significant than the existence of a material misstatement of financial

8    results and a material weakness.  Accordingly, Mattel believed that the retroactive

9    classification, standing alone, would likely trigger a minimal response from

10   regulators—a "slap on the wrist."  So, Mattel and PwC decided to execute this

11   gambit, thereby burying the material misstatement of Mattel's third quarter financial

12   results and hiding the severe deficiencies in Mattel's internal controls.

13       20.    When the PwC audit team closed its 2017 audit without disclosure of

14   the known material misstatement, it celebrated in the halls of Mattel.  As Whitaker

15   reported, a PwC partner walked through the halls of Mattel high-fiving people over

16   the fact that there would be no restatement and the 2017 audit was complete.

17       21.    On February 28, 2018, Mattel published its 2017 Form 10-K to

18   investors reporting its financial results for the fourth quarter and the full year.  The

19   Form 10-K, which Euteneuer signed, made no disclosure whatsoever of the fact that

20   Mattel's third quarter results had been materially misstated; that Mattel had material

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 10 -

1    weaknesses in its internal controls; or that it and PwC had determined to avoid a

2    restatement by retroactively reclassifying the HiT IP.  Rather than disclose the truth,

3    Defendants made a host of affirmative materially false and misleading statements in

4    the 2017 Form 10-K, including reporting the materially misstated third quarter

5    results, and representing that the HiT IP had been reclassified for purely legitimate

6    reasons.  Defendant Euteneuer certified that "the financial statements, and other

7    financial information included" in the Form 10-K "fairly present in all material

8    respects the financial condition, results of operations and cash flows" of Mattel.  He

9    further certified that he "evaluated the effectiveness of Mattel's internal control over

10   financial reporting," and "concluded that it was "effective as of December 31, 2017."

11   For its part, PwC stated in its audit report that Mattel "maintained, in all material

12   respects, effective internal control over financial reporting as of December 31,

13   2017," and that the Company's financial results were accurate.

14          22.    Mattel and PwC succeeded in concealing their misconduct from

15   investors for about a year and a half—until a letter from a whistleblower forced their

16   hand.  On August 8, 2019, Mattel shocked the market by disclosing that it received

17   a whistleblower letter, and that it was pulling a debt offering scheduled to close the

18   next day while it investigated the allegations in the letter.  The market reacted with

19   surprise and concern.  For instance, the Associated Press published an article titled

20   "Mattel shares sink on whistleblower letter," reporting that Mattel shares "tumbled

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 11 -

1
2
3
4

more than 10% in morning trading after the toymaker pulled a debt offering upon learning of a letter from an anonymous whistleblower."   Mattel's stock price immediately plummeted, falling from $13.43 to $11.31, or by 16%, in a single trading day on exceptionally high trading volume.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

23.    On October 29, 2019, Mattel finally admitted what it should have long before—that its financial results for the third and fourth quarters of 2017 had been materially misstated, its internal controls suffered from multiple material weaknesses, and it would restate its financial results to admit and correct these errors. That day, the Company issued a Form 8-K and press release admitting that "Mattel's management identified the third quarter 2017 accounting error associated with its tax valuation allowance during its year-end accounting closing procedures for the quarter ended December 31, 2017.  The error was not properly assessed nor were findings and conclusions documented."   The Company further admitted that this known error was "not disclosed in the 2017 10-K," and attributed this "failure" to "lapses in judgment by management" as well as the "advice" of "the lead audit engagement partner of Mattel's outside auditor," namely, Defendant Abrahams. Mattel further admitted, contrary to its Class Period representations, "that there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017."

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 12 -

1     24.     The October 29, 2019 Form 8-K also disclosed that CFO Euteneuer

2     would be departing the Company after a six-month transition period, and that he was

3     "informed of the transition plan on October 23, 2019," less than a week before the

4     Company's announcement.  Lastly, the Company concluded that Abrahams "was in

5     violation of the SEC's auditor independence rules," and reported that he, along with

6     "certain other members of [the] audit team," had been replaced.  PwC placed

7     Abrahams on administrative leave immediately thereafter.

8     25.     On November 12, 2019, Mattel issued its severely belated restatement

9     of historical financial results (defined herein as the "Restatement").   In the

10    Restatement, Mattel admitted that, at the time it issued is third quarter 2017 financial

11    results, it had understated its loss by approximately $109 million and materially

12    misstated several other financial metrics.  It further admitted that it suffered from

13    multiple material weaknesses in internal controls.  One of these deficiencies was so

14    severe that it was not remediated until December 31, 2018, while the other was so

15    significant that it still had not been remediated as of the issuance of the Restatement

16    in November 2019.

17    26.     The SEC and the U.S. Attorney's Office for the Southern District of

18    New York have subpoenaed Mattel for documents related to the whistleblower letter

19    and the facts alleged herein.  Mattel's stock price has not recovered, and currently

20    trades at approximately $9.21 per share.

21

1

## II.   JURISDICTION AND VENUE

2

3

4

5

27.    This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

6

7

28.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

8

9

10

11

29.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

12

13

14

15

30.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

16

## III.   THE PARTIES

17

### 1.    Lead Plaintiffs and the Additional Named Plaintiff

18

19

20

31.    Lead Plaintiff DeKalb is a defined benefit pension fund founded in 1949 and headquartered in Decatur, Georgia with approximately $1.5 billion in assets under management.  DeKalb serves all permanent officers, full and part-time

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 14 -

1
2
3
4

employees, elected officials, and deputies of DeKalb County.  As reflected in the certification previously filed with the Court (ECF No. 19), DeKalb purchased Mattel common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

5
6
7
8
9
10
11
12

32.    Lead Plaintiff New Orleans is a defined benefit pension fund founded in 1947 and headquartered in New Orleans, Louisiana with approximately $375 million in assets under management.  New Orleans serves the officers and employees of the City of New Orleans and the parochial and judicial officers and employees of Orleans Parish.  As reflected in the certification previously filed with the Court (ECF No. 19), New Orleans purchased Mattel common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

13
14
15
16
17

33.    Additional named plaintiff Houston Municipal is a governmental defined benefit pension plan with approximately $3 billion in assets under management.   Houston Municipal provides retirement, disability and survivor benefits for eligible employees of the City of Houston and Houston Municipal. Houston Municipal was created in 1943 and currently has over 28,000 participants.

18

**2.    Defendants**

19
20

34.    Defendant Mattel, Inc. (defined above as "Mattel" or "the Company") is a global toy-manufacturing conglomerate.  Mattel is a Delaware corporation with

21

1
2

its headquarters located in El Segundo, California.  Mattel common stock trades on the NASDAQ under the ticker symbol MAT.

3
4
5
6
7
8
9
10
11
12
13
14

35.     Defendant Joseph J. Euteneuer ("Euteneuer") was appointed Chief Financial Officer ("CFO") of Mattel with an effective date of September 25, 2017.  Prior to his official appointment, he completed a transition period that, on information and belief, lasted multiple weeks.  On October 29, 2019, as a result of the Audit Committee's investigation into the whistleblower letter concerning the materially false and misleading misstatements alleged herein, Mattel announced that Euteneuer would be stepping down from his position after a six-month transition period.  In light of the disruption to the global economy due to Covid-19, however, Euteneuer's tenure has been temporarily extended.  Prior to joining Mattel, Euteneuer was the CFO at Sprint Corporation, a Fortune 500 company.  Prior to that, Euteneuer was CFO at Qwest Communications, XM Satellite Radio and Comcast Corporation.  Euteneuer is also a Certified Public Accountant.

15
16
17
18
19
20

36.     Defendant Margaret H. Georgiadis ("Georgiadis") was the Chief Executive Officer ("CEO") of Mattel from February 8, 2017 until April 19, 2018. Prior to becoming CEO of Mattel, Georgiadis served in several executive capacities. After spending several years as a partner at McKinsey, Georgiadis was the Executive Vice President of Card Products and Chief Marketing Officer for Discover Financial; a Principal at Synetro Capital, a private equity firm; Google's Vice

21

1   President of Global Sales Operations; and, prior to becoming CEO of Mattel,

2   Google's President of the Americas.  By the time Georgiadis departed Mattel in

3   April 2018, Mattel stock had declined by 50%.

4          37.    Defendant Kevin Farr ("Farr") was Mattel's CFO from February 2000

5   until September 29, 2017.  Prior to becoming CFO, Farr served in various leadership

6   roles at Mattel since 1991.    Before joining Mattel, Farr spent 10 years at

7   PricewaterhouseCoopers.

8          38.    Defendant PricewaterhouseCoopers ("PwC") has served as Mattel's

9   registered outside auditing firm since 1974 and was responsible for auditing the

10  Company's financial statements and internal controls over financial reporting.  PwC

11  issued unqualified audit reports on the Company's financial statements and internal

12  controls for fiscal years 2017 and 2018 and stated that it conducted its audits in

13  accordance with controlling auditing standards.  PwC consented to the incorporation

14  by reference of its unqualified audit reports on the Company's financial statements

15  and on management's assessment of internal controls in Mattel's Class Period Forms

16  10-K.

17         39.    Defendant Joshua Abrahams ("Abrahams") was an audit partner at

18  PwC who led the Mattel audit team during the Class Period.  On November 6, 2019

19  following PwC's receipt of a whistleblower letter implicating Abrahams in the

20  materially false and misleading misstatements alleged herein, news outlets reported

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 17 -

1
2

that Abrahams was removed from the Mattel audit team and PwC placed Abrahams on administrative leave.  Abrahams has since left PwC as a result of his conduct.

3
4
5
6
7
8
9
10
11
12
13
14

40.    Georgiadis, Euteneuer, and Farr are collectively referred to herein as the "Executive Defendants."  The Executive Defendants, because of their high-ranking positions and direct involvement in the everyday business of Mattel and its subsidiaries, directly participated in and controlled the management of Mattel's operations, including its public reporting functions, had the ability to, and did control, Mattel's conduct, and were privy to confidential information concerning Mattel and its business, operations and financial statements, as alleged herein. Abrahams, because of his direct involvement in the audits of Mattel and his acts as alleged herein, directly participated in and controlled Mattel's public reporting functions, had the ability to, and did control, Mattel's conduct, and was privy to confidential information concerning Mattel and its business, operations and financial statements, as alleged herein.

15
16

41.    The Executive Defendants and Mattel are sometimes collectively referred to herein as the "Mattel Defendants."

17
18

42.    Mattel, PwC, Abrahams, and the Executive Defendants together are sometimes collectively referred to herein as the "Defendants."

19
20
21

## IV.  SUMMARY OF THE FRAUD

### A.  Mattel's Business Faltered in 2017, Causing Investor Concern

43.     The time leading up to (and indeed continuing through) the Class Period was a difficult one for Mattel.  The internet age has been challenging for toy manufacturers. As children have embraced electronics like iPhones and video games, toy manufacturers have faced declining demand.  Mattel, traditionally the largest toy manufacturer in the world, found itself on rocky financial standing by 2017 after years of deteriorating financial performance.  Mattel's struggles were so significant that investors became concerned over whether it could continue as an independent Company, and Mattel announced a major restructuring plan to assure investors that it could successfully navigate its substantial challenges.

44.     With Mattel in a vulnerable financial position, rumors that Hasbro might acquire the Company began to circulate shortly before the Class Period. Business Insider reported on March 15, 2017 that one of the reasons a combination of the two companies "[made] sense" was because "Mattel has been struggling lately as children are becoming less interested in Barbie/American Girl dolls and more interested in electronics and brands like Star Wars.  The company's stock has struggled after a rough holiday season, and investors are pricing in a dividend cut."

45.     On April 20, 2017, Mattel announced first quarter financial results that were widely described as disappointing by market analysts.  Mattel reported that

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 19 -

1  sales were down 15% and it had suffered an operating loss of $127 million.  Barclays

2  reported on April 20, 2019 that "Mattel's 1Q17 results were surprisingly bad.  [W]e

3  view these results as a set-back to already low investor sentiment on the stock.  We

4  really look forward to commentary by new CEO, Margaret Georgiadis, who will

5  hopefully provide a roadmap for investors that outlines prospects for better results

6  ahead."

7  46.     Analysts reported that it was critical for the Company to right the ship

8  over the next several quarters with "flawless" execution.  On April 21, 2017,

9  Barclays reported that "it is tough to make the bull case at this point in time.  For us

10  to view that glass as half full, Mattel needs to deliver upon its guidance flawlessly

11  for the remainder of this year, demonstrate to investors that cultural improvements

12  and operational changes not only have traction but are sustainable and that LT

13  financial goals are tangible."  Forbes reported the next day, April 22, 2017, that

14  "Mattel's dividend is in serious danger of a cut. And longer-term, if Mattel continues

15  down its current failure spiral—it's off by nearly half since 2013—one could see

16  Hasbro or private equity taking Mattel out of the picture via acquisition."

17  47.     The faltering state of Mattel's business prompted the Company to make

18  significant changes to its strategic operations and long-term business plan.  On June

19  14, 2017 Mattel management announced a new strategic plan meant to achieve

20  growth and focus on certain products that it believed would enable long-term

21

profitability.  The Company announced that its new growth strategy would focus on "building its Power Brands (American Girl, Barbie, Fisher-Price, Hot Wheels, and Thomas & Friends) into 360 degree connected systems of play and experiences; accelerating growth in emerging markets; and transforming its innovation pipeline." The Company announced that this "strategic repositioning" required it to "reshap[e] operations."  In connection with this overhaul, Georgiadis explained that Mattel needed to "shift our business aggressively in a new strategic direction and transform how we operate[.]"

48.     Given the precarious state of Mattel's business, the market was focused on whether the Company would be able to execute this critical rebuild.  For example, SunTrust Robinson Humphrey reported on June 14, 2017 that the "strategic blueprint will be key to reaccelerating sales/earnings growth and enhancing shareholder returns over the longer-term."

49.     On July 27, 2017, however, the Company announced second quarter 2017 financial results, which continued to be disappointing, as Mattel missed revenue, gross margin, and earnings expectations.

50.     As discussed in further detail below, in early September 2017, rumors began circulating that Toys "R" Us would be filing for bankruptcy, which it ultimately did on September 18, 2017. Toys "R" Us was Mattel's largest customer and largest vendor of Mattel's products, and its bankruptcy put substantial additional

pressure on Mattel. Barclays reported on September 20, 2017 that "[g]iven the potential for lost cash flow, we believe the Toys "R" Us bankruptcy could be particularly negative for MAT. . . . As we wait to see how this situation unfolds, we can draw one major conclusion: the Toys "R" Us bankruptcy underscores the vulnerability of Mattel's balance sheet and cash flows."

51. Mattel also became unable to pay its dividend. Mattel paid dividends of $0.38 per share to holders in the first and second quarters of 2017 and cut dividends to $0.15 per share in the third quarter of 2017. On October 26, 2017, Mattel announced that it was suspending its quarterly dividend entirely beginning in the fourth quarter of 2017 "in order to increase financial flexibility, strengthen balance sheet and facilitate strategic investments." Mattel also announced a plan to cut $650 million in costs to shore up its fragile state.

52. By late 2017, Mattel's position had weakened so significantly that it was exposed to a hostile takeover bid by rival Hasbro. BMO analysts reported on October 30, 2017 that "[w]e think investors can also start looking at Mattel from a sale of the company perspective, or breakup value. We believe its brands and manufacturing footprint could be worth more than $10 billion in their current state. Thus, the company could have value to a financial, industry, or entertainment conglomerate buyer."

1      53.    Then, on November 11, 2017, the Wall Street Journal reported that
2   Hasbro had made a takeover offer for Mattel after the latter had "tak[en] a beating
3   [that] year" with a market value "at about 5 billion, or less than half as much as
4   Hasbro's, which is currently more than 11 billion."

5      54.    Adding to its woes, Mattel was an extremely debt-heavy company—
6   and remained so throughout the Class Period.  Mattel held between $2.6 and $3
7   billion of debt between the second quarter of 2017 and the third quarter of 2019.  On
8   December 9, 2017, Mattel disclosed that it was seeking to issue an additional $1
9   billion in unsecured notes so that it could pay its maturing debt.  Unfortunately for
10  Mattel, it was getting much more expensive for the Company to borrow, as its
11  worsening financial state made its bonds increasingly risky.  All the major credit
12  rating agencies, including Moody's, S&P, and Fitch Ratings, had by then
13  downgraded Mattel to "subprime" or "junk-bond" status.

14     55.    All told, Mattel's stock cratered during 2017. Mattel's stock was
15  trading at $27.67 on January 3, 2017. After Mattel disclosed its third quarter results
16  on October 26, 2017, its stock price had fallen to $12.90, or a decrease of almost
17  53% from the start of the year.

18
19
20
21

**B.** **Mattel Was Riddled with Severe Deficiencies in Internal Controls that Contributed to a Material Misstatement of Financial Results and Enabled Mattel to Cover Up that Misstatement with PwC**

56.     Unbeknownst to investors, by the beginning of the Class Period on August 2, 2017, Mattel was plagued with severe deficiencies in its internal controls. These deficiencies contributed to a material misstatement of Mattel's financial results, and then enabled Mattel management to conspire with PwC to cover up those material errors rather than disclose them to investors.

57.     As detailed further below, the report of Brett Whitaker, who served as Mattel's Director of Tax during the Class Period, demonstrates that Mattel's control deficiencies were widespread and severe—including key financial documents being stashed in boxes piled around Mattel's headquarters, a lack of reconciliation between important ledgers providing support for Mattel's reported financials, senior executives not understanding what they had signed off on, and the lack of a process for setting and confirming the tax valuation allowance at issue in this case, which was unquestionably material to Mattel's financial performance.

### 1.     Brief Background on Internal Controls

58.     The securities laws and SEC regulations require that public companies maintain robust controls over their disclosures and financial reporting.  These "internal controls" are, generally speaking, internal processes and standards that

1
2

ensure that the information about a public company's business operations and financial results in its public filings is complete and accurate.

3
4
5
6

59. Internal controls are critical to public companies and their investors because they provide reasonable assurance that a company's publicly-reported financial results are materially accurate, and that any material fraud or misstatement is detected and disclosed.

7
8
9
10

60. Public companies like Mattel are required to design and implement two kinds of internal controls to ensure that their representations to investors—both financial and non-financial—are accurate: "disclosure controls and procedures" and "internal controls over financial reporting."

11
12
13
14

61. "Disclosure controls and procedures" ensure that information required to be disclosed by a company under the Exchange Act is communicated to company management and its board sufficiently in advance of the company's filing dates, to allow them ample time to consider it and disclose it to investors.

15
16
17
18
19
20

62. Similarly, "internal controls over financial reporting" are designed by or under the supervision of a company's CEO and CFO to provide reasonable assurances that a company's financial statements are accurate, reliable and prepared in accordance with Generally Accepted Accounting Principles ("GAAP") before they are disclosed to investors. As discussed below, company management is required to review and evaluate these controls quarterly to determine their

21

1
2
effectiveness at preventing or detecting material misstatements of financial statements in a timely manner.

3
4
5
6
7
8
9
10
11
12
63.     The effectiveness of Mattel's internal controls was particularly important to Mattel investors during the Class Period.  At this time, as described in Section IV.A., above, Mattel was navigating an extremely challenging series of events.  As analysts noted, to return the Company to profitability and keep it viable as an independent entity, Mattel needed to execute "flawlessly."  Investors were paying close attention to whether Mattel's strategic rebuild would work, and whether the rebuild would ultimately rejuvenate the Company's financial results.  Significant internal control weaknesses would cause investors to lose faith in the Company's ability to turn its business around, and to lose trust in its management and publicly-reported financial results.

13
14
15
16
17
18
64.     As explained in further detail below in Section X, Defendants represented throughout the Class Period that Mattel maintained effective controls.  Defendants' representations assured investors that they could rely on the information, both financial and non-financial, reported in Mattel's SEC filings to make informed investment decisions, which, again, was particularly important given the fragile and uncertain state of Mattel's business.

19
20
65.     Those representations were false when made—and Defendants have now admitted as much.  As reported by Brett Whitaker—and as the Company has

21
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 26 -

1
2
3

now acknowledged—Mattel's controls suffered from multiple, undisclosed material weaknesses in violation of a number of statutes, SEC regulations, and governing standards, described in detail in Section VII.

4

### 2.   Unbeknownst to Investors, Mattel's Internal Controls Were Severely Deficient

5
6
7
8
9
10
11
12
13
14

66.     Brett Whitaker has substantial executive experience.  Whitaker earned a Bachelor's degree in Accounting and a Master's degree in Taxation from the University of Washington.  He began his career in accounting as an intern with Ernst & Young LLP ("E & Y"), one of the "Big Four" accounting firms, and later joined E & Y's National Tax Accounting and Risk Advisory group, where he worked for seven years until 2012.  Whitaker then left E & Y and went on to become the Tax Manager at Zynga from 2012 until 2013.  He then managed U.S. GAAP accounting for all foreign subsidiaries of Amazon from 2013 through June 2015.  Whitaker left Amazon for Nike, where he served as the Tax Director for Income Tax Accounting before joining Mattel in May 2017, where he remained until March 2018.

15
16
17
18
19
20

67.     Lead Counsel interviewed Mr. Whitaker.  Before taking control of tax reporting for Mattel, Whitaker familiarized himself with the Company's processes. When Whitaker joined the Company in May 2017, Mattel was approximately a month away from the close of its second quarter 2017, so Whitaker "shadowed" Clara Wong (Mattel's Vice President of Tax) throughout the closing process,

21

1   including attending meetings with Wong and learning how Mattel's closing process

2   worked.  After the second quarter closed, Whitaker took control and was responsible

3   for leading the tax team through the third quarter closing process.

4        68.    Upon arriving at Mattel in May 2017, Whitaker observed a number of

5   red flags and critical deficiencies within Mattel's system of internal controls related

6   to the tax and accounting departments.  In describing the environment at Mattel, he

7   said: "If you just walked around the halls, you would know that this place was

8   riddled with issues and alarms were going off everywhere."

9        69.    First, Whitaker observed that the Company did not have an adequate

10  system of documentation for its financial statements.  There were boxes of loose

11  paper everywhere containing important financial documentation that was used to

12  support and substantiate the financial statements, and this was how the accounting

13  and tax departments operated.  The support for Mattel's financials was kept in these

14  boxes and binders of loose paper, there was no organization, and important

15  information was not backed up electronically.  To understand Mattel's financial

16  statements and the support for what was reported in the Company's SEC filings,

17  Whitaker had to "literally scrummage through boxes and boxes of loose paper to try

18  and gain understanding."  Whitaker reported that "we just couldn't find anything.  It

19  was like I was back in the 1980's and I don't mean that as a joke.  I had never seen

20  anything like it in my entire life.  That was the biggest red flag.  We just couldn't

21

1    find anything."  Given the severe deficiencies in how Mattel documented the support

2    for its financial statements, when Whitaker had questions about Mattel's financials

3    or where to find support for a specific entry, the people who had signed off on the

4    entries did not have answers.  Whitaker said further that it was "impossible not to be

5    aware of [the Company's reliance on disorganized piles of paper] because when you

6    walked around the office it was everywhere.  It was kind of a running joke between

7    departments, including Internal Audit."

8         70.    Second, when Whitaker was able to gain access to backup materials—

9    for example, the forecasts considered in determining Mattel's income tax expense in

10   a given quarter—the numbers often did not "tie out."  In other words, the numbers

11   did not reconcile.  "We literally couldn't figure out how the numbers reconciled,"

12   Whitaker reported.  Whitaker recalled attending meetings with senior Mattel

13   employees who had signed off on the Company's reported financials who

14   themselves could not figure out how to reconcile the numbers.  "It was almost as if

15   they didn't know what they had signed off on.  They admittedly in some cases were

16   not even sure what they had signed off on," Whitaker reported.

17        71.    This was also true with respect to PwC, Mattel's long-time outside

18   auditor.  According to Whitaker, when he arrived at Mattel, he had a series of

19   meetings with the primary PwC partners on the Mattel audit team—Joshua

20   Abrahams, John Brierley, and Chip Lightfoot.  During these meetings, even the PwC

21   
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 29 -

1    partners were unable to explain how past quarters' numbers were reconciled, and

2    they had been signing off on Mattel's financial statements for years.

3        72.    Third, there was extremely ineffective communication between the tax

4    department and the Financial Planning & Analysis ("FP&A") department.  This was

5    a critical breakdown because Mattel's tax provisioning was based in part on the

6    Company's forecast and budget, for which FP&A was responsible.   Whitaker

7    explained that normally, at a company with adequate controls, the FP&A and tax

8    departments would work in tandem—they were "tied at the hip"— because many

9    determinations as to tax liabilities relied on FP&A analysis.  However, at Mattel, the

10   two departments "could not have been in more different worlds."  As a result, "There

11   was a lot of confusion about what was being booked as a tax provision."

12       73.    Fourth, and as discussed in further detail below, the Company lacked

13   an internal control or formal process for determining, documenting and confirming

14   its tax valuation allowance.  This was a fundamental failure.  Companies must have

15   key controls that mitigate the risk that financial statements, including deferred tax

16   assets and income tax expense, are materially misstated.  Since the Company's

17   deferred tax asset was material prior to and during the Class Period (it was $580

18   million as of June 30, 2017, for example), Mattel should have had controls in place

19   to ensure that the Company's deferred tax asset balance was recorded in accordance

20   with GAAP.  This would include a formal process for determining whether the

21

1  deferred tax asset required a valuation allowance at any point, and an established

2  process for calculating, documenting, and confirming the accuracy of the allowance.

3      74.     Mattel's process of applying its internal controls in the Tax department

4  was also deficient and superficial, as was the purported testing of such internal

5  controls that was performed by Mattel's Internal Audit department.  The internal

6  control process consisted principally of having the individual who was responsible

7  for implementing the control sign a document stating that the control had been

8  followed and send the document to the Internal Audit department.   Whitaker

9  reported that Mattel's Tax department employees simply "checked the box"

10 sometimes days or weeks after the control was purportedly performed, instead of

11 substantively performing the steps described by each specific internal control.

12 Whitaker also stated that Mattel's Internal Audit employees responsible for testing

13 the effectiveness of various tax internal controls did not have any experience or

14 knowledge in tax, and would simply review the signed document, but did not

15 perform any actual testing of the controls to understand whether they were actually

16 designed and implemented effectively by Mattel's Tax department.  If the Internal

17 Audit department requested back-up documentation for the tax calculation, they

18 lacked the knowledge to adequately test its accuracy.  "I can tell you first hand from

19 an internal audit standpoint, these people knew nothing about tax," Whitaker

20 reported.  "It was really just a check the box exercise.  Hey, did you sign this? The

21

1   review was really just initialing a document. That would satisfy it. To say they

2   would test it, that would be a stretch. And they didn't even know what they were

3   testing. That was the environment we were operating in." Whitaker added that the

4   Internal Audit department itself was open about its lack of tax knowledge and the

5   fact that it was not qualified to manage the internal controls process for tax. "They

6   were very vocal about the fact that they knew nothing about tax."

7        75.    Relatedly, Whitaker reported that PwC, which was supposed to be

8   evaluating Mattel's internal controls, performed a similar "check the box exercise,"

9   rather than perform an actual test and evaluation of the controls. Whitaker explained

10  that "an effective control is something you are actually doing while you are actually

11  at task. Going back after the fact and signing a piece of paper does not actually mean

12  that you are doing the internal control. PwC did the same thing in their testing—

13  check the box."

14       76.    Whitaker reported that these internal control issues were well-known

15  throughout the Company during the Class Period, including when Whitaker arrived

16  at Mattel in May of 2017. Whitaker's supervisor, Clara Wong—who reported

17  directly to CFO Euteneuer—maintained an open dialogue with Whitaker during his

18  time at Mattel. "She was very open and honest with me," Whitaker reported. Wong

19  stated to Whitaker that she knew supporting documentation for the Company's

20

21

1  financials was lackluster and that there was inherent risk in the way the Company
2  had been compiling its financials.

3      77.    Part of what Wong had brought Whitaker in to do in his new role was
4  to fix these issues. "She brought me in to fix this because this was my background,"
5  Whitaker reported. However, "quite contrary to that, once I got there, although
6  aware of [the problems] and willing to discuss it, she abstained from taking any steps
7  to improve it. We spoke daily, and I was very vocal about my concerns. Her
8  reactions would flip-flop."

9      78.    In addition, after the close of Mattel's second quarter 2017 financial
10 statements, in approximately July 2017, Shirley Wang, Manager of Internal Audit at
11 Mattel, scheduled a meeting with Whitaker to discuss the Tax department's internal
12 controls. She explained that the Internal Audit department was testing the Tax
13 department's controls for compliance with the Sarbanes-Oxley Act of 2002 and that,
14 in its review, Internal Audit had found that the controls were either non-existent or
15 extremely dated and agreed that the problem needed to be addressed.

16     79.    It was clear to Whitaker that, in order to lead the third quarter close for
17 the tax department, he was going to need support and manpower to sort through all
18 of the paper information since Mattel did not have a sufficient system of
19 documentation. Thus, immediately after Mattel published its second quarter 2017
20 results on August 2, 2017, Whitaker hired Katie Danzig ("Danzig") as Mattel's

21

1    Senior Manager of Tax.   Danzig reported directly to Whitaker during the Class

2    Period.

3        **C.**     **Mattel Materially Understated Its Losses for the Third Quarter**
            **2017**

4

5            **1.**    **Mattel and PwC Initially Decide Not to Record A Reserve**
                    **Against Mattel's Deferred Tax Assets**

6        80.     As the third quarter of 2017 was coming to an end on September 30,

7    2017, Mattel faced a key decision with material financial consequences: whether to

8    record a "valuation allowance" against its deferred tax assets.  This was a significant

9    decision because any allowance would represent a reduction in the value of one of

10   Mattel's largest assets and would impact some of the Company's most critical

11   financial metrics, such as its net income.  As of June 30, 2017, Mattel carried $580

12   million in deferred tax assets on its balance sheet.  Any valuation allowance would

13   have to be deducted from Mattel's income, thus reducing any profit or enlarging any

14   losses—meaning that this decision would have a major impact on Mattel's financial

15   performance at a time when investor concern abounded.

