JOHN W. SPIEGEL (SBN 78935)
john.spiegel@mto.com
JOHN M. GILDERSLEEVE (SBN 284618)
john.gildersleeve@mto.com
LAUREN C. BARNETT (SBN 304301)
lauren.barnett@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

Attorneys for MATTEL, INC.,
MARGARET H. GEORGIADIS,
JOSEPH J. EUTENEUER,
and KEVIN FARR

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MATTEL, INC. SECURITIES LITIGATION | Case No. 19-CV-10860-AB (PLAx) **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT** Filed Concurrently: - Notice of Motion & Motion to Dismiss - Request for Judicial Notice - Declaration of Lauren C. Barnett - [Proposed] Order Date:   December 4, 2020 Time:   10:00 a.m. Ctrm:   7B Judge:  Hon. André Birotte Jr. |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................... 1

II. FACTUAL ALLEGATIONS ...................................................................... 3

    A.    Mattel Makes a Non-Cash Tax Accounting Error in 2017 ................... 3

        1.    Relevant Accounting Principles ................................................ 3

        2.    In Q3 2017, Mattel Records a Valuation Allowance ................ 4

        3.    In Q4 2017, Mattel Effectively Corrects the Allowance ............. 5

    B.    Mattel Investigates and Discloses the Error in 2019 ........................... 6

    C.    Plaintiffs Allege Securities Fraud ....................................................... 8

III. ARGUMENT ............................................................................................. 9

    A.    No Specific Facts Support a "Strong Inference" of Scienter .................. 9

        1.    Merely Restating Financials Does Not Show Scienter ............... 9

        2.    No Specific Facts Show Knowledge of Wrongdoing ................ 10

        3.    PwC's Advice Undercuts Any Scienter Inference ...................... 15

        4.    Lack of Stock Sales Undercuts Any Scienter Inference ............ 16

        5.    Plaintiffs' Other Scienter Allegations Add Nothing .................. 16

        6.    Viewed Holistically, the Scienter Allegations Fail .................... 19

    B.    No Specific Facts Show Loss Causation ............................................. 20

        1.    No Revelation About the Error Preceded the Decline ............... 21

        2.    Announcing an Investigation Does Not Reveal Fraud .............. 22

        3.    Mattel's Stock Price Fell by Happenstance of Timing .............. 24

IV. CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*In re Accuray, Inc. Sec. Litig.*,
 757 F. Supp. 2d 936 (N.D. Cal. 2010)...............................................................12

*In re Aspeon, Inc. Sec. Litig.*,
 168 F. App'x 836 (9th Cir. 2006)................................................................14, 19

*Brown v. InnerWorkings, Inc.*,
 2019 WL 4187385 (C.D. Cal. Mar. 27, 2019) ..................................10, 11, 13, 17

*Casula v. athenahealth, Inc.*,
 2011 WL 4566115 (D. Mass. Sept. 30, 2011)....................................................16

*In re Century Aluminum Co. Sec. Litig.*,
 749 F. Supp. 2d 964 (N.D. Cal. 2010)...............................................................14

*In re Cirrus Logic Sec. Litig.*,
 946 F. Supp. 1446 (N.D. Cal. 1996)..................................................................15

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*
 *Align Tech., Inc.*,
 856 F.3d 605 (9th Cir. 2017).......................................................................10, 17

*Curry v. Yelp Inc.*,
 875 F.3d 1219 (9th Cir. 2017)......................................................2, 10, 12, 23

*In re Downey Sec. Litig.*,
 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)...............................................16, 17

*Dura Pharm., Inc. v. Broudo*,
 544 U.S. 336 (2005) .........................................................................................2

*Espinoza v. Whiting*,
 8 F. Supp. 3d 1142 (E.D. Mo. 2014)..................................................................16

*Glazer Capital Mgmt. v. Magistri*,
 549 F.3d 736 (9th Cir. 2008)............................................................................18

*In re Hansen Nat. Corp. Sec. Litig.*,
 527 F. Supp. 2d 1142 (C.D. Cal. 2007).........................................................10, 15

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Huang v. Higgins*,
 2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) ..................................................... 24

*In re Int'l Rectifier Corp. Sec. Litig.*,
 2008 WL 4555794 (C.D. Cal. May 23, 2008)...................................................... 10

*Jackson Inv. Grp., LLC v. Thomas*,
 325 F. Supp. 3d 1334 (N.D. Ga. 2017) ................................................................ 15

*In re Levi Strauss & Co. Sec. Litig.*,
 527 F. Supp. 2d 965 (N.D. Cal. 2007)................................................................... 15

*Lipton v. Pathogenesis Corp.*,
 284 F.3d 1027 (9th Cir. 2002).............................................................................. 16

*Lloyd v. CVB Fin. Corp.*,
 811 F.3d 1200 (9th Cir. 2016)........................................................................*passim*

*Loos v. Immersion Corp.*,
 762 F.3d 880 (9th Cir. 2014).........................................................................*passim*

*M&M Hart Living Tr. v. Global Eagle Entm't, Inc.*,
 2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) ..................................................... 10

*In re Maxwell Tech., Inc. Sec. Litig.*,
 18 F. Supp. 3d 1023 (S.D. Cal. 2014) ............................................................ 18, 20

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
 540 F.3d 1049 (9th Cir. 2008)................................................................... 3, 11, 22

*Mineworkers' Pension Scheme v. First Solar Inc.*,
 881 F.3d 750 (9th Cir. 2018)................................................................................. 22

*N.Y. Hotel Trades Council & Hotel Ass'n of N.Y., Inc. Pension Fund v.
 Impax Labs. Inc.*,
 2019 WL 3779262 (N.D. Cal. Aug. 12, 2019)..................................................... 24

*Nguyen v. Endologix, Inc.*,
 962 F.3d 405 (9th Cir. 2020)....................................................................1, 9, 12, 16

*In re NVIDIA Corp. Sec. Litig.*,
 768 F.3d 1046 (9th Cir. 2014).....................................................................9, 17, 18

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
  50 F. Supp. 3d 1328 (C.D. Cal. 2014) .................................................. 10, 13, 14, 18

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ................................................................. *passim*

*Perrin v. SouthWest Water Co.*,
  2011 WL 10756419 (C.D. Cal. June 30, 2011) .............................................. 11, 14

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ........................................................................ 12

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ........................................................... 15

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .................................................................... 16, 25

*Rok v. Identiv, Inc.*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017),
  *aff'd*, 716 F. App'x 663 (9th Cir. 2018) ............................................................ 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................... *passim*

*In re U.S. Aggregates, Inc. Sec. Litig.*,
  235 F. Supp. 2d 1063 (N.D. Cal. 2002) ............................................................ 14

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018) .................................................................. *passim*

*Zamir v. Bridgepoint Educ., Inc.*,
  274 F. Supp. 3d 1057 (S.D. Cal. 2017) ............................................................ 17

*Zucco Ptrs., LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .................................................................. *passim*

**FEDERAL STATUTES**

15 U.S.C. § 78u-4(b) .............................................................................. 9, 20

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

## I.     INTRODUCTION

In August 2019, Mattel cancelled a debt offering that was about to close so it could investigate allegations in a letter by a purported whistleblower.  Mattel's stock price fell as investors speculated about the letter's allegations, the content of which was not disclosed.  In October 2019, Mattel announced the investigation's findings: a non-cash accounting error occurred in the third quarter of 2017 (resulting in an *under*statement of quarterly net loss) and was effectively corrected in the fourth quarter (resulting in an offsetting *over*statement of quarterly net loss).  The error had *no impact* on Mattel's full-year results for 2017 or any later period.  When the findings were announced, analysts explained that the investigation had dispelled the concerns that caused the August stock-price decline, and Mattel's stock price rose.