16       81.     A deferred tax asset is an asset that a company can use to reduce or

17   eliminate a future tax liability.  This includes deductible "carryforwards"—i.e.,

18   deductions or credits that cannot be utilized on the tax return during the current year

19   (because the company has suffered a loss, for example) but may instead be carried

20   forward to reduce taxable income or taxes payable in a future year.  ASC 740-10-

21   | AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br>Case No. 19-CV-10860-AB (PLAx) | - 34 - |

1    25-2; ASC 740-10-20.  In this sense, deferred tax assets are comparable to prepaid

2    assets or credits.  Thus, deferred tax assets have real value, and are recorded as

3    "assets" under GAAP because they can be used in the future to reduce a company's

4    tax payments by offsetting future taxable income.

5          82.    The value of deferred tax assets depends on whether the company will,

6    in fact, generate taxable income in the future.  If it likely will generate income in the

7    future, then the asset has value because it can be used to offset future tax liability on

8    that income.  Conversely, if the company likely will not generate income, then the

9    asset has less or no value because it will not be able to be used to offset a future tax

10   liability, as there likely will be no future tax liability.

11         83.    As with any other asset, companies are required to value deferred tax

12   assets on a quarterly basis and determine the probability that the company will be

13   able to use the deferred tax assets.  This evaluation necessarily requires determining

14   whether the company is likely to have future taxable income against which it could

15   ultimately use the deferred tax assets.

16         84.    GAAP requires that if a company determines it likely will not be able

17   to use all or some of its deferred tax assets because the company is unlikely to have

18   a sufficient amount of future taxable income, the company must record a "valuation

19   allowance" against the deferred tax assets.   ASC 740-10-30-5.   A valuation

20   allowance reduces the value of the asset, as it is "[t]he portion of a deferred tax asset

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 35 -

for which it is more likely than not that a tax benefit will not be realized . . . . The valuation allowance shall be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized."  ASC 740-10-30-24.  As noted above, the recognition of a valuation allowance (or a change in the valuation allowance from one period to another) is charged, or in the case of a reduction, credited, to the company's income for that reporting period.

85.    As Mattel was preparing its third quarter 2017 financial statements during the first few weeks of October, Mattel had approximately $600 million of deferred tax assets on its books, and any material reduction in value of those assets was of great consequence for Mattel, especially given the landscape of Mattel's business at this time.

86.    As noted above, recording a valuation allowance against Mattel's deferred tax assets would have negatively impacted Mattel's earnings for the quarter and the year, and threatened to "absolutely tank" the Company's financial performance, Whitaker reported.  Importantly, recording the valuation allowance would also have communicated to investors that the Company would likely not make money in the near term.  According to Whitaker, this kind of action "tells investors that you do not see the ship turning around any time soon.  It is very indicative of the future state of things, and you want to avoid that at all costs."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

87.    Given the significance of this determination, Whitaker and his team were meeting multiple times a week with PwC leading up to the close of the third quarter to determine whether to record a valuation allowance.  Whitaker's team included Clara Wong and Dermot Martin ("Martin"), Senior Director of Tax at Mattel and Whitaker's counterpart.  The PwC team consisted of lead partner Joshua Abrahams ("Abrahams"), and partners Chip Lightfoot ("Lightfoot") and John Brierley ("Brierley").

88.    Senior Mattel executives and these PwC partners regularly discussed with Defendant Euteneuer whether Mattel would record a valuation allowance.  Whitaker reported that Wong met frequently with Euteneuer about the valuation allowance issue and regularly updated Whitaker following those discussions.  "She did that very regularly," Whitaker reported, noting that he and Wong spoke on a daily basis.  PwC partners Abrahams and Lightfoot were also having regular meetings with Euteneuer, Whitaker reported, and were very focused on the issue of whether to take the allowance, as it could have been as high as approximately half a billion dollars.  They often similarly updated Whitaker after their meetings with Euteneuer.   Whitaker reported that "Abrahams was very open about his conversations with the CFO as well."

89.    Despite the importance of this determination, Whitaker reported that as this decision was being made, Mattel did not have internal controls in place to assess

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 37 -

1
2
3
the value of the Company's deferred tax assets or the need for a valuation allowance on a quarterly basis. "That's how not conscious of this we were as a company," he said.

4
5
6
7
8
9
10
90.    According to Whitaker, the discussions about whether to record a valuation allowance continued up to and past the end of the third quarter, September 30, 2017. In approximately the last week of September or the first week in October, Mattel and the PwC team decided not to record a valuation allowance against Mattel's deferred tax assets for the third quarter of 2017, despite the fact that the poor state of the business raised questions about the likelihood of future income against which to use these deferred tax assets.

11
12
13
14
15
16
17
18
19
20
91.    Whitaker explained that this decision was questionable because Mattel's business was performing poorly and "things were drastically falling fast." Still, Mattel and PwC believed there was enough uncertainty about the future of the business and whether it would generate taxable income to avoid taking a valuation allowance in the third quarter. According to Whitaker, in deciding not to record a valuation allowance against Mattel's deferred tax asset at this time, Mattel was being unreasonably optimistic about its forecast. Despite this decision, they nonetheless recognized internally that even if they did not record a valuation allowance in the third quarter, they would very likely have to record it in the next quarter. According to Whitaker, "the forecast at the time was looking pretty grim. We probably should

21

1
2

have been considering at least a partial allowance if not a full allowance on the domestic deferred tax assets."

3
4

## 2. Mattel and PwC Abruptly Change Course Just Before Mattel Publicly Issued Its Third Quarter 2017 Financial Results

5
6
7
8
9
10

92.     As Mattel's third quarter reporting period came to an end on September 30, 2017, the Company began its formal closing process, which typically takes approximately two weeks to complete.  About a week into the process, Whitaker and his team started to book the appropriate tax journal entries based on the decision by senior Mattel management and the PwC audit team that there would be no valuation allowance taken against Mattel's domestic deferred tax assets.

11
12
13
14
15

93.     However, with approximately one week left in the closing process, the Company and PwC suddenly reversed their decision, and decided that Mattel was required to record a valuation allowance.  The abrupt about-face was based on a decision to write-off approximately $100 million in receivables from Toys "R" Us in the coming quarters, including a large portion of that amount in the third quarter.

16
17
18
19
20

94.     As noted above, the Company had learned that Toys "R" Us filed for bankruptcy on September 18, 2017.  This news put extreme pressure on Mattel because Toys "R" Us was Mattel's biggest customer and retailer.  Toys "R" Us had purchased a lot of Mattel toy inventory, the payment obligation for which was reflected by Mattel on its balance sheet as "accounts receivable" that Toys "R" Us

21

1
2
3
4
5
6
7
8
9
10
11

would now be unable to sell and would ultimately return to Mattel.  Mattel might have to write-off those accounts receivable, resulting in a loss—depending on where it stood in the hierarchy of creditors—which could significantly impact Mattel's financial performance.  Mattel, including Defendants Georgiadis and Euteneuer, acknowledged the significance of the Toys "R" Us bankruptcy and discussed it frequently during conference calls with investors, particularly because the Toys "R" Us bankruptcy was likely to have a significant adverse impact on Mattel and its near-term results.  Given the fragile state of the Company and that 15% of its receivables were left exposed by the bankruptcy, Mattel risked losing important cash flow and being forced to record a significant loss on any amounts deemed uncollectible, which would also have a material negative impact on the Company's earnings.

12
13
14
15
16
17
18
19
20

95.    Mattel desperately needed the Toys "R" Us receivables to be paid given the state of its business and was, according to Whitaker, "waiting on pins and needles" to learn where in the line of creditors it stood, and thus, whether and how much of the account receivables it would have to write-off.  Whitaker explained that the Company was "desperately needing the cash at the time, and that was going to determine whether we were going to write off the full accounts receivable balance." If the Company did need to write off the full Toys "R" Us accounts receivable balance—meaning that this was not cash or income the Company would receive—it would no longer be able to justify its decision to not take a valuation allowance

21

1
2
3
4

against its deferred tax assets.  This was because the write-off would put Mattel in a cumulative net operating loss position in the United States over the three-year period ending September 30, 2017, which was a critical consideration in determining whether to record a valuation allowance.

5
6
7
8
9
10
11
12

96.   With approximately one week left in the closing process, and after Whitaker's team had already been calculating journal entries based on the decision to not take a valuation allowance, Whitaker was approached by Abrahams and Lightfoot as he sat in his office one evening.  They informed Whitaker that Mattel would have to write off approximately $100 million of accounts receivable, including a material write-off in the third quarter of 2017.  This meant that they needed to reverse the decision not to take a valuation allowance against Mattel's deferred tax assets and had to scramble to calculate the correct valuation allowance.

13
14
15

97.   Whitaker was shocked and upset because it would typically take several weeks of work to accurately calculate a valuation allowance, and he was now being asked to do that in approximately a week, as the books were about to be closed.

16
17
18
19
20

98.   Whitaker, Lightfoot, and Abrahams immediately went to speak with Christine Lew ("Lew"), Mattel's Vice President of Accounting.  Lew confirmed that the new plan was to record a valuation allowance against Mattel's domestic deferred tax assets, and that Whitaker's team had to do so in approximately the one week left before the Company was to close its books and then publish its third quarter financial

21

1
2
3
4

results.  Wong, too, confirmed that this was the new plan.  Whitaker expressed his concern about the lack of supporting documentation and his team's ability to reverse course and perform a multi-week analysis in such a short period of time, but the directive did not change.

5
6
7
8
9

99.    Whitaker and his team, including Danzig, worked nonstop for days to create the tax valuation allowance entry.  This would have been an extremely difficult undertaking under any circumstances, but was particularly risky because Mattel did not have the proper internal controls or supporting documentation in place to ensure that this process was correctly executed.

10
11
12
13
14
15
16
17
18
19

100.    After working quickly to meet their deadline without access to the backup materials they needed, Whitaker's team calculated a valuation allowance of approximately $175 million to $200 million against Mattel's deferred tax assets.  "We had so little confidence in what we were reporting because we didn't have the back-up to tie it out," he said.  "Typically, there is a trail of documentation that supports what you are reporting, and that just did not exist."  Whitaker reported that this issue of the absence of "back-up" to support Mattel's financials came up regularly in meetings with Martin and Wong.  Whitaker said that Danzig had frequent meetings with Martin to "understand the labyrinth that was Mattel," and that these discussions "were regular and often heated."

20
21

1    101.   The analysis prepared by Whitaker and his team reflecting a valuation

2    allowance of approximately $175 million to $200 million was immediately signed

3    off on internally and given to PwC to review.   While Mattel was preparing its

4    financial disclosures, PwC had only days to review the new tax entry before Mattel

5    was to publish its financial statements.

6    102.   The valuation allowance that Whitaker's team created was included in

7    draft financial statements that were being circulated to all senior executives,

8    including to CFO Euteneuer.  Further, Abrahams and Lightfoot, who were extremely

9    focused on the valuation allowance issue particularly given the Toys "R" Us

10   bankruptcy, spoke openly about the fact that they were having regular meetings with

11   CFO Euteneuer on these issues.  In fact, Mattel's third quarter 2017 Form 10-Q

12   issued on October 26, 2017 mentions the valuation allowance recorded during the

13   quarter in numerous sections.  According to Whitaker, "the idea that a potential half

14   billion-dollar allowance is something [CFO Euteneuer] would not have known about

15   would be implausible.  It seems outlandish."

16                    **3.    Because of Mattel's Faulty Internal Controls, PwC Finds**
                             **a Critical Error in the Valuation Allowance Calculation**
17                           **"Days Before" Financials Are Published**

18   103.   Days before Mattel was to report third quarter earnings on October 26,

19   2017, PwC discovered a material error in the way the valuation allowance was

20

21

1  calculated that required Whitaker and his team to quickly and haphazardly redo the

2  entire tax entry, yet again.

3       104.   Specifically, days before Mattel's financial results were due to be

4  publicly released, Whitaker and Danzig received a call from Brierley at PwC.

5  Brierley told Whitaker and Danzig that Mattel had improperly reduced its total

6  deferred tax assets by several hundred million dollars, which had the effect of

7  improperly reducing the valuation allowance amount on those assets (as well as

8  improperly reducing Mattel's reported net loss for the quarter) by a similar amount.

9  In other words, the valuation allowance, and Mattel's net loss, needed to be

10  substantially higher than they were.

11       105.   The error stemmed from the fact that Mattel had improperly offset its

12  deferred tax assets by netting out the value of deferred tax liabilities emanating from

13  certain intellectual property assets.  As explained in detail in Section VIII below,

14  companies are permitted to do this type of netting when the property has a "finite

15  life," i.e., when its value can be depreciated over a fixed time period, such as a

16  machine that depreciates over 15 years.  But GAAP generally prohibits companies

17  from doing this type of netting when the property has an "indefinite life," like certain

18  kinds of intellectual property, which was the case here.

19       106.   When Whitaker was informed of this error, he was floored.  As noted

20  above, the error had the effect of increasing Mattel's valuation allowance—and, in

21

1   turn, its quarterly loss—by hundreds of millions of dollars.  Whitaker and Martin

2   called Wong immediately.  The support for PwC's conclusion was a spreadsheet that

3   Martin showed to Whitaker's team, which Whitaker and Danzig had never seen

4   before.  This spreadsheet was the sole support substantiating the massive error

5   precisely because Mattel lacked controls to assess the value of its deferred tax assets

6   and calculate any required allowance.

7       107.  At the direction of Abrahams, Whitaker and his team, without

8   additional supporting documentation other than Martin's single spreadsheet, redid

9   the tax entry just days before Mattel was to publish third quarter results.  The result

10  of the recalculation was to increase the valuation allowance recorded against

11  Mattel's deferred tax assets as of September 30, 2017 from the previously-

12  determined $175-$200 million to $562 million.

13      108.  At this time, as in earlier during the closing process, draft financial

14  statements were regularly shared with senior Mattel executives, including CFO

15  Euteneuer, for their review.  Given the material error in the way the first valuation

16  allowance was calculated, the Company's draft financial results—including its net

17  income—varied significantly by hundreds of millions of dollars.  According to

18  Whitaker, the wild swings in the valuation allowance and Mattel's financial results

19  "were something that could not be ignored" because they were so material, and even

20

21

1   more so because the Company was intensely focused on how the Toys "R" Us

2   bankruptcy would impact its results.

3       109.   As was the case earlier in the closing process, given the critical period

4   of time that the Company was in and the urgency of its decisions, Abrahams was in

5   regular contact with CFO Euteneuer about the Toys "R" Us receivables, Mattel's

6   valuation allowance, and the impact on the Company's financial results.  Whitaker,

7   too, was in ongoing contact with Abrahams because the valuation allowance issue

8   was so important, and Abrahams shared with Whitaker that he spoke frequently with

9   Euteneuer throughout this time.

10      110.   According to Whitaker, Mattel's failure to discover this error in its own

11  valuation allowance calculation was yet another illustration of the material

12  weaknesses in Mattel's internal controls.  Mattel simply had no controls in place to

13  detect this sort of error and no intelligence as to its own assets.  Whitaker called this

14  state of affairs "the perfect example of a material weakness."

15      111.   Given the severity of this problem, Whitaker expected that PwC would

16  require Mattel to disclose material deficiencies in its accounting and disclosure

17  controls, particularly given that PwC discovered the error.  According to Whitaker,

18  PwC requiring the disclosure of material weaknesses would ultimately have been

19  positive for the Company because it would have forced the Company to invest in

20  fixing these issues.  Whitaker had almost daily meetings with Wong and Brierley,

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 46 -

1   and they repeatedly told him that Mattel needed to change its internal control

2   processes and policies.  However, PwC did not require the disclosure of any material

3   weakness, and nothing was done to repair the Company's internal controls.

4        112.  As Whitaker reported, "That was a bone of contention between me and

5   John Brierley.  I wanted to have the best department that I could.  I was very upset

6   that there was no internal control deficiency recognized [in the Company's SEC

7   filings].  That might have been the thing that finally encouraged leadership to give

8   us the resources and the budget to start fixing things.  I remember being very upset

9   about that."

10       113.  On October 26, 2017, Mattel publicly reported its third quarter results,

11  including the valuation allowance of $562 million and a loss of $603 million.  The

12  Company made no mention of the existence of a material weakness in its internal

13  controls over financial reporting in its announcement or in its third quarter 2017

14  Form 10-Q filed with the SEC on October 26, 2017.  Instead, in violation of SEC

15  reporting regulations, in Mattel's third quarter 2017 Form 10-Q, Defendants

16  Euteneuer and Georgiadis reported that they had "evaluated the effectiveness of

17  [Mattel's] disclosure controls and procedures," and that Mattel's internal controls

18  were effective as of September 30, 2017.

19       114.  In truth, unbeknownst to investors, Mattel's internal controls were

20  severely deficient, and its third quarter financial results had been materially

21

misstated—specifically, Mattel's reported loss for the third quarter of 2017 was understated by approximately $109 million, or by 18%.

### 4.   After Third Quarter 2017 Results are Published, Whitaker Finds Another Material Error Requiring A Restatement

115.   As a result of these errors, PwC recommended that Mattel develop a new internal control concerning its deferred tax asset valuation allowance analysis by the end of the year.  Whitaker described the absence of this control during the period in which the Company had calculated a large valuation allowance as "quite alarming," noting that, "the idea that we didn't have an internal control around that already is absurd."

116.   Whitaker was given responsibility for developing the new control.  As part of that process, he wanted to understand the support for the spreadsheet that Martin had produced showing the netting error days before third quarter financials were published, given that there was no time to vet this data prior to publishing third quarter results.  In approximately the beginning of January 2018 (at some point before January 12), Whitaker and Martin set up a meeting to review all existing documentation relating to the netting issue and the classification of Mattel's intangible assets.

117.   Whitaker described his meeting as follows: "It was an odd meeting.  He [Martin] had us lock ourselves into a conference room, which we never did, and he

1
2
3
4
5
6
7

produced several boxes and binders of loose paper to walk me through. And I thought he was going to say, 'Here is where the backup is.' And instead, he said, 'I think the support is somewhere in here. Let's try to find it.'" It was concerning to Whitaker that Mattel had just published its third quarter 2017 financials and relied on a solitary spreadsheet to calculate a $562 million entry for which Martin did not even know where the supporting documentation was. But, Whitaker said, "this is how things were done at Mattel."

8
9
10
11
12
13
14
15

118. Whitaker and Martin spent hours in the conference room going through boxes of paper trying to find the support for Mattel's valuation allowance. Whitaker eventually came across a single loose piece of paper with numbers and values listed on it that referenced the intellectual property assets and values that were set forth on the spreadsheet that Martin had supplied to support the recalculation of the third quarter valuation allowance. Whitaker was hopeful that this document would "tie everything out" and provide support for the numbers listed on the spreadsheet they had used when calculating the valuation allowance.

16
17
18
19
20

119. Whitaker noticed that one of the intellectual property assets listed on the paper was related to Mattel's 2011 acquisition of HIT Entertainment Ltd., which included Thomas & Friends, Barney & Friends, and Bob the Builder ("HiT IP"). In the third quarter, Mattel had treated this asset as having a finite life (i.e., amortizing over a fixed period) and had therefore netted the deferred tax liability resulting from

21

1
2
3
4
5

the HiT IP against Mattel's deferred tax assets, thereby reducing its valuation allowance.  Because this asset was valued at $311 million, and the deferred tax liability related to the asset was valued at approximately $109 million, this netting had a material impact in lowering the allowance reported by Mattel as of the end of the third quarter of 2017.

6
7
8
9
10
11
12
13
14
15

120.   Whitaker noticed that the HiT IP was listed on the piece of paper as having no amortization—in other words, it was listed as an indefinite-lived asset. As explained in further detail below in Section VIII, this meant that the deferred tax liability related to this asset should <u>not</u> have been used to reduce/net against Mattel's deferred tax assets or the Company's allowance in the third quarter.  When Whitaker realized this, his "heart started racing and alarm bells started going off because we had just reported in our third quarter 2017 Form 10-Q that the HiT IP was being amortized.  If this [the indication that the HiT IP was indefinite-lived] was true, it meant we had completely mistreated this" in the Company's third quarter financial statements.

16
17
18
19
20

121.   Had the HiT IP been classified properly, the valuation allowance that Mattel recorded in the third quarter would have been approximately $109 million higher, and its reported loss would have been approximately $109 million larger. This was precisely the same type of error that PwC identified days before Mattel's third quarter results were published.

21

1    122.   When Whitaker explained the mistake to Martin, Martin said, "there

goes my f***ing job."   Referring to the Company's severely deficient internal

controls and the errors those deficiencies had enabled, Whitaker said that he "had

never seen anything like it in my entire life."

### D. After Mattel Concludes that a Restatement Is Required, Mattel and PwC Conspire to Cover Up the Material Misstatement of Mattel's Financial Results and Mattel's Severe Internal Control Deficiencies

123.   As explained below, rather than report a material weakness and restate

Mattel's recently-issued third quarter 2017 financial statements, PwC and Mattel

conspired to change the accounting treatment of the HiT IP and retroactively

reclassify it to match the way Mattel had improperly treated it (as a finite asset).  The

purpose of this maneuver was to avoid the restatement of Mattel's third quarter

results and avoid an admission of the material weaknesses in internal controls.

124.   After discovering the error described above, Whitaker confirmed with

Mattel's accounting team that the HiT IP was not being amortized for accounting

purposes, contrary to how it was treated for purposes of Mattel's SEC filings.

Whitaker and Greg Dunlap ("Dunlap")—a Deloitte tax partner who had been filling

in for Wong, who was on sick leave—immediately called Wong to walk her through

the error.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 51 -

1   125.   Whitaker assessed the impact of the error as approximately $109
2   million.

3   126.   The following Monday morning, January 15, 2018, Whitaker scheduled
4   a meeting at Wong's request with Mattel's SVP of Accounting, Joe Johnson; VP of
5   accounting, Lew; VP of Internal Audit, Beverly Lively; Director of Internal Audit,
6   Vladimir Marinescu; Assistant Controller, Nathan Yoo; Wong; Whitaker; and
7   Martin.

8   127.   During the January 15 meeting, all attendees agreed that this was a
9   serious error in Mattel's financial statements.  "Everybody understood it.  There was
10  no conflict or confusion on that," Whitaker reported.

11  128.   There was discussion about whether and to what extent it constituted
12  an internal control deficiency.  Lively and Marinescu believed that this constituted
13  a material weakness based on the fact that it was so significant, and it was the second
14  time in one quarter that an issue like this was discovered.

15  129.   Whitaker reported that by the end of the meeting, "there was no conflict
16  that this was a material weakness.  One, this was so material.  Two, this was not the
17  first time we had this error."

18  130.   Despite this collective conclusion, Johnson, Mattel's SVP of
19  Accounting who reported directly to CFO Euteneuer, protested that, "We cannot
20  have a material weakness.  That would be the kiss of death."

21

131.   Whitaker explained that he understood Johnson's remark to mean that the market would react very poorly to Mattel admitting that its financial statements were materially misstated and that it had a material weakness in its internal controls, particularly given the many challenges the Company was already facing. "Our company [was] tanking.  To then go out and say we have no sufficient controls, as an investor, you would read that and say, what else don't you have control over?" In addition, the Company was a defendant in a securities class action suit at the time, and Martin expressed the view that these types of admission would "add fuel to the fire," Whitaker noted.  Also, Mattel had just secured new debt on December 20, 2017.  Given the material error in the valuation allowance, there was concern over the fact that the financial information Mattel had provided to secure that debt was incorrect.  "Those kinds of things were at the tops of peoples' minds at the meeting," Whitaker reported.

132.   The agreement leaving that meeting was, "this was a clear-cut material weakness," Whitaker said, but the team was holding out a thin sliver of hope that perhaps Mattel might be able to find a way to characterize it differently.

133.   Lew then researched ways to avoid restating financial results and admitting a material weakness.  On the afternoon of January 15, 2018, she sent an email to Whitaker, Johnson, Wong, Martin, and others containing Ernst & Young's interpretation of certain guidance suggesting that, in certain circumstances, a

1   company might be able to assess the materiality of an error against its annual results

2   as a whole, rather than by reference to the impact on its quarterly results (which was

3   not true). Indeed, the same guide from Ernst & Young provided that even when a

4   company deems an error material for specific prior quarters but not for the full year

5   cumulatively, the company would still have to separately disclose the error. It stated

6   further that "if the error being corrected materially affected a prior quarter of the

7   current fiscal year, the SEC staff would expect the registrant to file an Item 4.02

8   Form 8-K with respect to those interim financial statements." Nevertheless, Lew

9   wrote, "We may have a tiny miniscule sliver of hope."

10      134.   The Mattel team wondered whether they could perhaps "get away with"

11  a "Little r" restatement rather than a "Big R" restatement, Whitaker reported. A

12  "Big R" restatement is when the correction of an error in a company's financial

13  statements, whether due to a mistake or fraud, is significant enough to require that

14  the company file a Form 8-K with the SEC evincing a material event, withdrawal of

15  prior period filings and the auditor's opinion on those filings, and revision of the

16  prior period financial information before refiling with the SEC.

17      135.   By contrast, so-called "Little r" restatements occur when no prior

18  periods are materially misstated, but the accumulation of misstatements in prior

19  periods taken together becomes material. In such "Little r" restatements, companies

20  typically disclose the correction of the error (likely in a footnote) in their current

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 54 -

financial statements but would not amend or restate their prior period SEC filings. Notably, the entire concept of "Little r" restatements is dubious to begin with, as they are not mentioned or otherwise contemplated in ASC 250, the GAAP provision governing restatements for correction of an error and what a company is required to do when it discovers an error in previously-issued financial statements.

136. A follow-up meeting with the individuals noted above, including Whitaker, Johnson, Lew, Wong, Marinescu and Lively, then occurred on January 16, 2018 at 9:30 am. Whitaker reported that the collective view at this meeting was still that the error required a "Big R" restatement, meaning that Mattel's third quarter financials would have to be restated, and Mattel would have to disclose a material weakness. Before that decision was formally made, however, Johnson requested a meeting with Mattel's legal team.

137. The meeting with Mattel's legal team occurred in Johnson's office soon thereafter, and included Whitaker, Wong, Johnson, and Mattel's head legal officer.[1] The Company's SEC counsel was on the phone. The conclusion of this meeting was that everyone agreed with the determination that Mattel's financial statements had been materially misstated, the Company had a serious material weakness in its internal controls, and Mattel was required to issue a ("Big R") restatement of its third

---

[1] Mattel's SEC filings from this time period indicate that the Company's Chief Legal Officer and Secretary was Robert Normile.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 55 -

1
2
3

quarter 2017 results.  "There was absolutely zero doubt in anyone's mind that we had a material misstatement that would result in a restatement of third quarter earnings," Whitaker reported of this meeting.

4
5
6

138.   The meeting participants decided to communicate this conclusion to CFO Euteneuer, and then set up a meeting with PwC to communicate the findings to them.

7
8
9
10
11
12
13
14

139.   Wong, Johnson, and Lew met with Euteneuer on either January 16 or 17, 2018 to share the group's conclusion regarding the need for a restatement of third quarter results and the admission of a material weakness.  Right after Wong's meeting with Euteneuer, Wong came to Whitaker's office to tell him they had just met with Euteneuer and update him on how the meeting went.  Wong reported to Whitaker that Euteneuer accepted the decision to restate third quarter earnings, and "was very aware of it."  Euteneuer requested that Wong set up a meeting to discuss that conclusion with PwC.

15
16
17
18
19
20

140.   The meeting with PwC was subsequently scheduled.  Whitaker expected to attend, but before the meeting started, Wong told Whitaker that only VPs and above would attend, which meant Whitaker would not participate.  "I remember being kind of shocked by it," Whitaker reported.  Wong, Johnson and Lew attended for Mattel.  Whitaker believes that Abrahams, Brierley, and Lightfoot attended this meeting from PwC.

21

1    141.   Immediately following the meeting with PwC, Whitaker received a call

2    from Martin to come to his office and meet with him, Wong, and Dunlap for a debrief

3    of the meeting with PwC.  After closing the door, Wong told Whitaker that during

4    the meeting with PwC, "Josh Abrahams' immediate response, to everyone's

5    surprise, was that we cannot have a material weakness and we need to figure out a

6    way for that not to be the result."  "The mandate" from Abrahams "was for everyone

7    to see what kind of a technical argument we could make" to avoid a restatement and

8    avoid reporting a material weakness.

9    142.   After the meeting, Brierley came to Whitaker's office and shut the door.

10   Brierley reiterated that they needed to find a way to not have the material weakness

11   and to avoid a restatement.   Brierley told Whitaker that his "team was now

12   scavenging the earth to try to find a technical argument that could be made to say

13   there was no material weakness."

14   143.   A couple of days later, Wong came to Whitaker and communicated to

15   Whitaker that PwC had manufactured a plan to avoid a restatement.  PwC's plan was

16   to change the classification of the HiT IP asset from an indefinite-lived asset to a

17   finite-lived asset retroactively as of the start of the fourth quarter, October 1, 2017,

18   thereby matching its classification to the manner in which the Company had treated

19   it in the third quarter, and purportedly rendering the valuation allowance "correct"

20   as of the fourth quarter.  When Whitaker questioned how they could make this

21   AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL         - 57 -
     SECURITIES LAWS
     Case No. 19-CV-10860-AB (PLAx)

1  retroactive change, Wong's response was that "they would rather have a slap on their

2  wrist from the SEC."