Although investors viewed the accounting error as inconsequential, Plaintiffs reflexively allege securities fraud.  Plaintiffs' theory is that Mattel should have announced, before its 2019 investigation, that it had made the error in 2017 and had related control weaknesses.  Yet the only loss for which Plaintiffs seek to recover is the stock-price decline in August, when Mattel first announced the investigation.  Under settled Ninth Circuit law, the market's reaction to the announcement of an investigation—especially an investigation into *unspecified* matters—"cannot form the basis of a viable loss causation theory" because "the market cannot possibly know what the investigation will ultimately reveal." *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014).  For this reason alone, and multiple others, Plaintiffs fail to state a claim.

The Private Securities Litigation Reform Act ("PSLRA") imposes "[e]xacting pleading requirements." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The "heightened pleading requirements are meaningful ones, requiring courts carefully to evaluate securities fraud complaints to ensure compliance with the statute's elevated pleading standards." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 413 (9th Cir. 2020).  For two independent reasons, the Amended Complaint ("AC")

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

fails to meet the PSLRA's requirements.  Because Plaintiffs cannot amend to allege an actionable loss, the AC should be dismissed with prejudice.

      *1. No scienter.*  Plaintiffs fail to plead specific facts supporting the required "strong inference" of scienter—that is, intent to defraud or deliberate recklessness. *Tellabs*, 551 U.S. at 313-14.  "In general, the mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco Ptrs., LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009).  Rather, Plaintiffs must plead "detailed and specific allegations" showing "a nexus between [allegedly] wrongful behavior and Individual Defendants' knowledge." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1227-28 (9th Cir. 2017).  Yet no specific pleaded facts show that Mattel's CEO or CFO *knew* before the 2019 investigation that Mattel was required to restate financials or disclose a control weakness.  The AC rests almost entirely on the account of a single former employee who is not alleged to have interacted with Mattel's CEO or CFO *at all*, much less regarding the 2017 accounting error.

      Plaintiffs even concede that Mattel's outside auditor, PricewaterhouseCoopers ("PwC"), audited Mattel's 2017 financial statements, Mattel consulted with PwC about the error, and PwC advised Mattel *not* to restate financials or disclose any control weakness.  Adhering to PwC's advice was not intentional fraud, especially on an arcane tax-accounting matter that the market later deemed a non-event.  Plaintiffs also allege *no* suspicious insider trading in Mattel's stock, which further "detract[s] from a scienter finding." *Webb v. SolarCity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018).  The conjecture of a lone former employee who does not claim he had access to Mattel's executives must give way to the strong inference that Mattel properly followed the advice of its outside auditor, without fraudulent intent.

      *2. No loss causation.*  Plaintiffs' failure to plead specific facts showing loss causation is an equally compelling, independent ground for dismissal.  The federal securities laws do not "provide investors with broad insurance against market losses." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Rather, Plaintiffs

can recover only for losses caused by an alleged fraud.  Here, Plaintiffs seek to recover for a stock-price decline in August 2019 that was *not* preceded by the revelation of any purportedly hidden facts about the accounting error.  Mattel's stock price fell after it disclosed *only* that it had received a letter on an unspecified subject and that it was cancelling a $250 million debt offering set to close that day.  Ninth Circuit law bars Plaintiffs from treating that disclosure "as a coded message revealing the fraud," *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008), especially since analysts called it a "mystery," Ex. 16 at 487, that "could be anything," Ex. 10 at 432.[1]  Because Plaintiffs cannot "correlate [their] losses to anything other than the announcement of an internal investigation," they cannot plead loss causation as a matter of law.  *Loos*, 762 F.3d at 883.

## II.   FACTUAL ALLEGATIONS

Mattel is a global toy-manufacturing company with common stock that trades on the NASDAQ.  ¶ 34.[2]  The AC's allegations about Mattel rest almost entirely on the purported recollections of Brett Whitaker, who—after less than two years at each of Zynga, Amazon, and Nike—joined Mattel as a Director of Tax in May 2017 and left in March 2018.  ¶¶ 57, 66.  Whitaker worked with Dermot Martin, a Senior Director of Tax, and reported to Clara Wong, Senior Vice President of Tax and Customs.  Wong reported to Mattel's CFO, Joseph Euteneuer.  ¶¶ 67, 76, 87.

### A.   Mattel Makes a Non-Cash Tax Accounting Error in 2017

#### 1.   Relevant Accounting Principles

Mattel's accounting error related to deferred tax assets.  "A deferred tax asset is an asset that a company can use to reduce or eliminate a future tax liability."  ¶ 81.  "The value of deferred tax assets depends on whether the company will, in fact,

---

[1] "Ex." refers to the exhibits to the Declaration of Lauren C. Barnett.

[2] Paragraph citations refer to the AC.  Facts in this section are drawn from the AC's allegations, which are assumed true for purposes of this motion only, and from documents incorporated by reference in the AC and/or subject to judicial notice.

generate taxable income in the future." ¶ 82.  "[I]f the company likely will not generate income, then the asset has less or no value because it will not be able to be used to offset a future tax liability." *Id.*  If a company determines that it likely will be unable to use some or all of its deferred tax assets, it must record a "valuation allowance" against the deferred tax assets. ¶ 84.  Doing so reduces a company's net income in the amount of the valuation allowance. *Id.*

When calculating a valuation allowance, some deferred tax *liabilities* (which reflect tax to be paid in the future) can be netted against deferred tax assets.  This netting reduces the value of deferred tax assets, reduces any valuation allowance, and increases net income.  However, deferred tax liabilities arising from assets with an *indefinite* useful life (that is, assets not being amortized) generally may not be netted against deferred tax assets. ¶¶ 105, 252-259.

### 2. In Q3 2017, Mattel Records a Valuation Allowance

On September 18, 2017, Toys "R" Us filed for bankruptcy protection. ¶ 94. Because Toys "R" Us was a major customer, "15% of [Mattel's] receivables were left exposed to the bankruptcy." *Id.*  The bankruptcy therefore led Mattel to record a valuation allowance for the third quarter, which ended September 30, 2017.  In October 2017, as Mattel was preparing its third-quarter financials, PwC told Whitaker that Mattel would have to write off about $100 million in receivables from Toys "R" Us. ¶¶ 93, 95-96.  Based on that lower taxable income, "Whitaker's team calculated a valuation allowance of approximately $175 million to $200 million against Mattel's deferred tax assets." ¶ 100.

Later in October 2017, PwC told Whitaker that he had "improperly reduced [Mattel's] total deferred tax assets by several hundred million dollars, which had the effect of improperly reducing the valuation allowance." ¶¶ 103-106.  In fact, PwC explained, Mattel's deferred tax assets were higher, so the valuation allowance should be higher too—not $175 million to $200 million, but $562 million. ¶ 107.