3      144.    According to Whitaker, Mattel believed that retroactively reclassifying

4  the HiT IP asset exposed Mattel to minimal penalties from regulators.  That is, if the

5  SEC looked into the reclassification issue and discovered that the HiT IP had been

6  retroactively reclassified, this fact, by itself, would trigger a far less significant

7  response than the existence of a material misstatement of financial results and a

8  material weakness.  Accordingly, Mattel and PwC decided to change the accounting

9  treatment of the HiT IP asset, make that change retroactive to October 1, 2017, and

10  bury the known error and avoid the disclosure of material weaknesses in Mattel's

11  internal controls.

12      145.    This reclassification was done as a maneuver to enable Mattel to avoid

13  a required restatement of third quarter results and the disclosure of material

14  weaknesses in Mattel's internal controls.  Whitaker reported that "it was never our

15  intent" in October 2017 (or during the fourth quarter more generally) to reclassify

16  the HiT IP.  Whitaker also explained, as discussed above, that while the Company

17  was assessing the impact of the Toys "R" Us bankruptcy and considering whether

18  to record a valuation allowance, Whitaker and his team had regular meetings with

19  the FP&A group about Mattel's budget and forecast.  One of the items discussed

20  during these meetings was a spreadsheet that detailed the variables that might have

21  

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 58 -

1
2
3
4
5
6
7

an impact on Mattel's earnings.  Had there been any prior discussion about reclassifying the HiT IP as a finite-lived asset, which would have impacted earnings, this would have been one of the main items on the spreadsheet and would have been discussed.  Instead, the first time Whitaker ever heard of the idea to change the life of the HiT IP asset was after the error was discovered and financials were already published, and PwC and Mattel were searching for a "technical argument" to avoid a restatement.

8
9
10
11
12
13
14
15
16
17
18
19

146.   Corroborating Whitaker's report, Lead Counsel obtained a copy of an internal Mattel spreadsheet with the file name "Copy of Q4 2017 Significant Items." The spreadsheet is titled, "Mattel, Inc., Q4 Close Significant Items, December 31, 2017."  Included in this spreadsheet is a list of significant items expected to impact Mattel's fourth quarter financial statements.  The spreadsheet lists approximately 39 different items, ranging in size from less than a million dollars (such as the "Fuhu building lease write off") to $70 million (such as "inventory obsolescence"), which add up to $246.5 million.  Nowhere does the spreadsheet mention the HiT IP, let alone contain any mention of reclassifying the HiT IP to a finite-lived asset.  If Mattel had actually been considering reclassifying the HiT IP during the fourth quarter (and certainly at any time on or around October 1, 2017), it would have been reflected in this document.

20
21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 59 -

1    147.   Whitaker explained that the document was regularly updated to reflect

2    any item that would impact Mattel's fourth quarter financial results.  He said that

3    "[a]ccounting had gotten to the point where things were so dire that they were

4    tracking every single material adjustment that might be made to the financial

5    statements prior to year-end."  To this end, the spreadsheet even contained items

6    "that were not large or material, but everything was being considered.  That's how

7    concerned people were with how the business was doing.  We were tracking all of

8    these potential adjustments because all of them were significant at that moment in

9    time."  Reiterating that the reclassification of the HiT IP undoubtedly would have

10   been listed in the spreadsheet, Whitaker said that "if we were always planning to

11   change the HiT IP to be amortizable, this would have been one of the biggest items

12   on that sheet.  And it's not on there."

13   148.   Soon after Wong shared PwC's plan with Whitaker, Brierley came to

14   speak with Whitaker.  Whitaker asked Brierley to speak candidly with him as if "we

15   were just two guys in a bar talking," and then asked Brierley how this retroactive

16   treatment of the HiT IP could possibly "be right."  Whitaker reported that Brierley

17   "just shook his head, because he knew it was bull****."  "I said, 'I want no part of

18   this,' and I asked him to leave," Whitaker reported.

19   149.   Although both Mattel and PwC concluded that Mattel's third quarter

20   2017 financial statements contained a material misstatement, none of the senior

21

Mattel executives involved in this determination, including CFO Euteneuer, and none of the PwC audit partners, including Abrahams, Lightfoot, and Brierley, informed Mattel's Audit Committee of the misstatement.  As explained in further detail below, governing audit standards required that PwC report this error to Mattel's Audit Committee.  Had Mattel management and PwC been acting in good faith, at a bare minimum, they would have informed the Audit Committee of these important facts and let the Audit Committee decide how to proceed with handling the error and disclosure requirements.

150.   Defendants failed to report these errors and material weaknesses to the Audit Committee notwithstanding the fact that they knew they were required to do so.  Mattel's Class Period proxy statements filed with the SEC set forth the roles and responsibilities of Company's Audit Committee.  For example, Mattel's 2019 Proxy Statement filed with the SEC on April 4, 2019 provides that among the "Primary Responsibilities" of Mattel's Audit Committee are:

- Assist the Board in fulfilling the Board's oversight responsibilities regarding the quality and integrity of Mattel's financial reports, the independence, qualifications, and performance of Mattel's independent registered public accounting firm, the performance of Mattel's internal audit function, and Mattel's compliance with legal and regulatory requirements[;]

- Sole authority to appoint or replace the independent registered public accounting firm; directly responsible for the compensation and oversight of the work of the independent registered public

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

accounting firm for the purpose of preparing or issuing an audit report or related work[;]

- Meet with the independent registered public accounting firm and management in connection with each annual audit to discuss the scope of the audit and the procedures to be followed[;]

- Review and discuss Mattel's quarterly and annual financial statements with management, the independent registered public accounting firm, and the internal audit group[;]

- Discuss with management and the independent registered public accounting firm Mattel's practices with respect to risk assessment, risk management, and critical accounting policies[; and]

- Discuss periodically with the independent registered public accounting firm and the senior internal auditing officer the adequacy and effectiveness of Mattel's accounting and financial controls, and consider any recommendations for improvement of such internal control procedures[.]

151.    Moreover, Defendant Euteneuer and the PwC audit partners failed to report the known errors and material weaknesses to the Audit Committee despite the fact that they met with the Audit Committee specifically to discuss the accuracy of the Company's 2017 financial statements, including the existence of any material weaknesses, so that the Audit Committee could approve their filing with the SEC. As stated in the Company's 2018 Proxy:

[T]he Audit Committee has reviewed and discussed with management, the senior internal auditing officer of Mattel, and PwC, the audited financial statements of Mattel as of and for the year ended December 31, 2017 and Management's Report on Internal Control Over Financial Reporting. Management has confirmed to the Audit Committee that, as required by Section 404 of the Sarbanes-Oxley Act, management has

evaluated the effectiveness of Mattel's internal control over financial reporting using the framework in *Internal Control – Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission. Based on this evaluation, management concluded that Mattel's internal control over financial reporting was effective as of December 31, 2017. …

In addition, Mattel's Chief Executive Officer and Chief Financial Officer reviewed with the Audit Committee, prior to filing with the SEC, the certifications that were filed pursuant to the requirements of the Sarbanes-Oxley Act and the disclosure controls and procedures management has adopted to support the certifications. …

The Audit Committee has discussed with PwC the matters required to be discussed by Auditing Standard No. 1301, "Communications with Audit Committees", as adopted by the Public Company Accounting Oversight Board (the "PCAOB"). …

Based on the reports and discussions described above, the Audit Committee recommended to the Board that the audited financial statements be included in Mattel's Annual Report on Form 10-K for the year ended December 31, 2017, for filing with the SEC.

152.   During these discussions, neither Mattel's senior management nor PwC informed the Audit Committee of the highly material facts of which they were aware concerning the material misstatement of Mattel's financial results and the material weaknesses in its internal controls.  Instead, Mattel's senior management and PwC proceeded to execute the plan they had agreed on to avoid the required restatement of Mattel's third quarter results and the required admission of material weaknesses in the Company's internal controls.

1         153.   Before Mattel's 2017 Form 10-K was due to be filed in February 2018,

2   Mattel and PwC conducted a final review of Mattel's financial statements.  During

3   the review, Martin discovered a third error again related to the accounting for

4   Mattel's intellectual property.  The third error was of a similar nature to the first two,

5   as Mattel improperly netted certain deferred tax liabilities related to indefinite-lived

6   assets, a violation of GAAP, when it was attempting to determine its valuation

7   allowance as of December 31, 2017.  The error was valued at approximately $20

8   million, which was just above PwC's materiality threshold.  Whitaker recalled that

9   "there was this 'oh sh**' moment because we just got through this storm, they

10  somehow concluded, albeit fraudulently—in my opinion—that we didn't have a

11  material weakness, and there was this feeling in the office that 'we can't get through

12  another one.'"

13        154.   After the error was communicated to PwC, PwC spent an entire day at

14  Mattel's offices figuring out if they could net other, immaterial errors against this

15  one to take it below the materiality threshold and avoid having to report it.  Where

16  errors are not material, PwC is supposed to alert Mattel and the Company's Audit

17  Committee, but no disclosure is required.  PwC successfully carried out this exercise

18  to reduce the effect of the third error and decided that it did not have to be reported.

19  This, along with the cover-up, meant that Mattel would not have to report any

20  weaknesses or errors in its 2017 Form 10-K.

21

1    155.   When the issue was resolved and the audit was completed, Lightfoot

2    walked through the halls of Mattel high-fiving people to celebrate the fact that there

3    would be no restatement and the 2017 audit was finally signed off on.  Lightfoot also

4    sent a congratulatory email stating that the issue was resolved and PwC's audit was

5    completed satisfactorily.

6    156.   During this time period, Dunlap ran to Whitaker's office, closed the

7    door, and said to Whitaker, "Brett, tell Chip [Lightfoot] to take me off these emails

8    because I don't want to be subpoenaed when the SEC looks at this."  Whitaker said

9    that "this was the moment when I knew that this was beyond my understanding."

10   157.   On February 27, 2018, Mattel filed its 2017 fourth quarter and annual

11   results with the SEC on Form 10-K, which was signed by Defendants Georgiadis

12   and Euteneuer.  In its 2017 Form 10-K, Mattel made no disclosure to investors of

13   the truth.  Mattel said nothing about the fact that its 2017 third quarter results were

14   materially misstated.  It made no mention of the material weaknesses in internal

15   controls from which it suffered.  It certainly made no disclosure about the fact that,

16   along with PwC, it had concocted a plan to avoid restating its third quarter results as

17   summarized above.

18   158.   Instead, Defendants made numerous false statements in the 2017 Form

19   10-K.  For instance, Mattel reported, and Defendant Euteneuer certified, that

20   Mattel's "internal control over financial reporting was effective as of December 31,

21

1    2017."   The Form 10-K also included false representations, described in detail

2    below, asserting that Mattel reclassified the HiT IP during the fourth quarter for

3    purely legitimate reasons.  In truth, this reclassification was an instrument to avoid

4    a restatement.  Similarly, in violation of PCAOB accounting standards, PwC issued

5    an unqualified audit opinion incorporated into Mattel's 2017 Form 10-K stating that

6    Mattel's internal controls over financial reporting were effective as of December 31,

7    2017 and that Mattel's financial statements were accurate and prepared in

8    accordance with GAAP.

9       159.   After Mattel's 2017 10-K was published, Whitaker expressed his

10   concerns to Patricia Bojorquez in Human Resources ("HR") at Mattel.  Bojorquez

11   instructed him to call Mattel's ethics hotline but stated that his grievance would go

12   to the Head of Internal Audit, who would obviously know Whitaker's identity,

13   although the hotline was supposed to be anonymous.  Accordingly, Bojorquez

14   advised Whitaker to set up a meeting with Lively and express his concerns to her.

15   HR ultimately told Whitaker that there was nothing they could do.

16      160.   HR told Whitaker that he could leave the Company but would have to

17   pay back the stipend the Company gave him to move his family to Los Angeles for

18   the job.  Whitaker resigned from Mattel in March 2018.

19

20

21

1

2

**E.      Mattel and PwC Are Forced to Disclose a Whistleblower Letter Concerning the Fraud**

3

161.   Mattel and PwC concealed their wrongdoing from investors for nearly

4

two years—and only made a disclosure when a whistleblower forced their hand.

5

After the market closed on August 8, 2019, Mattel filed a Form 8-K with the SEC

6

disclosing that the Company "was made aware of an anonymous whistleblower

7

letter" and, as a result, would initiate an investigation related to the "matters set forth

in the letter."

8

162.   The Form 8-K further disclosed that "[t]o provide the Company with

9

an opportunity to investigate the matters set forth in the letter, the offering of the

10

Company's 6.00% Senior Notes due 2027 that was scheduled to close on August 8,

11

2019 has been terminated.  The Company intends to refinance its 4.350% Senior

12

Notes due October 2020 prior to maturity."

13

163.   The market reacted with surprise and concern in response to this news.

14

On August 9, 2019, the Associated Press published an article titled "Mattel shares

15

sink on whistleblower letter" reporting that Mattel shares "tumbled more than 10%

16

in morning trading after the toymaker pulled a debt offering upon learning of a letter

17

from an anonymous whistleblower."  Bloomberg reported the same day that Mattel

18

shares were "down 11%, most in six months . . . more than any full-day loss since

19

Feb. 15[.]"

20

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 67 -

164.   Another Bloomberg article dated August 9, 2019 reported that "Mattel Inc. fell the most in almost 6 months on Friday after the company said it would pull a bond sale as it looks into 'an anonymous whistleblower letter.'  The toymaker became aware of the letter on Aug. 6, according to a filing late yesterday.  Mattel said it is terminating the sale of senior notes due in 2027 'to provide the company with an opportunity to investigate the matters set forth in the letter.'"  The same Bloomberg article quoted Jefferies analyst Stephanie Wissink as commenting that the allegations in the whistleblower letter are likely "'material enough to prevent' the bond deal rather than just delay it."  A CNBC article from the same day titled "Mattel stock craters after pulling bond sale over anonymous whistleblower letter" similarly reported that the bond sale, "which was worth an estimated $250 million, had initially [been] scheduled to close on Thursday.  Mattel said it intends to refinance bonds that are due in October 2020 prior to maturity."

165.   An August 9, 2019 Fox Business article titled "Barbie doll-maker Mattel has a whistle blower" reported that "Burt Flickinger, managing director at Strategic Resource Group, told FOX Business the whistleblower letter comes at a time when the four cornerstones of Mattel's business are crumbling.  Its core brands and categories have been in a secular state [of] decline for decades[.]'"

166.   The L.A. Business Journal also reported on August 9, 2019 that "Mattel's stocks tumbled Friday after [Mattel] announced it terminated the sale of

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 68 -

1
2
3

senior notes so it could investigate an anonymous whistleblower letter. . . . Mattel intended to refinance its 4.35% senior notes due October 2020 before they matured. . . . Shares of Mattel fell more than 15% on intraday trading."

4
5
6
7
8
9
10
11
12
13
14

167.  As news outlets reporting on Mattel's disclosure recognized, it is extremely rare for an issuer to pull an offering after the bonds have priced. According to an August 9, 2019 article in the International Financing Review, "[c]ancelling a deal in between pricing and settlement . . . has only happened three times before[.] . . . Pulling a deal after pricing is extremely rare and suggests the company and banks were wary of any potential legal risks that could arise if the deal went ahead." The article quoted an investor as acknowledging that "'[t]he banks are all about printing paper, but if this does lead to a loss for investors they could be accused of not performing due diligence[.]'"  Mattel's decision to pull its bond offering after pricing and one day before it was scheduled to close therefore indicated the seriousness of the issues raised in the whistleblower letter.

15
16
17
18

168.  In response to Mattel's disclosure, Mattel's stock price declined 16% in a single day.  Mattel's stock price fell from $13.43 on August 8, 2019, to a closing price of $11.31 on August 9, 2019, on exceptionally high volume of over 15 million shares traded.

19
20
21

V. **MATTEL'S POST CLASS PERIOD ADMISSIONS**

169.   Following that August 8, 2019 disclosure, Mattel made a series of admissions that corroborated the whistleblower letter and the facts alleged herein, as set forth below.

A.   **Mattel Admits That Its Third and Fourth Quarter 2017 Financial Results Were Materially False When Issued, and Announces that the Company Will Issue A Restatement**

170.   On October 29, 2019, Mattel released positive financial results for the third quarter of 2019.  These results included net sales up 3% versus the prior year, a 23% increase in operating income, a 3% increase in revenue, and adjusted earnings per share of $0.26 compared to adjusted EPS of $0.18 in the prior year quarter. Mattel beat street expectations for EPS and revenue and raised its 2019 guidance.

171.   Analysts were pleased with the Company's results.  For example, on October 29, 2019, BMO Capital Markets reported that Mattel "posted 3Q results that beat the Street and were much better than investors feared, especially after Hasbro's big miss last week.  [Mattel] also shrugged off tariff impacts and raised its 2019 full year guidance."   On October 30, 2019, Wells Fargo Securities issued an analyst report providing that the third quarter "was another solid quarter with sales/EBITDA upside and cost savings again tracking better than expected. . . . Fundamentals, lower than anticipated inflating and tight working capital management are driving a positive 2019 Oper CF outlook.  …. [W]e believe [Mattel] will see strong upside

1
2

follow-through vs. possible incremental near-term [Hasbro] weakness."  Buoyed by these results, Mattel's stock price closed up on October 29, 2019.

3
4
5
6
7
8
9
10
11
12
13

172.   Also on October 29, 2019, at the same time it disclosed these positive financial results, Mattel filed a Form 8-K with the SEC addressing the findings from the whistleblower investigation.  Mattel announced that the Company would be restating its quarterly financial data for the three and nine months ended September 30, 2017 as reported in Mattel's third quarter 2017 Form 10-Q and the three months ended December 31, 2017 as reported in Mattel's 2017 Form 10-K, and that those financial statements "should no longer be relied upon due to material misstatements."  The decision to restate financial results is an admission by Mattel and PwC that Mattel's financial statements in its third quarter 2017 Form 10-Q and 2017 Form 10-K were materially false when issued, as explained below in Section X.

14
15

173.   Specifically, Mattel's October 29, 2019 Form 8-K disclosed that Mattel's

16
17
18
19

> previously issued unaudited consolidated financial statements for the three and nine months ended September 30, 2017, which are included in the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2017, and the unaudited consolidated financial information for the three months ended December 31, 2017, which is included in the Company's Annual Report on Form 10-K for the year ended December 31, 2017, should no longer be relied upon due to material misstatements.

20
21

1   Mattel added that "related press releases, earnings releases, and investor

2   communications describing Mattel's financial statements for these periods should

3   no longer be relied upon."  As a result, the Company planned to amend its 2018

4   Form 10-K to restate "the unaudited quarterly financial data for the three month

5   periods ended September 30, 2017 and ended December 31, 2017 set forth in Note

6   17 - Quarterly Financial Information (Unaudited) (including restatement of related

7   information for the nine months ended September 30, 2017)," as well as

8   "Management's Report on Internal Control over Financial Reporting included under

9   Item 8 and correspondingly, to restate the Evaluation of Disclosure Controls and

10  Procedures included under Item 9A."

11      174.  The Form 8-K further reported that "the Company has reassessed its

12  conclusions regarding the effectiveness of its internal control over financial

13  reporting as of December 31, 2018" and "has determined that certain material

14  weaknesses existed as of December 31, 2018 and subsequently, and therefore the

15  Company has concluded that its internal control over financial reporting as of

16  December 31, 2018 was not effective and that Management's Report on Internal

17  Control on Financial Reporting as of December 31, 2018 should also no longer be

18  relied upon."

19      175.  In a press release filed as an exhibit to Mattel's October 29, 2019 Form

20  8-K, the Company provided further detail on the accounting misstatements that

21

1   would be corrected in the forthcoming restatement.  In addition to reporting the

2   positive financial results as described above, the press release stated that the

3   Company's "investigation determined that income tax expense was understated by

4   $109 million in the third quarter of 2017, and overstated by $109 million in the fourth

5   quarter of 2017[.]"  It went on to state that the "Audit Committee's investigation

6   found errors in publicly-filed Mattel financial statements for the last two quarters of

7   2017, failures to properly consider and disclose such errors to the then-Chief

8   Executive Officer ('CEO'), Margaret Georgiadis, and the Audit Committee once

9   they became known, and violations of auditor independence rules."

10       176.   The press release contained a section entitled "Mattel's 10-Q for the

11   Quarter Ended September 30, 2017 ("Q3 2017 10-Q") and 10-K for the Year Ended

12   December 31, 2017 ("2017 10-K") Contain Errors" further describing the

13   accounting errors creating the need for the Restatement.  Specifically:

14       Mattel's previously reported net loss of $603.3 million for the third
         quarter ended September 30, 2017 was understated by $109 million due

15       to an error in calculating its tax valuation allowance. The correct
         reported net loss for the quarter ended September 30, 2017 should have

16       been a net loss of $712.3 million.

17       A change in accounting for an intangible asset in the fourth quarter of
         2017 resulted in an effective correction of the error for the 2017 annual

18       results. However, the tax expense remained uncorrected in the Q3 2017
         10-Q and was therefore overstated in the quarter ended December 31,

19       2017. As a result, Mattel's previously reported loss of $281.3 million
         for the quarter ended December 31, 2017 should have been reported as

20       a net loss of $172.3 million.

21

1    177.   Notably, the Company also admitted that "lapses in judgment by

2    [Mattel] management" were to blame for the misstatement.  Specifically, the press

3    release stated:

4        Mattel's management identified the third quarter 2017 accounting error
         associated with its tax valuation allowance during its year-end

5        accounting closing procedures for the quarter ended December 31,
         2017. The error was not properly assessed nor were findings and

6        conclusions documented. The error was not reported to Mattel's then-
         CEO, Margaret Georgiadis, and the Audit Committee, and was also not

7        disclosed in the 2017 10-K. The investigation revealed that a
         confluence of one-time events, management's reliance on the

8        accounting advice sought and received on the error from the lead audit
         engagement partner of Mattel's outside auditor, and lapses in judgment

9        by management contributed to these failures.

10   178.   In light of these findings, the Company admitted "that there were

11   material weaknesses in its internal control over financial reporting at the time of the

12   preparation of its financial statements for the quarters ending on September 30, 2017

13   and December 31, 2017."

14   179.   The October 29, 2019 Form 8-K also disclosed that CFO Euteneuer

15   would be departing the Company after a six-month transition period and that he was

16   "informed of the transition plan on October 23, 2019," less than a week before the

17   release of the October 29, 2019 Form 8-K and press release.

18   180.   News outlets immediately tied Defendant Euteneuer's departure to the

19   discovery of these accounting errors.  For example, Forbes reported on October 30,

20   2019 that "Euteneuer's exit . . . is one of four steps Mattel announced late Tuesday

21

| AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS Case No. 19-CV-10860-AB (PLAx) | - 74 - |
|---|---|

1    in response to the probe that found errors in publicly-filed financial statements for

2    the last two quarters of 2017 and failures of the company's reporting procedures,

3    among other conclusions."

4        181.   Lastly, regarding Joshua Abrahams, PwC's lead audit partner for

5    Mattel, the press release stated that the

6        Audit Committee's investigation and a separate investigation by
         Mattel's outside auditor concluded that certain actions in specific HR-

7        related activities by the lead audit partner of Mattel's outside auditor,
         namely providing recommendations on candidates for Mattel's senior

8        finance positions, was in violation of the SEC's auditor independence
         rules. He also provided feedback on senior finance employees.

9

10 It went on to state that "Mattel's outside auditor has replaced its lead audit

11 engagement partner and certain other members of its audit team for its audit

12 engagement with Mattel.  The Audit Committee and Mattel's management support

13 this decision."

14        182.   Following Mattel's issuance of its Audit Committee's findings in

15 October 2019, Whitaker saw that neither the Company nor PwC was fully accepting

16 responsibility for what had occurred, but instead were attempting to minimize the

17 issues.  When he saw the Audit Committee findings, he "thought that this was the

18 largest injustice I have ever experienced in my entire career."  He called the Wall

19 Street Journal.

20

21

1

2

3

4

183.   On November 6, 2019, the Wall Street Journal published an article titled "Mattel, PwC Obscured Accounting Issues, Former Executive Says" detailing Whitaker's account of the internal control deficiencies at Mattel and PwC's cover-up of the valuation allowance misstatement that led to the need for a restatement.

5

6

7

8

9

10

11

12

184.   The November 6, 2019 Wall Street Journal article also reported that Abrahams, who led the Mattel audit team, had been put on administrative leave, and that he was expected to leave PwC entirely as a result of his conduct during PwC's investigation into the whistleblower allegations.  Thereafter, a November 14, 2019 Bloomberg article reported that, according to a written statement from PwC, "[t]he lead partner overseeing the Mattel audit is no longer with the firm[.]   We will continue to take the appropriate actions in response to any allegations of misconduct."

13

14

15

16

17

185.   The news of Abrahams' role in the accounting scandal sparked a slew of backlash from the news media about PwC's ongoing issues with auditor independence.   The same November 14, 2019 Bloomberg article, for example, reported that former investment analyst Jon Baumunk, currently an accounting professor at San Diego State University, explained that

18

19

20

> [a]n auditor who is truly independent would have insisted that the CEO and the audit committee be told about the error.   Auditors make mistakes, but the problem uncovered was far bigger than the $109 million value of the under-reported tax expense, which artificially inflated [Mattel's] third quarter revenue in 2017.   Investors look for

21

1
2
3

whether a company has control over its operations, whether it is being frank with investors and if they can trust the numbers. More importantly, Mattel is prone to quarterly swings in its earnings and stock price and the ability to track those quarterly patterns is crucial to investors.

4

186. Thereafter, a February 26, 2020 article in ProMarket—the publication

5

of the Stigler Center at the University of Chicago Booth School of Business—

6

confirmed that Abrahams had left PwC as a result of his involvement in the scandal

7

at Mattel. The article reported specifically that "Abrahams has now left PwC after

8

the Wall Street Journal quoted a second whistleblower, Brett Whitaker, saying PwC

9

and Abrahams were complicit in Mattel's attempt to cover-up errors in reporting its

10

deferred tax balances."

11

### B. Mattel Files the Restatement

12

187. On November 12, 2019, Mattel filed with the SEC its amended 2018

13

Form 10-K/A with restated financials (the "Restatement"). As discussed above and

14

detailed further below, the purpose of the Restatement was to restate Mattel's

15

previously issued financial statements as of and for the three and nine-month periods

16

ended September 30, 2017, and the Company's previously reported consolidated

17

financial information for the three months ended December 31, 2017, to correct for

18

material misstatements. The Restatement also restated Management's Report on

19

Internal Control over Financial Reporting included under Item 8 and the Evaluation

20

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 77 -

1    of Disclosure Controls and Procedures included under Item 9A in the Form 10-K/A

2    based on material weaknesses in Mattel's internal controls over financial reporting.

3        188.   In the Restatement, Mattel again confirmed that, contrary to its

4    statements during the Class Period, its accounting suffered from multiple material

5    weaknesses.   The Restatement defines a material weakness specifically as "a

6    deficiency, or a combination of deficiencies, in internal control over financial

7    reporting, such that there is a reasonable possibility that a material misstatement of

8    the company's annual or interim financial statements will not be prevented or

9    detected on a timely basis."

10       189.   Mattel admitted in the Restatement that its internal controls were

11   "ineffective" at the time of the preparation of its financial statements for the quarters

12   ended September 30, 2017 and December 31, 2017 (and subsequent reporting

13   periods) because the internal controls suffered from two material weaknesses.  First,

14   Mattel admitted that it had a material weakness that existed as of September 30, 2017

15   in management's control over the Company's review of its income tax valuation

16   allowance.  According to the Restatement, this material weakness was remediated

17   during the three months ended December 31, 2018.  Second, Mattel admitted that it

18   had a material weakness in its monitoring control activities, and specifically that the

19   Company failed to properly design and operate controls to assess and communicate

20   known financial statement errors and internal control deficiencies in a timely manner

21   AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL          - 78 -
     SECURITIES LAWS
     Case No. 19-CV-10860-AB (PLAx)

1   to those parties responsible for taking corrective action, such as the Audit

2   Committee.  As discussed below, this material weakness also resulted in the

3   restatement of Mattel's consolidated financial statements as of and for the three and

4   nine-month periods ended September 30, 2017 and financial information for the

5   three months ended December 31, 2017.  This latter material weakness was so severe

6   that it remained unremediated as of the time of the Restatement.

7       190.   The Restatement included "Management's Report on Internal Control

8   Over Financial Reporting (As Restated)," which provided:

9       Management is responsible for establishing and maintaining adequate
        internal control over financial reporting (as defined in Exchange Act
10      Rules 13a-15(f) and 15d-15(f)). Mattel's management, including Ynon
        Kreiz, its principal executive officer, and Joseph J. Euteneuer, its
11      principal financial officer, evaluated the effectiveness of Mattel's
        internal control over financial reporting using the framework in
12      *Internal Control-Integrated Framework* (2013) issued by the
        Committee of Sponsoring Organizations of the Treadway Commission
13      (the COSO framework). In connection with the Original Filing, Mattel
        included Management's Report on Internal Control Over Financial
14      Reporting therein, which expressed management's conclusion that
        Mattel's internal control over financial reporting was effective as of
15      December 31, 2018. In connection with filing this Form 10-K/A for the
        year ended December 31, 2018, management, including Mattel's
16      principal executive officer and principal financial officer, reassessed
        the effectiveness of Mattel's internal control over financial reporting as
17      of December 31, 2018 based on the COSO framework. Based on that
        reassessment, management determined that Mattel did not maintain
18      effective internal control over financial reporting as of December 31,
        2018 due to the existence of the material weakness described below….