Although Plaintiffs call these changes "chaos," ¶ 5, with Whitaker "shocked

-4-

and upset" at having to work quickly and to fix his mistake, ¶ 97, Plaintiffs admit that "[t]he abrupt about-face was based on a decision to write off approximately $100 million in receivables from Toys 'R' Us." ¶ 93. Mattel did not control when Toys "R" Us filed for bankruptcy. And, Plaintiffs affirmatively plead that PwC, which caught Whitaker's error and instigated the increase to $562 million, "did not require the disclosure of any material weakness." ¶ 111.

### 3.    In Q4 2017, Mattel Effectively Corrects the Allowance

After Mattel closed its third-quarter books, "PwC recommended that Mattel develop a new internal control concerning its deferred tax asset valuation allowance analysis." ¶ 115. Whitaker was charged with developing the control. ¶ 116.

In January 2018, Whitaker saw a chart showing the deferred tax liabilities that Mattel had netted against deferred tax assets in calculating its valuation allowance. ¶¶ 118-121. One deferred tax liability, of $109 million, arose from intellectual property (including the Thomas & Friends brand) that was listed as *indefinite*-lived, which meant it "should not have been used to reduce/net against Mattel's deferred tax assets," such that Mattel's third-quarter valuation allowance should have been $109 million higher (and net income that quarter $109 million lower). ¶¶ 120-121.

Whitaker attended three meetings on this subject, none of which was attended by Mattel's CEO or CFO. At these meetings, according to Whitaker, there was a "collective view" that Mattel would have to restate its third-quarter financials. ¶¶ 126-131, 136, 137. Still, "the team was holding out a thin sliver of hope" that a restatement would not be required. ¶¶ 132, 134.

At this point, Whitaker's involvement ended. Wong, Whitaker's supervisor, elevated the issue to Mattel's CFO Euteneuer. ¶ 138. The AC does not allege that Whitaker interacted with Euteneuer, or Mattel's CEO Georgiadis, on the subject.

Ultimately, Mattel and PwC considered whether the Thomas asset had been "classified properly" as indefinite-lived or should have been classified as finite-lived all along. ¶ 121. Because the brand's value was deteriorating, Mattel determined

that the Thomas asset no longer had an indefinite useful life:

> In the fourth quarter of 2017, Mattel determined a triggering event had occurred due to a change in brand strategy, which resulted in lower forecasted revenue attributable to the nonamortizable intangible asset. … As such, Mattel determined that the intangible asset should no longer be designated as a nonamortizable intangible asset, but should be amortized starting in the fourth quarter of 2017.

Ex. 1 (2017 10-K) at 47.  Reclassifying the asset as finite-lived in the fourth quarter effectively corrected the third-quarter error, and shifting the expense by one quarter had no effect on Mattel's year-end 2017 results.  Ex. 5 at 279.

Plaintiffs allege that "PwC had manufactured a plan to avoid a restatement," ¶ 143, and "advised Mattel not to revise (i.e., restate) the results of operations for the third quarter," ¶ 305.  Yet, despite deriding it as a "maneuver," ¶ 123, "instrument," ¶ 158, and "device," ¶ 193, Plaintiffs never claim that reclassifying the Thomas asset was *incorrect*—*i.e.*, that the asset was *not* finite-lived.

### B.     Mattel Investigates and Discloses the Error in 2019

On August 6, 2019, Mattel learned PwC had received a whistleblower letter relating to Mattel's accounting for the Thomas asset.  Mattel received that news just two days before a $250 million offering of its corporate debt was scheduled to close.  On August 8, 2019, after the market closed, Mattel announced that it was cancelling the offering.  Mattel stated in full:

> On August 6, 2019, Mattel, Inc. (the "Company") was made aware of an anonymous whistleblower letter.  To provide the Company with an opportunity to investigate the matters set forth in the letter, the offering of the Company's 6.00% Senior Notes due 2027 that was scheduled to close on August 8, 2019 has been terminated.  The Company intends to refinance its 4.350% Senior Notes due October 2020 prior to maturity.

¶¶ 161-162; Ex. 4 at 255.  Because "it is extremely rare for an issuer to pull an offering after the bonds have priced," ¶ 167, "[t]he market reacted with surprise and concern."  ¶¶ 22, 163.  The next day, Mattel's stock price fell nearly 16%.  ¶ 168.

As analysts made clear, the market knew nothing about the substance of the whistleblower letter or Mattel's investigation.  *See* Ex. 10 at 432 (Jefferies: "Could Be Anything"); Ex. 13 at 456 (Barclays: "Given the continued lack of information,

the stock is down 14% …. [T]here are too many unknowns.  The list of hypotheticals ranges from the benign to the extreme."); Ex. 12 at 450 (Wells Fargo: "there is wide range of speculation as to what the claim entails"); Ex. 11 at 440 (UBS: "it is unclear as to whether the letter is regarding the Fisher-Price recent recall being worse than expected or another issue perhaps similar in nature").

On October 29, 2019, after the market closed, Mattel announced the outcome of its Audit Committee's independent investigation into the whistleblower letter:

> The investigation determined that income tax expense was understated by $109 million in the third quarter of 2017, and overstated by $109 million in the fourth quarter of 2017, with no impact for the full year. The errors were non-cash, did not affect operating income or EBITDA, and had no impact on Mattel's full year financial results for 2017 or subsequent periods.

Ex. 5 at 278; *see* ¶¶ 172-179.  Mattel attributed the error to multiple factors:

> [A] confluence of one-time events, management's reliance on the accounting advice sought and received on the error from the lead audit engagement partner of Mattel's outside auditor, and lapses in judgment by management contributed to these failures.  The investigation did not find that management engaged in fraud.

Ex. 5 at 279.  Mattel explained it would restate financials for the third and fourth quarters of 2017; that it had material weaknesses in internal controls; and that PwC would "reissu[e] its audit report."  *Id.* at 259.  Mattel also announced that Euteneuer "will leave the Company after a transition period of up to six months."  *Id.* at 260.

Analysts reacted positively to the investigation's findings.  One analyst wrote:

> **The whistleblower letter is a mystery/overhang no more.**  Despite lots of conjecture in the investment community about the contents of the letter, **most people put accounting fraud low on the list**; the recall of the Fisher Price Rock n Play Sleeper was at the top.  At the end of the day, **the company had some benign accounting issues in 2017 (and not fraud)**, which affected neither full year results nor operating income or EBITDA.

Ex. 16 at 487 (Barclays) (emphases added); *see* Ex. 14 at 471 (BMO: "much less significant an issue than feared"); Ex. 15 at 477 (SunTrust: "[T]hese errors had NO material impact on FY17 numbers and did not affect operating income for EBITDA. … The conclusion … is also likely to be received favorably by investors."); Ex. 17 at 502 (DA Davidson: "MAT made only one accounting change regarding timing of

-7-

2H17 tax expense."); Ex. 18 at 510 (Jefferies: "[w]e expect a relief rally"); Ex. 19 at 521 (MKM: "Bulls were relieved the issue was far less severe than feared and the financial impact is non-cash."); Ex. 20 at 528 (KeyBanc: "we (and investors) had been bracing for a worse outcome"). On October 30, 2019, Mattel's stock price rose 14%. ¶ 171; Ex. 21 at 551.