19

20

21
        AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL        - 79 -
        SECURITIES LAWS
        Case No. 19-CV-10860-AB (PLAx)

1
2
3
4
5
6
7
8

We failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including the chief executive officer and the board of directors, as appropriate. Mattel has determined that this control deficiency constitutes a material weakness. The material weakness resulted in the restatement of Mattel's consolidated financial statements as of and for the three and nine month periods ended September 30, 2017 and financial information for the three months ended December 31, 2017, related to an accounting misstatement associated with the tax valuation allowance.  Additionally, this material weakness could result in a misstatement of Mattel's consolidated financial statements or disclosures that could result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

9
10
11
12
13
14

191.  PwC concurred in the Restatement and similarly restated its audit report in its "Report of Independent Registered Public Accounting Firm."  Specifically, PwC's restated report provided that contrary to its previous conclusion, Mattel did not maintain effective control over financial reporting as of December 31, 2018 because of the continuing material weaknesses in its internal control over financial reporting.  The report stated:

15
16
17
18
19
20

[I]n our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control-Integrated Framework* (2013) issued by the COSO because a material weakness in internal control over financial reporting existed as of that date as the Company did not properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including the chief executive officer and the board of directors, as appropriate.

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 80 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to above is described in the accompanying Management's Report on Internal Control Over Financial Reporting. ….

> ***Restatement of Management's Conclusion Regarding Internal Control over Financial Reporting***

> Management and we previously concluded that the Company maintained effective internal control over financial reporting as of December 31, 2018. However, management has subsequently determined that a material weakness in internal control over financial reporting related to the failure to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including the chief executive officer and the board of directors, as appropriate, existed as of that date. <u>Accordingly, management's report has been restated and our present opinion on internal control over financial reporting, as presented herein, is different from that expressed in our previous report</u>.

192.  As noted above and explained in detail below in Section VIII, in the Restatement, Mattel also admitted that because of its improper consideration of an indefinite-lived intangible asset and resultant deferred tax liability in Mattel's tax valuation allowance calculation for the three months ended September 30, 2017, the Company was forced to restate its financial results for the third and fourth quarters of 2017.  The result of the error caused Mattel's provision for income taxes to be understated by $109 million for the third quarter of 2017, which impacted other key

1    metrics in the third quarter.  Mattel understated its net loss by approximately $109

2    million, effectively overstating earnings by $0.32 per share.

3         193.   In the fourth quarter, as alleged above, Mattel covered up this error by

4    reclassifying the HiT IP asset as finite-lived.  This maneuver also had the effect of

5    causing Mattel's financial results for the fourth quarter 2017 to be materially

6    misstated.  According to the Restatement, if Mattel had properly reported an accurate

7    valuation allowance in the third quarter, it would have reported an allowance of

8    $670.9 million.  Then, when the Company later reclassified the HiT IP in the fourth

9    quarter, it should have also consequently reduced its valuation allowance by $109

10   million as a result of the reclassification.  This reduction would have resulted in a

11   credit to fourth quarter income of approximately $109 million, which would have

12   reduced the fourth quarter loss that Mattel originally reported.  Mattel never recorded

13   this credit to income in its originally-issued fourth quarter results, of course, because

14   the reclassification was done simply to bury the known error by making the treatment

15   of the HiT IP correspond to the misstated valuation allowance that the Company had

16   improperly reported in the third quarter.  Indeed, the fact that Mattel did not record

17   this credit to income at the time of the reclassification is further confirmation that

18   the reclassification was done as a device to avoid the required restatement and the

19   admission of material weaknesses in Mattel's internal controls.

20        194.   The Restatement explained:

21   AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
     SECURITIES LAWS
     Case No. 19-CV-10860-AB (PLAx)                                           - 82 -

On August 6, 2019, Mattel was made aware of an anonymous whistleblower letter. An independent investigation was initiated in August 2019 on matters discussed in that letter. The investigation concluded there were material tax related misstatements in the previously issued unaudited consolidated financial statements as of and for the three and nine month periods ended September 30, 2017 and previously reported unaudited consolidated financial information for the three months ended December 31, 2017 and failures to properly consider and communicate such misstatements to Mattel's then Chief Executive Officer and Audit Committee. The investigation did not find that management engaged in fraud. As it relates to the accounting misstatement, it was concluded that Mattel had failed to properly consider an indefinite-lived intangible asset in its tax valuation allowance calculation for the three months ended September 30, 2017, which caused the provision for income taxes to be understated by $109.0 million. In the fourth quarter of 2017, Mattel determined that the intangible asset was no longer indefinite-lived. This change resulted in an effective correction of the tax misstatement for the 2017 annual results. However, the provision for income taxes remained uncorrected for the three months ended September 30, 2017, which resulted in an overstatement of the tax expense for the three months ended December 31, 2017.

195. Defendants again reiterated the disclosures made in the Restatement during a November 15, 2019 conference call with investors. For instance, Mattel's Senior Vice President and Corporate Controller Yoon Hugh reiterated that

in light of the investigation's conclusions, management determined that there were material weaknesses that existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017. One of those material weaknesses related to the control over the review of income tax valuation allowance analysis. This material weakness was remediated during the 3 months ended December 31, 2018, after enhancements in the design of the control were made and were operating effectively for a sufficient period of time as of December 31, 2018. The second material weakness related to a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

deficiency in monitoring control activities. Management determined this material weakness still existed as of December 31, 2018.

196. Bloomberg reported on November 15, 2019 that "Mattel plans to formalize its policy spelling out how it evaluates, documents, and discloses accounting errors and build in stronger procedures by the end of the year," further demonstrating that the Company lacked these essential controls during the Class Period.

## C. The SEC and SDNY Subpoena Mattel

197. In its Form 10-K for the year ended December 31, 2019, Mattel disclosed that it received a subpoena from the SEC in December 2019 "seeking documents related to the whistleblower letter and subsequent investigation[.]"

198. Then, in its Form 10-Q for the first quarter of 2020, Mattel disclosed that it also received a subpoena from the U.S. Attorney's Office for the Southern District of New York. The Company disclosed that it was "responding to requests from the United States Attorney's Office for the Southern District of New York ('SDNY') related to this matter. Mattel cannot predict the eventual scope, duration or outcome of potential legal action by the SEC or SDNY, if any, or whether any such action could have a material impact on Mattel's financial condition, results of operations or cash flows."

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 84 -

1

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

2

3

4

5

6

199.    As set forth above and further below, numerous facts demonstrate that Defendants Euteneuer, Georgiadis, Farr, Mattel, Abrahams and PwC knew or were severely reckless in not knowing that Mattel's financial statements were materially false and misleading when issued, and that statements concerning the Company's internal controls were materially false and misleading when made.

7

8

9

200.    <u>First</u>, numerous facts demonstrate that the cover-up at issue in this case discussed in detail at ¶¶123-60, above, was intentional and was specifically discussed and agreed upon at the highest levels of Mattel and PwC.

10

11

12

13

14

15

16

17

18

19

20

201.    As set forth in greater detail above, after Mattel filed its third quarter 2017 Form 10-Q and while Whitaker was conducting an internal review of Mattel's intangible assets in January 2018, Whitaker discovered that an improperly characterized intellectual property asset (the HiT IP) resulted in Mattel understating its valuation allowance by $109 million for the third quarter 2017.  In early January 2018, after Whitaker and Martin discussed the error with Wong, Lew, and Johnson, as well as Mattel's head of legal and its SEC counsel, the entire group agreed that Mattel's third quarter 2017 financial statements contained a material error, and that the Company should restate them and admit to the material weakness in internal controls.  This conclusion was communicated to CFO Euteneuer, who did not dispute it.

21

202.   The conclusion was then communicated to PwC, including Abrahams, who instructed Mattel that they would need to find a technical argument to avoid admitting a material weakness and issuing a restatement.  As a result, both Mattel and PwC proceeded to "scavenge the earth to try to find a technical argument that could be made to say there was no material weakness."  Ultimately, PwC and Mattel covered up the material error by retroactively altering the characterization of the HiT IP to match the manner in which it was improperly treated when calculating the misstated allowance.  After successfully carrying out this plan, PwC even celebrated in the hallways of Mattel.

203.   Throughout this time, no one—including Euteneuer and Abrahams—reported the material misstatement in the third quarter financials or the material weaknesses to the Audit Committee, even though they knew the Audit Committee exercised oversight over such matters.  This failure is even more egregious given that they actually met with the Audit Committee to discuss Mattel's 2017 financial statements, and the existence of any material weaknesses, so that the Audit Committee could determine whether to authorize their filing with the SEC.  The fact that senior officers of Mattel and PwC's audit partners conspired to cover up the material misstatement rather than report the error to Mattel's Audit Committee demonstrates an intent to deceive.

204.  The statements made in the 2017 Form 10-K further indicate an intent to deceive.  CFO Euteneuer signed the 2017 Form 10-K when he knew it contained false financial information.  He executed SOX Certifications in the 2017 Form 10-K certifying that he had evaluated Mattel's internal controls and that they were effective, when he knew that was untrue.

205.  PwC then issued an unqualified audit report, which was incorporated into Mattel's 2017 Form 10-K, providing that the Company's internal controls were effective as of December 31, 2017, when it knew that was untrue.  PwC also represented that the financial information in the 2017 Form 10-K was accurate when it knew that the data for the periods ending September 30, 2017 and December 31, 2017 was materially misstated.

206.  The fact that Defendants exploited the material weaknesses in Mattel's internal controls to execute the cover-up further supports a strong inference of scienter.  As alleged above, not only were PwC—including Abrahams, Brierley, and Lightfoot—and Mattel, including CFO Euteneuer, aware of the material misstatement in Mattel's third quarter 2017 Form 10-Q by January 2018 at the latest, they exploited the deficiencies in Mattel's internal controls as a means of covering up this material misstatement.  Indeed, such a cover-up would not have been possible without extremely deficient internal controls.  This, too, supports a strong inference

1   of scienter as to the false statements concerning the purported effectiveness of

2   Mattel's internal controls.

3   207.   The circumstances of Euteneuer's announced departure from Mattel

4   further support an inference of his knowledge as to the cover-up.  As alleged above,

5   on October 29, 2019, Mattel announced, along with its Audit Committee findings,

6   that Euteneuer would be leaving Mattel.   The fact that the announcement of

7   Euteneuer's departure was concurrent with the culmination of the Audit Committee

8   investigation indicates that the investigation uncovered misconduct on Euteneuer's

9   part.  Further, Mattel informed Euteneuer of its decision to terminate him just days

10  before the October 29, 2019 press release was issued.  And when announcing his

11  departure, Mattel stated that "lapses in judgment by management"—that is,

12  management's treatment of known facts—contributed to the Restatement.  These

13  facts support a strong inference of scienter.

14  208.   Similarly, following the results of Mattel's Audit Committee

15  investigation, Abrahams was replaced as PwC's lead audit partner for Mattel and

16  was placed on administrative leave from PwC.  Subsequent news reports indicate

17  that since being placed on administrative leave, Abrahams has left PwC, and have

18  tied his departure to his participation in the cover-up at Mattel.  His departure

19  supports a strong inference of scienter.

20

21

1    209. <u>Second</u>, numerous facts demonstrate that Defendants were at a
2    minimum severely reckless in disregarding that their statements in Mattel's third
3    quarter 2017 financial statements, including the third quarter Form 10-Q, investor
4    presentations, earnings releases, and earnings call, were materially false and
5    misleading.

6    210. As described above in ¶¶56-79, above, from the beginning of the Class
7    Period, Mattel lacked internal controls for determining a valuation allowance on its
8    deferred tax assets. Mattel then initially determined not to record a valuation
9    allowance against its domestic deferred tax assets for the third quarter of 2017.
10   Whitaker's team prepared Mattel's third quarter tax entry based on this decision.
11   Then, approximately a week prior to closing, Abrahams and Lightfoot informed
12   Whitaker that Mattel would need to record a valuation allowance against its deferred
13   tax assets—reversing their earlier conclusion and rendering Whitaker's team's prior
14   work meaningless. Whitaker's team had to work at breakneck speed to draft a tax
15   entry for the valuation allowances. After submitting the tax entry with the valuation
16   allowance to PwC to review, PwC informed Whitaker and Mattel that the valuation
17   allowance was understated by several hundred million dollars. Whitaker's team had
18   to scramble to redo the tax entry once again days before Mattel's third quarter results
19   were to be published, and again in the absence of internal controls to govern this
20   process.

21

211.   As alleged above, throughout Mattel's third quarter 2017 process, Mattel's draft financial statements reflecting these dramatic swings in the tax entry and its net income were sent to Mattel's senior executives, including CFO Euteneuer. Given the drastic fluctuations between the various financial statements due to the different valuation allowances, varying by hundreds of millions of dollars, these discrepancies were impossible to ignore (especially within the context of Mattel's and the market's focus on Mattel's results due to the Toys "R" Us bankruptcy). Abrahams told Whitaker that he spoke regularly with CFO Euteneuer concerning the valuation allowance issue, as it was important to Mattel's third quarter results.

212.   Given Mattel's, CFO Euteneuer's, and PwC's knowledge that the Company's financial results were vacillating materially in the days before they were due to be published, it was reckless at a minimum for Mattel to nonetheless issue its third quarter results and certify their accuracy.  Defendants had every opportunity to instead delay Mattel's issuance of those results until the Company could ensure their accuracy.

213.   The inference of recklessness is further supported by numerous facts demonstrating how important these issues were to the Company and investors at this time.  As discussed above in Section IV.A., Mattel was in a fragile financial state and was in the middle of a financial and strategic rebuild.  The market was constantly scrutinizing the Company to determine whether it could successfully execute the

1  rebuild and turn the Company around.  Further, Toys "R" Us had just declared

2  bankruptcy, and the Company learned that it would have to write down a significant

3  amount, approximately $100 million, of receivables.  This was extremely material

4  for Mattel, and the Company was intensely focused on the impact that the

5  bankruptcy would have on its results.  Further, as of the second quarter 2017, Mattel

6  reported $580 million in deferred tax assets (which had reached over $600 million

7  by the third quarter), one of the largest assets on its balance sheet.  Given the

8  importance of this asset, Defendants Euteneuer and Georgiadis represented in

9  Mattel's SEC filings—including in its third quarter 2017 Form 10-Q—that they

10  "regularly assess[] the need for a valuation allowance against its deferred tax assets."

11  214.  Third, Defendants' repeated statements throughout the Class Period

12  that they evaluated Mattel's controls and found them effective were severely

13  reckless at a minimum.  As discussed in detail above, Mattel's internal control

14  deficiencies were severe, open, and notorious from the beginning of the Class

15  Period, and they were not evaluated in any true and substantive way.

16  215.  Specifically, the Company lacked a reasonable documentation system

17  for its financial records, as well as basic institutional internal controls such as an

18  internal control for evaluating the need for and calculating valuation allowance on

19  deferred tax assets.  As Whitaker reported, Mattel's severe internal control

20  deficiencies were widely recognized and even plainly visible due to boxes of

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 91 -

1
2
3
4
5
6
7
8
documents and loose papers scattered throughout the office.  Given how open and obvious these deficiencies were, Whitaker said that these issues "were very well known in the company," including among Mattel executives.  Indeed, as alleged above, when Whitaker was hired he had conversations about these issues with both Wong and Mattel's Internal Audit department.  Wong "knew there was risk inherent in the way [Mattel] had been approaching things."  Similarly, the Internal Audit manager told Whitaker that in her review, she found that certain controls "were either non-existent or extremely dated."

9
10
11
12
13
14
15
16
17
18
216.   In the face of these fundamental, widespread deficiencies, Defendants Euteneuer, Farr, Georgiadis, and PwC's representations that Mattel's internal controls were effective were severely reckless at a minimum.  As explained above, any reasonable investigation into Mattel's internal and disclosure controls would have revealed the glaring issues plaguing those controls.  Further, the severity and long-lasting nature of the material weaknesses at issue in this case are powerful evidence that Defendants either knew about the material weaknesses or, at a minimum, acted with severe recklessness.  This is particularly true for PwC, which has been Mattel's independent auditor for more than 45 years and is intimately familiar with the Company.

19
20
217.  As evident by his conversations with his subordinates, review of the Company's draft financial statements, and conversations with Mattel's auditor PwC,

21

1    CFO Euteneuer was made aware of the consequences of Mattel's deficient internal

2    controls, including the misstatement of the Company's 3Q 2017 valuation allowance

3    by hundreds of millions of dollars just days before the 3Q 2017 results were

4    published. During the following fourth quarter, Euteneuer was also made aware of

5    Mattel's understatement of the third quarter valuation allowance by another $109

6    million and was consulted by PwC as they conspired to fraudulently avoid issuing a

7    restatement. Thus, Euteneuer was aware of severe internal and disclosure control

8    deficiencies while falsely maintaining that he had evaluated and found both

9    sufficiently effective.

10       218.  Notably, Euteneuer, other senior Mattel executives and PwC were not

11   only aware of the Company's material weaknesses, but they exploited those material

12   weaknesses to avoid the required restatement in January 2018. Specifically, after

13   the Company unquestionably knew of the material error in its third quarter financial

14   statements, neither Euteneuer nor any PwC audit partner reported the error to the

15   Audit Committee—a step that assisted them greatly in covering up the misstatement.

16       219.  Fourth, the scienter of Mattel as a corporate entity is derived from the

17   scienter of its executives, including but not limited to the Defendants. Numerous

18   individuals who made and participated in making the misstatements described herein

19   possessed the requisite scienter, including the named Defendants as well as Johnson,

20   Wong, Martin, and Lew. As alleged above, each of these additional individuals also

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 93 -

1   knew of and was responsible for the material misstatements and omissions in

2   Mattel's SEC filings regarding the Company's tax valuation allowance and financial

3   results, and each was aware of Mattel's deficient internal controls throughout the

4   Class Period, including at the time of the cover-up.  As Mattel's Senior Vice

5   President of Accounting—i.e., the Company's most senior accounting officer (save

6   for the CFO)—Johnson was intimately involved with the closing processes each

7   quarter, and with preparing and approving Mattel's financial statements.  As alleged

8   above, he participated in meetings in January 2018 during which the material

9   misstatement was discussed.  When he learned of the misstatement, Johnson asserted

10  that "we can't have a material weakness.  That would be the kiss of death."  Johnson

11  actively participated in conspiring with PwC to cover up the misstatement and avoid

12  both a restatement and reporting a material weakness in Mattel's annual report.

13  Similarly, Lew, as Mattel's Vice President of Accounting, was intimately involved

14  with preparing and approving Mattel's financials and was well aware of Mattel's

15  misstatements, internal control deficiencies and the cover-up.  Among other things,

16  Lew participated in meetings in January 2018 during which the material

17  misstatement was discussed and the cover-up was planned.  As described above,

18  Lew herself looked for loopholes that would potentially enable Mattel to avoid a

19  restatement.  Additionally, both Lew and Johnson were responsible for approving

20  and signing off on Mattel's quarterly and annual financial statements.

21

220.   Similarly, the scienter of PwC as a corporate entity is derived from the scienter of its employees, including Abrahams, Brierley, and Lightfoot.   As described herein, Abrahams, Brierley, and Lightfoot knew of the misstatements in Mattel's financial results, knew of the internal control deficiencies present at Mattel throughout the Class Period, and were instrumental in exploiting those deficiencies to orchestrate the cover-up in January 2018.  This is not a case merely alleging the misapplication of GAAP, where the main question is whether such misapplication was severely reckless.  Instead, as alleged in detail in Sections IV.D. and IX, PwC knew of the errors in Mattel's financial statements and the material weaknesses in Mattel's controls, and PwC undertook a scheme to intentionally conceal those known facts.  Instead of reporting these known facts to Mattel's Audit Committee as it was required to do under governing PCAOB standards, PwC chose to help Mattel conceal them from investors.  A reasonable auditor in PwC's position would not have acted as PwC did.

## VII.   MATTEL VIOLATED STATUTES, REGULATIONS, AND STANDARDS REQUIRING IT TO ESTABLISH EFFECTIVE INTERNAL CONTROLS, AND CERTIFY THEIR EFFECTIVENESS TO INVESTORS

### A.   Laws and Regulations Governing Internal Controls

221.   Public companies like Mattel are required to design and implement two kinds of internal controls to ensure that their representations to investors—both

1
2
financial and non-financial—are accurate: "disclosure controls and procedures" and "internal controls over financial reporting."

3
4
5
6
7
8
9
10
11
12
222.   As noted above, "disclosure controls and procedures" mandate that information required to be disclosed by a company under the Exchange Act is communicated to company management, including its CEO and CFO, sufficiently in advance of the company's filing dates, to allow senior management ample time to consider it and disclose it to investors.  Disclosure controls and procedures include, for example, components meant to provide reasonable assurances that allowances are recorded properly to permit preparation of financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"), the common set of accounting principles, standards, and procedures that United States companies use to compile their financial statements.

13
14
15
16
17
18
19
223.   Likewise, "internal controls over financial reporting" are designed by or under the supervision of a company's CEO and CFO to provide reasonable assurances that a company's financial statements are accurate, reliable and prepared in accordance with GAAP before they are disclosed to investors.  Management is required to review and evaluate these controls quarterly to determine their effectiveness with respect to preventing or detecting material misstatements of financial statements in a timely manner.

20
21

1    224.  Several statutes and regulations required Defendants to maintain

2    adequate internal controls and disclosure controls and procedures—and to either

3    publicly certify to investors that the controls they had in place were adequate or

4    disclose any material weaknesses.

5    225.  First, federal law requires that the CEO and CFO of public companies

6    certify the company's quarterly and annual reports filed with the SEC and the

7    procedures established by the company to prepare the company's financial

8    statements and its disclosures generally.

9    226.  Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241

10   ("SOX")—meant to ensure that a public company's CEO and CFO take a proactive

11   role in their company's public disclosures and to give investors confidence in the

12   accuracy, quality, and reliability of a company's periodic SEC reports—requires that

13   a CEO and CFO of a public company address in their quarterly and annual SEC

14   filings (Forms 10-Q and 10-K, respectively: (1) the material accuracy and fair

15   presentation of the report's disclosures; (2) establishment and maintenance of

16   "disclosure controls and procedures"; and (3) deficiencies in, and material changes

17   to, internal control over financial reporting.  The CEO and CFO must certify that:

18   (1) they have reviewed the periodic report; (2) it does not contain any untrue

19   statement of material fact or omit to state a material fact necessary to make any

20   statements made not misleading; (3) based on their knowledge, the financial

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 97 -

1 | statements and other financial information fairly present the financial condition and

2 | operations of the company; (4) they have maintained disclosure controls and internal

3 | controls and have designed such controls to ensure that all material information is

4 | made known to them and to provide reasonable assurance regarding the reliability

5 | of financial information; and (5) they have disclosed to the audit committee and

6 | auditors all significant deficiencies and material weaknesses in the design or

7 | operation of internal controls. These certifications communicate to investors that all

8 | material information required to be disclosed is contained in the report.

9 |     227. Section 404 of SOX, 15 U.S.C. § 7262, requires that management of a

10 | public company and its outside auditor annually evaluate the effectiveness of the

11 | company's internal controls over financial reporting and disclose the conclusion,

12 | including any material weaknesses, to investors. Specifically, Section 404 reiterates

13 | the need for public company management to establish and maintain a system of

14 | internal controls relating to, among other things, financial reporting, and to

15 | document, test, and maintain those controls and procedures to ensure their

16 | effectiveness, as well as to assess and report on the design and operating

17 | effectiveness of internal controls over financial reporting on an annual basis. Section

18 | 404 of SOX was "intended to bring information about material weaknesses in

19 | [internal controls] into public view." SEC Release 33-8810.

20 |

21 |

228.   Under the Public Company Accounting Oversight Board's ("PCAOB") Accounting Standards, a "material weakness" in internal controls over financial reporting is a control deficiency that gives rise to a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis.  A "significant deficiency," by contrast, is a deficiency in internal control over financial reporting that is less severe than a material weakness, but important enough to merit attention by those responsible for oversight of a company's financial reporting.

229.   Second, Section 404 of SOX requires management at public companies to select an internal control framework and then assess and report on the design and operating effectiveness of those internal controls on an annual basis.   Most companies, including Mattel, adopt a framework published by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") to report on their internal controls in compliance with SOX.

230.   The COSO Framework states: "[i]nternal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" relating to (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.

1    231.   COSO identifies interrelated components of internal control: control

2    environment, risk assessment, control activities, information and communication,

3    and monitoring activities.  At minimum, Mattel's system of internal controls lacked

4    the "control activities," "information and communication," and "monitoring"

5    components.

6    232.   The "information and communication" component requires that an

7    "organization obtains or generates and uses relevant, quality information to support

8    the functioning of internal control"; internally communicates information, including

9    objectives and responsibilities for internal control, necessary to support the

10    functioning of internal control"; and "communicates with external parties regarding

11    matters affecting the functioning of internal control."   The COSO Executive

12    Summary explains that

13        [i]nformation is necessary for the entity to carry out internal control
          responsibilities to support the achievement of its objectives.
14        Management obtains or generates and uses relevant and quality
          information from both internal and external sources to support the
15        functioning of other components of internal control.  Communication
          is the continual, iterative process of providing, sharing, and obtaining
16        necessary information.

17    233.   The "control activities" component requires that an "organization

18    selects and develops control activities that contribute to the mitigation of risks to the

19    achievement of objectives to acceptable levels"; "selects and develops general

20    control activities over technology to support the achievement of objectives"; and

21

"deploys control activities through policies that establish what is expected and procedures that put policies into action." The COSO Executive Summary further explains that "[c]ontrol activities are the actions established through policies and procedures that help ensure that management's directives to mitigate risks to the achievement of objectives are carried out. [] They may be preventive or detective in nature and may encompass a range of manual and automated activities[.]"

234. The "monitoring activities" component requires that an "organization selects, develops, and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning," and "evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate."

235. Third, SEC regulations required that Mattel maintain an adequate system of controls and disclose any weaknesses in those controls. Item 307 of SEC Regulation S-K, 17 CFR § 229.307, requires that a company disclose the conclusions of its CEO and CFO regarding the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by the periodic report.

236. Item 308 of Regulation S-K, 17 CFR § 229.308(a)(3), similarly requires that a company provide annual reports on the state of its internal controls over financial reporting containing a statement of management's responsibility for

1
2
3
4
5
6
7
8

maintaining adequate internal controls, identifying the framework used by management to evaluate the effectiveness of the internal controls, and the assessment of the effectiveness of the internal controls.  Under Item 308 "[m]anagement is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting."  A statement that internal controls over financial reporting are effective is, therefore, an assertion by management that there are no material weaknesses in such internal controls.

9
10
11
12
13
14

237.   In addition to management's annual report on internal controls over financial reporting, SEC Regulation § 240.13a-15(d) requires that companies such as Mattel evaluate any change in its internal controls over financial reporting that occur during each of its fiscal quarters.  After such evaluation, Item 308 requires that a company disclose any change to its internal controls over financial reporting during its last fiscal quarter.

15
16

**B.**    **Mattel Violated Statutes and Regulations Governing Internal Controls**

17
18
19

238.   In Mattel's Class Period quarterly and annual SEC filings, Defendants certified the effectiveness of Mattel's internal and disclosure controls, represented that there were no material weaknesses in those controls, and thus, that all material

20
21

1
2
information was disclosed to investors and the Company's financial statements were accurate.

3
4
5
6
7
8
9
10
239.   For example, Defendants Georgiadis and Euteneuer certified in the Company's Class Period SEC filings that they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures" as required by SOX, certifying that these and other controls would prevent the Company's financial statements from being misstated and would ensure that its other disclosures were not misleading. Mattel also stated in its quarterly SEC filings that the Company "made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting."

11
12
13
14
15
16
17
240.   These statements were false.   As described in Section IV, above, Mattel's internal and disclosure controls suffered from material weaknesses rendering them inadequate and ineffective throughout the Class Period.  Specifically, due in part to these deficiencies (and also due to Mattel's senior management and Mattel's auditor exploiting these deficiencies), Mattel materially misstated its third quarter 2017 financial statements, and Mattel and PwC successfully engaged in a cover-up of those material misstatements.

18
19
20
241.   As Defendants have now admitted, Mattel's internal and disclosure controls were ineffective at least as of September 30, 2017 because of two material weaknesses: first, Mattel lacked a control for assessing the need for and calculating

21
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

a valuation allowance against its deferred tax assets, and second, Mattel failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action, such as Mattel's Audit Committee.

242.   As alleged above, Defendants either knew of or recklessly disregarded these material weaknesses in Mattel's internal controls and failed to report them either to Mattel's Audit Committee or to investors in violation of Sections 302 and 404 of SOX, and Items 307 and 308 of Regulation S-K.

243.   Throughout the Class Period, Mattel also represented that it adhered to the COSO Framework for its internal controls.  In truth, Mattel's deficient internal controls were not in compliance with the COSO Framework.

244.   Before and throughout the Class Period, the support for Mattel's financial statements resided in a collection of unorganized boxes filled with loose papers.  Further, when relevant information could be found, it often did not reconcile with the financial statements. These facts strongly indicate that management was not obtaining the appropriate quality information it needed to properly execute on its internal control objectives and to prepare its financial statements in accordance with GAAP.  This was in violation of the information and communication component of

the COSO framework, which required that Mattel "obtain[] or generate[] and use[] relevant, quality information to support the functioning of internal control."