On November 12, 2019, Mattel restated its financials to shift $109 million of valuation allowance from the fourth to the third quarter of 2017, explaining:

> In the fourth quarter of 2017, Mattel determined that the intangible asset was no longer indefinite-lived. This change resulted in an effective correction of the tax misstatement for the 2017 annual results. However, the provision for income taxes remained uncorrected for the [third quarter], which resulted in an overstatement of the tax expense for the [fourth quarter].

¶ 194. Mattel cited two control weaknesses: one regarding "management's control over the review of the income tax valuation allowance analysis" in the third quarter of 2017, and one regarding "monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." Ex. 6 at 409, 410; ¶¶ 189, 195. PwC also restated its audit report. ¶ 191.

## C.     Plaintiffs Allege Securities Fraud

On April 20, 2020, the Court consolidated two actions against Mattel and granted an unopposed lead-plaintiff motion. ECF No. 27. On May 29, 2020, the lead plaintiffs, plus an "[a]dditional named plaintiff," filed the AC. ¶¶ 31-33.

The AC asserts putative class claims on behalf of purchasers of Mattel stock from August 2, 2017 to August 8, 2019 against Mattel, its former CEO Georgiadis, its CFO Euteneuer, and its former CFO Farr (who preceded Euteneuer), as well as PwC and PwC's former lead audit partner, Joshua Abrahams. ¶¶ 34-39, 445. Plaintiffs claim Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by making false statements about Mattel's third- and fourth-quarter 2017 results and lack of a control weakness, which statements allegedly caused Mattel's stock price to fall on August 9, 2019, after Mattel cancelled its debt offering. ¶ 435.

-8-

## III.   ARGUMENT

"To plead a claim under § 10(b) and Rule 10b-5, a plaintiff must allege '(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.'" *Nguyen*, 962 F.3d at 413 (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014)).

Plaintiffs fail to allege scienter and loss causation.

### A.   No Specific Facts Support a "Strong Inference" of Scienter

Plaintiffs must "state with particularity facts giving rise to a strong inference that [Defendants] acted" with scienter.  15 U.S.C. § 78u-4(b)(2)(A).  Scienter is the "'intent to deceive, manipulate, or defraud' or 'deliberate recklessness.'"  *Webb*, 884 F.3d at 851.  "'Deliberate recklessness is an *extreme* departure from the standards of ordinary care which presents a danger of misleading … that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'"  *Id.*; *see In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) ("the standard for recklessness is actually much closer to one of intent" and requires "'some degree of intentional or conscious misconduct'").

"The PSLRA's 'strong inference' requirement has teeth."  *Nguyen*, 962 F.3d at 414.  "To qualify as 'strong' … an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  "Given the substantial costs that securities fraud litigation can impose, the 'strong inference' standard reflects Congress's attempt to halt early on securities litigation that lacks merit or is even abusive, while allowing plaintiffs with potentially winning claims to proceed to discovery."  *Nguyen*, 962 F.3d at 414.  In short, "[t]he bar set by *Tellabs* is not easy to satisfy."  *Webb*, 884 F.3d at 855.

#### 1.   Merely Restating Financials Does Not Show Scienter

"In general, the mere publication of a restatement is not enough to create a

-9-

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

strong inference of scienter." *Zucco*, 552 F.3d at 1000; *see, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) ("'a failure to follow GAAP [Generally Accepted Accounting Principles], without more, does not establish scienter'"). "[GAAP] violations, even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state." *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *13 (C.D. Cal. May 23, 2008).

Likewise, "[m]ere allegations that [a company] had deficient internal controls are insufficient to give rise to a strong inference of scienter." *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1364 (C.D. Cal. 2014) (collecting cases); *see Brown v. InnerWorkings, Inc.*, 2019 WL 4187385, at *4 (C.D. Cal. Mar. 27, 2019) ("Without specific factual allegations, the mere existence of deficient internal controls is 'insufficient to give rise to a strong inference of scienter.'"). "Presumably every company that issues a financial restatement because of GAAP errors will cite as a reason lack of effective controls." *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (quotation marks omitted).

Accordingly, mere allegations that Mattel restated financials and had deficient internal controls cannot establish scienter. "[I]f [such] 'boilerplate allegations were sufficient, an inference of scienter would follow virtually any time a company issued a restatement.' That, of course, is not the law." *IXIA*, 50 F. Supp. 3d at 1363. As explained below, no other factual allegations establish scienter, either.

### 2.  No Specific Facts Show Knowledge of Wrongdoing

The PSLRA requires "detailed and specific allegations" establishing "a nexus between the [allegedly] wrongful behavior and Individual Defendants' knowledge." *Curry*, 875 F.3d at 1227-28; *see, e.g.*, *Apollo*, 774 F.3d at 607 ("we require that the Plaintiffs allege scienter with respect to each of the individual defendants"); *M&M Hart Living Tr. v. Global Eagle Entm't, Inc.*, 2017 WL 5635424, at *14 (C.D. Cal. Aug. 20, 2017) ("because Plaintiff has not adequately alleged scienter as to any

-10-
MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

individual Defendant, Plaintiff has failed to allege scienter of Global Eagle").

No specific factual allegations show that the individual defendants at Mattel "'knowingly and recklessly engaged in an improper accounting practice,' for example, that [] external auditors counseled against a practice or [a] CFO was aware that the practice was improper." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (quoting *Metzler*, 540 F.3d at 1068-69); *see Brown*, 2019 WL 4187385, at *3-4 (plaintiff must show "individual Defendants 'personally directed' [] GAAP compliance, 'manually adjust[ed]' any data, or otherwise were involved in such details" and "knew that accounting principles were 'being incorrectly interpreted and applied" or "controls suffered from material weaknesses"); *Perrin v. SouthWest Water Co.*, 2011 WL 10756419, at *10 (C.D. Cal. June 30, 2011) (plaintiff must show "accounting violations were apparent to senior management").

***First***, Brett Whitaker—the sole witness behind the AC's factual narrative—is not alleged to have interacted with CEO Georgiadis or CFO Euteneuer *at all*, let alone about whether Mattel should restate financials or disclose a control weakness.[3] Plaintiffs do not even allege that Whitaker attended any meeting on those subjects that Georgiadis or Euteneuer also attended, regardless of whether they interacted. To the contrary, Plaintiffs allege that Whitaker was *excluded* from a call about the third-quarter error because he was too junior. ¶ 140 ("Wong told Whitaker that only VPs and above would attend, which meant Whitaker would not participate."). Whitaker's purported recollections do not concern Georgiadis at all, and the little he recounts about Euteneuer is entirely second-hand.[4]

---

[3] The same is true of Mattel's former CFO Farr, who left Mattel just after the start of the class period. ¶ 37.