245.   Further, that Mattel lacked a key control surrounding an analysis that should have been done every quarter to evaluate whether Mattel's deferred tax asset was fully recoverable or needed a valuation allowance, similarly violated COSO. Whitaker stated that such a control was typical in tax departments at other companies he worked for but did not exist in Mattel's internal control framework.  This was in violation of the control activities component of the COSO framework, which required that Mattel "select[] and develop[] control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels."

246.   As described above, misstatements in Mattel's financial statements, as well as material weaknesses in the Company's internal controls, were routinely not reported to Mattel's Audit Committee.  As the Company has admitted, as of the time the Restatement was issued, its internal controls continued to suffer from a "material weakness related to a deficiency in monitoring control activities" which failed to ensure that such misstatements and material weaknesses were being reported to the Audit Committee and other appropriate parties.  Contrary to Mattel's Class Period statements representing that the Company's controls complied with COSO, including the requirement that Mattel "communicate[] internal control deficiencies

in a timely manner to" its Audit Committee, this deficiency in Mattel's monitoring control violated the COSO Framework.

## VIII. **MATTEL VIOLATED GAAP**

247. Compliance with GAAP is a fundamental obligation of publicly traded companies such as Mattel. GAAP is the official standard for accounting accepted by the SEC and is primarily promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA"), which standards are referenced as "Accounting Standards Codification" ("ASC"). GAAP is recognized by the accounting profession as conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP and which reflect the underlying basis and framework for the promulgation of accounting standards.

248. At all times throughout the Class Period, Mattel asserted in its SEC filings that the Company's financial statements complied with GAAP. Contrary to these statements, the Restatement was an admission that Mattel's historical financial statements violated GAAP. SEC Regulation S-X provides that Mattel's annual and interim financial statements filed with the SEC "which are not prepared in

1  accordance with [GAAP] will be presumed to be misleading or inaccurate."   17

2  C.F.R. § 210.4-01(a).

3       249.   As discussed further below, Mattel's financial statements included in

4  its Class Period SEC filings were not prepared in accordance with GAAP.   By

5  misclassifying certain of Mattel's intellectual property for tax purposes, Mattel

6  understated its income tax valuation allowance against its deferred tax assets,

7  thereby understating its losses in the third quarter of 2017, and misstated several

8  other financial metrics.   The financial metrics that Mattel misstated in its financial

9  statements for the relevant reporting periods during the Class Period are set forth

10  below in Section X.   Mattel's failure to disclose these errors and restate its financial

11  statements also violated basic GAAP principles governing Mattel's responsibility to

12  timely disclose material errors.

13       **A.**   <u>**GAAP Accounting for Deferred Tax Assets**</u>

14       250.   GAAP required that Mattel account for the Company's deferred tax

15  assets in accordance with ASC 740, *Accounting for Income Taxes* ("ASC 740").

16  ASC 740 "addresses financial accounting and reporting standards for the effects of

17  income taxes that result from an enterprise's activities for financial accounting and

18  reporting for income taxes."   ASC-740-10-05-1.

19       251.   In Mattel's Forms 10-K, Mattel described certain accounting policies

20  that   "Mattel   considers   most   critical   in   preparing   its   consolidated   financial

21

1 statements. Management has discussed the development and selection of these

2 critical accounting policies and estimates with the Audit Committee of its Board of

3 Directors[.]" One of these critical accounting policies is "Income Taxes," which

4 Mattel represented it accounted for in accordance with ASC 740. Mattel provided

5 further that accounting for income taxes was a "critical accounting estimate[]"

6 because it "could materially affect Mattel's consolidated financial statements."

7 252. ASC 740-10-30-3 provides that the total income tax expense (or

8 benefit) for a period is the sum of deferred tax expense (or benefit) and income taxes

9 currently payable or refundable. ASC 740 further provides that a deferred tax

10 expense (or benefit) is the change during a period in an entity's deferred tax

11 liabilities and assets. ASC 750-10-30-4.

12 253. Under GAAP, deferred tax assets are the consequences attributable to

13 deductible "temporary differences" and "carryforwards." A "temporary difference"

14 is "[a] difference between the tax basis of an asset or liability computed pursuant to

15 the requirements in [ASC] 740-10 for tax positions, and its reported amount in the

16 financial statements that will result in taxable or deductible amounts in future years

17 when the reported amount of the asset or liability is recovered or settled,

18 respectively." ASC-740-10-20. "Carryforwards" include "deductions or credits that

19 cannot be utilized on the tax return during a year that may be carried forward to

20

21

reduce taxable income or taxes payable in a future year." ASC-740-10-20. Deferred tax liabilities are the consequences attributable to taxable "temporary differences."

254. In other words, if the difference between the tax laws (used to measure what the company will pay currently in tax as reflected in its income tax return) and accounting standards (used to define what the company reports in tax expense for financial statement purposes) result in a company paying more tax than it reflects in its financial statements as tax expense, a deferred tax asset is created representing the difference. Alternatively, if the difference between the tax laws and accounting standards result in a company paying less tax than it reflects in its financial statements, a deferred tax liability is created.

255. If a company determines that it may not be able to realize in its financial statements the benefits of a previously-recorded deferred tax asset (in essence "a prepaid tax asset"), such asset must be eliminated or have its net carrying value reduced by a valuation allowance. ASC 740-10-30-2; ASC 740-10-30-4. A company is required to recognize a full or partial valuation allowance for deferred tax assets "if, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. The valuation allowance shall be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized." ASC 740-10-30-5. When a company records a valuation allowance reducing its deferred

tax assets, it concurrently records an income tax expense for the same amount as the other side of the accounting entry.

256.   As Mattel explained in its 2017 Form 10-K:

Certain income and expense items are accounted for differently for financial reporting and income tax purposes. As a result, the income tax expense reflected in Mattel's consolidated statements of operations is different than that reported in Mattel's tax returns filed with the taxing authorities. Some of these differences are permanent, such as expenses that are not deductible in Mattel's tax return, and some differences reverse over time, such as depreciation expense. These timing differences create deferred income tax assets and liabilities. Deferred income tax assets generally represent items that can be used as a tax deduction or credit in Mattel's tax returns in future years for which Mattel has already recorded a tax benefit in its consolidated statements of operations. Mattel records a valuation allowance to reduce its deferred income tax assets if, based on the weight of available evidence, management believes expected future taxable income is not likely to support the use of a deduction or credit in that jurisdiction. Management evaluates the level of Mattel's valuation allowances at least annually, and more frequently if actual operating results differ significantly from forecasted results.

257.   GAAP requires that when a company assesses whether it needs to record a valuation allowance against its deferred tax assets, it must consider certain sources of taxable income, one of which is the existence of deferred tax liabilities. ASC 740-10-30-18.  GAAP normally requires that when calculating a valuation allowance, a company first net its deferred tax liabilities against its gross deferred tax assets and then determine the portion of the residual deferred tax assets (i.e., after

1

2

the offset of the deferred tax liabilities) which may be realized in the future.  Any remainder should be reduced by a valuation allowance.

3

4

5

6

7

8

9

10

11

12

258.   However, when the source of a deferred tax liability is an asset—such as intellectual property (an intangible asset)—with an <u>indefinite</u> useful life, the deferred tax liability <u>cannot be netted against deferred tax assets</u> under GAAP.  This is because there is no measurable likelihood that the asset's utility (intangible asset in this case) giving rise to the deferred tax liability, will expire before the deferred tax assets expire.  Specifically, under ASC 350, *Intangibles—Goodwill and Other* ("ASC 350"), for public companies such as Mattel, recovery of the book values of indefinite-lived intangible assets (or land) generally do not occur through periodic diminution represented by depreciation or amortization, but through impairment or disposal.  ASC 350-30-35-6.

13

14

15

16

259.   The key point is that GAAP ASC 740 mandates that most deferred tax liabilities that arise from indefinite-lived assets <u>cannot</u> be used to offset (or net against) gross deferred tax assets for the purposes of determining a valuation allowance required against the deferred tax asset.

17

18

19

20

## B.   <u>GAAP Requires Correction of Material Errors in Previously-Issued Financial Statements Via Restatement</u>

260.   Importantly, GAAP requires prompt correction, by way of restatement, of previously-issued financial statements that are found to be materially misstated.

21

261.   ASC 250, *Accounting Changes and Error Corrections* ("ASC 250") defines an error in prior-period financial statements as an "error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared."  ASC 250-10-20.

262.   Under GAAP, where an error in financial statements discovered after such statements are issued is deemed to be material, GAAP requires that such errors be disclosed.  Specifically, ASC 250 requires that such error "be reported as an error correction, by <u>restating the prior-period financial statements</u>."  ASC 250-10-45-23.  ASC 250 further defines a "[r]estatement" as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements."  ASC 250-10-20.

### C.   <u>Mattel Violated GAAP By Failing to Issue a Restatement Once It Identified A Material Misstatement in Its Financial Results</u>

263.   Mattel had recorded noncurrent deferred tax assets of $580 million and $96 million in noncurrent deferred tax liabilities on its balance sheet as of June 30, 2017.  These balances were not disclosed as standalone line items in Mattel's balance sheet but constituted a portion of the line items "Other noncurrent assets" and "Other

1
2

noncurrent liabilities," respectively, and were disclosed more specifically in the notes to the financial statements.

3
4
5
6
7
8
9
10
11

264. As alleged above in Section IV.C., during the closing process for the third quarter financial statements, Mattel and PwC decided that Mattel needed to record a valuation allowance against its domestic deferred tax assets. Just before Mattel's third quarter 2017 financial statements were filed, PwC identified material errors in the way Mattel calculated its valuation allowance. Specifically, PwC discovered that Mattel improperly netted deferred tax liabilities that arose from intangible assets with indefinite useful lives, as prohibited by ASC 740. The netting of these deferred tax liabilities had the impact of improperly reducing the gross deferred tax assets and, in turn, the required valuation allowance.

12
13
14
15
16

265. After haphazardly rushing to correct this calculation prior to filing its financial statements, Mattel ultimately recorded a $562 million valuation allowance against its domestic deferred tax assets as of September 30, 2017. Primarily as a result of this valuation allowance, Mattel's deferred tax assets decreased to $76 million as of September 30, 2017.

17
18
19
20

266. While this $562 million valuation allowance increased Mattel's loss for the quarter ended September 30, 2017, this allowance (and, similarly, the net loss reported by Mattel for the quarter in its third quarter 2017 Form 10-Q) was nonetheless materially understated because of a material error. As alleged above, in

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 113 -

January 2018, before Mattel published its 2017 Form 10-K, Whitaker and Martin discovered another error in the way Mattel's valuation allowance for deferred tax assets was calculated in the Company's third quarter 2017 Form 10-Q. Specifically, a deferred tax liability arising from the HiT IP—an indefinite lived intangible asset—was improperly used to net against the gross deferred tax assets when determining Mattel's valuation allowance. The HiT IP was deemed by Mattel to have an indefinite life as of September 30, 2017, and therefore the deferred tax liability related to such asset could not be netted against deferred tax assets for purposes of determining the amount of the valuation allowance.

267. The impact of this error was that Mattel incorrectly reduced the valuation allowance on its domestic deferred tax assets by $109 million in the third quarter of 2017 by improperly netting deferred tax liabilities related to an indefinite-lived intangible asset associated with the Company's Thomas & Friends brand (part of the HiT IP) in its calculation of the valuation allowance. As discussed above, in most cases, GAAP does not allow companies to use deferred tax liabilities arising from indefinite-lived assets to offset deferred tax assets for the purposes of determining a valuation allowance, as Mattel improperly did.

268. Although Defendants were aware by no later than January 2018 that Mattel's third quarter 2017 Form 10-Q therefore contained material misstatements, Defendants failed to immediately investigate the errors and promptly restate Mattel's

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 114 -

1

2

3

results reflected in the Company's third quarter Form 10-Q.  Instead, Mattel and PwC conspired to cover-up the error, as described above, in violation of ASC 250 and PCAOB standards (discussed further below).

4

5

6

7

8

9

10

11

269.  This error was the reason that the loss disclosed by Mattel for the three months ended September 2017 in its initially-published third quarter 2017 Form 10-Q was $603 million, instead of the restated $713 million, as well as the reason why its income tax expense was materially understated.  When Mattel subsequently reclassified the economic life of the HiT IP asset as of October 1, 2017 but did not record any corresponding credit to income in connection with this reclassification, this maneuver had the impact of overstating the net loss reported for the fourth quarter of 2017 in Mattel 2017 Form 10-K by approximately the same $109 million.

12

13

14

15

16

17

18

270.  In accordance with GAAP, once Mattel identified an error in its previously-issued financial statements concerning its valuation allowance for deferred tax assets, it should have assessed if such financial statements were materially misstated, which they were.  Once Mattel determined that such financial statements were materially misstated, it was required by GAAP to inform the public that such statements were not to be relied upon and also to promptly restate them. ASC 250-10-45-23.

19

20

271.  Instead, when Mattel discovered this error in January of 2018, rather than restate its results for the third quarter 2017, which had been issued in October

21

of 2017, Mattel and PwC conspired to cover-up the error in violation of ASC 250 and PCAOB standards. Mattel did not perform a proper assessment of this error at the time it was identified nor did it document any findings and conclusions. This cover-up resulted in additional misstatements in Mattel's 2017 Form 10-K. Specifically, instead of restating the Company's third quarter 2017 Form 10-Q as GAAP required, Mattel and PwC reclassified the HiT IP to no longer be an indefinite-lived asset, to effectively match the manner in which Mattel had incorrectly calculated and reported its valuation allowance. In its November 2019 Restatement, Mattel thus reported that while "[t]his change resulted in an effective correction of the tax misstatement for the 2017 annual results . . . the provision for income taxes remained uncorrected for the three months ended September 30, 2017, which resulted in an overstatement of the tax expense for the three months ended December 31, 2017."

## IX. PWC FALSELY CERTIFIED THAT IT HAD AUDITED MATTEL'S FINANCIAL STATEMENTS AND INTERNAL CONTROLS FOR 2017 AND 2018 IN ACCORDANCE WITH CONTROLLING AUDITING STANDARDS

272. PwC's liability in this action arises from its own Class Period statements certifying that it had audited Mattel's financial statements and internal controls for the calendar years ended December 31, 2017 and December 31, 2018 in accordance with the controlling auditing standards of the PCAOB, which PwC knew

1   were false and misleading when made.  Among other things, PwC's statements

2   misrepresented that it had (1) conducted its audits in compliance with PCAOB

3   auditing standards, when that was not the case; (2) a reasonable basis for its opinions

4   that the Company's internal controls were effective and contained no material

5   weaknesses, when that also was not true; and (3) that Mattel's financial statements

6   complied with GAAP, when they did not.  Had PwC complied with controlling

7   PCAOB auditing standards, the only reasonable conclusions PwC could have drawn

8   would have been that Mattel's financial statements were not prepared in accordance

9   with GAAP, and the Company's internal controls were not effective due to the

10  existence of material weaknesses.

11      273.   As set forth above in Section VIII, Mattel's financial statements did not

12  comply with GAAP because the Company improperly used deferred tax liabilities

13  arising from intangible indefinite-lived intellectual property to calculate and net

14  against the amount of income tax valuation allowance required for the third quarter

15  of 2017.  PwC knew of this error no later than January 2018, prior to the issuance of

16  Mattel's 2017 Form 10-K.  PwC also knew that Mattel's internal controls were not

17  effective when Mattel issued its SEC filings during the Class Period.

18      **A.   PCAOB Auditing Standards**

19      274.   PCAOB's auditing standards are referenced by the acronym AS, which

20  stands for "Auditing Standards."  PCAOB auditing standards represent the rules and

21  
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 117 -

1  guidelines by which an audit of public companies must be planned, performed, and

2  reported on, and are, therefore, a measure of audit quality and the objectives to be

3  achieved in an audit.  Auditors have a responsibility to their profession to comply

4  with the standards accepted by their fellow practitioners.  AS 1001, *Responsibilities*

5  *and Functions of the Independent Auditor* ("AS 1001").

6  275.  AS 1001.01 provides that the "objective of the ordinary audit of

7  financial statements by the independent auditor is the expression of an opinion on

8  the fairness with which they present, in all material respects, financial position,

9  results of operations, and its cash flows in conformity with generally accepted

10  accounting principles."  The auditor's report is the medium through which the

11  auditor expresses his conclusions or, if circumstances require, disclaims them.  AS

12  1001.01.  In either case, the auditor is required to state whether the audit has been

13  made in accordance with the standards of the PCAOB.  These standards require the

14  auditor to state whether the financial statements are presented in conformity with

15  generally accepted accounting principles (GAAP) and to identify those

16  circumstances in which such principles have not been consistently observed in the

17  preparation of the company's financial statements.

18  276.  To this end, an audit represents the highest level of assurance an

19  external auditor can provide to the benefit of potential investors with respect to the

20  reliability of financial statements when making an informed investment decision.

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 118 -

1  For this reason, the independence of external auditors is important so that the

2  auditor's opinion is impartial, unbiased, and free from any undue influence or

3  conflict of interest to override the professional judgment of the auditor.

4  Accordingly, PCAOB auditing standards, AS 1005, *Independence* ("AS 1005")

5  require that auditors must maintain "an independence in mental attitude" in all

6  matters related to an audit.   AS 1005.01.   The PCAOB states further that

7  "[i]ndependent auditors should not only be independent in fact; they should avoid

8  situations that may lead outsiders to doubt their independence."  AS 1005.03.

9  277.   Pursuant to AS 3101, *The Auditor's Report on an Audit of Financial*

10  *Statements When the Auditor Expresses an Unqualified Opinion* ("AS 3101"), an

11  auditor should only issue an "unqualified opinion" when the auditor has "conducted

12  an audit in accordance with the standards of the [PCAOB] and concludes that the

13  financial statements, taken as a whole, are presented fairly, in all material respects,

14  in conformity with the applicable financial reporting framework."   AS 3101.02.

15  Thus, an auditor may express an unqualified audit opinion only when the auditor has

16  formed such an opinion on the basis of an audit performed in accordance with

17  generally accepted auditing standards.   Accordingly, when an auditor has failed to

18  conduct its audit in accordance with the standards established by the PCAOB, it is

19  limited to only expressing a qualified or adverse opinion, disclaiming its opinion, or

20  issuing no opinion at all.  AS 3101.

21

278.   In addition to auditing financial statements, external auditors may also be engaged to perform audits on—and express their conclusions on—the effectiveness of a company's internal controls over financial reporting.  Where an auditor conducts an audit of a company's internal controls over financial reporting in conjunction with its audit of the company's financial statements, the auditor reports its conclusions on both components in the auditor's report.  This "integrated report" is incorporated into the company's Form 10-K.  AS 2201.01, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS 2201").

279.  PCAOB auditing standards state that "[i]f one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective."  AS 2201.03.  A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

280.   Additionally, PCAOB auditing standards state that if a company's internal controls have "one or more material weaknesses, the auditor must express an adverse opinion on the company's internal control over financial reporting."  AS 2201.90.

1    281.   Importantly, auditors are also required to express an adverse opinion on

2    a company's internal controls over financial reporting if material weaknesses are

3    identified "subsequent to the date as of which internal control over financial

4    reporting is being audited but before the date of the auditor's report."  AS 2201.93,

5    .96.

6                    **B.    PwC's Violations of the PCAOB Auditing Standards**

7    282.   In its auditor reports that are incorporated into each of Mattel's

8    originally-issued 2017 and 2018 Forms 10-K, PwC stated that Mattel's internal

9    controls over financial reporting were effective as of the end of each calendar year.

10   As described below, PwC violated several PCAOB standards by issuing false and

11   misleading unqualified audit reports in Mattel's 2017 and 2018 Forms 10-K by

12   failing to report material weaknesses discovered during PwC's annual audits and

13   quarterly reviews of Mattel's financial results, and by failing to require Mattel to

14   restate its financial statements to correct known material errors.

15   283.   Additionally, as explained below, once PwC became aware that

16   Mattel's system of internal controls was deficient and contained material

17   weaknesses—issues which persisted throughout the Class Period—PwC had a duty

18   to inform Mattel's management that Mattel's quarterly and annual filings should

19   disclose such weaknesses.  PwC's failure to do so time and again throughout the

20   Class Period also violated PCAOB auditing standards.

21

1

2

### 1. PwC Violated PCAOB Auditing Standards in Failing to Report Material Weaknesses Beginning in the Second Quarter 2017

3

4

5

6

284.   As alleged above, PwC has served as Mattel's auditor for over 45 years. PwC was thus intimately familiar with the way Mattel's Accounting and Tax departments functioned, including its system of internal controls over financial reporting, and the way the Company prepared its quarterly and annual SEC filings.

7

8

9

10

11

12

13

285.   Speaking to the familiarity of an outside auditor with a company based on the longevity of the auditor's relationship with that company, AS 4105, *Reviews of Interim Financial Information* ("AS 4105") provides that an "accountant who has audited the entity's financial statements for one or more annual periods would have acquired sufficient knowledge of an entity's internal control as it relates to the preparation of annual financial information and may have acquired such knowledge with respect to interim financial information." AS 4105.13.

14

15

16

17

18

19

20

286.   Given the longevity of PwC's relationship with Mattel, at a bare minimum, PwC was aware as of the beginning of the Class Period, when Mattel published its second quarter 2017 financial statements on August 2, 2017, that Mattel was lacking key controls regarding the evaluation of whether its deferred tax asset was impaired and the calculation of a valuation allowance.  As Mattel's deferred tax asset was material as of the beginning of the Class Period (nearly $600 million), the lack of these key internal controls constituted a material deficiency of which PwC

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 122 -

1  was aware.  Indeed, Mattel purportedly regularly assessed the need to record a

2  valuation allowance, and PwC was involved in that process, giving it direct

3  knowledge of the lack of internal controls governing that process.

4      287.  Despite this knowledge, at no time during the Class Period did PwC

5  require that Mattel disclose material weaknesses in its internal controls.

6      288.  Moreover, as Mattel and PwC were finalizing Mattel's third quarter

7  2017 financial statements in October 2017, PwC discovered a significant error that

8  impacted Mattel's calculation of its income tax valuation allowance.  After PwC

9  informed Whitaker of the error, Whitaker and his team corrected the mistake days

10  before the results were published.  This sequence of events further demonstrated to

11  PwC that Mattel lacked controls for the calculation of its valuation allowance.

12      289.  These issues and fundamental failures were exacerbated by Mattel's

13  other material control deficiencies, as described above—Mattel's lack of sufficient

14  supporting documentation for its reported financials, and its deficient procedure for

15  reporting known errors to the Audit Committee.  Rather than alerting the Audit

16  Committee that Mattel's controls suffered from this material weakness that should

17  be disclosed, PwC exploited this very weakness to cover up the known material

18  misstatement in Mattel's financial statements.

19      290.  In Mattel's second and third quarter 2017 Forms 10-Q, PwC did not

20  require that Mattel report material weaknesses in its internal controls despite the fact

21

1  that, as of June 30, 2017 and September 30, 2017, it understood that Mattel lacked

2  controls governing the Company's calculation of its valuation allowance,  lacked an

3  effective and enforced control ensuring that material errors were reported to Mattel's

4  Audit Committee, and lacked a system for reliably documenting the support for its

5  financial statements, among other deficiencies.

6  291.   Although PwC was only required to publish audit reports in Mattel's

7  annual reports on Form 10-K, PCAOB auditing standards nonetheless required that

8  PwC communicate issues that were discovered during its review of Mattel's interim

9  financial reporting—such as material weaknesses in the Company's internal

10  controls—to Mattel executives and the Audit Committee.  Specifically, AS 4105.29,

11  *Reviews of Interim Financial Information* ("AS 4105") provides that when

12  [a]s a result of conducting a review of interim financial information, the
   accountant may become aware of matters that cause him or her to
13  believe that . . . modification to the disclosures about changes in internal
   control over financial reporting is necessary for the certifications to be
14  accurate and to comply with the requirements of Section 302 of [SOX]
   and Securities Exchange Act Rule 13a-14(a) or 15d-14(a), whichever
15  applies . . . the accountant should communicate the matter(s) to the
   appropriate level of management as soon as practicable.
16
17  292.   AS 4105.33 further provides:

18  When conducting a review of interim financial information, the
   accountant may become aware of matters relating to internal control
19  that may be of interest to the audit committee. Matters that should be
   reported to the audit committee are referred to as significant
20  deficiencies. A significant deficiency is a deficiency, or a combination
   of deficiencies, in internal control over financial reporting, that is less

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL           - 124 -
    SECURITIES LAWS
    Case No. 19-CV-10860-AB (PLAx)

severe than a material weakness yet important enough to merit attention by those responsible for oversight of the company's financial reporting. <u>The accountant should communicate significant deficiencies or material weaknesses of which the accountant has become aware to the audit committee or those responsible for oversight of the company's financial reporting in a timely manner and prior to the registrant filing its periodic report with the SEC.</u>

293.   As Defendants later admitted and as described above in Sections IV.C. and D., PwC failed to communicate the existence of material weaknesses in Mattel's internal controls to Mattel's Audit Committee in violation of PCAOB auditing standards.   The lack of such communication was a violation of AS 4105 in connection with PwC's interim review of Mattel's third quarter 2017 Form 10-Q.

294.   Further, although PwC did not opine on the effectiveness of Mattel's internal controls in the Company's Forms 10-Q, its failure to require Mattel to disclose the existence of material weaknesses in Mattel's Class Period Forms 10-Q was a violation of PCAOB auditing standards.  AS 4105.46; AS 2905.

## 2.   PwC Knowingly Made Materially False and Misleading Statements in Mattel's 2017 and 2018 Forms 10-K

295.   PCAOB auditing standards provide that if a company's system of internal controls contains a material weakness, such system of controls cannot be considered effective, and, accordingly, the auditor must express an adverse opinion regarding the effectiveness of the company's system of internal controls.   AS 2201.90.  In violation of this standard, in its audit reports that are incorporated into

each of Mattel's originally-issued 2017 and 2018 Forms 10-K, PwC stated that Mattel's internal controls over financial reporting were effective as of the end of each year.

296.   As discussed above in Sections IV.C. and D, PwC was aware that Mattel's internal controls were not designed and operating effectively when it issued these audit reports.  Therefore, PwC's unqualified audit opinions regarding Mattel's internal controls as of December 31, 2017, and December 31, 2018, incorporated into Mattel's 2017 and 2018 Forms 10-K, respectively, were materially false and misleading and violated AS 2201 and AS 3101.02.

297.   Further, as alleged above, in January 2018 while Mattel was preparing its 2017 year-end financial statements, Whitaker discovered that the Company had understated its income tax valuation allowance and, by extension, Mattel's net losses, by approximately $109 million in its third quarter 2017 Form 10-Q.  As Whitaker described, Mattel's accounting and finance executives concluded that Mattel needed to restate its previously-issued third-quarter 2017 financial results and disclose the existence of the material weaknesses in Mattel's internal controls that contributed to these errors.

298.   When Mattel reported this material misstatement to PwC—including Abrahams and Brierley—the PwC audit team manufactured a cover-up at Abrahams' direction so that Mattel could surreptitiously avoid both restating its

1
2
3
4
5
6
7
8
9

financial statements and disclosing material weaknesses in its internal controls.  PwC assisted the Company in devising a scheme by which Mattel would retroactively, as of the beginning of the fourth quarter 2017, reclassify the HiT IP to match its improper accounting treatment reflected in the third quarter valuation allowance. Once PwC and Mattel executed the cover-up, PwC issued an unqualified audit opinion as to the effectiveness of Mattel's internal controls over financial reporting incorporated into Mattel's 2017 Form 10-K despite knowing that the 2017 Form 10-K contained material misstatements relating to the Company's third quarter results and the existence of material weaknesses in internal controls.

10
11
12
13
14
15
16
17
18

299.   Finally, once PwC became aware in January 2018 that Mattel's results of operations in its recently-issued third quarter 2017 Form 10-Q were materially misstated due to an understated deferred tax asset valuation allowance, it had a duty to advise Mattel to restate the results for the third quarter of 2017.  Instead, PwC did the opposite and advised Mattel not to revise its third quarter 2017 financial statements and instead determined a method to conceal the error, another violation of PCAOB standards.  PwC's unqualified audit opinion in Mattel's 2017 Form 10-K was additionally materially false and misleading for these reasons and violated AS 2201 and 3101.02.

19
20

300.   Because these material weaknesses persisted throughout the Class Period but were not reported by Mattel or mentioned by PwC in its integrated audit

21

report, nor did PwC advise Mattel's management to report such material weaknesses in its interim Forms 10-Q filed during the Class Period, PwC's audits and interim reviews of Mattel's 2018 Form 10-K and Class Period Forms 10-Q similarly violated PCAOB auditing standards.

301.   In addition to its materially false and misleading statements concerning the adequacy of Mattel's internal controls, PwC's statement in Mattel's 2017 Form 10-K that the Company's "consolidated financial statements . . . present fairly, in all material respects, the financial position of the Company as of December 31, 2017" was also materially misleading.  PwC was aware that Mattel's "Quarterly Financial Information" contained in Note 16 of the Company's 2017 Form 10-K, which included financial data from the third and fourth quarters of 2017, was materially misstated, as described above.  PwC was complicit in covering up this misstated financial data.  Specifically, despite the representation that the quarterly financials were "unaudited," PwC was aware of the misstatements in the Note 16 regarding Mattel's third quarter results since it was aware of the $109 million error in the third quarter, and therefore knew that Note 16 was misleading.  PwC was further aware that the fourth quarter 2017 results disclosed in Note 16 were also misstated by approximately $109 million, as a result of the effort to conceal the error in the third quarter financial statements.