[4] *E.g.*, ¶ 88 ("Whitaker reported that Wong met frequently with Euteneuer"); ¶ 109 ("Abrahams shared with Whitaker that he spoke frequently with Euteneuer"); ¶ 139 ("Wong reported to Whitaker that Euteneuer accepted the decision to restate third quarter earnings"). Whitaker's paraphrasing of Wong's alleged statement that "they

-11-

Under Ninth Circuit law, Whitaker lacks "reliable personal knowledge of the defendants' mental state." *Zucco*, 552 F.3d at 998; *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-63 (9th Cir. 2014) (rejecting "impressions of witnesses who lacked direct access to the executives" and "lack first hand knowledge regarding what the individual defendants knew or did not know"); *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948-49 (N.D. Cal. 2010) ("opinions and observations" of witnesses who "had no personal interactions with" executives cannot show "what these individual Defendants knew or did not know"). The AC is "the report of Brett Whitaker," ¶ 57, and it cites no other witness whose purported recollections might establish the "Individual Defendants' knowledge." *Curry*, 875 F.3d at 1227-28.

**Second**, even if it were reliable, Whitaker's hearsay account is not "indicative of scienter." *Zucco*, 552 F.3d at 995. Whitaker peppers his account with adjectives typical of confidential-witness allegations. *E.g.*, ¶ 115 ("alarming"); ¶ 120 ("alarm bells"); ¶ 140 ("shocked"). But without specific facts showing intentional fraud by the individual defendants at Mattel, strong rhetoric adds nothing. *See Nguyen*, 962 F.3d at 416 ("The allegations sourced to CW1 are high on alarming adjectives—'serious and unsolvable,' 'dangerous,' 'urgent,' and so on. … Strong rhetoric is not a substitute for 'particular[] facts giving rise to a strong inference' of scienter.").

As for Georgiadis, Plaintiffs never allege she knew anything about the third-quarter error. As Plaintiffs concede, the Audit Committee found that "[t]he error was not reported to Mattel's then-CEO, Margaret Georgiadis," ¶ 177, and cited "failures to … disclose such errors to … Georgiadis," ¶ 175; *see* Ex. 5 at 278, 279.

As for Euteneuer, no specific pleaded facts show that he *knew* Mattel failed to issue a required restatement or to disclose a control weakness. Plaintiffs plead that, at a meeting Whitaker did not attend, Euteneuer accepted a preliminary "decision to would rather have a slap on the wrist from the SEC" is similar—not only is it double hearsay, but it leaves "they" undefined. ¶ 143.

-12-

restate third quarter earnings" purportedly made by lower-level Mattel employees, ¶¶ 15, 139, or at least "did not dispute" it, ¶ 201. Then, Plaintiffs plead, "Euteneuer requested that Wong set up a meeting to discuss that conclusion with PwC." ¶ 139.

Euteneuer then utterly disappears from Plaintiffs' narrative. Neither Whitaker *nor Euteneuer* attended that key meeting with PwC. ¶ 140 ("Wong, Johnson, and Lew attended for Mattel."). Euteneuer is not alleged to have heard, much less endorsed, what Plaintiffs portray as nefarious comments by PwC partners about seeking "a technical argument" or "figur[ing] out a way" not to disclose a weakness. ¶¶ 141-142.[5] Nor do Plaintiffs allege the most basic facts—what was discussed and when—about any other interaction Euteneuer might have had with PwC, or his own team, about whether a restatement or other disclosure was required. Absent specific pleaded facts to the contrary, the natural and far more compelling inference is that, having told his team to consult with PwC, Euteneuer agreed with the final judgment of PwC and his team that no restatement or other disclosure was required.

**Third**, Plaintiffs cannot invoke either "narrow exception[]" to the rule that a restatement alone cannot show scienter. *IXIA*, 50 F. Supp. 3d at 1359 (citing *Zucco*, 552 F.3d at 1000). The first exception does not apply because the obscure, technical tax-accounting error was not "of such prominence or obviousness that it would be absurd to suggest that management was without knowledge." *Id.* Shifting a portion of the valuation allowance by one quarter was "non-cash, did not affect operating income or EBITDA, and had no impact on Mattel's full year financial results for 2017 or subsequent periods." Ex. 5 at 278. Analysts ultimately called the error "benign," Ex. 16 at 487, and cause for "relief," Ex. 18 at 510. PwC advised Mattel *not* to restate financials or disclose a control weakness, and even now, Plaintiffs

---

[5] Plaintiffs fail to support the premise that being disinclined to restate financials or disclose a control weakness is improper and shows scienter. *See Brown*, 2019 WL 4187385, at *4 (rejecting theory that scienter "can be inferred based on [an] effort to 'minimize' control weaknesses and 'downplay' their impact").

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

never claim that reclassifying the Thomas asset was *incorrect*.

*Webb* is instructive.  SolarCity restated net income by 15%-67% across seven quarters, revealing that its sales division actually had operated at a loss.  884 F.3d at 849, 858.  Although management "had reason to suspect that … internal accounting controls were imperfect," the Ninth Circuit held that the more compelling inference was of an "honest mistake."  *Id.* at 856.  Mattel's restatement was far more benign—it had *zero* impact on net income and merely shifted part of a valuation allowance by one quarter.  *See In re Aspeon, Inc. Sec. Litig.*, 168 F. App'x 836, 839 (9th Cir. 2006) (restatements that "shuffled funds amongst [three] quarters" "do not give rise to a strong inference" of scienter); *IXIA*, 50 F. Supp. 3d at 1364 (no scienter inference as errors "merely shifted earnings from present to future periods; overall revenues were not impacted"); *Perrin*, 2011 WL 10756419, at *3-6 (no scienter inference despite "widespread accounting errors" and 15 material weaknesses).

The second exception does not apply because Plaintiffs make no "allegations regarding ... management's role in the company that are particular and suggest that the defendant must have known its accounting methodology was wrong."  *IXIA*, 50 F. Supp. 3d at 1359 (citation omitted).  Plaintiffs allege nothing about Georgiadis; Farr had left Mattel in September 2017, ¶ 37; and as for Euteneuer, Plaintiffs allege only that, as CFO, he saw draft financials in the ordinary course, ¶¶ 108, 211.  But the mere fact "that senior management ... closely reviewed the accounting numbers generated ... each quarter" does not show scienter.  *Zucco*, 552 F.3d at 1000; *see In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 973 (N.D. Cal. 2010) ("bare allegations that [] officers had access to financial statements and analyzed [them] does not support the inference that defendants knew about the accounting error").  That is especially so given the non-cash nature of Mattel's restatement, which was not "'such an extreme departure' from the norm that [a CFO], simply by reading the financial statements, would have known of [it]."  *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002).

### 3. PwC's Advice Undercuts Any Scienter Inference

PwC's advice to Mattel precludes any "strong inference" of scienter.  As the Audit Committee's investigation found, Mattel's error was due in part to "reliance on the accounting advice sought and received on the error from the lead audit engagement partner of Mattel's outside auditor."  Ex. 5 at 279; ¶¶ 23, 177.

Plaintiffs affirmatively plead that PwC advised Mattel *not* to restate financials and *not* to disclose a control weakness.  In the third quarter, "PwC did not require the disclosure of any material weakness."  ¶ 111.  In the fourth quarter, "PwC … advised Mattel not to revise (i.e., restate) the results of operations for the third quarter of 2017."  ¶ 305.  Then, "PwC issued unqualified audit reports on [Mattel's] financial statements and internal controls for fiscal years 2017 and 2018."  ¶ 38; *see* ¶ 216 (citing "PwC's representations that Mattel's internal controls were effective").  Plaintiffs even plead that PwC prompted Mattel's non-disclosure.  ¶ 18 ("PwC had concocted just such a plan"); ¶ 143 ("PwC had manufactured a plan").