1    302.   The same misleading "Quarterly Financial Information" including

2   financial data from the third and fourth quarters of 2017 was contained in Note 17

3   of Mattel's 2018 Form 10-K filed with the SEC on February 22, 2019.  Thus, PwC's

4   statement in Mattel's 2018 Form 10-K that the Company's "consolidated financial

5   statements . . . present fairly, in all material respects, the financial position of the

6   Company as of December 31, 2018 and 2017" was also materially misleading.

7              **3.    PwC Violated PCAOB Auditing Standards When It Did
                     Not Require Mattel to Restate its Third Quarter 2017
8                    Form 10-Q**

9    303.   After PwC learned no later than January 2018 that Mattel's third

10   quarter 2017 Form 10-Q contained a material misstatement, PCAOB auditing

11   standards mandated that PwC require Mattel to restate those financial statements.

12   Specifically, AS 4105.46 provides:

13        Subsequent to the date of the accountant's review report or the
          completion of the interim review procedures, if a report is not issued,
14        the accountant may become aware that facts existed at the date of the
          review report (or the completion of the review procedures) that might
15        have affected the accountant's report (or conclusion, if a report is not
          issued) had he or she then been aware of those matters. Because of the
16        variety of conditions that might be encountered, the specific actions to
          be taken by the accountant in a particular case may vary with the
17        circumstances. In any event, the accountant should consider the
          guidance in AS 2905, *Subsequent Discovery of Facts Existing at the*
18        *Date of the Auditor's Report*.

19    304.  AS 2905, *Subsequent Discovery of Facts Existing at the Date of the*

20   *Auditor's Report* ("AS 2905") addresses the actions an auditor is required to take

21

once it identifies facts that may have impacted its previous conclusions had those facts been known then.  AS 2905.04-.07.  AS 2905.04 instructs that once such facts are discovered, the auditor should first determine whether such facts are reliable and existed as of the time the previous financials were issued.  AS 2905.05 provides that if the facts were reliable and existed as of the time the previous financial statements were issued, the auditor should evaluate whether (a) those facts would have impacted the auditor's conclusion and (b) the auditor believes persons are relying on the previously-issued financial statements.  AS 2905.06-07 states that auditors should then advise the company to make appropriate disclosure of such facts and restate the company's previously-issued financial statements, and that the auditor should take the steps deemed necessary to satisfy himself that the client has made the requisite disclosures.  AS 2905.06 also requires auditors to revise their audit reports in these circumstances.

305.   Under these standards, once PwC was informed of the $109 million material misstatement in Mattel's third quarter 2017 Form 10-Q, PwC was required to advise Mattel to restate its results of operations for the third quarter of 2017.  Instead, PwC did the opposite and advised Mattel <u>not</u> to revise (i.e., restate) the results of operations for the third quarter of 2017 and instead created a method to conceal the error, which was accomplished by reclassifying the economic life of the

HiT IP intangible asset as of October 1, 2017 so as to match its improper treatment in the calculation of the allowance, and not reporting the $109 million error.

### 4. In Conspiring to Cover Up A Material Misstatement, PwC Also Violated PCAOB Standards of Independence and Due Care

306.    PCAOB auditing standards require the exercise of due professional care and professional skepticism during all phases of an audit. AS 1015, *Due Professional Care in the Performance of Work* ("AS 1015").  The exercise of due professional care and professional skepticism is the overarching obligation that an auditor must adhere to when performing procedures underlying the expression of an audit opinion.  The concept of due professional care concerns "what the independent auditor does and how well he or she does it."  AS 1015.04.  An auditor should have "the degree of skill commonly possessed" by other auditors and should exercise it with "reasonable care and diligence" and "professional skepticism."  AS 1015, .05, .07.

307.    Further, in addition to its auditing standards, the PCAOB requires auditors who are engaged to audit public companies to act in accordance with certain ethics and independence rules.  PCAOB Rule 3502, *Responsibility Not to Knowingly or Recklessly Contribute to Violations* ("Rule 3502"), provides that "[a] person associated with a registered public accounting firm shall not take or omit to take an action knowing, or recklessly not knowing, that the act or omission would directly

1   and substantially contribute to a violation by that registered public accounting firm

2   of the Act, the Rules of the Board, the provisions of the securities laws relating to

3   the preparation and issuance of audit reports and the obligations and liabilities of

4   accountants with respect thereto, including the rules of the Commission issued under

5   the Act, or professional standards."

6   308.   After the Company identified material misstatements in Mattel's then

7   recently-issued third quarter 2017 Form 10-Q with respect to the understatement of

8   the Company's valuation allowance for its deferred tax assets, as well as the material

9   weakness in the Company's internal controls associated with the error, PwC was

10  required to communicate such information to Mattel's Audit Committee.

11  309.   Instead, as alleged above, the lead engagement partner of PwC's audits

12  of Mattel during the Class Period, Abrahams, assisted Mattel in "covering up" the

13  material misstatements in the Company's financial statements.

14  310.   By doing so, Abrahams violated PCAOB auditing standards with

15  respect to professional due care (AS 1015), as well as PCAOB Rule 3502 forbidding

16  public accountants from knowingly or recklessly contributing to violations such as

17  those reflected in Mattel's financial statements during the Class Period.

18  311.   PwC's failure to report any of the known misstatements in Mattel's

19  financial statements, or known material weaknesses in Mattel's internal controls, to

20  Mattel's Audit Committee also violated AS 1301.  Communication between auditors

21

and a company's Audit Committee is a critical part of any audit.  AS 1301, *Communications with Audit Committees* ("AS 1301"), provides that auditors must provide a company's audit committee with information regarding "observations arising from the audit that are significant to the financial reporting process."  AS 1301.03.  Specifically, auditors "should communicate to the audit committee matters arising from the audit that are significant to the oversight of the company's financial reporting process.  This communication includes, among other matters, complaints or concerns regarding accounting or auditing matters that have come to the auditor's attention during the audit and the results of the auditor's procedures regarding such matters."  AS 1301.24.

312.  Similarly, PCAOB standards require that auditors communicate all material weaknesses and significant deficiencies that were identified during an audit to the audit committee prior to the issuance of the auditor's report on financial statements.  AS 1305.04.

313.  PwC violated AS 1301 and 1305 by failing to communicate to Mattel's Audit Committee the significant errors and material weaknesses it was aware of regarding Mattel's accounting for income taxes and internal controls.

314.  Further, as noted above, "AS 1005" required that PwC maintain "an independence in mental attitude" in all matters related to its audit, AS 1005.01, and provides that "[i]ndependent auditors should not only be independent in fact; they

should avoid situations that may lead outsiders to doubt their independence," AS 1005.03.  When performing its 2017 audit of Mattel's financial statements and internal controls, PwC failed to maintain independence in fact as well as an appearance of independence.  As described above, PwC was determined to find a way to avoid restating Mattel's third quarter 2017 financial statements and to avoid reporting material weaknesses in the Company's internal controls.  PwC violated AS 1005 requiring it to be independent in fact as well as appearance when it manufactured and was complicit in a scheme to conceal a misstatement.

C.      **Mattel's Relationship with PwC Violated Auditor Independence Requirements**

315.    Further exacerbating these issues, PwC's relationship with Mattel ran afoul of widely accepted auditor independence requirements.

316.    The objective of the audit of financial statements by an independent auditor is the expression of a conclusion on the fairness with which they present, in all material respects, the financial position, results of operations, and a company's cash flows in conformity with GAAP.  The independence of outside auditors is important to ensure that the auditor's conclusion is impartial, unbiased, and free from any undue influence or conflict of interest to override the professional judgment of the auditor.  To this end, the PCAOB auditing standards require that auditors

1
2

maintain "an independence in mental attitude" in all matters related to its audit.  AS 1005.01.

3
4
5
6
7
8
9
10
11
12
13
14
15
16

317.   PwC's checkered history with independence issues hardly began with Mattel.  PwC has been the subject of consistent scrutiny in recent years for its failure to adhere to these requirements.  For example, on September 23, 2019, the SEC charged PwC with improper professional conduct in connection with 19 different engagements on behalf of 15 separate issuers and violating auditor independence rules in connection with engagements for one issuer where PwC performed prohibited non-audit services.  Specifically, the SEC found that PwC violated PCAOB Rule 3525, *Audit Committee Pre-approval of Non-Audit Services Related to Internal Control Over Financial Reporting*, which requires an auditor to describe in writing to the audit committee the scope of work, discuss with the audit committee the potential effects of the work on independence, and document the substance of the independence discussion.  PwC's actions deprived numerous issuers' audit committees of the information necessary to assess PwC's independence.  PwC paid over $7.9 million in monetary relief to settle the charges.

17
18
19
20

318.   Then, in January 2020, PwC was battling conflict of interest allegations concerning its work for Sonangol, the government-owned oil group that underpins Angola's economy.  PwC's work for Sonangol raised conflict of interest concerns because PwC was also retained to audit the company's accounts while at the same

21

1  time collecting fees to advise on a major restructure. During the time PwC was

2  retained to perform audit work among other various services for Sonangol,

3  Sonangol's chairwoman was involved in an elaborate criminal scheme to embezzle

4  money from the Angolan government. As a result of these conflict of interest claims,

5  PwC's contract with Sonangol was terminated early and the head of PwC's tax

6  advisory team for Angola and Portugal has stepped down.

7  319.  Not only does PwC have a recent history rife with independence

8  violations, recent data shows that PwC clients are more likely to revise their financial

9  statements than clients of any of the other "Big Four" audit firms—Ernst & Young

10  LLP, Deloitte Consulting, and KPMG LLP.

11  320.  A December 17, 2019 Wall Street Journal article reported that

12  PwC has had a streak of accounting problems surface recently at U.S.
   companies it audits, including an uptick in high-profile restatements.
13  Its clients account for three of the five biggest restatements so far this
   year, measured by cumulative impact on net income[.] . . . Companies
14  audited by PwC have been more prone over the last couple of years than
   clients of the other Big Four firms to do the most serious type of
15  restatement[.]

16  321.  According to the article, PwC clients issued more restatements in 2018

17  than the remaining 3 "Big Four" audit firms combined: "Since the start of 2018, PwC

18  clients have done 15 of these 'Big R' restatements, more than the combined total of

19  11 for companies audited by Deloitte LLP, Ernst & Young LLP and KPMG LLP[.]"

20

21

1   322.   PwC's work for Mattel was similarly plagued by the need for a

2   restatement and troubling independence issues.   For example, Mattel's internal

3   investigation found that PwC's lead audit partner for Mattel—Abrahams—"was in

4   violation of the SEC's auditor independence rules" by "providing recommendations

5   on candidates for Mattel's senior finance positions."   These recommendations

6   resulted in a new controller at Mattel, as well as a senior vice president for tax, during

7   the 2017-2018 timeframe.   This ran directly afoul of both PCAOB and SEC

8   independence rules providing that auditors cannot advise their clients on hiring

9   specific candidates for specific jobs, based on the principle that auditors are not

10  supposed to audit their own work.   AS 1005.03; 17 C.F.R. § 210.2-01.

11  323.   Further, PwC provided both audit services and consulting services to

12  Mattel, which calls into question the ability of PwC to be independent in its audits

13  given the significant amount of revenue PwC generated from consulting services

14  provided to Mattel.   Mattel paid PwC more than nearly $10 million in fees for tax

15  and audit services in 2018 alone, including $1.2 million for tax services.   These sorts

16  of fees are nothing new for Mattel and PwC—in 2016, Mattel paid PwC $8.6 million;

17  $9.4 million in 2017; and nearly $11 million in 2019.

18

19

20

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

# X. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

324. Throughout the Class Period, Defendants made numerous materially false and misleading statements and omissions concerning several subjects, including: (i) the effectiveness of Mattel's internal controls and procedures; (ii) the accuracy of Mattel's financial statements, including its reported tax valuation allowance, net income/loss and earnings per share; (iii) the reclassification of the HiT IP asset in the fourth quarter of 2017; (iv) Mattel's compliance with GAAP; and (v) PwC's auditing of Mattel's financial statements and its audit reports. These materially false and misleading statements and omissions are set forth below.

## A. Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2017

325. On August 2, 2017, Mattel filed its Form 10-Q for the second quarter of 2017 (the "Q2 2017 Form 10-Q"), which was signed by Defendants Georgiadis and Farr. Defendants Georgiadis and Farr certified in Exhibits 31.0 and 31.1 in the 2Q 2017 10-Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that they had: (1) designed internal controls over financial reporting to provide reasonable assurance that Mattel's financial statements were accurate and complied with GAAP; (2) evaluated the effectiveness of Mattel's disclosure controls and procedures and presented the conclusions regarding that effectiveness in the Q2 2017 Form 10-Q; and (3) designed disclosure controls and procedures to ensure that

material information about Mattel was made known to them.  Specifically, they certified that:

> 1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

326.   The statements above were materially false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of June 30, 2017, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP.  Specifically, as set forth above in greater detail in ¶¶66-79 and Section VII: (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which

1  made it extremely difficult to even locate the support for its published financial

2  statements; (2) even when that support could be located, Mattel's financial back-up

3  information often did not reconcile or "tie-out" with the financial statements, and

4  senior Mattel executives would sign-off on the financial statements without

5  adequately reconciling the financial statements with the supporting information; (3)

6  Mattel lacked coordination between the accounting and tax departments; and (4)

7  Mattel lacked an internal control for determining and confirming its valuation

8  allowance on its deferred tax assets, which was a critical failure in light of the

9  materiality of those assets.  Notably, the Company has admitted that its internal

10  controls were deficient as of September 30, 2017.  These deficiencies did not

11  suddenly arise as of that date.  In fact, as quoted below, the Company stated that

12  there had been no material changes to its internal controls over financial reporting

13  as of June 30, 2017 and September 30, 2017, demonstrating that the deficiencies

14  existed as of the second quarter of 2017 as well.

15  327.  Second, contrary to the statement in section 4(c) of the certification,

16  Defendants Georgiadis and Farr had not truly evaluated the effectiveness of Mattel's

17  disclosure controls as of June 30, 2017.  Specifically, as set forth above in greater

18  detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether

19  disclosure controls were actually effective or even followed, and instead engaged in

20

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
   SECURITIES LAWS
   Case No. 19-CV-10860-AB (PLAx)

- 141 -

1   after-the-fact "check the box" exercises that were devoid of any meaningful review
2   and evaluation.

3       328.   Third, contrary to the statement in section 4(a) of the certification, as of
4   June 30, 2017, Mattel's disclosure controls were severely deficient, and did not
5   provide assurance that the information required to be disclosed by Mattel in its SEC
6   filings was in fact properly collected, communicated and reported in Mattel's SEC
7   filings. As Mattel would later admit, at the time it prepared its financial statements
8   for the third and fourth quarters of 2017, it "failed to properly design and operate
9   effective monitoring control activities to properly assess and communicate known
10  financial statement errors and internal control deficiencies in a timely manner to
11  those parties responsible for taking corrective action. . . ."  As Mattel would later
12  specify, its disclosure controls and procedures were materially deficient precisely
13  because they did not ensure that the material errors in its third quarter 2017 financial
14  statements were "properly assessed" or that "findings and conclusions [were]
15  documented" or that the errors were reported to the Audit Committee or "disclosed
16  in the 2017 10-K." These material deficiencies in disclosure controls and procedures
17  that senior Mattel executives and PwC exploited did not suddenly arise in September
18  30, 2017, but rather, existed as of June 30, 2017.  At no point in 2017 did the
19  Company state that it had changed its disclosure controls and procedures to remove
20  controls that had existed before.

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 142 -

329.   Further, in Item 4. "Controls and Procedures," the Q2 2017 Form 10-Q stated:

*Evaluation of Disclosure Controls and Procedures*

As of June 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2017.

*Changes in Internal Control Over Financial Reporting*

During the quarter ended June 30, 2017, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

330.   The statements set forth above were materially false and misleading when made.  First, contrary to these statements, Defendants Georgiadis and Farr had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of June 30, 2017.  Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether

1   disclosure controls were actually effective or even followed, and instead engaged in

2   after-the-fact "check the box" exercises that were devoid of any meaningful review

3   and evaluation.

4       331.   Second, as of June 30, 2017, Mattel's disclosure controls were severely

5   deficient, and did not provide reasonable assurance that the information required to

6   be disclosed by Mattel in its SEC filings was in fact properly collected,

7   communicated and reported in Mattel's SEC filings.  On November 15, 2019, during

8   a conference call with investors, Mattel's Senior Vice President and Corporate

9   Controller Yoon Hugh reiterated that Mattel suffered from a "material weakness

10  related to a deficiency in monitoring control activities" at the time it prepared its

11  financial statements for the third and fourth quarters of 2017.  As Mattel would later

12  specify, its disclosure controls and procedures were materially deficient precisely

13  because they did <u>not</u> ensure that the material errors in its third quarter 2017 financial

14  statements were "properly assessed" or that "findings and conclusions [were]

15  documented" or that the errors were reported to the Audit Committee and "disclosed

16  in the 2017 10-K."  The material deficiencies in disclosure controls and procedures

17  that senior Mattel executives and PwC exploited did not suddenly arise in September

18  30, but rather existed as of June 30, 2017.  At no point in 2017 did the Company

19  state that it had changed its disclosure controls and procedures to remove controls

20  that had existed before.

21

**B.    Materially False And Misleading Statements And Omissions Concerning The Third Quarter 2017**

332.    On October 26, 2017, Mattel filed its Form 10-Q with the SEC setting forth the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q").  The Q3 2017 Form 10-Q was signed by Defendants Georgiadis and Euteneuer.  The Q3 2017 Form 10-Q provided a number of statements concerning Mattel's valuation allowance for its deferred tax assets, its tax provision, its net loss, and its loss per share.  For example, the Q3 2017 Form 10-Q stated:

> Mattel regularly assesses the need for a valuation allowance against its deferred tax assets. In making that assessment, Mattel considers both positive and negative evidence related to the likelihood of realization of the deferred tax assets to determine, based on the weight of available evidence, whether it is more-likely-than-not that some or all of the deferred tax assets will not be realized. In evaluating the need for a valuation allowance, Mattel considered its recent operating results which resulted in a cumulative net operating loss in the U.S. for the 36-month period ending September 30, 2017. The 36-month cumulative U.S. loss from operations is considered strong negative evidence and outweighs other positive subjective evidence, such as projections of future income. <u>As a result, in the third quarter Mattel established a valuation allowance on its U.S. federal and state deferred tax assets. This results in a discrete non-cash charge to the quarter of $561.9 million for the balance of these net deferred tax assets as of December 31, 2016</u>.

333.    The Q3 2017 Form 10-Q further stated: "Net loss for the third quarter of 2017 was $603.2 million. . . . [It] was negatively impacted by discrete non-cash

tax expense of $561.9 million related to the establishment of a valuation allowance on deferred tax assets that will likely not be realized and lower gross profit."

334.   The financial statements included in the 3Q 2017 Form 10-Q reiterated Mattel's net loss of $603.2 million and reported a net loss on a per share basis of $1.75, as well as a provision for income taxes of $664.5 million.

335.   Mattel has now admitted that the statements set forth above were materially false when made.  Mattel admitted in the Restatement that its net loss, net loss per share, valuation allowance, and income tax provision reported in the Q3 2017 Form 10-Q were all materially understated when issued.  The misstatements of these financial metrics are set forth in the chart below:

| Mattel's Materially Misstated Financial Metrics for the 2017 Third Quarter | | | | |
|---|---|---|---|---|
| Financial Metric | As Previously Reported | Corrections | As Restated | Percent Understatement |
| Net Loss | $603 million | $110 million | $713 million | 18% |
| Net Loss Per Common Share | $1.75 | $0.32 | $2.07 | 16% |
| Valuation Allowance | $562 million | $109 million | $671 million | 19% |
| Provision for Income Tax | $664 million | $113 million | $777 million | 17% |

336.   Mattel also included similar financial data for the nine months ended September 30, 2017.  Specifically, for the nine months ended September 30, 2017,

Mattel reported a net loss of $772.6 million, a net loss per share of $2.25, a valuation allowance of $561.9 million, and a provision for income tax of $614.4 million. Mattel admitted in the Restatement that its net loss, net loss per share, valuation allowance, and income tax provision for the nine month period ended September 30, 2017, reported in the Q3 2017 Form 10-Q, were all materially understated when issued. The misstatements of these financial metrics are set forth in the chart below:

| Mattel's Materially Misstated Financial Metrics For The Nine Months Ended September 30, 2017 | | | | |
|---|---|---|---|---|
| Financial Metric | As Previously Reported | Corrections | As Restated | Percent Understatement |
| Net Loss | $772 million | $107 million | $879 million | 14% |
| Net Loss Per Common Share | $2.25 | $0.31 | $2.56 | 14% |
| Valuation Allowance | $562 million | $109 million | $671 million | 19% |
| Provision for Income Tax | $614 million | $114 million | $729 million | 19% |

337.   Defendants Georgiadis and Euteneuer also certified in Exhibits 31.0 and 31.1 in the 3Q 2017 10-Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which

such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

338.   First, contrary to the statement in paragraph 4(b) of the certification, as of September 30, 2017, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP.  As Mattel would later admit, "there were material weaknesses in [Mattel's] internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017[,]" concerning, among other things, "the control over the review of income tax valuation allowance analysis."  Additionally, as set forth above in greater detail in ¶¶66-79 and Section VII: (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be

located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

339.   Second, contrary to the statement in section 4(c) of the certification, Defendants Georgiadis and Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of September 30, 2017.   Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

340.   Third, contrary to the statement in section 4(a) of the certification, as of September 30, 2017, Mattel's disclosure controls and procedures were severely deficient as of September 30, 2017 and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was in fact properly collected, communicated, and reported in Mattel's SEC filings.   As Mattel would later admit in the Restatement, management "failed to properly design and operate

1    effective monitoring control activities to properly assess and communicate known

2    financial statement errors and internal control deficiencies in a timely manner to

3    those parties responsible for taking corrective action."  As Mattel would further

4    admit, these "<u>material weaknesses [] existed at the time of the preparation of our</u>

5    <u>financial statements for the third and fourth quarters of 2017</u>."  As Mattel would later

6    specify, its disclosure controls and procedures were materially deficient precisely

7    because they did not ensure that the material errors in its third quarter 2017 financial

8    statements were "properly assessed" or that "findings and conclusions [were]

9    documented" or that the errors were reported to the Audit Committee or "disclosed

10   in the 2017 10-K."

11        341.   Fourth, contrary to the statement in paragraph 3 of the certification,

12   Mattel's financial results for the third quarter 2017 did not "fairly present in all

13   material respects the financial condition," and "results of operation."  As noted

14   above, Mattel's financial results for the three and nine months ended September 30,

15   2017 were materially misstated in numerous respects.  Senior Mattel executives,

16   including Defendant Euteneuer, had personally witnessed Mattel's inability to

17   accurately report its financial results in the days before they were reported, as he

18   witnessed Mattel's financial results wildly fluctuate in draft financial statements that

19   were circulated internally.

20

21

342.   Further, in Item 4. "Controls and Procedures," the Q3 2017 Form 10-Q

stated:

*Evaluation of Disclosure Controls and Procedures*

As of September 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2017.

*Changes in Internal Control Over Financial Reporting*

During the quarter ended September 30, 2017, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

343.   The statements set forth above were materially false and misleading when made.  Contrary to the statement that Defendants Georgiadis and Euteneuer "evaluated" Mattel's disclosure controls and procedures, Defendants Georgiadis and Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of September 30, 2017.  Specifically, as set forth above in greater

1  detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether

2  internal controls were actually effective or even followed, and instead engaged in

3  after-the-fact "check the box" exercises that were devoid of any meaningful review

4  and evaluation.

5      344.  Second, contrary to Defendants' statements, Mattel's disclosure

6  controls and procedures were severely deficient as of September 30, 2017 and did

7  not provide reasonable assurance that the information required to be disclosed by

8  Mattel in its SEC filings was in fact properly collected, communicated, and reported

9  in Mattel's SEC filings.   As Mattel would later admit in the Restatement,

10 management "failed to properly design and operate effective monitoring control

11 activities to properly assess and communicate known financial statement errors and

12 internal control deficiencies in a timely manner to those parties responsible for

13 taking corrective action."   As Mattel would further admit, these "material

14 weaknesses [] existed at the time of the preparation of our financial statements for

15 the third and fourth quarters of 2017."  As Mattel would later specify, its disclosure

16 controls and procedures were materially deficient precisely because they did not

17 ensure that the material errors in its third quarter 2017 financial statements were

18 "properly assessed" or that "findings and conclusions [were] documented" or that

19 the errors were reported to the audit committee or "disclosed in the 2017 10-K."

20

21

345.    Finally, the 3Q 2017 Form 10-Q, as well as each of Mattel's SEC disclosures during the Class Period,  stated that the financial statements contained therein had been prepared in accordance with GAAP: "The accompanying unaudited consolidated financial statements and related disclosures have been prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP') applicable to interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X."

346.    These statements were false and misleading when made. As set forth above, Mattel has admitted that its financial statements for the third quarter of 2017 were materially misstated in violation of GAAP.  Mattel's specific GAAP violations are also detailed above in Section VIII.

347.    On October 26, 2017, Mattel issued an earnings release, which it also filed with the SEC on Form 8-K, as well as an investor presentation for its conference call.  Each of these documents reported the same false financial results for the third quarter of 2017, including Mattel's reported net loss, net loss per share, valuation allowance and provision for income taxes.  These documents also reported the same false financial results for the nine month period ended September 30, 2017, including net loss, net loss per share, valuation allowance, and provision for income taxes.  Mattel has now admitted that this financial information in the earnings release, Form

1

2

8-K, and investor presentation was materially misstated when issued, as set forth in the charts above at ¶¶335-36.

3

## C.   Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter and Full Year 2017

4

5

6

7

8

9

10

348.   On February 1, 2018, Mattel held a conference call with investors and analysts to discuss its financial results for the fourth quarter and full year 2017 (the "4Q 2017 Earnings Call").  On the 4Q 2017 Earnings Call, Defendant Euteneuer discussed the Company's tax position, and reiterated the false third quarter tax valuation allowance, stating "As I mentioned on our third quarter earnings call, we booked a onetime noncash charge of $561.9 million to record a valuation allowance for a significant portion of our deferred tax assets."

11

12

13

14

15

349.   This statement was materially false when made.  At the time he made this statement, Defendant Euteneuer knew that Mattel's valuation allowance for the third quarter of 2017 had been materially understated by approximately $109 million, and that the Company had reclassified the HiT asset as a definite-lived asset so as to avoid the GAAP-required restatement.

16

17

18

19

20

350.   Mattel also issued a series of documents setting forth its financial results for the fourth quarter and full year 2017, many of which reiterated the false financial information Mattel had issued in the third quarter and contained additional false and misleading statements concerning the fourth quarter and year-end 2017.

21

1   All of these documents also completely omitted numerous highly material facts that
2   were known to both Mattel and PwC.

3      351.  For example, on February 1, 2018, Mattel issued an earnings release,
4   which it filed with the SEC on Form 8-K, setting forth its results for the fourth
5   quarter and year-end 2017.  That same day, Mattel issued an investor presentation
6   concerning its results for the fourth quarter and year-end 2017, which listed
7   Defendants Georgiadis and Euteneuer on the cover page.  On February 27, 2018,
8   Mattel filed an annual report on Form 10-K with the SEC setting forth the
9   Company's financial and operating results for the year ended December 31, 2017
10   (the "2017 Form 10-K") and for interim periods, including as of September 30, 2017.
11   The 2017 Form 10-K was signed by Defendants Georgiadis and Euteneuer.

12      352.  Nowhere in the 2017 Form 10-K, the February 1, 2018 earnings release,
13   or the February 1, 2018 investor presentation, did Mattel disclose any of the
14   following highly material facts: (1) Mattel's internal controls over financial
15   reporting and disclosure controls and procedures were severely deficient; (2)
16   Mattel's senior management had determined that the Company's financial
17   statements for the third quarter of 2017 were materially misstated, including that its
18   loss for the third quarter was understated by approximately $110 million; (3)
19   Mattel's senior management had conspired with PwC to retroactively reclassify the
20   HiT asset as a definite-lived asset to avoid the GAAP-required restatement, and to

21

avoid admitting to material weaknesses in internal controls; and (4) the prior understatement, coupled with the subsequent reclassification of the HiT IP, resulted in the misstatement of Mattel's fourth quarter financial statements, including a $106 million net loss overstatement for the fourth quarter. The 2017 Form 10-K, the February 1, 2018 earnings release, and the February 1, 2018 investor presentation were materially false and misleading for the failure to disclose this information.

353. Moreover, these documents set forth a number of statements that were affirmatively false and misleading. For example, Note 16 of the 2017 Form 10-K reiterates Mattel's third quarter 2017 financial results, including a net loss of $603.2 million, a net loss per common share of $1.75, and a net discrete tax expense of $561.9 million. These figures were materially misstated by the amounts set forth above in the chart at ¶335.

354. The 2017 Form 10-K also stated that the "[n]et loss in the third quarter of 2017 included net discrete tax expense of $561.9 million, primarily related to the establishment of a valuation allowance." This statement was also materially false and misleading when made. As Mattel has admitted, Mattel's reported third quarter tax expense was materially understated by approximately $109 million.

355. The 2017 Form 10-K also reported false and misleading financial results for the fourth quarter of 2017. Specifically, the 2017 Form 10-K reported a net loss for the fourth quarter of $281.3 million and a net loss per share of $0.82.