Just as allegations that "external auditors counseled against a practice" add to a scienter inference, *Lloyd*, 811 F.3d at 1207, approval by outside auditors *undercuts* a scienter inference and strengthens the non-fraud inference.  *See Webb*, 884 F.3d at 857 ("the accounting error was so subtle that … professional auditors missed it"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1254 (S.D. Cal. 2010) (no scienter based on part on "independent auditor's approval"); *Hansen*, 527 F. Supp. 2d at 1158 ("The Court finds Deloitte & Touche LLP's unqualified opinion 'highly probative' of an absence of scienter."); *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 991 (N.D. Cal. 2007) (no scienter where valuation allowance "was a product of an audit by KPMG in which KPMG issued an unqualified opinion"); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1463 (N.D. Cal. 1996) (that company "made extensive disclosure to, and voluntarily consulted with, E&Y" "tends to negate an inference of scienter"); *see also Jackson Inv. Grp., LLC v. Thomas*, 325 F. Supp. 3d 1334, 1350 (N.D. Ga. 2017) ("auditors repeatedly issued unqualified

approvals"); *Espinoza v. Whiting*, 8 F. Supp. 3d 1142, 1151 (E.D. Mo. 2014) ("[the] independent auditor, Ernst & Young, … believed it was appropriate"); *Casula v. athenahealth, Inc.*, 2011 WL 4566115, at *7 (D. Mass. Sept. 30, 2011) ("sign-off on its financial statements from its outside auditor" "does weigh heavily against an inference of intent to defraud").

### 4. Lack of Stock Sales Undercuts Any Scienter Inference

Plaintiffs allege *no* stock sales, suspicious or otherwise, by Mattel insiders. "[L]ack of stock sales can detract from a scienter finding," *Webb*, 884 F.3d at 856, and "supports the opposite inference," *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012); *see Nguyen*, 962 F.3d at 415 ("If defendants had sought to profit from this scheme in the interim, such as by selling off their stock … , the theory might have more legs."); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *14 (C.D. Cal. Aug. 21, 2009) ("any inference of scienter is negated by the complete lack of stock sales"). In fact, Euteneuer bought Mattel stock during the class period, which further detracts from any scienter inference. Ex. 3 at 251; *see Webb*, 884 F.3d at 856 ("rather than selling shares, [CEO] purchased additional stock").

Plaintiffs allege no other motive for fraud. They claim that "full disclosure of the truth could have further harmed Mattel's stock price and decimated investor confidence." ¶ 14. But the Ninth Circuit rejects such generic allegations. *See, e.g.*, *Webb*, 884 F.3d at 856 ("motive to boost the company's profitability and stock prices … [is] not 'specific' or 'particularized,' as our precedents require"); *Rigel*, 697 F.3d at 884 ("routine corporate objectives" do not suffice); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) (if generic motives sufficed, "virtually every company … that experiences a downturn in stock price could be forced to defend securities fraud actions").

### 5. Plaintiffs' Other Scienter Allegations Add Nothing

***Euteneuer's departure.*** Euteneuer's "six-month transition period" does not show scienter. ¶ 179. "[C]onclusory allegations that a financial manager resigns or

-16-

retires … shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter." *Brown*, 2019 WL 4187385, at *4 (quoting *Zucco*, 552 F.3d at 1002). Plaintiffs fail to rebut what the Ninth Circuit calls the "reasonable assumption" that a CFO left due to the mere fact of a restatement, *not* underlying wrongdoing. *Webb*, 884 F.3d at 857 ("corporate reshuffling allegations" fail because plaintiff failed to "rebut the 'reasonable assumption' that the reshuffling 'occurred as a result of [a] restatement's issuance itself'"). That Euteneuer stayed on for six months (indeed, he stayed even longer) *negates* any scienter inference. *See Align*, 856 F.3d at 622 ("that [CFO] remained an employee … for an additional six months … diminishes any inference of scienter"); *NVIDIA*, 768 F.3d at 1063 (no scienter inference where executives "remained … in some type of advisory role"). Moreover, the independent investigation by Mattel's Audit Committee "did not find that management [including Euteneuer] engaged in fraud." Ex. 5 at 279.

**SOX certifications.** That Georgiadis and Euteneuer signed Sarbanes-Oxley certifications adds nothing. ¶ 204. "Boilerplate language in a corporation's 10-K form, or required certifications under Sarbanes-Oxley section 302(a), … add nothing substantial to the scienter calculus." *Zucco*, 552 F.3d at 1003-04; *see Zamir v. Bridgepoint Educ., Inc.*, 274 F. Supp. 3d 1057, 1072 (S.D. Cal. 2017) ("giv[ing] no weight" to SOX certifications). "[If] simply alleging that the Individual Defendants' signatures … creates a strong inference of scienter, 'scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'" *Downey*, 2009 WL 2767670, at *9.

**No report to Audit Committee.** That "no one … reported the material misstatement in the third quarter financials or the material weaknesses to the Audit Committee," ¶ 203, adds nothing, either. As noted, no specific pleaded facts show Euteneuer or Georgiadis knew about any material misstatement or weakness. Mattel later acknowledged, as a control weakness, a failure to communicate with "those

-17-

parties responsible for taking corrective action, such as the Audit Committee." ¶ 189; Ex. 6 at 409.  A mere control weakness, however, cannot support a "strong inference" of scienter.  *See, e.g.*, *IXIA*, 50 F. Supp. 3d at 1364.

***Collective scienter.***  Although Plaintiffs hint at a "collective scienter" theory, ¶ 219 ("[n]umerous individuals … possessed the requisite scienter"), that is not the law in the Ninth Circuit, *see IXIA*, 50 F. Supp. 3d at 1354-55 (collecting cases).  Plaintiffs must "plead scienter with respect to those individuals who actually made the false statements."  *Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008); *see Apollo*, 774 F.3d at 607 ("we require that the Plaintiffs allege scienter with respect to each of the individual defendants"); *In re Maxwell Tech., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1033 (S.D. Cal. 2014) ("corporate scienter is not sufficiently alleged … where one executive had the knowledge and other, perhaps-innocent executives made the statements").[6]

***Other "issues".***  Plaintiffs claim that the individual defendants at Mattel knew about other "issues."  To Whitaker, "the biggest red flag" was "boxes and binders of loose paper."  ¶ 69.  Whitaker also claims (with no examples) that "numbers often did not 'tie out,'" Mattel's tax and financial-planning departments had "ineffective communication," and Mattel had no control for valuation allowances.  ¶¶ 70-73.  Yet these observations never allegedly implicate Georgiadis, Euteneuer, or Farr.  The PSLRA's "[e]xacting pleading requirements," *Tellabs*, 551 U.S. at 313, do not permit vaguely asserting that "issues" were "widely recognized" or "'well-known.'"  ¶ 215.  Moreover, "PwC ... ha[d] been Mattel's independent auditor for more than 45 years."  ¶ 216.  Despite being "intimately familiar with the Company," *id.*, "PwC

[6] The Ninth Circuit has suggested that collective scienter might exist for statements "so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity."  *Glazer*, 549 F.3d at 744.  But Ninth Circuit explained that the statement would need to be outrageous, as if "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero."  *NVIDIA*, 768 F.3d at 1063 & n.13.