These financial metrics were materially false and misleading when issued. As a consequence of the scheme it employed to conceal the third quarter misstatement of financial results, and as Mattel admitted in the Restatement, its net loss and net loss per share reported in the 2017 Form 10-K were materially overstated, as set forth in the chart below:

| Mattel's Materially Misstated Financial Metrics for the 2017 Fourth Quarter | | | | |
|---|---|---|---|---|
| Financial Metric | As Previously Reported | Corrections | As Restated | Percent Misstatement |
| Net Loss | $281 million | $106 million | $175 million | 38% |
| Net Loss Per Common Share | $0.82 | -$0.31 | $0.51 | 38% |

356. On February 1, 2018, Mattel issued an earnings release, which it also filed with the SEC on Form 8-K, as well as an investor presentation for its conference call. Each of these documents reported the same false financial results for the fourth quarter of 2017, including Mattel's reported net loss and net loss per share. Mattel has now admitted that this financial information in the earnings release, Form 8-K, and investor presentation was materially misstated when issued, as set forth in the charts above at ¶355.

357. As explained above, instead of issuing a restatement during the fourth quarter 2017 to correct the materially understated third quarter 2017 valuation

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 158 -

1
2
3

allowance and net loss, as they should have done, Mattel and PwC decided to retroactively re-classify the HiT IP to avoid the required restatement.  In explaining this re-classification, the 2017 Form 10-K stated:

4
5
6

> In the third quarter of 2017, Mattel performed the annual impairment test for its nonamortizable intangible asset as required and determined that the nonamortizable intangible asset was not impaired as the fair value exceeded its carrying value.

7
8
9
10
11

> In the fourth quarter of 2017, Mattel determined a triggering event had occurred due to a change in brand strategy, which resulted in lower forecasted revenue attributable to the nonamortizable intangible asset. As a result, Mattel performed an interim impairment test which determined that the fair value was in excess of its carrying value, with an estimated fair value approximately 1.05x its carrying value. As such, Mattel determined that the intangible asset should no longer be designated as a nonamortizable intangible asset but should be amortized starting in the fourth quarter of 2017.

12
13
14
15
16
17
18
19
20

358.   This statement was materially false and misleading when made.  As Mattel would later admit, "[a] change in accounting for an intangible asset in the fourth quarter of 2017 resulted in an effective correction of the error for the 2017 annual results."  However, it was materially misleading for Mattel to assert that this "change in accounting" occurred because of a determination during the "fourth quarter of 2017" "that a triggering event had occurred due to a change in brand strategy," resulting in the asset being amortized.  The decision to reclassify the HiT IP was made in January 2018 as a device to avoid a restatement as required by GAAP, and to surreptitiously compensate for the material understatement of the

21

Company's third quarter loss without informing investors of that misstatement or disclosing material weaknesses in Mattel's internal controls.

359.   Item 8 of the 2017 Form 10-K, "Financial Statements and Supplementary Data," stated that Defendants Georgiadis and Euteneuer had evaluated the effectiveness of its internal controls using COSO's "Internal Control-Integrated Framework," and concluded that Mattel's internal controls were effective as of December 31, 2017:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Mattel's management, including Margaret H. Georgiadis, its principal executive officer, and Joseph J. Euteneuer, its principal financial officer, evaluated the effectiveness of Mattel's internal control over financial reporting using the framework in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). <u>Based on this evaluation, management concluded that Mattel's internal control over financial reporting was effective as of December 31, 2017. The effectiveness of the Company's internal control over financial reporting as of December 31, 2017 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.</u>

360.   This statement was false and misleading when made.   First, contrary to these statements, Defendants Georgiadis and Euteneuer had not truly "evaluated" the effectiveness of Mattel's internal controls over financial reporting as of December 31, 2017.   Specifically, as set forth above in greater detail in ¶¶75-76, Mattel executives conducted no substantive evaluation of whether internal controls

1   were actually effective or even followed, and instead engaged in after-the-fact

2   "check the box" exercises that were devoid of any meaningful review and

3   evaluation.

4       361.   Second, contrary to this statement, Mattel's internal controls over

5   financial reporting were not effective and in fact were severely deficient as of

6   December 31, 2017.  As Mattel would later admit, "there were material weaknesses

7   in its internal control over financial reporting at the time of the preparation of its

8   financial statements for the quarters ending on September 30, 2017 and December

9   31, 2017" related to the "control over the review of income tax valuation allowance

10  analysis."  Moreover, as set forth above in greater detail in ¶¶66-79 and Section VII:

11  (1) Mattel stored vital financial information necessary for accurate financial

12  reporting, including the back-up for Mattel's financial statements, in disorganized

13  boxes and binders of paper, which made it extremely difficult to even locate the

14  support for its published financial statements; (2) even when that support could be

15  located, Mattel's financial back-up information often did not reconcile or "tie-out"

16  with the financial statements, and senior Mattel executives would sign-off on the

17  financial statements without adequately reconciling the financial statements with the

18  supporting information; (3) Mattel lacked coordination between the accounting and

19  tax departments; and (4) Mattel lacked an internal control for determining and

20

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
    SECURITIES LAWS
    Case No. 19-CV-10860-AB (PLAx)                                    - 161 -

confirming its valuation allowance on its deferred tax assets, which was a critical

failure in light of the materiality of those assets.

362.   Item 9A. "Controls and Procedures" of the 2017 10-K stated that

Defendants Georgiadis and Euteneuer had evaluated Mattel's disclosure controls

and procedures and found them effective:

*Evaluation of Disclosure Controls and Procedures*

As of December 31, 2017, Mattel's disclosure controls and procedures
were evaluated, with the participation of Mattel's principal executive
officer and principal financial officer, to assess whether they are
effective in providing reasonable assurance that information required to
be disclosed by Mattel in the reports that it files or submits under the
Securities Exchange Act of 1934 is accumulated and communicated to
management, including its principal executive officer and principal
financial officer, as appropriate, to allow timely decisions regarding
required disclosure and to provide reasonable assurance that such
information is recorded, processed, summarized and reported within the
time periods specified in Securities and Exchange Commission rules
and forms. Based on this evaluation, Margaret H. Georgiadis, Mattel's
principal executive officer, and Joseph J. Euteneuer, Mattel's principal
financial officer, concluded that these disclosure controls and
procedures were effective as of December 31, 2017.

*Changes in Internal Control Over Financial Reporting*

There was no change in our internal control over financial reporting that
occurred during the period covered by this report that has materially
affected, or is reasonably likely to materially affect, our internal control
over financial reporting.

363.   The statements set forth above were false and misleading when made.

First, contrary to these statements, Defendants Georgiadis and Euteneuer had not

truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as

of December 31, 2017.  Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

364.    Second, as of December 31, 2017, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action."  As Mattel would further admit, these "<u>material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017</u>."  As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K."

365.  Further, in Exhibits 31.0 and 31.1 in the 2017 10-K, Defendants Georgiadis and Euteneuer certified, respectively, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1. I have reviewed this annual report on Form 10-K of Mattel, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

366.    These statements were false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of December 31, 2017, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP. As Mattel would later admit,

"there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" related to "the control over the review of income tax valuation allowance analysis." Moreover, as set forth above in greater detail in ¶¶66-79 and Section VII: (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

367. Second, contrary to the statement in section 4(c) of the certification, Defendants Georgiadis and Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of December 31, 2017. Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive

1  evaluation of whether disclosure controls were actually effective or even followed,

2  and instead engaged in after-the-fact "check the box" exercises that were devoid of

3  any meaningful review and evaluation.

4    368.   Third, contrary to the statement in section 4(a) of the certification, as of

5  December 31, 2017, Mattel's disclosure controls were severely deficient, and did

6  not ensure that material information about Mattel was properly disclosed in the

7  Company's SEC filings. As Mattel would later admit in the Restatement,

8  management "failed to properly design and operate effective monitoring control

9  activities to properly assess and communicate known financial statement errors and

10  internal control deficiencies in a timely manner to those parties responsible for

11  taking corrective action."   As Mattel would further admit, these "material

12  weaknesses [] existed at the time of the preparation of our financial statements for

13  the third and fourth quarters of 2017."   As Mattel would later specify, its disclosure

14  controls and procedures were materially deficient precisely because they did not

15  ensure that the material errors in its third quarter 2017 financial statements were

16  "properly assessed" or that "findings and conclusions [were] documented" or that

17  the errors were reported to the Audit Committee or "disclosed in the 2017 10-K."

18    369.   Fourth, contrary to the statement in paragraph 3 of the certification, "the

19  financial statements, and other financial information included in" the 2017 Form 10-

20  K did not "fairly present in all material respects the financial condition, results of

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 167 -

1 operations and cash flows of the registrant as of, and for, the periods presented in

2 this report."  Among other things, the 2017 Form 10-K reiterated Mattel's financial

3 results for the third quarter of 2017, which Defendant Euteneuer and other senior

4 Mattel executives knew were materially misstated.  Further, the 2017 Form 10-K

5 misleadingly described the reclassification of the HiT IP, which Defendant

6 Euteneuer and other senior Mattel executives knew was done as a device to avoid a

7 required restatement, and it contained results for the fourth quarter of 2017 that were

8 also materially misstated as a result of this scheme.

9      370.  Finally, in Exhibit 32.0, Defendants Georgiadis and Euteneuer

10 certified, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the

11 Sarbanes-Oxley Act of 2002, that the information contained in the 2017 Form 10-K

12 "fairly present[ed], in all material respects, the financial condition and results of

13 operations of the Company."

14      371.  This statement was false and misleading when made.  The information

15 in the 2017 Form 10-K did not fairly present Mattel's financial condition and results

16 because: (1) it contained materially misstated financial results for the quarters ending

17 September 30, 2017 and December 31, 2017, as set forth above; (2) it failed to

18 disclose that Mattel had determined that its financial results for the third quarter were

19 materially misstated and then conspired with PwC to avoid a restatement of those

20 results and the admission of material weaknesses in internal controls; and (3) it gave

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 168 -

1
2

false reasons for why the treatment of the HiT IP asset had changed, as set forth above.

3
4
5
6
7

372.   Further, Defendant PwC consented to the inclusion of its audit report in the 2017 Form 10-K, and this audit report was materially false and misleading when issued.  Specifically, on February 27, 2018, PwC issued an unqualified audit report included in the Company's 2017 Form 10-K for the year ended December 31, 2017.  The report stated:

8
9
10
11
12
13
14

> We have audited the accompanying consolidated balance sheets of Mattel, Inc. and its subsidiaries as of December 31, 2017 and 2016, and the related consolidated statements of operations, comprehensive income, cash flows, and stockholders' equity for each of the three years in the period ended December 31, 2017, including the related notes and schedule of valuation and qualifying accounts and allowances for each of the three years in the period ended December 31, 2017 appearing under Item 16 (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

15
16
17
18
19

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the COSO.

20
21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 169 -

1    373.   The statements set forth above were false and misleading when made

2    in several respects.  First, it was materially false and misleading for PwC to state that

3    it had conducted an "audit" of Mattel and thereby determined that its financial

4    statements were accurate, when during its 2017 audit, PwC conspired with Mattel to

5    avoid disclosing a known material error.  As set forth in greater detail in Sections

6    IV.C. and D, above, PwC was informed of a material misstatement issued in Mattel's

7    third quarter financial results in January 2018, and instead of advising Mattel to issue

8    a restatement and disclose the material weaknesses that existed at the time, PwC

9    designed and executed a plan to avoid issuing a restatement or disclosing any known

10   existing material weaknesses.  As alleged in section IX, PwC's conduct in its 2017

11   audit violated PCAOB standards.

12   374.   Second, it was materially false and misleading for PwC to state that the

13   financial statements in the 2017 Form 10-K fairly presented the financial position of

14   the Company as of December 31, 2017 and did so "in conformity with accounting

15   principles generally accepted in the United States of America."  Contrary to these

16   statements, Mattel has now admitted that its results for the third and fourth quarters

17   of 2017 were materially misstated in violation of GAAP.  Moreover, it was, at

18   minimum, misleading for PwC to represent that Mattel's financial statements were

19   accurate in all material respects when PwC was informed of a material misstatement

20   in Mattel's third quarter financial results in January 2018, yet designed and executed

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 170 -

1
2
a plan to avoid issuing a restatement or disclosing any known existing material weaknesses.

3       375.   Third, it was materially false and misleading for PwC to state that
4   Mattel "maintained, in all material respects, effective internal control over financial
5   reporting as of December 31, 2017, based on criteria established in Internal Control-
6   Integrated Framework (2013) issued by COSO."   Mattel has since admitted that it
7   "determined that there were material weaknesses in its internal control over financial
8   reporting at the time of the preparation of its financial statements for the quarters
9   ending on September 30, 2017 and December 31, 2017" "related to the control over
10   the review of income tax valuation allowance analysis" and "monitoring control
11   activities."   Similarly, PwC also restated its audit opinion for the year ending
12   December 31, 2018, finding that Mattel suffered a longstanding material weakness
13   in its internal controls over financial reporting as of December 31, 2018 that resulted
14   in the third and fourth quarter 2017 reporting errors.

15       376.   PwC also falsely stated that it had conducted its audit in compliance
16   with PCAOB standards and had an adequate basis for its opinions on the accuracy
17   of Mattel's financial statements and the sufficiency of its internal controls:

18       *Basis of opinions:*

19       The Company's management is responsible for these consolidated
20       financial statements, for maintaining effective internal control over
         financial reporting, and for its assessment of the effectiveness of

21
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 171 -

internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

377.   These statements were false and misleading when made. First, it was

materially false and misleading for PwC to state that it had conducted an "audit" of

1  Mattel in accordance with the standards of the PCAOB, and to describe the

2  purportedly appropriate audit procedures it employed, when PwC conspired with

3  Mattel during its 2017 audit to avoid disclosing a known material misstatement and

4  material weaknesses.  In fact, PwC was informed of a material misstatement issued

5  in Mattel's third quarter financial results in January 2018, and instead of advising

6  Mattel to issue a restatement and disclose the material weaknesses that existed at the

7  time, PwC designed and executed a plan to avoid issuing a restatement or disclosing

8  any material weaknesses. As alleged in section IX, PwC's conduct during its 2017

9  audit violated a host of PCAOB standards.

10      378.   Further, contrary to its representation that it was "independent," PwC

11  violated the SEC and PCAOB-mandated independence rules, as detailed above in

12  Section IX.  As Mattel's Audit Committee would later report, it "concluded that

13  certain actions in specific HR-related activities by the lead audit partner of Mattel's

14  outside auditor, namely providing recommendations on candidates for Mattel's

15  senior finance positions, was in violation of the SEC's auditor independence rules.

16  He also provided feedback on senior finance employees."  Among other things, PwC

17  violated PCAOB Rule 3526. "Communication with Audit Committees Concerning

18  Independence," when PwC failed to alert Mattel's Audit Committee of PwC's

19  violations of SEC and PCAOB auditor independence rules.

20

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
   SECURITIES LAWS
   Case No. 19-CV-10860-AB (PLAx)

- 173 -

**D.    Materially False And Misleading Statements And Omissions Concerning The First Quarter 2018**

379.    On April 5, 2018, in its 2018 Proxy Statement and Notice of Annual meeting of Stockholders to be Held on May 17, 2018, PwC once again represented that Mattel's financial statements contained therein presented its financial position fairly and that Mattel maintained sufficient, effective internal controls:

> Mattel's consolidated financial statements present fairly, in all material respects, its financial position as of December 31, 2017 and 2016, and its results of operations and cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America; and Mattel has maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control Integrated Framework issued by COSO.

380.    These statements were materially false and misleading when made. First, it was materially false and misleading for PwC to state that Mattel "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control-Integrated Framework (2013) issued by COSO," when PwC knew that Mattel did not maintain effective control over financial reporting, as alleged above in Section IX. Second, it was materially false and misleading for PwC to state that "Mattel's consolidated financial statements present fairly, in all material respects, its financial position as of December 31, 2017." Contrary to these statements, Mattel has now admitted that its results for the third and fourth quarters of 2017 were materially misstated in

1   violation of GAAP as referenced above.  Moreover, it was, at minimum, misleading

2   for PwC to represent that Mattel's financial statements were accurate in all material

3   respects when PwC was informed of a material misstatement in Mattel's third

4   quarter financial results in January 2018 yet designed and executed a plan to avoid

5   issuing a restatement or disclosing any material weaknesses that existed at the time.

6    381. On April 26, 2018, Mattel filed its Form 10-Q with the SEC setting

7   forth the Company's financial and operating results for the quarter ended March 31,

8   2018 (the "Q1 2018 Form 10-Q"). The Q1 2018 Form 10-Q was signed by

9   Defendants Georgiadis and Euteneuer.  Item 4. "Controls and Procedures" stated

10   that management had evaluated Mattel's disclosure control and procedures and

11   found them effective:

12    *Evaluation of Disclosure Controls and Procedures*

13    As of March 31, 2018, Mattel's disclosure controls and procedures
were evaluated, with the participation of Mattel's principal executive
14   officer and principal financial officer, to assess whether they are
effective in providing reasonable assurance that information required to
15   be disclosed by Mattel in the reports that it files or submits under the
Securities Exchange Act of 1934 is accumulated and communicated to
16   management, including its principal executive officer and principal
financial officer, as appropriate, to allow timely decisions regarding
17   required disclosure and to provide reasonable assurance that such
information is recorded, processed, summarized, and reported within
18   the time periods specified in Securities and Exchange Commission
rules and forms. Based on this evaluation, Margaret H. Georgiadis,
19   Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's
principal financial officer, concluded that these disclosure controls and
20   procedures were effective as of March 31, 2018.

21

382.   The statements set forth above were materially false and misleading when made.   First, contrary to these statements, Defendants Georgiadis and Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of March 31, 2018.   Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

383.   Second, as of March 31, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated, and properly reported in Mattel's SEC filings.   As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action."   As Mattel would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017."   As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial

statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K." Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "still existed as of December 31, 2018."

384. Defendants Georgiadis and Euteneuer also certified in Exhibits 31.0 and 31.1 in the 1Q 2018 10-Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that they: (1) designed disclosure controls and procedures to ensure that material information about Mattel was made known to them; and (2) designed internal controls over financial reporting to provide reasonable assurance that Mattel's financial statements were accurate and complied with GAAP. Specifically, Defendants Georgiadis and Euteneuer certified that:

> 1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) <u>Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;</u>

(b) <u>Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;</u>

(c) <u>Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;</u> and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

385.   The statements above were materially false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of March 31, 2018, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP.  As Mattel would later admit, "there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" related to "the control over the review of income tax valuation allowance analysis," and this deficiency was not remediated until December 31, 2018.  Moreover, as set forth above in greater detail in ¶¶66-79 and Section VII: (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for

1
2
determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

3
4
5
6
7
8
9
386. Second, contrary to the statement in section 4(c) of the certification, Defendants Georgiadis and Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls. Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

10
11
12
13
14
15
16
17
18
19
20
387. Third, contrary to the statement in section 4(a) of the certification, as of March 31, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Mattel would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017." As Mattel would later specify, its disclosure controls and procedures were

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 180 -

materially deficient precisely because they did <u>not</u> ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K."   Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "<u>still existed as of December 31, 2018</u>."

## E.   **Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2018**

388.   On July 25, 2018, Mattel filed its second quarter 2018 Form 10-Q setting forth the Company's financial and operating results for the quarter ended June 30, 2018 (the "Q2 2018 Form 10-Q").  The Q2 2018 Form 10-Q was signed by Defendant Euteneuer.  In Item 4. "Controls and Procedures," the Q2 2018 Form 10-Q stated that management had evaluated Mattel's disclosure control and procedures and found them effective:

*Evaluation of Disclosure Controls and Procedures*

<u>As of June 30, 2018 , Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective</u> in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within

the time periods specified in Securities and Exchange Commission rules and forms. <u>Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2018.</u>

*Changes in Internal Control Over Financial Reporting*

During the quarter ended June 30, 2018, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

389.   The statements set forth above were materially false and misleading when made.  First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of June 30, 2018.  Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

390.   Second, as of June 30, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated, and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and

1  internal control deficiencies in a timely manner to those parties responsible for

2  taking corrective action."   As Mattel would further admit, these "material

3  weaknesses [] existed at the time of the preparation of our financial statements for

4  the third and fourth quarters of 2017."  As Mattel would later specify, its disclosure

5  controls and procedures were materially deficient precisely because they did not

6  ensure that the material errors in its third quarter 2017 financial statements were

7  "properly assessed" or that "findings and conclusions [were] documented" or that

8  the errors were reported to the Audit Committee or "disclosed in the 2017 10-K."

9  Mattel further admitted that its "material weakness related to a deficiency in

10  monitoring control activities" "still existed as of December 31, 2018."

11      391.   Defendant Euteneuer also certified in Exhibit 31.1 in the 2Q 2018 10-

12  Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that he: (1) designed

13  disclosure controls and procedures to ensure that material information about Mattel

14  was made known to them; and (2) designed internal controls over financial reporting

15  to provide reasonable assurance that Mattel's financial statements were accurate and

16  complied with GAAP.  Specifically, he certified that:

17      1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

18      2. Based on my knowledge, this report does not contain any untrue
        statement of a material fact or omit to state a material fact necessary to
19      make the statements made, in light of the circumstances under which
        such statements were made, not misleading with respect to the period
20      covered by this report;

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL                - 183 -
    SECURITIES LAWS
    Case No. 19-CV-10860-AB (PLAx)

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the

registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

392. The statements above were materially false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of June 30, 2018, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP. As Mattel would later admit, "there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" related to "the control over the review of income tax valuation allowance analysis," and this deficiency was not remediated until December 31, 2018. Moreover, as set forth above in greater detail in ¶¶66-79 and Section VII: (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support

could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

393.   Second, contrary to the statement in section 4(c) of the certification, Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of June 30, 2018.  Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

394.   Third, contrary to the statement in section 4(a) of the certification, as of June 30, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated, and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly

1   assess and communicate known financial statement errors and internal control

2   deficiencies in a timely manner to those parties responsible for taking corrective

3   action." As Mattel would further admit, these "material weaknesses [] existed at the

4   time of the preparation of our financial statements for the third and fourth quarters

5   of 2017." As Mattel would later specify, its disclosure controls and procedures were

6   materially deficient precisely because they did not ensure that the material errors in

7   its third quarter 2017 financial statements were "properly assessed" or that "findings

8   and conclusions [were] documented" or that the errors were reported to the Audit

9   Committee or "disclosed in the 2017 10-K."   Mattel further admitted that its

10  "material weakness related to a deficiency in monitoring control activities" "still

11  existed as of December 31, 2018."

### F.   Materially False And Misleading Statements And Omissions Concerning The Third Quarter 2018

12

13  395.   On October 25, 2018, Mattel filed its third quarter 2018 Form 10-Q,

14  setting forth the Company's financial and operating results for the quarter ended

15  September 30, 2018 (the "Q3 2018 Form 10-Q"). The Q3 2018 Form 10-Q was

16  signed by Defendant Euteneuer.

17  396.   The 3Q 2018 Form 10-Q reiterated Mattel's previously reported false

18  third quarter 2017 financial metrics, including the $603.2 million net loss, a $1.75

19  net loss per common share, a $562 million valuation allowance on its deferred tax

20

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
    SECURITIES LAWS
    Case No. 19-CV-10860-AB (PLAx)

    - 187 -

1   assets, and a $664.5 million provision for income taxes.  These statements were false

2   and misleading as detailed above in the chart at ¶335.

3       397.   In Item 4. "Controls and Procedures," the 3Q 2018 Form 10-Q stated

4   that management had evaluated Mattel's disclosure control and procedures and

5   found them effective:

6       *Evaluation of Disclosure Controls and Procedures*

7       As of September 30, 2018, Mattel's disclosure controls and procedures
        were evaluated, with the participation of Mattel's principal executive
8       officer and principal financial officer, to assess whether they are
        effective in providing reasonable assurance that information required to
9       be disclosed by Mattel in the reports that it files or submits under the
        Securities Exchange Act of 1934 is accumulated and communicated to
10      management, including its principal executive officer and principal
        financial officer, as appropriate, to allow timely decisions regarding
11      required disclosure and to provide reasonable assurance that such
        information is recorded, processed, summarized, and reported within
12      the time periods specified in Securities and Exchange Commission
        rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's
13      principal executive officer, and Joseph J. Euteneuer, Mattel's principal
        financial officer, concluded that these disclosure controls and
14      procedures were effective as of September 30, 2018.

15      *Changes in Internal Control Over Financial Reporting*

16      During the quarter ended September 30, 2018, Mattel made no changes
        to its internal control over financial reporting that have materially
17      affected, or are reasonably likely to materially affect, its internal control
        over financial reporting.

18      398.   The statements set forth above were materially false and misleading

19   when made.  First, contrary to these statements, Defendant Euteneuer had not truly

20

21   | AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br>Case No. 19-CV-10860-AB (PLAx) | - 188 - |

1  "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of

2  September 30, 2018. Specifically, as set forth above in greater detail in ¶¶74-75,

3  Mattel executives conducted no substantive evaluation of whether disclosure

4  controls were actually effective or even followed, and instead engaged in after-the-

5  fact "check the box" exercises that were devoid of any meaningful review and

6  evaluation.

7      399.  Second, as of September 30, 2018, Mattel's disclosure controls were

8  severely deficient, and did not provide reasonable assurance that the information

9  required to be disclosed by Mattel in its SEC filings was collected, communicated

10 and properly reported in Mattel's SEC filings. As Mattel would later admit in the

11 Restatement, management "failed to properly design and operate effective

12 monitoring control activities to properly assess and communicate known financial

13 statement errors and internal control deficiencies in a timely manner to those parties

14 responsible for taking corrective action." As Mattel would further admit, these

15 "material weaknesses [] existed at the time of the preparation of our financial

16 statements for the third and fourth quarters of 2017." As Mattel would later specify,

17 its disclosure controls and procedures were materially deficient precisely because

18 they did not ensure that the material errors in its third quarter 2017 financial

19 statements were "properly assessed" or that "findings and conclusions [were]

20 documented" or that the errors were reported to the Audit Committee or "disclosed

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 189 -

1  in the 2017 10-K."  Mattel further admitted that its "material weakness related to a

2  deficiency in monitoring control activities" "<u>still existed as of December 31, 2018</u>."

3        400.   Defendant Euteneuer also certified in Exhibit 31.1 in the 3Q 2018 10-

4  Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

5        1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

6        2. Based on my knowledge, this report does not contain any untrue
       statement of a material fact or omit to state a material fact necessary to
7      make the statements made, in light of the circumstances under which
       such statements were made, not misleading with respect to the period
8      covered by this report;

9        3. <u>Based on my knowledge, the financial statements, and other financial
       information included in this report, fairly present in all material respects
       the financial condition, results of operations and cash flows of the</u>
10     <u>registrant as of, and for, the periods presented in this report;</u>

11       4. The registrant's other certifying officer(s) and I are responsible for
       establishing and maintaining disclosure controls and procedures (as
12     defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal
       control over financial reporting (as defined in Exchange Act Rules 13a-
13     15(f) and 15d-15(f)) for the registrant and have:

14       (a) <u>Designed such disclosure controls and procedures, or caused such
       disclosure controls and procedures to be designed under our
15     supervision, to ensure that material information relating to the registrant,
       including its consolidated subsidiaries, is made known to us by others
16     within those entities, particularly during the period in which this report
       is being prepared;</u>

17       (b) <u>Designed such internal control over financial reporting, or caused
       such internal control over financial reporting to be designed under our
18     supervision, to provide reasonable assurance regarding the reliability of
       financial reporting and the preparation of financial statements for
19     external purposes in accordance with generally accepted accounting
       principles;</u>

20

21

| AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br>Case No. 19-CV-10860-AB (PLAx) | - 190 - |
| --- | --- |

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

401.   The statements above were materially false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of September 30, 2018, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP.  As Mattel would later admit, "there were material weaknesses in its internal control over financial reporting at the

1   time of the preparation of its financial statements for the quarters ending on

2   September 30, 2017 and December 31, 2017" related to "the control over the review

3   of income tax valuation allowance analysis," and this deficiency was not remediated

4   until December 31, 2018.  Moreover, as set forth above in greater detail in ¶¶66-79

5   and Section VII: (1) Mattel stored vital financial information necessary for accurate

6   financial reporting, including the back-up for Mattel's financial statements, in

7   disorganized boxes and binders of paper, which made it extremely difficult to even

8   locate the support for its published financial statements; (2) even when that support

9   could be located, Mattel's financial back-up information often did not reconcile or

10  "tie-out" with the financial statements, and senior Mattel executives would sign-off

11  on the financial statements without adequately reconciling the financial statements

12  with the supporting information; (3) Mattel lacked coordination between the

13  accounting and tax departments; and (4) Mattel lacked an internal control for

14  determining and confirming its valuation allowance on its deferred tax assets, which

15  was a critical failure in light of the materiality of those assets.

16      402.   Second, contrary to the statement in section 4(c) of the certification,

17  Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure

18  controls as of September 30, 2018.  Specifically, as set forth above in greater detail

19  in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether

20  disclosure controls were actually effective or even followed, and instead engaged in

21

1
2

after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

403.   Third, contrary to the statement in section 4(a) of the certification, as of September 30, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action."  As Mattel would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017."  As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K."  Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "still existed as of December 31, 2018."

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 193 -

404. Additionally, on the same day, Mattel publicly issued an earnings release, which it also filed with the SEC on Form 8-K, which reiterated and incorporated the same false third quarter 2017 financial metrics, including a $603.3 million net loss, a $1.75 net loss per common share, a $562 million valuation allowance due to deferred tax assets, and a $664.5 million provision for income taxes. Mattel also issued an investor presentation accompanying its third quarter 2018 earnings call that included the same false financial metrics from the third quarter of 2017. These statements were materially false and misleading when made, as detailed above in the chart in ¶335.