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

did not require the disclosure of any material weakness," ¶ 111, and "represent[ed] that Mattel's internal controls were effective," ¶ 216.[7]

In any event, "paint[ing] a picture of a mismanaged organization in need of closer financial oversight" does not show scienter. *Webb*, 884 F.3d at 856; *see id.* at 851 (rejecting allegations based on 11 confidential witnesses "describ[ing] flaws in the company's accounting and financial systems"); *Aspeon*, 168 F. App'x at 839 (rejecting allegations that "senior management" were told "accounting system was 'disorganized' and needed 'enhanc[ement]'").

***"Wild swings".*** Plaintiffs' misleading claim that Euteneuer was "privy to the wild downward swings" in Mattel's third-quarter valuation allowance adds nothing. ¶ 8; *see* ¶ 108 ("wild swings … 'could not be ignored'"). There was *one* swing—from $175-$200 million to $562 million—and it resulted from Whitaker's own mistake. ¶¶ 103, 106. What Plaintiffs call the first swing was caused by the late-breaking Toys "R" Us bankruptcy, as Plaintiffs admit. ¶ 93. Even if Whitaker was "shocked and upset," ¶ 97, at having to work at "breakneck speed," ¶ 210, that timing was no failing at Mattel and no "red flag" to Euteneuer. And, PwC instigated the increase to $562 million after catching Whitaker's error. ¶¶ 103, 107.

### 6. Viewed Holistically, the Scienter Allegations Fail

Finally, taking a holistic view only confirms that the scienter allegations fail. *See Zucco*, 552 F.3d at 1008 ("A comprehensive perspective … cannot transform a series of inadequate allegations into a viable inference of scienter.").

Mattel's tax accounting error was non-cash and did not affect the key metrics Mattel reported about financial performance in 2017 or any later period. Plaintiffs never claim that reclassifying the Thomas asset as finite-lived was incorrect. Mattel

[7] Plaintiffs allege that Farr knew Mattel had a control weakness that was undisclosed in its *second*-quarter 2017 10-Q. But Mattel never acknowledged such a weakness and no specific pleaded facts show such a weakness existed. All Plaintiffs allege is that the "deficiencies did not suddenly arise" in the third quarter. ¶ 326. That conclusory assertion does not show scienter or falsity as to the second-quarter 10-Q.

-19-

conferred with PwC, PwC advised that no restatement or other disclosure was required, and Mattel relied on that advice.  There was no suspicious insider trading during the two years in which Mattel's stock price allegedly was inflated by fraud. Analysts ultimately noted that Mattel "made only one accounting change regarding timing of 2H17 tax expense," Ex. 17 at 502, a "benign accounting issue[]," Ex. 16 at 487, that "had NO material impact on FY17 numbers and did not affect operating income or EBITDA," Ex. 15 at 477.  And, not least, the Audit Committee, based on an investigation by independent counsel, "did not find that management engaged in fraud."  ¶ 194; *see, e.g.*, *Maxwell*, 18 F. Supp. 3d at 1045 ("That the audit committee conducted an investigation and did not find that the individual defendants had knowledge supports [their] claim that they lacked scienter.").

On the whole, the AC fails to yield an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  Absent specific facts to the contrary, the far stronger inference is that, on an arcane matter of tax accounting that investors later deemed a non-event, Mattel followed its outside auditor's advice without fraudulent intent.

## B.   No Specific Facts Show Loss Causation

Plaintiffs also fail to plead loss causation—that is, "that the act or omission … alleged to violate [the securities laws] caused the loss for which [Plaintiffs] seek[] to recover damages."  15 U.S.C. § 78u-4(b)(4).  Like scienter, loss causation must be pleaded with particularity.  *See Apollo*, 774 F.3d at 605.  "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'"  *Lloyd*, 811 F.3d at 1209-10.

Unable to allege that Mattel's stock price fell when it announced in October 2019 that it would restate financials and had control weaknesses, ¶ 171, *or* that it fell when Mattel actually issued the restatements and described the weaknesses, ¶ 439, Plaintiffs invoke a single stock-price decline that occurred months earlier, on August

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

9, 2019. On August 8, 2019, after the market closed, Mattel issued a Form 8-K that stated in its entirety:

> On August 6, 2019, Mattel, Inc. (the "Company") was made aware of an anonymous whistleblower letter. To provide the Company with an opportunity to investigate the matters set forth in the letter, the offering of the Company's 6.00% Senior Notes due 2027 that was scheduled to close on August 8, 2019 has been terminated. The Company intends to refinance its 4.350% Senior Notes due October 2020 prior to maturity.

Ex. 4 at 255; ¶¶ 161-162. The disclosure said *nothing* about the substance of the letter or the investigation. Still, boxed in by the lack of other stock-price declines, Plaintiffs claim that "[t]he information" about the misstatements alleged in the AC "was disseminated through a disclosure on August 8, 2019," ¶ 435, such that the stock-price decline the next day was caused by the alleged fraud. ¶¶ 434-439.

For multiple reasons, no specific pleaded facts show that the August 9, 2019 decline was caused by the alleged misstatements about third- or fourth-quarter 2017 financials or lack of a control weakness. Plaintiffs fail to plead loss causation.

### 1. No Revelation About the Error Preceded the Decline

Plaintiffs fail to plead with particularity that on August 8, 2019, the alleged "fraud was '*revealed* to the market and *caused* the resulting losses.'" *Loos*, 762 F.3d at 887. All that was revealed that day was that Mattel would "investigate" a whistleblower letter that it had received on an unspecified subject. Ex. 4 at 255. There was no mention of Mattel's third- or fourth-quarter 2017 financials, or of any control weakness, or of anything about accounting at all. Nor do Plaintiffs attempt to allege that such information entered the market through other means.

The contemporaneous reaction of market analysts confirms that no facts about the alleged fraud were revealed. Analysts said nothing about accounting and instead emphasized what the market did *not* know. Ex. 10 at 432 ("Could Be Anything"); Ex. 13 at 456 ("too many unknowns" and "list of hypotheticals ranges from the benign to the extreme"); Ex. 12 at 450 ("wide range of speculation"). One analyst speculated that the letter concerned "the Fisher-Price recent recall being worse than expected." Ex. 11 at 440. Looking back from October 2019, an analyst referred to

-21-

the "mystery" in August 2019 and even recalled that amid all the "conjecture in the investment community about the contents of the letter, most people put accounting fraud *low on the list*." Ex. 16 at 487 (emphasis added).

Despite citing analysts throughout the AC, *e.g.*, ¶¶ 45-46, 52, 63, 171, 443(g), Plaintiffs ignore the uniform analyst commentary about their sole alleged corrective disclosure. Instead, Plaintiffs cite press reports, but even those emphasized what investors did *not* know. ¶¶ 163-167; *see, e.g.*, Ex. 7 at 424 (AP: "The details of the complaint were not revealed …."); Ex. 8 at 426 (CNBC: "The company did not disclose the contents of the letter."); Ex. 9 at 429 (Bloomberg: "It didn't offer any further details about the letter.").