## G. Materially False And Misleading Statements And Omissions Concerning The Fourth Quarter and Full Year 2018

405. On February 22, 2019, Mattel filed an annual report on Form 10-K with the SEC setting forth the Company's financial and operating results for the fourth quarter and year ended December 31, 2018 (the "2018 Form 10-K"). The 2018 Form 10-K was signed by Defendant Euteneuer.

406. The 2018 Form 10-K reiterated and incorporated the false financial metrics from the third and fourth quarters of 2017. For the third quarter, in Note 17, the 2018 Form 10-K reported a net loss of $603.3 million, a $1.75 net loss per common share, and a $562 million valuation allowance on Mattel's deferred tax

assets.  These statements were materially false and misleading, as detailed in the chart in ¶335 above.

407.  For the fourth quarter 2017, the 2018 Form 10-K reported a $281.2 million net loss and a $0.82 net loss per common share, both of which were materially false and misleading, as detailed in the chart in ¶355 above.

408.  Item 9A. "Controls and Procedures" of the 2018 Form 10-K stated that Defendant Euteneuer had evaluated Mattel's disclosure controls and procedures and found them effective:

> *Evaluation of Disclosure Controls and Procedures*
>
> As of December 31, 2018, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of December 31, 2018.
>
> *Changes in Internal Control Over Financial Reporting*
>
> There was no change in our internal control over financial reporting that occurred during the period covered by this report that has materially

affected, or is reasonably likely to materially affect, our internal control over financial reporting.

409.   The statements set forth above were false and misleading when made. First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of December 31, 2018.  Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

410.   Second, as of December 31, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action."  As Mattel would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017."  As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because

they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K." Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "still existed as of December 31, 2018."

411.   Further, in Exhibit 31.1 in the original 2018 10-K, Defendant Euteneuer certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1. I have reviewed this annual report on Form 10-K of Mattel, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to

us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

1    412.    The statements above were materially false and misleading when made.

2    First, contrary to the statement in section 4(c) of the certification, Defendant

3    Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls

4    as of December 31, 2018.  Specifically, as set forth above in greater detail in ¶¶74-

5    75, Mattel executives conducted no substantive evaluation of whether disclosure

6    controls were actually effective or even followed, and instead engaged in after-the-

7    fact "check the box" exercises that were devoid of any meaningful review and

8    evaluation.

9    413.    Second, contrary to the statement in section 4(a) of the certification, as

10   of December 31, 2018, Mattel's disclosure controls were severely deficient, and did

11   not provide reasonable assurance that the information required to be disclosed by

12   Mattel in its SEC filings was collected, communicated and properly reported in

13   Mattel's SEC filings.  As Mattel would later admit in the Restatement, management

14   "failed to properly design and operate effective monitoring control activities to

15   properly assess and communicate known financial statement errors and internal

16   control deficiencies in a timely manner to those parties responsible for taking

17   corrective action."  As Mattel would further admit, these "material weaknesses []

18   existed at the time of the preparation of our financial statements for the third and

19   fourth quarters of 2017."  As Mattel would later specify, its disclosure controls and

20   procedures were materially deficient precisely because they did not ensure that the

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 199 -

material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the audit committee or "disclosed in the 2017 10-K." Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "still existed as of December 31, 2018."

414. Third, contrary to the statement in paragraph 3, the financial information in the 2018 Form 10-K did not fairly present in all material respects Mattel's financial results for the periods presented. Defendant Euteneuer knew that the 2018 Form 10-K contained materially misstated results for Mattel's 2017 third and fourth quarters.

415. Defendant PwC consented to the inclusion of its audit report in the 2018 Form 10-K, and this audit report was materially false and misleading when issued. Specifically, on February 22, 2019, PwC issued an unqualified audit report in the Company's 2018 Form 10-K for the year ended December 31, 2018. In its report, PwC stated:

> We have audited the accompanying consolidated balance sheets of Mattel, Inc. and its subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations, comprehensive (loss) income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2018, including the related notes and schedule of valuation and qualifying accounts and allowances for each of the three years in the period ended December 31, 2018 appearing under Item 16 (collectively referred to as the "consolidated financial statements"). We also have audited the

Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the COSO.

416.   The statements set forth were false and misleading when made. First, it was materially false and misleading for PwC to state that it had conducted an "audit" of Mattel and thereby determined that its 2017 and 2018 financial statements were accurate, when during its 2017 audit, PwC conspired with Mattel to avoid disclosing a known material error, and PwC's audit violated PCAOB standards in numerous respects.  As set forth in greater detail in Sections IV.C. and D, and Section IX, PwC was informed of a material misstatement issued in Mattel's third quarter financial results in January 2018, and instead of advising Mattel to issue a restatement and disclose the material weaknesses that existed at the time, PwC designed and executed a plan to avoid issuing a restatement or disclosing any known existing material weaknesses.

417.   Second, it was materially false and misleading for PwC to state that the financial statements in the 2018 Form 10-K fairly represented the financial position of the Company as of December 31, 2018, and did so "in conformity with accounting principles generally accepted in the United States of America."  Contrary to these statements, Mattel has now admitted that its results for the third and fourth quarters of 2017 were materially misstated in violation of GAAP.  Moreover, it was, at minimum, misleading for PwC to represent that Mattel's financial statements were accurate in all material respects when PwC was informed of a material misstatement in Mattel's third quarter financial results in January 2018, yet designed and executed a plan to avoid issuing a restatement or disclosing any known existing material weaknesses.

418.   Third, it was materially false and misleading for PwC to state that Mattel "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control-Integrated Framework (2013) issued by COSO."  Mattel has since admitted that it "determined that there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" "related to the control over the review of income tax valuation allowance analysis."  Mattel has also admitted that, as of year-end 2017 and 2018, its disclosure controls were severely deficient,

1  and did not provide reasonable assurance that the information required to be

2  disclosed by Mattel in its SEC filings was collected, communicated and properly

3  reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement,

4  management "failed to properly design and operate effective monitoring control

5  activities to properly assess and communicate known financial statement errors and

6  internal control deficiencies in a timely manner to those parties responsible for

7  taking corrective action."  As Mattel would further admit, these "material

8  weaknesses [] existed at the time of the preparation of our financial statements for

9  the third and fourth quarters of 2017."  As Mattel would later specify, its disclosure

10  controls and procedures were materially deficient precisely because they did not

11  ensure that the material errors in its third quarter 2017 financial statements were

12  "properly assessed" or that "findings and conclusions [were] documented" or that

13  the errors were reported to the Audit Committee or "disclosed in the 2017 10-K."

14  Mattel further admitted that its "material weakness related to a deficiency in

15  monitoring control activities" "still existed as of December 31, 2018." Similarly,

16  PwC also restated its audit opinion for the year ending December 31, 2018 for the

17  same reasons.

18      419.  Further, PwC falsely stated that it had conducted its audit in in

19  compliance with PCAOB standards and had an adequate basis for its opinions on the

20  accuracy of Mattel's financial statements and the sufficiency of its internal controls:

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 203 -

*Basis of opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and <u>are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.</u>

<u>We conducted our audits in accordance with the standards of the PCAOB.</u> Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

420.   These statements were materially false and misleading when made. First, it was materially false and misleading for PwC to state that it had conducted an "audit" of Mattel in accordance with the standards of the PCAOB, and to describe the purportedly appropriate audit procedures it employed, when PwC conspired with Mattel during its 2017 audit to avoid disclosing a known material misstatement and material weaknesses.  In fact, PwC was informed of a material misstatement issued in Mattel's third quarter financial results in January 2018, and instead of advising Mattel to issue a restatement and disclose the material weaknesses that existed at the time, PwC designed and executed a plan to avoid issuing a restatement or disclosing any material weaknesses. As alleged in Section IX, PwC's conduct violated a host of PCAOB standards.

421.   Further, contrary to its representation that it was "independent," PwC violated the SEC and PCAOB-mandated independence rules, as detailed above in Section IX.  As Mattel's Audit Committee would later report, it "concluded that certain actions in specific HR-related activities by the lead audit partner of Mattel's outside auditor, namely providing recommendations on candidates for Mattel's senior finance positions, was in violation of the SEC's auditor independence rules. He also provided feedback on senior finance employees." Among other things, PwC violated PCAOB Rule 3526. "Communication with Audit Committees Concerning

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 205 -

Independence," when PwC failed to alert Mattel's Audit Committee of PwC's violations of SEC and PCAOB auditor independence rules.

## H. Materially False And Misleading Statements And Omissions Concerning The First Quarter 2019

422. On April 26, 2019, Mattel filed its first quarter 2019 Form 10-Q, setting forth the Company's financial and operating results for the quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q"). The Q1 2019 Form 10-Q was signed by Defendant Euteneuer. Item 4. "Controls and Procedures" of the Q1 2019 Form 10-Q stated that management had evaluated Mattel's disclosure controls and procedures and found them effective:

*Evaluation of Disclosure Controls and Procedures*

As of March 31, 2019, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of March 31, 2019.

*Changes in Internal Control Over Financial Reporting*

There was no change in our internal control over financial reporting that occurred during the period of this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. We implemented internal controls to ensure we adequately assessed the adoption impact of the new lease standard, and its related amendments, on our financial statements. There were no significant changes to our internal control over financial reporting due to the adoption of the new standard.

423.   The statements set forth above were materially false and misleading when made.  First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of March 31, 2019.  Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

424.   Second, as of March 31, 2019, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action."  As Mattel would further admit, these

"material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017." As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K." Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "still existed as of December 31, 2018"—and, in fact, still had not been remediated as of the time of the Company's conference call in November 2019.

425.  Defendant Euteneuer also certified in Exhibit 31.1 in the 1Q 2019 Form 10-Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal

control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

426.    The statements above were materially false and misleading when made. First, contrary to the statement in section 4(c) of the certification, Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of March 31, 2019.  Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

427.    Second, contrary to the statement in section 4(a) of the certification, as of March 31, 2019, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action."  As Mattel would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters

of 2017." As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did <u>not</u> ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K." Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "<u>still existed as of December 31, 2018</u>"—and, in fact, <u>still</u> had not been remediated as of the time of the Company's conference call in November 2019.

## I.     **Materially False And Misleading Statements And Omissions Concerning The Second Quarter 2019**

428.   On July 26, 2019, Mattel filed its second quarter 2019 Form 10-Q, setting forth the Company's financial and operating results for the quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q"). The Q2 2019 Form 10-Q was signed by Defendant Euteneuer. In Item 4. "Controls and Procedures," the Q2 2019 Form 10-Q stated that management had evaluated Mattel's disclosure control and procedures and found them effective:

> <u>As of June 30, 2019 , Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective</u> in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding

required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. <u>Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2019.</u>

*Changes in Internal Control Over Financial Reporting*

During the quarter ended June 30, 2019 Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

429.   The statements set forth above were materially false and misleading when made.  First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of June 30, 2019.   Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

430.   Second, as of June 30, 2019, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control

1    activities to properly assess and communicate known financial statement errors and

2    internal control deficiencies in a timely manner to those parties responsible for

3    taking corrective action." As Mattel would further admit, these "<u>material</u>

4    <u>weaknesses [] existed at the time of the preparation of our financial statements for</u>

5    <u>the third and fourth quarters of 2017</u>." As Mattel would later specify, its disclosure

6    controls and procedures were materially deficient precisely because they did not

7    ensure that the material errors in its third quarter 2017 financial statements were

8    "properly assessed" or that "findings and conclusions [were] documented" or that

9    the errors were reported to the Audit Committee or "disclosed in the 2017 10-K."

10   Mattel further admitted that its "material weakness related to a deficiency in

11   monitoring control activities" "<u>still existed as of December 31, 2018</u>"—and, in fact,

12   <u>still</u> had not been remediated as of the time of the Company's conference call in

13   November 2019.

14        431.   Defendant Euteneuer also certified in Exhibit 31.1 in the 2Q 2019 10-

15   Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

16        1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

17        2. Based on my knowledge, this report does not contain any untrue
          statement of a material fact or omit to state a material fact necessary to
18        make the statements made, in light of the circumstances under which
          such statements were made, not misleading with respect to the period
19        covered by this report;

20

21

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the

registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

432.    The statements above were materially false and misleading when made. First, contrary to the statement in section 4(c) of the certification, Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of June 30, 2019.  Specifically, as set forth above in greater detail in ¶¶74-75, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

433.    Second, contrary to the statement in section 4(a) of the certification, as of June 30, 2019, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings.  As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly

assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Mattel would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017." As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were reported to the Audit Committee or "disclosed in the 2017 10-K." Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "still existed as of December 31, 2018"—and, in fact, still had not been remediated as of the time of the Company's conference call in November 2019.

## XI. LOSS CAUSATION

434. The market price of Mattel's publicly traded common stock was artificially inflated and/or maintained by the material misstatements and omissions complained of herein.

435. Defendants' misstatements and omissions concerning Mattel's internal controls, disclosure controls and procedures, and financial results artificially inflated and/or maintained the price of Mattel's stock. The artificial inflation in Mattel's stock price was removed when the conditions and risks misstated and omitted by

Defendants were revealed to the market and/or materialized. The information was disseminated through a disclosure on August 8, 2019. This disclosure reduced the amount of inflation in the price of Mattel's publicly traded stock, causing economic injury to Plaintiffs and other members of the Class.

436.  Specifically, after the close of trading on August 8, 2019, Mattel filed a Form 8-K with the SEC disclosing that on August 6, 2019 the Company was made aware of an anonymous whistleblower letter and that an independent investigation by the Audit Committee was initiated concerning the matters addressed in the whistleblower letter.  As a result of the whistleblower letter and the initiation of the internal investigation, Mattel terminated a bond offering of the Company's 6.00% Senior Notes due 2027 that had already priced and was scheduled to close on August 8, 2019.

437.  In response to this disclosure, Mattel's stock price fell nearly 16%, falling from a closing price of $13.43 on August 8 to a closing price of $11.31 on August 9, on extremely high trading volume of 15.25 million shares traded.  This decline represented an abnormal return of over 14% and was statistically significant at the 99% confidence level.

438.  No other Mattel-specific news was announced on August 8, 2019.  As set forth above, subsequent disclosures on October 29, 2019 (when the Restatement

1
2

was announced) and November 12, 2019 (when the Restatement was issued) corroborated the whistleblower letter.

3
4
5
6
7
8

439.   The lack of statistically significant negative price movement in Mattel's stock price in response to the Company's post-Class Period announcements on October 29, 2019 (*see* Section V.A., above) and November 12, 2019 (when Mattel's stock price declined just $0.10 per share) demonstrates that the market incorporated the news about the whistleblower letter and the concerns it raised into Mattel's stock price in response to the Company's August 8, 2019 disclosure.

9

## XII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

10
11
12
13
14
15
16
17

440.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

18
19
20

441.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 218 -

1   those statements was made, the speakers knew the statement was false or misleading,

2   or the statement was authorized or approved by an executive officer of Mattel who

3   knew that the statement was materially false or misleading when made.

4   **XIII.  THE PRESUMPTION OF RELIANCE**

5   442.   Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute*

6   *Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted

7   herein against Defendants are predicated upon omission of material fact that there

8   was a duty to disclose.

9   443.   Plaintiffs are also entitled to a presumption of reliance on Defendants'

10   material misrepresentations and omissions pursuant to the fraud-on-the-market

11   doctrine because, during the Class Period:

12       (a)   Mattel's common stock was actively traded in an efficient market on the NASDAQ;

13       (b)   Mattel's common stock traded at high weekly volumes;

14       (c)   As a regulated issuer, Mattel filed periodic public reports with the SEC;

15       (d)   Mattel was eligible to file registration statements with the SEC on Form S-3;

16       (e)   Mattel regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

21   AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 219 -

(f)   The market reacted promptly to public information disseminated by Mattel;

(g)   Mattel securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace;

(h)   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Mattel securities; and

(i)   Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased or acquired Mattel common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

444.   Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Mattel's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XIV.  **CLASS ACTION ALLEGATIONS**

445.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired securities issued by Mattel during the period from August 2, 2017 through August 8, 2019, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; Mattel's and PwC's affiliates and subsidiaries; the officers and directors of Mattel and PwC and

1    their subsidiaries and affiliates at all relevant times; members of the immediate

2    family of any excluded person; heirs, successors, and assigns of any excluded person

3    or entity; and any entity in which any excluded person has or had a controlling

4    interest.

5        446.   The members of the Class are so numerous that joinder of all members

6    is impracticable.  Throughout the Class Period, Mattel common shares were actively

7    traded on the NASDAQ.  As of February 2018, Mattel had approximately 344

8    million shares of common stock issued and outstanding.  Although the exact number

9    of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there

10   are at least thousands of members of the proposed Class.  Members of the Class can

11   be identified from records maintained by Mattel or its transfer agent(s), and may be

12   notified of the pendency of this action by publication using a form of notice similar

13   to that customarily used in securities class actions.

14       447.   Plaintiffs' claims are typical of the claims of the members of the Class

15   as all members of the Class were similarly damaged by Defendants' conduct as

16   complained of herein.

17       448.   Common questions of law and fact exist to all members of the Class

18   and predominate over any questions solely affecting individual members of the

19   Class. Among the questions of fact and law common to the Class are:

20

21   AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL     - 221 -
     SECURITIES LAWS
     Case No. 19-CV-10860-AB (PLAx)

(a)  whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b)  whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(c)  whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(d)  whether the members of the Class have sustained damages, and the proper measure of damages.

449.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interest that conflicts with the interests of the Class.

450.  A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

1

## XV.  CAUSES OF ACTION

2

### COUNT I
3

**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER**
**(Against The Mattel Defendants)**

4

5

451.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

6

7

452.   During the Class Period, the Mattel Defendants carried out a plan,

8

scheme and course of conduct which was intended to, and throughout the Class

9

Period, did: (i) deceive the investing public regarding Mattel's business, operations,

10

management and the intrinsic value of Mattel securities; (ii) enabled Defendants to

11

artificially inflate and maintain the price of Mattel securities; and (iii) caused

12

Plaintiffs and other members of the Class to purchase Mattel securities at artificially

13

inflated prices. In furtherance of this unlawful scheme, plan and course of conduct,

14

Defendants jointly and individually took the actions set forth herein.

15

453.   The Defendants named in this count: (i) employed devices, schemes,

16

and artifices to defraud; (ii) made untrue statements of material facts or omitted to

17

state material facts necessary in order to make the statements made, in light of the

18

circumstances under which they were made, not misleading; and (iii) engaged in

19

acts, practices, and a course of business that operated as a fraud or deceit upon the

20

purchasers of the Company's securities during the Class Period in an effort to

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 223 -

1   maintain artificially high market prices for Mattel securities in violation of Section

2   10(b) of the Exchange Act and Rule 10b-5.  The Defendants named in this count are

3   sued as primary participants in the wrongful and illegal conduct charged herein.

4   Certain Defendants are also sued as controlling persons as alleged below.

5       454.   These Defendants, individually and in concert, directly and indirectly,

6   by the use, means or instrumentalities of interstate commerce and/or of the mails,

7   engaged and participated in a continuous course of conduct to conceal and

8   misrepresent adverse material information about the business, operations and

9   financial results of Mattel as specified herein.

10      455.   These Defendants employed devices, schemes and artifices to defraud,

11  while in possession of material adverse non-public information and engaged in acts,

12  practices, and a course of conduct as alleged herein, which included the making of,

13  and the participation in the making of, untrue statements of material facts and

14  omitting to state material facts necessary in order to make the statements made, not

15  misleading, as set forth more particularly herein, and engaged in transactions,

16  practices and a course of business which operated as a fraud and deceit upon the

17  purchasers of Mattel securities during the Class Period.

18      456.   These Defendants are liable for the following materially false and

19  misleading statements and omissions made during the Class Period as alleged above:

20

21  AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
    SECURITIES LAWS
    Case No. 19-CV-10860-AB (PLAx)                                    - 224 -

     (a)    Defendant Mattel: Defendant Mattel is liable for all false and misleading statements and omissions made by any of the Mattel Defendants;

     (b)    Defendant Georgiadis: Defendant Georgiadis is liable for all the false and misleading statements and omissions in any SEC filing she signed, and that were made in any press releases or investor presentations during her tenure;

     (c)    Defendant Euteneuer: Defendant Euteneuer is liable for all the false and misleading statements and omissions in any SEC filing he signed, and that were made in any press releases, conference calls, or investor presentations; and

     (d)    Defendant Farr: Defendant Farr is liable for all the false and misleading statements and omissions in any SEC filing he signed.

457.   Defendants Georgiadis, Farr, and Euteneuer, as the most senior officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their high-ranking positions of control and authority as the most senior executive officers of the Company, each of these Defendants was able to control, and did directly control, the content of the public statements disseminated by Mattel during their respective tenures.  Defendants Georgiadis, Farr, and Euteneuer had direct involvement in the daily business of the Company and participated in the preparation and dissemination of Mattel's materially false and misleading statements and omissions set forth above.

458.   The allegations in this Complaint establish a strong inference that Defendants Mattel, Georgiadis, Farr, and Euteneuer acted with scienter throughout

the Class Period in that they had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts. As demonstrated by Defendants' material misstatements and omissions throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether their statements were false or misleading, even though such facts were available to them.

459. Plaintiffs and the other members of the Class have suffered damages in that, in reliance on the integrity of the market in which the securities trade and/or the material false and misleading statements and omissions made by Defendants, they paid artificially inflated prices for Mattel common stock, which inflation was removed from the stock when the true facts became known and/or the concealed risks materialized. Plaintiffs and the other members of the Class would not have purchased Mattel common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

460. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

1    461.   As a direct and proximate result of Defendants' wrongful conduct,

2    Plaintiffs and the other members of the Class suffered damages in connection with

3    their respective purchases of Mattel securities during the Class Period.

## COUNT II
### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against the Executive Defendants)

6    462.   Plaintiffs repeat and re-allege each and every allegation set forth above

7    as if fully set forth herein.

8    463.   Defendants Georgiadis, Farr, and Euteneuer acted as controlling

9    persons of Mattel within the meaning of Section 20(a) of the Exchange Act, as

10   alleged herein.

11   464.   By reason of their high-level positions of control and authority as the

12   Company's most senior officers and, in the case of Defendant Georgiadis, as its

13   Director, the Executive Defendants had the power and authority to influence and

14   control, and did influence and control, the decision-making and activities of the

15   Company and its employees, and to cause the Company to engage in the wrongful

16   conduct complained of herein. The Executive Defendants were able to and did

17   influence and control, directly and indirectly, the content and dissemination of the

18   public statements made by Mattel during the Class Period, thereby causing the

19   dissemination of the false and misleading statements and omissions of material facts

20   as alleged herein.  The Executive Defendants were provided with or had unlimited

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 227 -

access to copies of the Company's press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

465.   In their capacities as Mattel's most senior corporate officers, and as more fully described above, the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein.  Defendants Georgiadis, Farr, and Euteneuer signed Mattel's SEC filings and Sarbanes-Oxley certifications, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Mattel during the Class Period.

466.   Each of the Executive Defendants culpably participated in some meaningful sense in the fraud alleged herein.  Defendants Georgiadis, Farr, and Euteneuer each acted with scienter, as set forth more fully above.

467.   By virtue of their positions as controlling persons of Mattel and as a result of their own aforementioned conduct, Defendants Georgiadis, Farr, and Euteneuer, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is

1
2

liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

3
4

**COUNT III**
**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER**
**(Against PwC)**

5
6

468.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

7
8
9
10
11
12
13
14

469.   During the Class Period, PwC carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public regarding Mattel's business, operations, management and the intrinsic value of Mattel securities; (ii) enabled Defendants to artificially inflate and maintain the price of Mattel securities; and (iii) caused Plaintiffs and other members of the Class to purchase Mattel securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, PwC jointly and individually took the actions set forth herein.

15
16
17
18
19
20

470.   The Defendant named in this count: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the

21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 229 -

1 | purchasers of the Company's securities during the Class Period in an effort to

2 | maintain artificially high market prices for Mattel securities in violation of Section

3 | 10(b) of the Exchange Act and Rule 10b-5.  The Defendant named in this count is

4 | sued as a primary participant in the wrongful and illegal conduct charged herein.

5 | Another Defendant is also sued as a controlling person as alleged below.

6 | 471.  This Defendant, individually and in concert with the other Defendants,

7 | directly and indirectly, by the use, means or instrumentalities of interstate commerce

8 | and/or of the mails, engaged and participated in a continuous course of conduct to

9 | conceal and misrepresent adverse material information about the business,

10 | operations and financial results of Mattel as specified herein.

11 | 472.  This Defendant employed devices, schemes and artifices to defraud,

12 | while in possession of material adverse non-public information and engaged in acts,

13 | practices, and a course of conduct as alleged herein, which included the making of,

14 | and the participation in the making of, untrue statements of material facts and

15 | omitting to state material facts necessary in order to make the statements made, not

16 | misleading, as set forth more particularly herein, and engaged in transactions,

17 | practices and a course of business which operated as a fraud and deceit upon the

18 | purchasers of Mattel securities during the Class Period.

19

20

21 | AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 230 -

1
2
3

473. This Defendant is liable for the following materially false and misleading statements and omissions related to its 2017 and 2018 audits and audit reports, as set forth above.

4
5
6
7
8
9
10
11
12

474. The allegations in this Complaint establish a strong inference that PwC acted with scienter throughout the Class Period in that it had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and disclose such facts. As demonstrated by PwC's material misstatements and omissions throughout the Class Period, if PwC did not have actual knowledge of the misrepresentations and omissions alleged herein, it was reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether its statements were false or misleading, even though such facts were available to it.

13
14
15
16
17
18
19

475. Plaintiffs and the other members of the Class have suffered damages in that, in reliance on the integrity of the market in which the securities trade and/or the material false and misleading statements and omissions made by PwC, they paid artificially inflated prices for Mattel common stock, which inflation was removed from the stock when the true facts became known and/or the concealed risks materialized. Plaintiffs and the other members of the Class would not have purchased Mattel common stock at the prices they paid, or at all, if they had been

20
21

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 231 -

1 aware that the market price had been artificially and falsely inflated by PwC's

2 misleading statements.

3 476. By virtue of the foregoing, PwC has violated Section 10(b) of the

4 Exchange Act and Rule 10b-5 promulgated thereunder.

5 **COUNT IV**
**VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**

6 **(Against Abrahams)**

7 477. Plaintiffs repeat and re-allege each and every allegation set forth above

8 as if fully set forth herein.

9 478. Defendant Abrahams acted as a controlling person of PwC within the

10 meaning of Section 20(a) of the Exchange Act, as alleged herein.

11 479. By reason of his high-level position of control and authority as PwC's

12 lead audit partner for Mattel, and his responsibility for reviewing and approving

13 PwC's audit opinions incorporated into Mattel's filings with the SEC, Defendant

14 Abrahams had the power and authority to influence and control, and did influence

15 and control, the decision-making and activities of PwC and its employees, and to

16 cause PwC to engage in the wrongful conduct complained of herein. Abrahams was

17 able to and did influence and control, directly and indirectly, the content and

18 dissemination of the public statements made by PwC during the Class Period,

19 thereby causing the dissemination of the false and misleading statements and

20 omissions of material facts as alleged herein. Abrahams was provided with or had

21 
AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 232 -

unlimited access to copies of PwC's statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

480.    In his capacity as PwC's most senior audit partner for Mattel, and as more fully described above, Abrahams had direct and supervisory involvement in the day-to-day operations of PwC's audit work for the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities law violations as alleged herein.  Defendant Abrahams was directly involved in providing false information and certifying and/or approving the false statements disseminated by PwC during the Class Period.

481.    Abrahams culpably participated in some meaningful sense in the fraud alleged herein.  Defendant Abrahams acted with scienter, as set forth more fully above.

482.    By virtue of his position as a controlling person of PwC and as a result of his own aforementioned conduct, Defendant Abrahams is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as PwC is liable, under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
Case No. 19-CV-10860-AB (PLAx)

- 233 -

## XVI.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

(a)    Declaring that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such other and further relief as the Court may deem just and proper.

## XVII.  <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury.

Dated: May 29, 2020                    /s/ *Jonathan D. Uslaner*

                                       Jonathan D. Uslaner
                                       Bar No. 256898
                                       **BERNSTEIN LITOWITZ BERGER**
                                       **& GROSSMANN LLP**
                                       2121 Avenue of the Stars
                                       Suite 2575
                                       Los Angeles, CA 90067
                                       Telephone: (310) 819-3470
                                       jonathanu@blbglaw.com

                                       John Rizio-Hamilton (admitted *pro hac*
                                       *vice*)
                                       Brenna D. Nelinson
                                       Matthew Traylor
                                       **BERNSTEIN LITOWITZ BERGER**
                                       **& GROSSMANN LLP**
                                       1251 Avenue of the Americas
                                       New York, New York 10020
                                       Telephone: (212) 554-1400
                                       Facsimile: (212) 554-1448
                                       johnr@blbglaw.com

                                       *Lead Counsel for Lead Plaintiffs*
                                       *and the Class*

                                       Jacob A. Walker (SBN 271217)
                                       Block & Leviton LLP
                                       260 Franklin Street Suite 1860
                                       Boston, MA 02110
                                       Telephone: (617) 398-5600
                                       Facsimile: (617) 507-6020
                                       jake@blockesq.com

                                       *Additional Counsel for Additional*
                                       *Named Plaintiff Houston Municipal*
                                       *Employees Pension System*