Plaintiffs plead only tea leaves, with no specific facts showing they were read. But the Ninth Circuit has made clear that plaintiffs may not "plead loss causation through 'euphemism.'" *Metzler*, 540 F.3d at 1064. "So long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud." *Id.* Plaintiffs attempt to do what the Ninth Circuit forbids, claiming that Mattel's oblique reference to a letter was a "coded message" the market must have imbued with more meaning. But without specific pleaded facts supporting that theory, and with the uniform analyst commentary arrayed against them, Plaintiffs cannot show that the August 9, 2019 stock-price decline was caused by the "'very facts about which [Defendants allegedly] lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).

### 2.   Announcing an Investigation Does Not Reveal Fraud

Plaintiffs fail to plead loss causation for another, independent reason. Even if the market somehow intuited that the letter concerned the tax accounting error that later was revealed (which it demonstrably did not do), the most that was revealed on August 8, 2019 was that Mattel "would initiate an investigation." ¶ 161; *see* Ex. 4 at 255 (Mattel will "investigate the matters … in the letter").

-22-

Under Ninth Circuit law, announcing an investigation "cannot form the basis of a viable loss causation theory" because

> [t]he announcement of an investigation does not "reveal" fraudulent practices to the market.  Indeed, at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal. … Consequently, any decline in a corporation's share price following the announcement of an investigation **can only be attributed to market speculation about whether fraud has occurred**.

*Loos*, 762 F.3d at 890 (emphasis added); *see Curry*, 875 F.3d at 1225 (loss causation not pleaded by "asserting that where there is smoke, there must be fire"); *Apollo*, 774 F.3d at 608 ("a company's announcement of an internal investigation, by itself, … is insufficient to establish loss causation").

Indeed, the corrective disclosure alleged by Plaintiffs revealed *far less* to the market than even the disclosure in *Loos*, which the Ninth Circuit held failed to show loss causation.  In *Loos*, the company described the substance of the investigation: "an internal investigation into certain previous revenue transactions in its Medical line of business," which "could raise issues with respect to its previously-reported financial information, which could be material."  762 F.3d at 885.  Even so, the loss causation allegations failed because the plaintiff could not "correlate his losses to anything other than the announcement of an internal investigation."  *Id.* at 883.  Here, Mattel likewise disclosed an internal investigation, but unlike in *Loos*, it said *nothing* about what the investigation concerned or might reveal.

No specific pleaded facts show, or could show, that "the market and various analysts perceived the [investigation] to be related to [the] alleged misstatements." *Lloyd*, 811 F.3d at 1210-11.  By contrast, the plaintiff in *Lloyd* pleaded loss causation based on the disclosure of a subpoena because the company described the subpoena in detail[8] and analysts said it "validate[s] our overall concerns" about

---

[8] The *Lloyd* disclosure read: "The subpoena requests information regarding our loan underwriting guidelines, our allowance for credit losses and our allowance for loan loss calculation methodology, our methodology for grading loans and the process

whether the company "misled the Street."  *Id.* at 1204-05.  Here, Mattel did not describe the substance of the investigation, so the market could only speculate about what it concerned.  *See, e.g.*, *Rok v. Identiv, Inc.*, 2017 WL 35496, at *20 (N.D. Cal. Jan. 4, 2017) ("in *Lloyd*, it was far more clear … that the market had already understood the fraud to have been revealed (based on the analysis of … analysts at the time of the announcement of the SEC subpoena)"), *aff'd*, 716 F. App'x 663, 664 (9th Cir. 2018) (adopting Judge Breyer's "detailed and well-reasoned analysis").

Nor do Plaintiffs plead any "bombshell" revelation so explosive it necessarily would cause a stock-price decline.  *Lloyd*, 811 F.3d at 1210; *see N.Y. Hotel Trades Council & Hotel Ass'n of N.Y., Inc. Pension Fund v. Impax Labs. Inc.*, 2019 WL 3779262, at *3 (N.D. Cal. Aug. 12, 2019) (plaintiff "nowhere details a 'subsequent corrective disclosure' [like that] … in *Lloyd*"); *Huang v. Higgins*, 2019 WL 1245136, at *18 (N.D. Cal. Mar. 18, 2019) (disclosure "falls far short of the subsequent corrective disclosure in *Lloyd*").  In *Lloyd*, a lender revealed that its largest receivable was uncollectible—news so bad it inevitably would have caused a loss had it not been preceded by disclosure of a subpoena on the subject.  Again, the contrast could not be starker, as analysts reacted *positively* when Mattel revealed the findings of the Audit Committee's investigation.  *See* Ex. 14 at 471 ("much less significant an issue than feared"); Ex. 15 at 477 ("likely to be received favorably"); Ex. 19 at 521 ("far less severe than feared"); Ex. 20 at 528 ("we (and investors) had been bracing for a worse outcome"); Ex. 16 at 487 ("benign accounting issues").

### 3.    Mattel's Stock Price Fell by Happenstance of Timing

Plaintiffs concede why Mattel's stock price actually fell.  They affirmatively allege that Mattel's announcing the cancellation of a debt offering at the last minute was highly unusual and created market uncertainty.  "As the news outlets reporting on Mattel's disclosure recognized, it is *extremely rare* for an issuer to pull an

---

for making provisions for loan losses, and our provision for credit losses."  *Id.* at 1204.

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

offering after the bonds have priced." ¶ 167 (emphasis added); *see id.* ("[c]ancelling a deal in between pricing and settlement … has only happened three times before"). Indeed, the press reports Plaintiffs quote focus not on the letter—unsurprising, as no substance was revealed—but on the abruptness of the termination. ¶ 163 ("pulled a debt offering"); ¶ 164 ("pulling bond sale"); Ex. 7 at 424 (AP: "Shares in Mattel tumbled … after the toymaker pulled a debt offering ….").

That Mattel terminated the offering after the bonds had priced and on the very day the offering was set to close was purely a happenstance of timing. Had Mattel learned of the letter a week or two earlier, the bonds would not yet have priced, and cancelling the offering would have been less unusual. Had Mattel learned of the letter a month or two earlier, it might not have cancelled the offering at all, since the investigation could have been completed before closing. It was only because the letter happened to be sent to PwC on August 1, and then to be routed to Mattel on August 6 just before a $250 million debt offering set to close on August 8, that Mattel—out of prudence—chose to take "extremely rare" action that led to "surprise and concern" in the market. ¶¶ 163, 167; *see* Ex. 4 at 255.

Plaintiffs may recover losses caused by fraud, not by chance. "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210 (citation omitted). Here, Plaintiffs plead the proximate cause of the only decline for which they seek to recover: the chance, *unforeseeable* timing of when Mattel happened to receive the whistleblower letter.

## IV.   CONCLUSION

Plaintiffs' claims against Mattel, Georgiadis, Euteneuer, and Farr should be dismissed with prejudice for failure to plead scienter and loss causation.[9]

---

[9] The control-person claims under Section 20(a) fail because Plaintiffs fail to plead a primary violation of the securities laws. *See, e.g.*, *Rigel*, 697 F.3d at 886.

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

Dated:  July 28, 2020

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By:  _____
         */s/ John W. Spiegel*
          JOHN W. SPIEGEL

Attorneys for MATTEL, INC.,
MARGARET H. GEORGIADIS,
JOSEPH J. EUTENEUER,
and KEVIN FARR

-26-