**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
John Rizio-Hamilton
johnr@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

| | |
|---|---|
| **BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP** | **BLOCK & LEVITON LLP** |
| Jonathan D. Uslaner (SBN 256898) | Jacob A. Walker (SBN 271217) |
| jonathanu@blbglaw.com | 260 Franklin Street |
| 2121 Avenue of the Stars, Suite 2575 | Suite 1860 |
| Los Angeles, CA 90067 | Boston, MA 02110 |
| Telephone: (310) 819-3472 | Telephone: (617) 398-5600 |

*Counsel for Lead Plaintiffs and the Class*

*Additional Counsel for Additional Named Plaintiff Houston Municipal Employees Pension System*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| *In re Mattel, Inc. Securities Litigation* | Case No. 19-CV-10860-AB (PLAx) |
| | **LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| | Date: December 4, 2020 |
| | Time: 10:00 a.m. |
| | Ctrm: 7B |
| | Judge: Hon. André Birotte Jr. |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ..................................................................................... iii

I.      INTRODUCTION ...........................................................................................1

II.     SUMMARY OF THE FACTS ........................................................................3

        A.      Defendants Knew of Mattel's Severe Internal Control Deficiencies .....3

        B.      Mattel Materially Understated Its Loss for the Third Quarter of 2017 ...................................................................................................5

                1.      Mattel and PwC Decided Not to Record a Valuation Allowance ..........................................................................5

                2.      Mattel and PwC Abruptly Changed Course ................................7

                3.      Defendants Recklessly Issued Mattel's False Results..................8

        C.      Defendants Determine that Mattel Misstated Its Financial Results........9

        D.      Mattel and PwC Conspire to Conceal the Misstatement .......................12

        E.      Mattel's Stock Price Plummeted When Defendants Were Forced to Disclose Their Receipt of a Whistleblower Letter Concerning the Fraud................................................................................................15

        F.      Mattel Admitted that It Materially Misstated Its Financial Results and Falsely Certified Its Internal Controls During the Class Period ....15

III.    ARGUMENT.................................................................................................17

        A.      The Complaint Adequately Alleges the Mattel Defendants' Scienter....................................................................................................17

                1.      The Complaint Alleges Scienter as to the Mattel Defendants' Misstatements of Financial Results.......................18

                2.      The Mattel Defendants' Remaining Arguments Fail .................24

                3.      The Complaint Alleges Scienter as to Mattel's Internal Control Deficiencies .................................................................31

        B.      The Complaint Adequately Alleges Scienter Against PwC ................34

- i -

1. PwC Actively Participated in the Scheme to Conceal Known Material Misstatements and Material Weaknesses......................34

2. PwC's Remaining Arguments Fail ..............................................36

3. PwC's Audit Opinions Concerning Mattel's 2017 Financial Results Were Materially Misleading ..........................................40

C. The Complaint Pleads Loss Causation ...................................................41

1. The Complaint Adequately Alleges Loss Causation..................41

2. Defendants' Arguments Fail......................................................44

D. Defendants' Remaining Arguments Fail ...............................................47

E. The Complaint Alleges Control Person Liability ..................................50

IV. CONCLUSION ...............................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Accuray, Inc. Sec. Litig.*,
  757 F. Supp. 2d 936 (N.D. Cal. 2010)....................................................................28

*In re Adaptive Broadband Sec. Litig.*,
  2002 WL 989478 (N.D. Cal. Apr. 2, 2002).................................................23, 25, 50

*In re Allergan, Inc. Proxy Violation Sec. Litig.*,
  2018 WL 3912934 (C.D. Cal. Aug. 14, 2018) .......................................................50

*In re Amgen Inc. Sec. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008)..................................................................40

*In re Aspeon, Inc. Sec. Litig.*,
  168 F. App'x 836 (9th Cir. 2006)....................................................................25, 34

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................48

*In re Banc of California Sec. Litig.*,
  2017 WL 3972456 (C.D. Cal. Sept. 6, 2017)...................................................23, 33

*In re Cadence Design Sys., Inc. Sec. Litig.*,
  692 F. Supp. 2d 1181 (N.D. Cal. 2010)..............................................................20, 30

*In re Century Aluminum Co. Sec. Litig.*,
  749 F. Supp. 2d 964 (N.D. Cal. 2010)....................................................................25

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2020 WL 3026564 (D.N.J. June 5, 2020)................................................................31

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008)..................................................................28

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) .......................................................................21, 25, 27

*De Sejournet v. Mohidin*,
  2014 WL 7723573 (C.D. Cal. May 21, 2014)........................................................40

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................41, 46

*Edenbrook Capital, LLC v. RhythmOne Plc*,
    2019 WL 1791419 (N.D. Cal. Apr. 24, 2019)......................................................42

*In re Entropin, Inc. Sec. Litig.*,
    487 F. Supp. 2d 1141 (C.D. Cal. 2007)................................................................29

*In re Glob. Crossing, Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ..................................................................38

*In re Homestore.com, Inc. Sec. Litig.*,
    252 F. Supp. 2d 1018 (C.D. Cal. 2003)................................................................35

*In re Homestore.com, Inc. Sec. Litig.*,
    347 F. Supp. 2d 769 (C.D. Cal. 2004)..............................................................18, 21

*Huang v. Higgins*,
    2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) .....................................................47

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ..............................................................41, 50

*Karinski v. Stamps.com, Inc.*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020).........................................................42

*Kyung Cho v. UCBH Holdings, Inc.*,
    890 F. Supp. 2d 1190 (N.D. Cal. 2012)................................................................50

*In re LendingClub Sec. Litig.*,
    254 F. Supp. 3d 1107 (N.D. Cal. 2017)................................................................32

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ........................................................................passim

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ......................................................................43, 45, 46

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011)..................................................................20

*Mauss v. NuVasive, Inc.*,
    2018 WL 656036 (S.D. Cal. Feb. 1, 2018)...........................................................44

*Merkamerica Inc. v. Glover*,
2019 WL 8989833 (C.D. Cal. Dec. 3, 2019)............................................................48

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ...............................................................43, 45

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
2008 WL 7084629 (C.D. Cal. July 10, 2008) ...............................................50, 51

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...........................................................33

*Mild v. PPG Indus., Inc.*,
2018 WL 6787351 (C.D. Cal. Dec. 21, 2018)................................................23, 39

*Mineworkers Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .............................................................passim

*N.Y. Hotel Trades Council & Hotel Ass'n of N.Y., Inc. Pension Fund v.*
*Impax Labs. Inc.*,
2019 WL 3779262 (N.D. Cal. Aug. 12, 2019)..........................................47

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008)...........................................passim

*New Mexico State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011) ...............................................34, 37, 38

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W.*
*Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...................................................................29

*Oklahoma Firefighters Pension & Retirement Sys. v. IXIA*,
50 F. Supp. 3d 1328 (C.D. Cal. 2014).............................................................25

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019)..............................................18, 28, 31

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................................................40, 41

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ...................................................................43, 45

- v -

*Perrin v. Sw. Water Co.*,
2011 WL 10756419 (C.D. Cal. June 30, 2011)..........................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .................................................................................27

*Prodanova v. H.C. Wainwright & Co., LLC*,
2018 WL 8017791 (C.D. Cal. Dec. 11, 2018)..........................................................48

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................................19

*Richard v. Nw. Pipe Co.*,
2011 WL 3813073 (W.D. Wash. Aug. 26, 2011).....................................................24

*Robb v. Fitbit Inc.*,
2017 WL 219673 (N.D. Cal. Jan. 19, 2017)............................................................30

*Robb v. Fitbit Inc.*,
216 F. Supp. 3d 1017 (N.D. Cal. 2016)....................................................................47

*Roberts v. Zuora*,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020)..........................................................28

*Rok v. Identiv, Inc.*,
2017 WL 35496 (N.D. Cal. Jan. 4, 2017)............................................................46, 47

*S.E.C. v. Brandonisio*,
2013 WL 5371626 (D. Nev. Sept. 24, 2013).............................................................22

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016) ...................................................................................40

*SEC v. Collins & Aikman Corp.*,
524 F. Supp. 2d. 477 (S.D.N.Y. 2007) ...............................................................22, 36

*In re Silver Wheaton Corp. Sec. Litig.*,
2016 WL 3226004 (C.D. Cal. June 6, 2016)............................................................28

*In re Silver Wheaton Corp. Sec. Litig.*,
2019 WL 1512269 (C.D. Cal. Mar. 25, 2019) ...............................35, 36, 39, 40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................17, 18, 29

*In re Terayon Commc'ns Sys., Inc.*,
  2002 WL 989480 (N.D. Cal. Mar. 29, 2002) ......................................................... 20

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................................. 18

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .............................................................................................. 48

*Turocy v. El Pollo Loco Holdings, Inc.*,
  2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ......................................................... 20

*In re Twitter, Inc. Sec. Litig.*,
  2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ........................................................ 26

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................. 17, 23

*In re Velti PLC Sec. Litig.*,
  2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) .......................................................... 34

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ........................................................................... passim

*In re WageWorks, Inc., Sec. Litig.*,
  2020 WL 2896547 (N.D. Cal. June 1, 2020) ............................................... 22, 23, 24

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) ............................................................. 32

*Waterford Twp. Police v. Mattel, Inc.*,
  321 F. Supp. 3d 1133 (C.D. Cal. 2018), *aff'd sub nom.* 794 F. App'x
  669 (9th Cir. 2020) ............................................................................................... 42

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018) .......................................................................... 25, 34

**OTHER AUTHORITIES**

17 C.F.R. § 211.108 ..................................................................................................... 48

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 45

Plaintiffs respectfully submit this Memorandum of Points and Authorities in opposition to Defendants' Motions to Dismiss. ECF Nos. 39-42.[1]

## I. INTRODUCTION

This action presents a quintessential case of securities fraud. Mattel's senior executives knew that Mattel materially misstated its financial results and suffered from severe internal control deficiencies, and conspired with Mattel's auditor, PwC, to conceal those facts instead of disclosing them to investors. This deception succeeded for years—until a whistleblower forced Mattel to come clean. When Mattel disclosed its receipt of the whistleblower letter, its stock price plummeted, harming investors. Within weeks, Mattel admitted that it materially misstated its financial results for the third and fourth quarters of 2017 and would restate them; its management knew of the misstatements and made "lapses in judgment" in concealing them; and Mattel suffered from multiple weaknesses in its internal controls—all of which directly contradicted Defendants' public statements to investors throughout the Class Period.

Based on the report of a former senior Mattel executive with personal knowledge of key events, internal Mattel documents, and the Company's own admissions, the Complaint alleges Defendants' securities laws violations with an extraordinary level of detail that surpasses anything required by the PSLRA or controlling caselaw. Among other things, the Complaint details what the control deficiencies were; what the financial misstatement was and how Defendants made it; how Mattel's most senior executives in its Accounting, Tax, Legal and Internal Audit departments learned of the misstatement, the meetings at which they discussed it, and how they informed the

---

[1] "MB" refers to the brief by Defendants Mattel, Inc., Margaret H. Georgiadis, Joseph J. Euteneuer, and Kevin Farr (the "Mattel Defendants") at ECF No. 41-1. "PB" refers to the brief by Defendant PricewaterhouseCoopers ("PwC") at ECF No. 39-1. "AB" refers to the brief by Defendant Joshua Abrahams at ECF No. 40. Emphasis is added, and internal citations and quotations omitted, unless otherwise noted. Cites to "¶__" are to the Amended Class Action Complaint at ECF No. 34.

- 1 -

Company's CFO, Defendant Euteneuer, of it; how Mattel's senior executives then concocted a plan with the most senior members of PwC's audit team to conceal the misstatement; and the precise means by which Mattel and PwC executed that plan.

In their motions to dismiss, Defendants do not dispute that the Complaint adequately alleges that they made false statements, and that those false statements were material. Defendants' principal argument is that the Complaint does not allege their scienter. This argument fails. A litany of well-pled facts gives rise to a strong inference that Defendants acted with severe recklessness at a minimum, if not actual intent, including that: (1) Mattel's most senior executives in its Accounting, Tax, Internal Audit and Legal departments concluded that Mattel materially misstated its third quarter 2017 financial results, and was required to restate those results; (2) they informed Defendant Euteneuer of their conclusions; (3) they also informed the PwC audit team of their conclusions; (4) rather than disclose these facts to investors, Mattel's senior executives and the PwC audit team hatched a plan to conceal the misstatement, which involved misstating Mattel's results for the fourth quarter of 2017 in the opposite direction; (5) after executing this plan, Defendants Euteneuer and Georgiadis, and the PwC audit team, met with Mattel's Audit Committee and falsely assured them that the Company's financial results were accurate and its internal controls over financial reporting were sound; (6) Mattel issued its false financial results to investors in its 2017 Form 10-K, with Euteneuer and others falsely certifying that they were accurate; (7) Mattel's senior executives and the PwC audit team did not breathe a word of these events to the public for years, until they received a whistleblower letter; (8) within weeks of receiving that letter, Defendants admitted that Mattel materially misstated its results and management had known of the errors; and (9) Mattel announced the impending departure of Defendant Euteneuer, and the lead audit partner from the Mattel audit team left PwC. Such facts are more than sufficient to allege scienter.

Defendants next contend that the Complaint fails to allege loss causation, which is subject only to Rule 8's notice pleading requirements. Defendants' loss causation

arguments boil down to the assertion that loss causation exists only when the disclosure precipitating the stock price decline reveals the fraud. This argument is wrong as a matter of law. In *Mineworkers Pension Scheme v. First Solar Inc*., 881 F.3d 750 (9th Cir. 2018)—the Ninth Circuit's most recent and authoritative loss causation decision—the court considered and flatly rejected this argument, holding that "disclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id*. at 753. The Ninth Circuit held that all a plaintiff must demonstrate is "a causal connection between the fraud and the loss," and there are an "infinite variety" of ways to do this. *Id*. Here, the chain of causation is clear: (1) Defendants made false statements to investors concerning Mattel's financial results and internal controls; (2) that fraud triggered a whistleblower letter; and (3) when Mattel disclosed its receipt of the whistleblower letter, its stock price declined, causing investors' losses. Nothing more is required.

The Court should entirely deny Defendants' motions to dismiss.

## II.   SUMMARY OF THE FACTS

### A.   Defendants Knew of Mattel's Severe Internal Control Deficiencies

When the Class Period began on August 2, 2017, investor concern about Mattel abounded. The Company faced obsolescence due to a shift in consumer preferences for electronic games and toys, and its stock price was in freefall. ¶¶43-55. Mattel had recently reported an operating loss of $127 million and 15% decrease in sales year-over-year—results that analysts called "surprisingly bad." *Id*. Investors worried that Mattel would soon cut its quarterly dividend, which it did, and that it was a prime target for a hostile takeover bid from its largest competitor, Hasbro. *Id*. To weather these headwinds, Mattel engaged in a strategic overhaul and implemented major cost-cutting initiatives. ¶¶47-50. For these initiatives to work, and for investor confidence to be restored, it was imperative that Mattel be financially transparent and disciplined, including by employing rigorous internal controls. ¶63.

Brett Whitaker joined Mattel as Director of Tax in May 2017 after a nearly 15-

- 3 -

year career in the tax and accounting departments of some of the country's largest companies, including Ernst & Young, Amazon, and Nike. ¶66. Early on, Whitaker "shadowed" Clara Wong, Mattel's Vice President of Tax, to "familiarize[] himself with the Company's processes." ¶67. Whitaker immediately observed several critical, obvious deficiencies in Mattel's internal controls for its tax and accounting functions. ¶68. He stated, "If you just walked around the halls, you would know that this place was riddled with issues and alarms were going off everywhere." *Id.*

First, Mattel's documentation for its financial statements was severely deficient. ¶69. Mattel stored the back-up documents to substantiate its financial statements in boxes with no organization and "scattered throughout the office." ¶¶69, 215. Whitaker described trying to understand Mattel's financial statements as "literally scrummag[ing] through boxes and boxes of loose paper." ¶69. Whitaker reported that he often could not locate important financial documents that supposedly supported the results; as he put it, "we just couldn't find anything." *Id*. Given the severe deficiencies in how Mattel documented the support for its financial statements, even the people who had signed off on the entries did not have answers to Whitaker's questions about Mattel's financial statements. ¶¶69-70. Whitaker said that it was "impossible not to be aware of [the Company's reliance on disorganized piles of paper] because when you walked around the office it was everywhere. It was kind of a running joke between departments, including Internal Audit." *Id.*

Second, even when Whitaker was able to locate the necessary backup materials, the numbers often did not "tie out" or reconcile with the reported financials. ¶70. Whitaker attended meetings with senior Mattel management who had signed off on Mattel's reported financial results but could not figure out how to reconcile the numbers. *Id.* He reported that "they admittedly in some cases were not even sure what they had signed off on." *Id.* Whitaker also had meetings with the senior PwC partners on the Mattel audit team—lead partner Joshua Abrahams, John Brierley, and Chip Lightfoot—who were unable to explain how past quarters' numbers reconciled even

though they had signed off on Mattel's financial statements for years. ¶71.

Third, Mattel lacked <u>any</u> internal control or formal process for determining, documenting, and confirming its tax valuation allowance. ¶73. Public companies must have key controls that mitigate the risk that financial statements are materially misstated. *Id.* Mattel, however, had no process for ensuring that its deferred tax assets were valued in accordance with GAAP. *Id.* This was a fundamental failure because Mattel's deferred tax assets were material—amounting to $580 million as of June 30, 2017—and the valuation allowance materially impacted Mattel's income. *Id.*

These internal control deficiencies were pervasive and well-known throughout Mattel during the Class Period. ¶76. Whitaker's boss, Clara Wong, reported directly to Defendant Euteneuer, and spoke frequently with Whitaker about these deficiencies during his tenure at Mattel. *Id.* Whitaker reported that Wong was "very open and honest with me," and told him that she knew the supporting documentation for Mattel's financials was deficient and there was inherent risk in the way Mattel had been compiling its financial statements. *Id.* They regularly discussed the absence of "back-up" to support Mattel's financial statements. ¶100.

In July 2017, Shirley Wang, Mattel's Manager of Internal Audit, met with Whitaker to discuss the Tax department's controls. ¶78. Wang stated that Internal Audit tested the Tax department's controls for compliance with the Sarbanes-Oxley Act of 2002, and found that they were either non-existent or extremely dated. *Id.*

**B.   Mattel Materially Understated Its Loss for the Third Quarter of 2017**

**1.   Mattel and PwC Decided Not to Record a Valuation Allowance**

As the third quarter of 2017 was coming to a close on September 30, 2017, Mattel faced a decision with material financial consequences: whether to record a "valuation allowance" against its $580 million worth of deferred tax assets. ¶80. A deferred tax asset is an asset that a company can use to reduce or eliminate a future tax liability. ¶81. Deferred tax assets are recorded as "assets" under GAAP because they have real value in that they can reduce a company's tax payments by offsetting future

taxable income. *Id.* This includes deductions or credits that cannot be used during the current year because the company has a loss or insufficient taxable income, but may be carried forward to reduce taxable income or taxes payable in the future. *Id.* The value of deferred tax assets thus depends on whether the company will generate taxable income in the future; if the company is not likely to generate income, the deferred tax assets have less or no value because there will be no tax liability. ¶82.

Under GAAP, if a company determines it will not be able to use its deferred tax assets (because it is unlikely to have future taxable income to offset), it must record a "valuation allowance" against the deferred tax assets, which reduces their value. ¶¶83-84. Recording such an allowance was especially material for Mattel at the time. Any valuation allowance would be deducted from Mattel's income, thereby reducing any profit or enlarging any losses. As Whitaker explained, given that Mattel had nearly $600 million of deferred tax assets on its books, any material reduction in their value threatened to "absolutely tank" Mattel's results at a time of heightened investor concern about Mattel's business. ¶¶80, 86. Further, because the decision to record a valuation allowance was based on Mattel's income projections, recording a valuation allowance would have signaled to investors that "you do not see the ship turning around any time soon" and Mattel likely would not make money in the near-term. ¶¶86-87.

Given the significance of this determination, Whitaker and his team—including Wong and Dermot Martin, Senior Director of Tax—met multiple times a week with PwC leading up to the close of the third quarter to decide whether to record a valuation allowance. ¶87. Wong and Abrahams frequently discussed the valuation allowance with Defendant Euteneuer; Wong—with whom Whitaker spoke on a daily basis—regularly updated Whitaker after her discussions with Euteneuer. ¶88. The PwC team was equally focused on this issue, as the valuation allowance could have been as high as half a billion dollars, and updated Whitaker after their discussions with Euteneuer. *Id.* Whitaker reported that "Abrahams was very open about his conversations with the CFO." *Id.* Despite the materiality of this determination, as noted above, Mattel did not

have any internal control to determine the need for or amount of an allowance. ¶89.

After the end of the third quarter, PwC and Mattel decided not to record a valuation allowance. ¶90. Whitaker described this decision as unreasonably optimistic because "things were drastically falling fast" at Mattel, and "the forecast at the time was looking pretty grim." ¶¶90-91. Nevertheless, Whitaker and his team started to book the appropriate journal entries based on that decision. ¶92.

### 2. Mattel and PwC Abruptly Changed Course

With days left in the closing process, Mattel and PwC suddenly reversed course and decided to record a valuation allowance. ¶93. This was based on a decision to write-off approximately $100 million in receivables from Toys "R" Us. *Id.* Toys "R" Us had declared bankruptcy weeks earlier on September 18, 2017, which put pressure on Mattel because Toys "R" Us was Mattel's biggest customer and retailer. ¶¶93-95. Defendants Euteneuer and Georgiadis discussed the bankruptcy frequently during conference calls with investors because it was likely to have a significant adverse impact on Mattel. ¶94. Notwithstanding their awareness of these issues, Defendants chose not to record a valuation allowance until the eleventh hour. ¶95.

With one week left in the closing process, Abrahams and Lightfoot informed Whitaker that Mattel must record an allowance. ¶¶96-100. This required Whitaker to calculate the allowance in one week, which would normally take several weeks. *Id.* Whitaker expressed concern about the lack of supporting documentation and the insufficient time, but worked nonstop with his team to calculate the allowance. *Id.* Given Mattel's control deficiencies, Whitaker had "little confidence in what we were reporting because we didn't have the back-up to tie it out. Typically, there is a trail of documentation that supports what you are reporting, and that just did not exist." *Id.*

Whitaker's team calculated a valuation allowance of approximately $175 to $200 million. ¶100-01. Draft financial statements incorporating this valuation allowance were circulated to senior management, including Euteneuer, as they were throughout the entire closing process. ¶102. Further, Abrahams and Lightfoot told

- 7 -

Whitaker that they regularly met with Euteneuer about the allowance. *Id.*

### 3. Defendants Recklessly Issued Mattel's False Results

In issuing Mattel's third quarter results, Defendants blew through several glaring red flags alerting them of a severe risk that the results were materially misstated. Days before Mattel was to report its third quarter earnings on October 26, 2017, PwC discovered that Mattel had significantly understated the valuation allowance, which required Whitaker and his team to haphazardly redo the entry a second time. ¶103. The error stemmed from the fact that Mattel improperly offset its deferred tax assets by netting out the value of certain deferred tax liabilities. ¶105. When calculating a valuation allowance, some deferred tax liabilities (which reflect tax to be paid in the future) can be netted against deferred tax assets. This reduces the value of the assets, concomitantly reduces the required allowance, and increases net income. However, deferred tax liabilities arising from assets with an indefinite life (assets not being amortized) generally cannot be netted against deferred tax assets. *Id.*; ¶¶252-59.

The misstatement was not the result of "Whitaker's own mistake," as Defendants assert, but rather of Mattel's faulty internal controls. *See* MB 19. The reason the error occurred was because Mattel had no control for calculating its allowance. And the sole basis for PwC's conclusion that an error had been made was a single spreadsheet from Martin that neither he, nor anyone else, had given Whitaker before. ¶106.

Whitaker and his team recalculated the allowance days before Mattel was to publish its third quarter results. ¶107. The recalculation increased the tax valuation allowance from $175-$200 million to $562 million—or by <u>more than 200%</u>—and reduced Mattel's income by the same amount. *Id.*

During this process, as earlier, draft financial statements were regularly shared with senior Mattel executives for their review, including Defendant Euteneuer. ¶108. As a result of this error, Mattel's draft financial results varied by hundreds of millions of dollars. *Id.* According to Whitaker, the wild swings in these financial results "could not be ignored" because they were so material. *Id.* Further, during this time, Abrahams

was in constant contact with Euteneuer about the valuation allowance, and Whitaker was in ongoing contact with Abrahams, who shared with Whitaker that he spoke frequently with Euteneuer about these issues. ¶109.

Given the severity of this misstatement, Whitaker assumed that PwC would require that Mattel disclose the material weaknesses in its internal controls in its Form 10-Q for the third quarter. ¶¶111-13. Despite daily meetings between Whitaker, Wong, and Brierley during which they told Whitaker that Mattel needed to change its internal control processes, PwC did not require the disclosure of any material weaknesses. ¶111. As Whitaker stated, "that was a bone of contention between me and [] Brierley. . . . I was very upset that there was no internal control deficiency recognized." ¶112.

On October 26, 2017, Mattel filed its third quarter Form 10-Q reporting the $562 million valuation allowance and a $603 million quarterly loss, driven almost entirely by the allowance. ¶113. Mattel made no mention of the material weakness in its internal controls. *Id.* Notwithstanding the turmoil in calculating the allowance, Defendants Georgiadis and Euteneuer certified that they had "evaluated the effectiveness of [Mattel's] disclosure controls and procedures," that Mattel's internal controls were effective as of September 30, 2017, and that its reported financial statements were accurate. *Id*. These statements were false. ¶¶221-71.

**C.   Defendants Determine that Mattel Misstated Its Financial Results**

Whitaker wanted to understand the support for the spreadsheet that Martin produced showing the netting error days before third quarter results were published, as there was no time to vet this data before publishing those results. *Id.* In early January 2018, Whitaker and Martin set up a meeting to review all existing documentation relating to the netting issue and the classification of Mattel's intangible assets. *Id*. Whitaker described the meeting as "odd," reporting that Martin "had us lock ourselves into a conference room, which we never did, and he produced several boxes and binders of loose paper to walk me through. . . . [H]e said, 'I think the support is somewhere in here. Let's try to find it.'" ¶117. It was concerning to Whitaker that Mattel had

- 9 -

published its financial results, relied on a single spreadsheet to calculate a $562 million entry, and no one knew where the supporting documentation was, but "this is how things were done at Mattel." *Id.*

After spending hours searching, Whitaker found a single loose piece of paper that referenced the intellectual property assets on the spreadsheet Martin had supplied. ¶118. Included on the paper was Mattel's HiT Entertainment Ltd. intellectual property asset ("HiT IP"), valued at $311 million. ¶119. In the third quarter, Mattel had treated the HiT IP as finite for the purposes of netting deferred tax assets and liabilities, and had accordingly netted the deferred tax liability resulting from the HiT IP against Mattel's deferred tax assets, thereby reducing the ending valuation allowance. *Id.*

On the paper, however, the HiT IP was categorized as an indefinite-lived asset, meaning that the deferred tax liability related to the HiT IP should not have been netted against Mattel's deferred tax assets. ¶120. This meant that Mattel's valuation allowance and third quarter loss were both understated by $109 million. ¶121. Whitaker's "heart started racing and alarm bells started going off." *Id.* When Whitaker explained this to Martin, Martin said, "there goes my f***ing job." ¶122. Whitaker said that he "had never seen anything like [this] in [his] entire life." *Id.*

Whitaker and Deloitte tax partner Greg Dunlap promptly alerted Wong of the error. ¶124. On January 15, 2018, Whitaker scheduled a meeting at Wong's request with Mattel's SVP of Accounting, Joe Johnson; VP of Accounting, Christine Lew; VP of Internal Audit, Beverly Lively; Director of Internal Audit, Vladimir Marinescu; Assistant Controller, Nathan Yoo; and Martin. ¶126. Whitaker explained that by the end of this meeting, there was "no conflict or confusion" concerning the materiality of the error in Mattel's financial statements. ¶127. Whitaker also reported that "there was no conflict that this was a material weakness" because of the severity of the error and because it was the second time it occurred in one quarter. ¶129.

Despite this consensus, Johnson, Mattel's SVP of Accounting, who reported directly to Defendant Euteneuer, stated, "We cannot have a material weakness. That

- 10 -

would be the kiss of death." ¶130. Whitaker explained that he understood Johnson's statement to reference the anticipated negative market reaction to the disclosure of material weaknesses in Mattel's internal controls, especially in light of the significant financial headwinds Mattel was facing. ¶131. Although the agreement at the end of the meeting was that "this was a clear-cut material weakness," the team was holding out hope that they could find a way around it. ¶132.

The Mattel team considered whether they could "get away with" a "Little r" restatement—requiring only that a company disclose the correction of an error but not amend or restate prior SEC filings—rather than a "Big R" restatement—necessary when the correction of an error is significant enough to require that the company file a From 8-K with the SEC evincing a material event and revision of prior period financials. ¶¶133-35. Whitaker, Johnson, Lew, Wong, Marinescu, and Lively held a follow-up meeting on January 16, 2018 at 9:30 am, at the conclusion of which the collective view was that the error required a "Big R" restatement and disclosure of a material weakness in Mattel's internal controls. ¶136.

Whitaker, Johnson, and Wong then met with Mattel's legal team, including its Chief Legal Officer and outside SEC counsel. ¶137. This group <u>again</u> concluded that Mattel had materially misstated its third quarter results, Mattel had a material weakness in its internal controls, and Mattel would have to issue a "Big R" restatement. *Id*. Whitaker said that "<u>there was absolutely zero doubt in anyone's mind that we had a material misstatement that would result in a restatement of third quarter earnings</u>." *Id*.

On January 16th or 17th, 2018, Wong, Johnson, and Lew met with Euteneuer to share their conclusions that Mattel's financial results were materially misstated, that Mattel had material control deficiencies, and that Mattel needed to restate its third quarter 2017 financial results and disclose the material weakness. ¶139. Immediately thereafter, Wong briefed Whitaker on her meeting with Euteneuer. *Id*. Wong told Whitaker that Euteneuer was "very aware" of the error and accepted their conclusion that Mattel would need to restate its financial results for the third quarter 2017. *Id*. At

Euteneuer's request, Wong set up a meeting to discuss these issues with PwC. *Id*.

### D.    Mattel and PwC Conspire to Conceal the Misstatement

Wong, Johnson, and Lew met with PwC to discuss the misstatement. ¶140. Though Whitaker did not attend, his exclusion from this meeting was highly unusual given his role and his involvement in handling this issue, contrary to Defendants' suggestion. *See* MB 11. Immediately after the meeting, Whitaker met with Martin, Wong, and Dunlap. ¶141. Wong told Whitaker that during the meeting with PwC, Abrahams' "immediate response, to everyone's surprise, was that we cannot have a material weakness and we need to figure out a way for that not to be the result." *Id*. Whitaker reported that "the mandate" from Abrahams was "for everyone to see what kind of technical argument we could make" to avoid a restatement. *Id*. Brierley reiterated this "mandate" to Whitaker after the meeting and told Whitaker that PwC "was now scavenging the earth to try and find a technical argument that could be made to say there was no material weakness." ¶142.

A couple of days later, Wong informed Whitaker that PwC had manufactured a plan to conceal the misstatement. ¶143. Specifically, Mattel would retroactively reclassify the HiT IP asset as a finite-lived asset as of the start of the fourth quarter, October 1, 2017, to correspond to the way Mattel had improperly treated it in the third quarter. *Id*. When Whitaker challenged Wong on this plan, Wong responded that "they would rather have a slap on their wrist from the SEC." *Id.*

Defendants incorrectly contend that the Complaint fails to allege that this retroactive reclassification was incorrect. MB 13-14; PB 17. The Complaint alleges that the retroactive reclassification was an illegitimate maneuver done to enable Mattel to avoid a required restatement of its third quarter results and the disclosure of a material weakness in its internal controls, and that Mattel's statements about the reclassification were false. ¶¶145, 357. This is evidenced in three principal ways. First, Whitaker reported that "it was never [their] intent" to reclassify the HiT IP in the fourth quarter. *Id*. Whitaker met regularly with the Financial Planning & Analysis group about

- 12 -

the variables that might impact Mattel's earnings. *Id.* The group kept a spreadsheet detailing these variables for the end-of-year closing; had there been prior discussion about reclassifying the HiT IP during the fourth quarter—which would have impacted earnings—it would have been on the spreadsheet and discussed. *Id.* Instead, the first time reclassifying the HiT IP was raised was <u>after</u> the error was discovered. *Id.*

Further, Lead Counsel obtained the spreadsheet, named "Copy of Q4 2017 Significant Items" for the fourth quarter 2017 closing. ¶146. Had Mattel executives actually been considering reclassifying the HiT IP as of October 1, 2017, as Mattel claimed, it would have been reflected in that spreadsheet, which was frequently updated to reflect any item that would impact Mattel's fourth quarter results. ¶¶146-47. Yet the spreadsheet does <u>not</u> mention reclassifying the HiT IP, despite listing almost <u>forty</u> other items ranging in size from less than one million dollars to $246 million. *Id.* Whitaker explained that the spreadsheet contained items "that were not large or material . . . we were tracking all of these potential adjustments because all of them were significant at that moment in time." ¶147.

Second, if the reclassification were bona fide, Mattel would have properly accounted for the reclassification when it was made, but Mattel did not. When Mattel reclassified the HiT IP in the fourth quarter, that change should have reduced Mattel's valuation allowance by $109 million, which would have resulted in a credit to income of approximately the same amount. ¶¶193, 269. <u>Yet Mattel never recorded this credit to income in its originally-issued fourth quarter results.</u> *Id.* As a result of that failure, Mattel materially misstated its financial results for the fourth quarter 2017—this time, in the opposite direction of the third quarter misstatement and in the exact same amount, thereby "hiding" the prior misstatement in the year-end results. *Id.*

Third, in a conversation with Brierley soon after learning of PwC's plan, Whitaker asked Brierley how this retroactive treatment of HiT IP could be possibly "be right." ¶148. Brierly "just shook his head, because he knew it was bull****." *Id.*

Significantly, though both Mattel and PwC concluded that Mattel had materially

misstated its third quarter 2017 results, no one reported it to Mattel's Audit Committee. ¶149. Governing audit standards required PwC to report the misstatement, but PwC violated those standards. ¶¶306-14. Further, before Mattel filed its 2017 Form 10-K, Defendants PwC, Euteneuer, and Georgiadis met with the Audit Committee to discuss the accuracy of Mattel's financial statements and the existence of any material weaknesses, so that the committee could authorize the issuance of the 2017 Form 10-K. ¶151. During this meeting, neither Mattel's senior management nor PwC informed the Audit Committee of the material misstatement and material weaknesses, and instead led the committee to believe no such problems existed. ¶152.

In the last stages of PwC's audit before Mattel filed its 2017 Form 10-K, Martin discovered yet another error relating to the valuation allowance. ¶153. This $20 million error was just above PwC's materiality threshold. *Id*. Whitaker explained that, after panicking, PwC spent an "entire day" figuring out if they could net this error against other immaterial errors so that it would fall below the materiality threshold and Mattel would not have to report it. ¶154. PwC did just that. *Id*.

With that last issue resolved, Lightfoot walked through the halls of Mattel high-fiving people to celebrate the fact that there would be no restatement. ¶155. Dunlap then ran to Whitaker's office, closed the door, and said to Whitaker, "Brett, tell Chip [Lightfoot] to take me off these emails because I don't want to be subpoenaed when the SEC looks at this." ¶156. Whitaker said that "was the moment when I knew that this was beyond my understanding." *Id.*

On February 27, 2018, Mattel filed its 2017 Form 10-K, signed by Defendants Georgiadis and Euteneuer. ¶157. The Form 10-K made no mention of Mattel's misstated financial results for the third and fourth quarters, or its materially deficient internal controls. *Id*. Instead, Defendants Georgiadis and Euteneuer certified that Mattel's internal controls were effective and that its financial results were accurate. ¶158. The 2017 Form 10-K also provided Mattel's false justification for the reclassification of the HiT IP during the fourth quarter, representing that it was done

for purely legitimate reasons discovered during an impairment test, instead of as a cover-up to bury Mattel's accounting misstatements. *Id*. PwC issued a false and misleading unqualified audit opinion in Mattel's 2017 Form 10-K, stating that Mattel's internal controls over financial reporting were effective as of December 31, 2017 and that its financial statements were accurate and prepared in accordance with GAAP. *Id.*

### E. Mattel's Stock Price Plummeted When Defendants Were Forced to Disclose Their Receipt of a Whistleblower Letter Concerning the Fraud

Defendants concealed their fraud from investors for nearly two years. ¶161. On August 8, 2019, Mattel filed a Form 8-K with the SEC disclosing that the Company had been "made aware of an anonymous whistleblower letter" and would investigate the "matters set forth in the letter." *Id*. The Form 8-K disclosed further that "[t]o provide the Company with an opportunity to investigate the matters set forth in the letter," Mattel was terminating a bond offering scheduled to close that day. ¶162.

Concerned news outlets reported that "Mattel shares sink on whistleblower letter," which "comes at a time when the four cornerstones of Mattel's business are crumbling." ¶¶164-65. They also reported that terminating a bond offering after pricing is extremely rare: "[c]ancelling a deal in between pricing and settlement . . . has only happened three times before[.] . . . Pulling a deal after pricing is extremely rare and suggests the company and banks were wary of any potential legal risks that could arise if the deal went ahead." ¶167. Analysts reported that the whistleblower letter was likely "material enough to prevent the bond deal rather than just delay it." ¶164.

In response to this disclosure, Mattel's stock price fell 16%, from $13.43 on August 8, 2019 to $11.31 on August 9, on exceptionally high trading volume. ¶168.

### F. Mattel Admitted that It Materially Misstated Its Financial Results and Falsely Certified Its Internal Controls During the Class Period

On October 29, 2019, Mattel released positive financial results for the third quarter of 2019, including net sales up 3%, operating income up 23%, and adjusted earnings per share of $0.26, or almost 50% more than the 2018 third quarter. ¶170. The

- 15 -

market was pleased with Mattel's results, with analysts describing them as "much better" than expected. ¶¶171-72. That same day, Mattel filed a Form 8-K with the SEC addressing the findings from its whistleblower investigation. ¶172. Mattel announced that it was restating its financial results for: (1) the three and nine-month periods ended September 30, 2017; and (2) the three months ended December 31, 2017, and that these results "should no longer be relied upon <u>due to material misstatements</u>." *Id*.

Mattel reported that the "investigation determined that income tax expense was understated by $109 million in the third quarter of 2017 and overstated by $109 million in the fourth quarter of 2017[.]" ¶175. Mattel admitted that "<u>lapses in judgment by management</u>" were to blame for these misstatements. ¶¶175, 177. Mattel further admitted that the misstatement was identified during "Mattel's year-end accounting closing procedures" for 2017, but "was not properly assessed nor were findings and conclusions documented," i.e., it was covered up. ¶177. Mattel also admitted that its investigation found a "failure[] to properly consider and disclose" the misstatements to "the Audit Committee once they became known, and violations of auditor independence rules." ¶175. Mattel further admitted that, contrary to Defendants' Class Period statements, Mattel's "internal control over financial reporting" suffered from "material weaknesses" and was not effective as of September 30 and December 31, 2017, and December 31, 2018. ¶¶174, 178.

The Form 8-K also disclosed that Defendant Euteneuer would depart Mattel after a six-month transition period and that he was "informed of the transition plan on October 23, 2019," less than a week before the disclosure. ¶179. Despite Defendants' suggestion to the contrary, Euteneuer's transition period has been extended only because of challenges posed by the Covid-19 pandemic. ¶35. The market understood that Euteneuer's departure was directly related to the admissions in the Form 8-K, with Forbes reporting that Euteneuer's departure was "one of four steps Mattel announced late Tuesday in response to the probe that found errors in publicly-filed financial statements for the last two quarters of 2017 and failures of the company's reporting

- 16 -

procedures, among other conclusions." ¶180. Similarly, Mattel announced that it would be replacing Defendant Abrahams and other members of his audit team for violating auditor independence guidelines. ¶181. The market also understood Abrahams' removal to be directly related to Mattel's admissions in the October 29, 2019 Form 8-K. ¶¶184-86. Abrahams is no longer with PwC. ¶186.

On November 12, 2019, Mattel filed the Restatement, confirming that it had misstated its financial results for the third and fourth quarters of 2017. ¶187. Mattel also confirmed in the Restatement that its internal controls suffered from material weaknesses during the Class Period. *Id*. PwC similarly admitted that its prior certification of Mattel's internal controls was false when issued. ¶191. The SEC and the U.S. Attorney's Office for the Southern District of New York have subpoenaed Mattel concerning the whistleblower allegations and investigation. ¶¶197-98.

## III.   <u>ARGUMENT</u>

In their motions to dismiss, Defendants concede—as they must—that their Class Period statements concerning Mattel's financial results and internal controls were materially false. They focus their arguments only on the elements of scienter and loss causation. As set forth below, those arguments fail.

### A. The Complaint Adequately Alleges the Mattel Defendants' Scienter

In determining whether a complaint adequately alleges scienter, "courts must, as with any motion to dismiss . . . , accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 309 (2007). The question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23.

A complaint pleads scienter by raising a strong inference that the defendant acted with deliberate recklessness. *In re UTStarcom, Inc. Sec. Litig*., 617 F. Supp. 2d 964, 973, 976 (N.D. Cal. 2009). In the Ninth Circuit, "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5." *In re VeriFone Holdings,*

- 17 -

*Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). The inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. Instead, a scienter inference is "strong" when it is as likely as any other inference. *Id.*; *accord Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (quoting *Tellabs*). The Complaint alleges numerous facts demonstrating that Defendants recklessly disregarded (at a minimum) or knew (far more likely) of Mattel's misstatements of financial results and internal control deficiencies.

### 1. The Complaint Alleges Scienter as to the Mattel Defendants' Misstatements of Financial Results

First, Defendants Euteneuer and Georgiadis acted at least severely recklessly in issuing Mattel's third quarter 2017 financial results and certifying their accuracy in October 2017. During this time, Defendants were focused on the valuation allowance. ¶¶86-88. As detailed in the Complaint, Mattel's financial results vacillated significantly in the draft financial statements circulated to Georgiadis and Euteneuer. ¶102, 108, 341. These variations were massive, occurred just days before the results were to be issued, and put Defendants on notice that there was a significant risk that the results were wrong. ¶¶92-102, 211. Defendants could have—and should have—delayed issuing the results to ensure their accuracy. Instead, Defendants sped through these obvious red flags and recklessly published the results when they had grounds enough to know the risk of a misstatement was very high. *See VeriFone*, 704 F.3d at 708; *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 784 (C.D. Cal. 2004) (reckless conduct is that which "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it"); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016) (errors that "dramatically affected" financial results . . . "in ways that strongly suggest a typical corporate executive should have noticed them" supported scienter).

Defendants attempt to dismiss Plaintiffs' allegations concerning the swings in

- 18 -

Mattel's draft financial results as limited and insignificant. MB 19. Contrary to what Defendants contend, there were multiple swings—first when Defendants decided not to record a valuation allowance at all, then when they recorded an initial allowance of less than $200 million, and again when the allowance nearly tripled in size to almost $600 million. ¶¶108, 211. These vacillations were material and known: they were circulated to Defendants in draft financial statements, they occurred at a time when Mattel was in crisis, they impacted Mattel's income by hundreds of millions of dollars, they occurred because Mattel had no internal control for calculating its valuation allowance, and they occurred just days before Mattel was to publicly issue its results. ¶¶73, 88, 95, 108. Instead of heeding these red flags, Euteneuer and Georgiadis disregarded them, certified that Mattel's results were accurate, and certified that its internal controls were sound—conduct that is, at a minimum, deliberately reckless.

Second, by no later than early January 2018, Defendants' severe recklessness ripened into actual knowledge of Mattel's materially misstated financial results. Mattel's most senior executives in its Accounting, Tax, Internal Control, and Legal departments discussed the material misstatement in Mattel's third quarter financial statements and determined that a restatement was necessary. ¶¶124-39. Then, they informed Euteneuer of the material misstatement and the need for a restatement on January 16 or 17, 2018. ¶¶138-39, 201. Euteneuer understood and accepted that Mattel had materially misstated its third quarter results and needed to restate them. *Id.*

Despite Euteneuer's knowledge that Mattel had misstated its previously issued financial statements, he signed Mattel's 2017 Form 10-K that contained the misstated financial results, falsely certified the accuracy of those results, and falsely certified that Mattel's internal control over financial reporting was effective as of December 31, 2017. ¶¶157-58. His knowledge of facts contradicting his statements gives rise to a strong inference of scienter. *See, e.g*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1138, 1145 (9th Cir. 2017) (scienter where "defendants were aware in real time of QSI's financial information, and knew that their statements . . . were inconsistent with

this information"); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 814 (C.D. Cal. 2011) (strong inference of scienter based on defendants' knowledge of facts contradicting their statements); *In re Terayon Commc'ns Sys., Inc.*, 2002 WL 989480, at *8 (N.D. Cal. Mar. 29, 2002) (same).

Defendants assert that after Euteneuer learned of the material misstatement, he "disappears" from the narrative, and thus, the Court must conclude as a matter of law that the more "compelling inference is that . . . Euteneuer agreed with the final judgment of PwC and his team that no restatement or other disclosure was required"— presumably without ever speaking another word of it to Mattel's executives or PwC. MB 12-13. This argument fails. The Complaint alleges that: (1) the "judgment" of Mattel's most senior executives in Accounting, Tax, Internal Control, and Legal was that Mattel had materially misstated its results and was required to restate them and disclose its material weaknesses; (2) Euteneuer was told of these facts and accepted them; (3) far from exercising legitimate professional "judgment," PwC then concocted a plan to conceal the known misstatement; (4) PwC's audit partners widely discussed with senior Mattel executives that this was the purpose of the plan; and (5) Mattel has admitted that the misstatement was known in January 2018, and a restatement was in fact required. Given these facts, it is at least as compelling to infer that Euteneuer understood Mattel had misstated its results and went along with the plan to conceal the misstatement. *See Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *18 (C.D. Cal. Aug. 4, 2017) (strong inference of scienter where plaintiffs pled that defendants "actually knew specific information that was at odds with the state of affairs they presented"); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1191 (N.D. Cal. 2010) ("The competing inference, that he worked on these deals and innocently missed the most important details, is less plausible.").

To the extent Defendants are suggesting that Euteneuer did not follow up on the resolution of how to handle the known misstatement, and simply left the issue to PwC, turning a "blind eye" to a known misstatement also establishes scienter. Euteneuer

- 20 -

acted with scienter if he "had reasonable grounds to believe that material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort"—which is the case here. *Homestore.com*, 347 F. Supp. 2d at 784.

Third, the cover-up of the known material misstatement was intentional and discussed among the highest levels of Mattel and the PwC audit team. ¶¶123-58. After senior Mattel executives informed Euteneuer of the misstatement and the need for a restatement, those executives and PwC embarked on a mission to "scavenge[] the earth" to find a way to conceal the misstatement. ¶¶141-42. Defendants ultimately hid the misstatement by improperly reclassifying the HiT IP to match its incorrect treatment in the third quarter—and Mattel and PwC executives specifically discussed that the purpose of this maneuver was to conceal the misstatement. ¶¶143-52.

The manner in which Defendants improperly accounted for the reclassification in the fourth quarter underscores its intentionally deceptive nature. Defendants did not record the necessary credit to income in the fourth quarter that they would have if the reclassification had been legitimate. This caused Mattel to intentionally misstate its fourth quarter results in the opposite direction of its third quarter misstatement (i.e., by overstating its fourth quarter loss). ¶¶143-48, 193, 269. Defendants' failure to take the necessary $109 million credit to income was no "mistake," but rather was an intentional maneuver designed to conceal the third quarter misstatement in the year-end results.

Further substantiating this point, Whitaker reported—and internal Mattel documents confirm—that reclassification of the HiT IP was never contemplated among all of the other factors—big or small—that could have potentially impacted Mattel's fourth quarter 2017 earnings. ¶¶145-46. All of these facts demonstrate that the reclassification was a device to conceal the known error, which is powerful evidence of Defendants' intent to deceive. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (strong inference of scienter where "plaintiffs have alleged with specificity that the top executives actually directed the improper revenue recognition in violation

of both GAAP and their own accounting practices.").

Fourth, Georgiadis, Euteneuer, and PwC misled Mattel's Audit Committee—very strong evidence of scienter. Euteneuer, Georgiadis, and PwC met with the Audit Committee to discuss the accuracy of Mattel's 2017 financial results and the soundness of Mattel's internal controls. ¶¶149-52. The sole purpose of this meeting was to allow the Audit Committee to determine whether Mattel's financial results were accurate so that the 2017 Form 10-K could be published to investors. ¶151. These Defendants knew that Mattel had misstated its third and fourth quarter results, and suffered from severe internal control deficiencies, but concealed that information from the Audit Committee. *See, e.g.*, *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at \*6-7 (N.D. Cal. June 1, 2020) (failure to communicate information "suggest[s] deliberate recklessness because it indicates that senior management possessed information that, had it been communicated, would have indicated that the financial reporting was false"); *S.E.C. v. Brandonisio*, 2013 WL 5371626, at \*7 (D. Nev. Sept. 24, 2013) ("high degree of scienter" shown where defendants took steps to "cover their tracks"); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d. 477, 492-94 (S.D.N.Y. 2007) (efforts to conceal transactions from audit committee gave rise to inference of scienter).

The Mattel Defendants contend that these allegations cannot support an inference of scienter because the Complaint does not adequately allege that Euteneuer and PwC knew of any misstatement or material weakness, and thus, they could not have misled the Audit Committee. MB 17-18. Not so. Based on first-hand reports, internal Mattel documents, and Company admissions, the Complaint pleads in detail that Euteneuer and PwC knew—and Georgiadis at least deliberately disregarded—that Mattel had materially misstated its financial results and suffered from material control deficiencies, and misled the Audit Committee about those facts.

Fifth, Mattel's admissions support an inference of scienter. Mattel has admitted that it misstated its results; it knew of the material misstatement; it concealed the misstatement; and this misconduct was the result of "lapses in judgment by

- 22 -

management." ¶177. Even that charitable phrase wreaks of culpability. The admission of "lapses in judgment" by management demonstrates that the misstatements were not mere oversights. Rather, "management" (including Defendants) made a conscious decision—a "judgment"—to conceal a known misstatement. *See WageWorks*, 2020 WL 2896547, at *7 (scienter where investigation found that "senior management" failed to communicate key information, and "[h]ad the reporting error stemmed from a mere . . . failure at oversight, WageWorks would not have identified management's failure to communicate information as a key reason for the false financial reports").

Sixth, Euteneuer's departure supports an inference of scienter as to him. Where an executive's departure is "accompanied by suspicious circumstances" showing that he was connected to the fraud, the departure supports scienter. *See id.* at *6 (termination announced alongside disclosure that internal control deficiencies were due to "management's failure" supported inference of scienter). In the same October 29, 2019 Form 8-K that Mattel announced Euteneuer's departure, it also announced the findings of the Audit Committee, including that because of "lapses in judgment by management," Mattel had misstated its financial results and needed to restate them. ¶¶179-80, 207. Mattel informed Euteneuer of its decision to terminate him only days before issuing that Form 8-K. *Id.* Such circumstances show a connection between Euteneuer's knowledge of the fraud and his departure from Mattel, which supports an inference of scienter. *See Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018) (inference of scienter where "timing of [defendant's] termination and PPG's announcement of remedial measures" coincided); *UTStarcom, Inc.*, 617 F. Supp. 2d at 976 (inference of scienter "at least as compelling as any opposing inference" where defendants' departure "occurred contemporaneously with the financial restatements and the commencement of internal and SEC investigations"); *In re Banc of California Sec. Litig.*, 2017 WL 3972456, at *8 (C.D. Cal. Sept. 6, 2017) (resignation supported inference of scienter where it was announced the same day as SEC investigation); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *14

- 23 -

(N.D. Cal. Apr. 2, 2002) (departures that occurred as the company restated and conducted internal investigation "add[s] one more piece to the scienter puzzle").

Defendants nonetheless incorrectly assert that Euteneuer's departure does not support an inference of scienter because he supposedly left due to "the mere fact of a restatement." MB 17. The Court cannot reach that conclusion as a matter of law. There is a strong inference of scienter where, as here, an executive's departure is tied to the company's admission of misstatements and accompanied by an acknowledgment that the misstatements were not merely mistakes. *See WageWorks, Inc*., 2020 WL 2896547, at *6 (scienter where defendants' resignations were announced in the same press release that announced the need for a restatement and finding that "the use of the same statement and the close temporal proximity to the initial revelations weigh against an innocent inference"); *Richard v. Nw. Pipe Co*., 2011 WL 3813073, at *5 (W.D. Wash. Aug. 26, 2011) (CEO's departure probative of scienter where he resigned during pendency of investigation and less than a month before company issued restatement). This inference is particularly strong here because, as noted above, Plaintiffs plead several facts demonstrating that Euteneuer knew of the misstatements.

### 2. The Mattel Defendants' Remaining Arguments Fail

The Mattel Defendants assert several additional arguments, each of which fails. The Mattel Defendants contend that merely restating financial results, by itself, does not show scienter. MB 2, 9-10, 13-14. This argument fails for two reasons. First, it mischaracterizes the Complaint. Plaintiffs do not rely solely on the existence of a restatement to plead scienter, "mere allegations" that Mattel had deficient internal controls, or "boilerplate allegations." *Id.* at 9-10. Plaintiffs allege—in painstaking detail based on first-hand witness reports, internal Mattel documents, and corporate admissions—that Defendants knew of a material error in Mattel's financial statements and of severe deficiencies in its internal controls, and conspired with PwC to conceal these facts and evade their disclosure obligations. Thus, Plaintiffs have set forth "specific allegations that defendants possessed the requisite mental state." MB 10.

- 24 -

Second, Defendants are wrong to suggest that the restatement is irrelevant. The Ninth Circuit has held that "[v]iolations of GAAP standards can . . . provide evidence of scienter" "when significant GAAP violations are described with particularity in the complaint." *Daou Sys.*, 411 F.3d at 1016. That is precisely the case here. Relatedly, the Mattel Defendants assert that the Restatement cannot support an inference of scienter because: (1) the accounting violations were not so "obvious[] that it would be absurd" to suggest Defendants were unaware of them; and (2) there are no allegations about "management's role in the company" suggesting that they knew the accounting was wrong. MB 13-14. Again, the Mattel Defendants simply ignore the central allegations that: (1) numerous senior Mattel executives knew about the material misstatement; (2) they told Euteneuer about it; and (3) they conspired with PwC to cover it up.

Defendants' authorities are inapposite for the same reason. In the cases Defendants rely on, the debate was over whether the nature of the GAAP violations could support an inference that defendants knew about the misstatement. *See* MB 9-10, 13-14. In contrast, here, Defendants unquestionably knew about a material misstatement, and engaged in a cover up to conceal it. *See Adaptive*, 2002 WL 989478, at *13 ("by corroborating GAAP violations with detailed evidence of the contemporaneous decision-making behind the accounting errors, Plaintiffs have set forth sufficient circumstantial evidence" that defendants knew statements were false). Thus, unlike in *Webb v. SolarCity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018), for example, the facts show that this was not an "honest mistake." *See also In re Aspeon, Inc. Sec. Litig.*, 168 F. App'x 836, 839 (9th Cir. 2006) (no allegations that defendants knew financials were false); *Oklahoma Firefighters Pension & Retirement Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1364 (C.D. Cal. 2014) (no scienter where plaintiffs relied principally on magnitude of restatement); *Perrin v. Sw. Water Co.*, 2011 WL 10756419, at *3-6 (C.D. Cal. June 30, 2011) (no allegations that defendants knew of accounting errors); *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 973 (N.D. Cal. 2010) (same).

- 25 -

Next, Defendants incorrectly contend that no facts show knowledge of wrongdoing. MB 10-11. To start, this argument ignores that recklessness is enough to show scienter. *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at \*13 (N.D. Cal. Apr. 17, 2020) (rejecting argument that "Plaintiffs have not pointed to evidence showing that they intended to mislead investors" and finding that "deliberative recklessness is sufficient"). Even if the Complaint had to show knowledge of wrongdoing, it does: (1) after Mattel executives and counsel determined that Mattel had materially misstated its financials and needed to restate, Euteneuer was told of these decisions; (2) rather than disclose the misstatement, Defendants concealed it; (3) Defendants evaded the restatement through the use of a bogus reclassification; (4) Defendants misled the Audit Committee; and (5) Defendants hid these facts until a whistleblower forced their hand.[2]

Similarly, the Mattel Defendants improperly frame the scienter inquiry as requiring Plaintiffs to show that Defendants "knew . . . that Mattel was required to restate financials." MB 2, 12. Plaintiffs do not need to show that Defendants knew Mattel was required to issue a restatement. Plaintiffs need only establish a strong inference that Defendants recklessly disregarded a material error in Mattel's financial statements and material weaknesses in internal controls. As outlined above, the Complaint pleads copious facts easily giving rise to this inference.

Defendants next argue that Whitaker lacked personal interaction with the Mattel Defendants and therefore lacks reliable personal knowledge of the alleged fraud. MB 11-12. This argument does not hold water. As an initial matter, a witness's identity is

[2] Defendants relatedly assert that there can be no inference of scienter because the Audit Committee "did not find that management engaged in fraud." MB 20. This argument is irrelevant because an outright corporate admission of "fraud" is not required to allege a Section 10(b) violation; if it were, it would be nearly impossible to plead a claim. Moreover, Defendants' argument ignores that intentional fraud is not the standard—recklessness is all that is required.

- 26 -

normally withheld from securities complaints, yet such confidential sources routinely suffice to support securities fraud claims. *See Daou Sys.*, 411 F.3d at 1015 ("Naming sources is unnecessary so long as [they] are described with sufficient particularity to support the probability that a person in [their] position . . . would possess the information alleged and the complaint contains adequate corroborating details.").

Here, Whitaker has taken the rare step of going on record with his identity, which lends significant credibility to his account. Moreover, Defendants are wrong that Whitaker is attenuated from the central events in the Complaint, provided only "conjecture," or is otherwise unreliable. MB 2. Whitaker was a senior Mattel tax executive who was in the "eye of the storm" and in a position to know the facts alleged. He provided a highly detailed account—far beyond "strong rhetoric" (MB 12)—based on his first-hand knowledge, which included specifics of: (1) the severe internal control deficiencies he observed first-hand and discussed with Euteneuer's direct report, Internal Audit, and PwC (¶¶66-79); (2) his efforts to design a new internal control and subsequent discovery of the material misstatement of third quarter results (¶¶115-22); (3) the meetings he organized and attended where senior Mattel executives and counsel confirmed that the error was material and required a restatement (¶¶123-38); (4) the meeting at which Defendant Euteneuer was informed of those facts (¶139); (5) the meetings with PwC where it was informed of those facts, and worked with Mattel to concoct a plan to conceal those facts (¶¶140-48); (6) the manner in which those facts were concealed (i.e., by retroactively reclassifying the HiT IP (*id.*); and (7) the telling reactions of PwC and Mattel personnel when the scheme was executed and the misstatements were successfully concealed (¶¶154-56). Whitaker's detailed report is strongly corroborated by internal Mattel documents, a whistleblower letter, and the Company's and PwC's admissions. ¶¶161-96.[3]

---

[3] Defendants' cases provide no support. Unlike here, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) involved low-level

Defendants' suggestion that a witness must directly interact with the named defendants is wrong as a matter of law. The question is whether the witness was in a position to know the facts reported (Whitaker was) and whether the report is probative (Whitaker's surely is). There is no additional requirement that a witness have direct contact with a named defendant for the witness's account to support a securities fraud claim. *See, e.g.*, *LifeLock*, 780 F. App'x at 484-85 n.5 (refusing to discount witness allegations that named defendant received reports because witness lacked direct contact with that defendant, noting that the witness was "in a position to be personally knowledgeable" that defendants had certain discussions); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus"); *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *3 n.3 (C.D. Cal. June 6, 2016) (witness in a position to infer information based on his position at the company); *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1059-60 (C.D. Cal. 2008) (strong inference of scienter though witnesses had not "ever spoken or had other contact with any of the seven non-management directors . . . and none is alleged to have personal knowledge relating to the two management directors"); *Roberts v. Zuora*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (rejecting argument that witness allegations could not support strong inference of scienter because they lacked "direct contact with the defendants").

The Mattel Defendants next assert that their reliance on PwC's "advice" precludes any scienter inference. MB 15-16. That is quite a stretch. This argument ignores that PwC was complicit in the fraud, and its so-called "advice" was a means

employees far removed from executives who provided only vague information. Unlike the "opinions and observations" provided by confidential witnesses in *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 948-49 (N.D. Cal. 2010), Whitaker recounted facts and actual conversations concerning the central issues in this case.

through which the fraud was committed. Where—like here—"the officers and the auditor were complicit in the ultimate misrepresentations of [Mattel's] financial condition, [t]he fact that" PwC "may have approved the accounting methods will not shield" Defendants "from liability for deception such methods may have caused." *In re New Century*, 588 F. Supp. 2d 1206, 1231-32 (C.D. Cal. 2008); *see also id.* ("The extent of the . . . Defendants' reliance, the scope of any independent obligations for accounting violations, and whether they were reckless in a spite of the audit opinion remain open questions at this stage. The Court therefore does not consider the audit opinion to undermine the particularity with which Plaintiffs have alleged scienter."). None of the cases Defendants cite for this argument deal with facts like those present here—i.e., an outside auditor with knowledge of a misstatement who helps the company conceal it. *See* MB 15-16.

The Mattel Defendants also incorrectly argue that their lack of stock sales undercuts any scienter inference. MB 16. Insider selling is not required to plead scienter. *See, e.g.*, *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("the lack of stock sales by a defendant is not dispositive as to scienter"); *accord In re Entropin, Inc. Sec. Litig.*, 487 F. Supp. 2d 1141, 1154 (C.D. Cal. 2007) (same). This is especially true where, as here, the Complaint alleges Defendants' knowledge.

Defendants relatedly argue that the Complaint alleges no other motive for fraud, but under *Tellabs*, "a motive allegation" is not required, "for allegations must be considered collectively[.]" *Tellabs*, 551 U.S. at 310; *see* MB 16. In any event, Plaintiffs do plead motive for the concealment of the known misstatements—specifically, that senior Mattel executives themselves acknowledged that the state of Mattel's business was fragile and alerting the market to the misstatement and material weaknesses would have been the "kiss of death." ¶130. *See VeriFone*, 704 F.3d at 709 (scienter where "overriding concern was avoiding the 'unmitigated disaster' of missing earnings targets, which led [defendants] to ignore unprecedented increases in inventory at the

- 29 -

same time [defendant] was 'obsessed' with reducing it and claimed publicly that VeriFone had achieved supply chain efficiencies").

The Mattel Defendants also argue that Georgiadis did not know "anything" about the material error in Mattel's third quarter 2017 results. MB 12, 14. This argument fails for multiple reasons. First, there is a strong inference that Georgiadis knew of the misstatement. As noted above, Mattel's draft third quarter financial results were vacillating wildly due to errors in the days before they were published, a red flag that strongly indicated that the results were wrong. Georgiadis' direct report, Euteneuer, unquestionably knew about the misstatement in January 2018. Beyond Euteneuer, knowledge of the misstatement pervaded Mattel's C-suite: numerous senior Mattel executives repeatedly discussed the misstatement—including Mattel's SVP of Accounting (Mattel's most senior accounting officer), Joe Johnson; VP of Accounting, Christine Lew; SVP of Tax and Customs (who reported directly to Euteneuer), Clara Wong; and VP of Internal Audit, Beverley Lively. They also discussed the misstatement with Mattel's Chief Legal Officer and Mattel's outside SEC counsel. They then concocted a plan to cover it up with the PwC audit team, including Abrahams, Brierley, and Lightfoot. In short, this material misstatement was a hardly a well-kept secret. Given all these facts, the inference of Georgiadis' knowledge is <u>at least</u> as plausible as the inference that she was "oblivious." *See Robb v. Fitbit Inc.*, 2017 WL 219673, at *6-7 (N.D. Cal. Jan. 19, 2017) (where COO knew of important information, most plausible inference was that CEO knew too); *Cadence Design Sys.*, 692 F. Supp. 2d at 1192–93 ("[H]aving penetrated the Defendants' executive circle . . . Plaintiffs may support an inference that the other executive officers were aware of certain key facts about certain key deals[.]").

Even assuming *arguendo* that Georgiadis was unaware of the misstatement, her conduct was severely reckless. In light of the facts summarized above, the only way that Georgiadis could have been blissfully ignorant of the misstatement is if she simply turned a blind eye to the issue. "Recklessly turning a 'blind eye' to impropriety is

- 30 -

equally culpable conduct under Rule 10b–5." *VeriFone*, 704 F.3d at 708.

Last, Defendants misunderstand Plaintiffs' corporate scienter allegations. MB 18. It is universally accepted that the scienter of any named Mattel Defendant is imputed to Mattel—thus, there can be no dispute that Euteneuer's and Georgiadis' scienter is imputed to Mattel. *See LifeLock*, 780 F. App'x at 485. Further, even under the strictest imputation standard employed by courts, the scienter of other individuals who participated in making the false statements is also imputed to the company. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *24 (D.N.J. June 5, 2020). Plaintiffs have identified several other individuals who played key roles in the false statements and the concealment thereof, including Johnson and Lew. Their scienter is also imputed to Mattel for purposes of corporate scienter. ¶219.

### 3. The Complaint Alleges Scienter as to Mattel's Internal Control Deficiencies

The Complaint alleges that Defendants misrepresented the adequacy of Mattel's internal controls beginning on August 2, 2017, the first day of the Class Period. Defendants do not challenge the falsity of these statements, and argue only that the Complaint fails to allege scienter. Numerous facts give rise to a strong inference of scienter as to Mattel's internal control deficiencies.

First, from the start of the Class Period, Mattel's internal control deficiencies were severe, obvious, and well-known. ¶¶66-79. As Whitaker reported, "if you just walked around the halls, you would know that this place was riddled with issues and alarms were going off everywhere. . . . It was kind of a running joke between departments, including Internal Audit." ¶¶68-69. For example, Mattel's inadequate system of documentation for its financial statements—i.e., papers scattered about the office—was open and notorious. ¶69. Soon after joining Mattel, Whitaker found that financial statements did not tie out to the back-up, and that Mattel and PwC officials admittedly did not know the accuracy of financial information they had approved. ¶¶70-71. Whitaker reported that Wong, his boss and Euteneuer's direct report, was well

- 31 -

aware of these deficiencies and knew that there was risk in the way Mattel had been compiling its financials. ¶¶76-77. Further, Mattel's Internal Audit team had reviewed the controls and found them to be deficient. ¶78. Given that the deficiencies were severe, prevalent, widely-discussed, and quickly observed by Whitaker, it was at least severely reckless for Defendants Euteneuer, Georgiadis and Farr to falsely certify that Mattel's internal controls were adequate. *See In re LendingClub Sec. Litig*., 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017) ("internal controls over financial reporting fell squarely within [the CFO's] oversight[, a]nd LendingClub's admission that material weaknesses . . . existed . . . suggests it would be absurd for [the] CFO [] to have been blind to these weaknesses and improprieties when the company assured investors its controls performed adequately and effectively").

Second, Defendants Georgiadis and Euteneuer learned of the impact of these deficient internal controls prior to the publication of Mattel's third quarter 2017 financial results when they observed in draft financial statements that the amount of Mattel's valuation allowance repeatedly changed by material amounts. ¶¶92-109, 217. These material vacillations were due to repeated errors, occurred just days before the results were to be published to investors, and occurred because Mattel's internal control for calculating a valuation allowance was non-existent. Given Euteneuer's and Georgiadis' knowledge of these red flags, it was at least severely reckless for them to certify the adequacy of Mattel's internal controls. *See New Century*, 588 F. Supp. 2d at 1229-30 (finding "a strong inference of scienter with respect to alleged misstatements regarding internal controls" where defendant knew of "problems with internal controls from before the time of the alleged misrepresentations"); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig*., 694 F. Supp. 2d 1192, 1213 (W.D. Wash. 2009) (strong inference of scienter as to internal control deficiencies where plaintiffs alleged red flags "that the allowance was under-provisioned," and where defendants were responsible for financial reporting).

Third, Defendant Euteneuer not only knew of, but <u>exploited</u> the material

weaknesses in Mattel's internal controls to conceal known misstatements. ¶218. Specifically, Euteneuer met with the Audit Committee prior to the publication of Mattel's 2017 financial statements specifically to discuss the accuracy of those financials and the effectiveness of Mattel's internal controls, and failed to disclose the adverse facts of which he was aware. ¶¶149-52. After taking advantage of Mattel's deficient internal controls to cover up the material misstatement and avoid a restatement, Euteneuer signed certifications assuring investors that Mattel's controls were sufficient and its financial statements were accurate. ¶157-58. The fact that Euteneuer certified the accuracy of Mattel's internal controls after he intentionally exploited their deficiencies gives rise to a strong inference of scienter. *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("For [SOX] certifications to have any substance, signatories to the certifications must be held accountable for the statements."); *Banc of California*, 2017 WL 3972456, at *8 (scienter where executive signed proxy with misleading statements).

The Mattel Defendants argue that the Complaint does not allege that they knew of these internal control deficiencies and "red flags," and attempt to couch these issues as mere "mismanagement." *See* MB 18-19. This argument is unavailing. As noted above, Mattel's internal control deficiencies were severe, pervasive, obvious, well-known and widely-discussed, including at the start of the Class Period. Consequently, the far more compelling inference is that Defendants were aware of these deficiencies, or <u>at least</u> recklessly turned a blind eye to them. Nor do these allegations amount to mere "mismanagement." *See* MB 19. The severe internal control deficiencies contributed to Mattel's material misstatement of financial results. Defendants exploited the deficiencies to conceal the known misstatement of financial results. Defendants then falsely certified to investors that the results were accurate, and the internal controls were sound. That is not mismanagement—it is securities fraud. *See VeriFone*, 704 F.3d at 708 (scienter where complaint alleged that "inventory control deficiencies enabled [defendants] to enter the incorrect manual adjustments that allowed VeriFone to hit its

- 33 -

targets" and where later disclosures "admitted numerous material weaknesses in its internal control over financial reporting throughout 2007"). None of these facts existed in *Webb*, 884 F.3d at 856 or *Aspeon*, 168 F. App'x at 839.

### B. The Complaint Adequately Alleges Scienter Against PwC

A complaint pleads scienter against an auditor by alleging that the auditor's "accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that . . . no reasonable accountant would have made the same decisions" if confronted with the same facts. *New Century*, 588 F. Supp. 2d at 1233. Courts may look to the alleged GAAP and GAAS violations, and any other allegations about the auditor's representations or conduct. *See generally In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *33 (N.D. Cal. Oct. 1, 2015) (courts may look to "facts that shed light on the mental state of the accountant," including that the accountant helped "falsif[y] the financial statements"). Allegations of recklessness are sufficient where an auditor "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011).

This case does not follow the traditional fact pattern where an outside auditor is attenuated from a defendant's fraud by virtue of its limited access to information, and courts must examine the nature of the GAAP or GAAS violations to seek an inference of recklessness. In contrast to the normal auditor case, here, PwC unquestionably knew of the material misstatement and played a key role in concealing it. By any reckoning, such misconduct falls far short of the "reasonable accountant" standard.

### 1. PwC Actively Participated in the Scheme to Conceal Known Material Misstatements and Material Weaknesses

The Complaint alleges specific facts demonstrating that: (1) PwC knew of the material weaknesses in Mattel's internal controls; (2) knew of the material misstatement of third quarter results; and (3) exploited the material weaknesses to

- 34 -

cover up that material misstatement.

First, Mattel's deferred tax assets were material at all relevant times, and PwC knew that Mattel did not have an internal control in place to evaluate the need for, quantify, and confirm a valuation allowance on those assets. ¶115. PwC knew that Mattel miscalculated its valuation allowance prior to reporting third quarter 2017 results because it lacked such a control. ¶¶110-12. PwC also knew of or recklessly disregarded the other readily-apparent material control weaknesses detailed in the Complaint. ¶216. Nevertheless, PwC did not require that Mattel report any material weakness in its internal controls at any time during the Class Period. ¶¶111-13. *See New Century*, 588 F. Supp. 2d at 1231 ("The allegations support an awareness on the part of [the] audit team that internal controls were problematic, but the team nevertheless accepted incomplete documentation in reaching its determinations.").

Second, PwC knew of the material misstatements in Mattel's financial statements when it gave its unqualified audit opinion included in Mattel's 2017 Form 10-K. ¶¶123-58. In January 2018, after determining that the error required Mattel to restate, senior Mattel executives, including Wong, Johnson, and Lew, met with PwC— Abrahams, Brierley, and Lightfoot—to inform them of the misstatement. ¶140-41. Such knowledge suffices to give rise to an inference of scienter as to PwC. *See In re Silver Wheaton Corp. Sec. Litig.*, 2019 WL 1512269, at *13 (C.D. Cal. Mar. 25, 2019) (scienter where auditor continued to issue clean audit opinions despite knowledge of risks); *In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1044 (C.D. Cal. 2003) (where auditor had reason to know that certain "transactions and the accounting of them were improper," "[t]he fact that it also allowed some of them to be reported shows that [the auditor] acted with deliberate recklessness").

Third, PwC and Mattel conspired to manufacture a scheme to cover up the error by capitalizing on the material weaknesses in Mattel's internal controls. ¶¶123-58. Abrahams mandated that they find a way to conceal the misstatement and avoid reporting a material weakness in internal controls. ¶¶141-142. To do so, PwC and

Mattel retroactively changed the classification of the HiT IP, despite not contemplating this before. ¶¶143-48; 202. The reclassification was illegitimate—as shown by the fact that Mattel did not take the necessary credit to income, resulting in a misstatement of fourth quarter results—and was done to avoid a restatement. ¶¶144-45. After successfully executing the plan, senior PwC personnel walked through the halls of Mattel giving out high-fives. ¶155. *See New Century*, 588 F. Supp. 2d at 1231 (finding scienter as to auditor based on "allegations that the officers and the auditor were complicit in the ultimate misrepresentations of New Century's financial condition").

Fourth, after executing this scheme, PwC met with Mattel's Audit Committee to obtain authorization to publish Mattel's financial statements. ¶¶149-52. Governing audit standards required PwC to inform the Audit Committee of any misstatements or material weaknesses. Rather than do so, PwC concealed the known errors and material weaknesses from the Audit Committee (¶¶306-14), which shows an intent to deceive. *See Collins & Aikman*, 524 F. Supp. 2d. at 492-94.

Fifth, despite all this, PwC then issued unqualified audit opinions in Mattel's 2017 and 2018 Forms 10-K falsely stating that it conducted its audits in compliance with PCAOB standards, that Mattel's financial statements complied with GAAP, and that Mattel's internal controls were effective. Such knowing misstatements demonstrate scienter. *See Silver Wheaton*, 2019 WL 1512269, at *13.

Finally, Abrahams' departure supports an inference of scienter as to PwC. ¶¶184-86. While PwC generally contends that "personnel departures do not establish scienter," (PB 19), under the circumstances of this case, Abrahams' administrative leave and ultimate termination do buttress the inference of scienter. Mattel pointed the finger at him in its disclosures, PwC removed him from the audit team after PwC received the whistleblower letter, and he left PwC soon after the investigation. These circumstances connect his departure to the fraud. *See* authority cited *supra*, p. 23-24.

### 2. PwC's Remaining Arguments Fail

PwC incorrectly asserts that there is a "particularly stringent" standard for

pleading auditor scienter that applies here. PB 14. Contrary to the position that "scienter allegations against accountants or auditors carry a little bit of a heavier burden, the [the Ninth Circuit] has previously advised against developing separate rules of thumb for each type of scienter allegation." *New Mexico State Inv. Council*, 641 F.3d at 1095. In any event, Plaintiffs' allegations would satisfy even the most exacting scienter standard. Again, this is not a situation where there was mere restatement and the question is whether, based on the nature of the GAAP violations, there is a plausible inference of the auditor's recklessness. In this case, Plaintiffs' allegations establish PwC's knowledge of—and active participation in—the fraud.

PwC next argues that Plaintiffs are asking the Court to infer that PwC concealed during the fourth quarter the same error that it corrected during the prior quarter, which is supposedly implausible. PB 15-16. However, the Court need not draw any inferences because the Complaint pleads—in significant detail—that PwC carried out a plan to conceal a known material misstatement and material weaknesses. Further, PwC's concealment of the known misstatement in the fourth quarter makes sense. When PwC initially identified an error in the third quarter allowance and required it to be corrected, that was <u>before</u> Mattel published its financials. Conversely, "just three months later," PwC and Mattel faced a very different situation: Mattel had already reported its third quarter results and correcting the material error would require a restatement and the admission of a material weakness. Faced with this new reality, PwC and Mattel decided to conceal the misstatement rather than make the required disclosures.

PwC also argues that in January 2018, it "suggested enhancements" to Mattel's internal controls, which is how Whitaker discovered the misstatement, and which supposedly suggests that PwC's audit was sufficient. PB 16-17. That PwC belatedly told Mattel to implement a control does nothing to change the fact that PwC intentionally concealed a known material misstatement and deficient internal controls. Moreover, while PwC directed Mattel to implement a key control it did not previously have, PwC made <u>no disclosure</u> of the material weakness that this control was meant to

- 37 -

address, and instead provided a false unqualified audit opinion on Mattel's controls over financial reporting—facts that enhance PwC's scienter.

PwC further contends that scienter cannot exist because PwC's retroactive reclassification of the HiT IP "proved correct." PB 17. Multiple facts in the Complaint demonstrate that this determination was not legitimate. *See* argument *supra*, p. 21-22. Specifically: (1) Mattel executives did not discuss reclassifying the HiT IP until after they learned of the misstatement; (2) the HiT IP appears nowhere in the spreadsheet listing the items that would impact Mattel's earnings; (3) Mattel and PwC executives discussed that the reclassification was a device to avoid a restatement; and (4) Mattel never took the credit to income that would have resulted from a legitimate reclassification in the fourth quarter, thereby misstating fourth quarter earnings.

PwC relatedly argues that Plaintiffs cannot establish scienter simply by pointing to a GAAP violation. PB 15 & n.7. That much is true, but the Complaint does so much more. The Complaint alleges in detail how PwC violated GAAP and GAAS by intentionally concealing a known error in Mattel's financial statements and material weaknesses in Mattel's internal controls. *See In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 346–47 (S.D.N.Y. 2004) (finding that "far from relying solely on allegations of GAAP violations or allegations of mere negligence, plaintiffs devote over thirty paragraphs of the Complaint to allegations that [the auditor] was well aware that the Companies' books were misleading, and that it played an active role in creating the schemes used to inflate the Companies' revenue," and "ignored numerous red flags, and was aware of and itself perpetrated" GAAP violations); *New Mexico State Inv. Council*, 641 F.3d at 1102 (finding scienter where "[t]he Complaint is loaded with specific allegations of how and why EY should have investigated deficient or missing documentation. Even after being alerted to potential problems during the 2003 corrective reforms, EY's behavior, . . . its unqualified audit opinions, did not change. These red flags further support a strong inference of scienter.").

PwC also contends that the GAAP violations cannot support scienter because

they "involved complex issues of accounting." PB 17. Again, however, PwC ignores that it knew of the misstatements and control weaknesses and concealed them.

PwC next argues that the Complaint sets forth no motive allegations "for why a premier audit firm would risk its reputation" by engaging in fraud. PB 18. PwC similarly contends that "auditors lack a rational economic incentive . . . to participate in fraud with their clients." PB 14-15. First, motive is not required to plead scienter. *PPG Indus., Inc.*, 2018 WL 6787351, at *6 ("failure to allege motive is not fatal"). This is particularly true given that the Complaint pleads PwC's knowledge of and participation in the fraud. Second, even if motive were required, the Complaint pleads it. PwC wanted to avoid a restatement because PwC's clients issue significantly more restatements than clients of the other Big Four accounting firms, and PwC has featured prominently in several recent accounting scandals—suggesting that this type of behavior is actually quite typical for this self-described "premier audit firm." *See* MB 18; ¶¶315-23. Plaintiffs also allege that the dual roles PwC played for Mattel—both as auditor and consultant—called into question PwC's ability to be unbiased. ¶323. "In cases involving an auditor performing a dual role, an auditor may take on a vested interest in the performance and profitability of its client, and consequently weaken its ability to rely on its reputation in countering as 'irrational' allegations that it participated in a client's fraud." *Silver Wheaton*, 2019 WL 1512269, at *13.

Finally, PwC argues that auditors are permitted to make "technical arguments" on accounting issues, and characterizes PwC's decision to conceal a material error as an exercise of "professional judgment." PB 19-20. This position ignores the myriad well-pled facts in the Complaint establishing that the reclassification of the HiT IP was a mechanism to conceal a known material misstatement and a material weakness and avoid a required restatement. Characterizing such misconduct as an exercise of "professional judgement" is unmoored from reality. *See New Century*, 588 F. Supp. 2d at 1235 (scienter where, "as opposed to KPMG's suggestion of a reasoned judgment, Plaintiffs offer an equally compelling inference of a deliberate choice" to issue an

unqualified audit opinion without verifying objections to the opinion); *Silver Wheaton*, 2019 WL 1512269, at *14 (auditor's arguments against scienter "based on its contention that its actions and opinions were reasonable" were "unavailing as they rely on facts that are not before the Court and are nonetheless unpersuasive given the strength of plaintiffs' allegations"); *De Sejournet v. Mohidin*, 2014 WL 7723573, at *11 (C.D. Cal. May 21, 2014) ("malicious" inferences "as compelling as any opposing innocent inference" regarding auditor scienter).

### 3. PwC's Audit Opinions Concerning Mattel's 2017 Financial Results Were Materially Misleading

PwC does not challenge that its audit opinions for 2017 and 2018 were materially false and misleading as to their conclusions that Mattel's internal controls were effective. Instead, PwC advances a limited argument that the portion of its audit opinions concerning Mattel's 2017 year-end financial statements was not misleading because those financials were technically "correct." PB 20-21. This argument fails.

To start, PwC's argument rests on the incorrect legal principle that a statement is actionable <u>only</u> when it is <u>literally</u> false. Contrary to what PwC assumes, a statement is actionable, even if literally correct, when it fails to disclose material facts necessary to make it not misleading. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) ("The disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers."); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707-08 (9th Cir. 2016) (once defendants choose to speak on a subject, they are "bound to do so in a manner that wouldn't mislead investors as to potentially negative information within their possession"). These principles apply equally to opinion statements: if an opinion "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," then the opinion is actionable. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).

- 40 -

Here, PwC's audit opinions were misleading as to Mattel's 2017 financial results because they omitted material facts that conflicted with "what a reasonable investor would take from the statement." *Id*. Specifically, they omitted that: (1) PwC knew that Mattel's third and fourth quarter results were misstated in Mattel's 2017 Form 10-K, and (2) the only reason Mattel's 2017 year-end financials were supposedly "presented fairly" is because, to hide the material misstatement of third quarter results, Mattel and PwC intentionally misstated Mattel's fourth quarter results in the same amount, but in the opposite direction, of the third quarter misstatement. ¶301.[4]

## C. The Complaint Pleads Loss Causation

Loss causation is subject only to Rule 8(a)'s notice pleading requirements. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *see also In re Immune Response Sec. Litig*., 375 F. Supp. 2d 983, 1025 (S.D. Cal. 2005). In the Ninth Circuit, this "requires no more than the familiar test for proximate cause." *Mineworkers Pension Scheme v. First Solar Inc*., 881 F.3d 750, 753 (9th Cir. 2018) ("*First Solar*") (citing *Dura*, 544 U.S. at 346). The Complaint easily meets this standard.

### 1. The Complaint Adequately Alleges Loss Causation

*First Solar* is the Ninth Circuit's most recent and authoritative decision on what is required to plead loss causation. There, the district court noted that there were two lines of competing authority as to the standard for loss causation, and certified to the Ninth Circuit the question of the proper test. The Ninth Circuit accepted the question and resolved it unequivocally. 881 F.3d at 752-53.

The first line of authority—including the cases Defendants rely on—took a more restrictive approach to loss causation that essentially requires disclosure of the fraud. *Id.* The second line of authority took a broader approach, requiring only a causal

---

[4] PwC also argues that it is not the "maker" of the unaudited quarterly financial results in Mattel's Forms 10-K. PB 21. This is irrelevant. PwC obviously <u>is</u> the "maker" of its false and misleading audit opinions.

connection between the facts misrepresented and the loss later suffered, without revelation of the fraud itself. *Id.* The Ninth Circuit adopted the broad approach, holding that the loss causation inquiry "requires no more than the familiar test for proximate cause." *Id.* at 753. Under this "general proximate cause test," plaintiffs "need only show a 'causal connection' between the fraud and the loss." *Id.* at 752-53. The Court explained that "[b]ecause loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* at 753. *First Solar* emphasized that "loss causation is a context-dependent inquiry as there are an infinite variety of ways for a tort to cause a loss." *Id.* (quoting *Lloyd*, 811 F.3d at 1210).

Significantly, *First Solar* specifically considered and rejected the argument that Defendants repurpose here—namely, that a disclosure precipitating a stock price decline must reveal a "fraud" or the existence of false statements, holding that: "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." 881 F.3d at 753; *accord Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *17-18 (C.D. Cal. Jan. 17, 2020) (loss causation adequately pled where the defendants' "misstatements . . . as opposed to some other fact, foreseeably caused the plaintiff's loss"); *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1156-57 (C.D. Cal. 2018), *aff'd sub nom.* 794 F. App'x 669 (9th Cir. 2020) (under *First Solar*, loss causation adequately pled where plaintiff "at least alleged a correlation between" disclosures and stock price declines); *Edenbrook Capital, LLC v. RhythmOne Plc*, 2019 WL 1791419, at *9 (N.D. Cal. Apr. 24, 2019) (under *First Solar*, proper test is "the familiar proximate cause test, not one that is unique to securities cases").

The Ninth Circuit further explained that "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause"—it is not required. *First Solar*, 881 F.3d at 754. Accordingly, the Court explained that the very cases Defendants rely on—which focus on the

- 42 -

revelation of the fraud as the touchstone of loss causation—are confined to their facts, "should be understood as fact-specific variants of the basic proximate cause test" and do not reflect the "rule." *Id.* at 753-54. *See Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008).

In cabining the cases on which Defendants rely, the Court also emphasized that its "approval of one theory should not imply our rejection of others":

> A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss. That a stock price drop comes immediately after the revelation of fraud can help to rule out alternative causes. But that sequence is not a condition of loss causation. This rule makes sense because it is the underlying facts concealed by fraud that affect the stock price.

*First Solar*, 881 F.3d at 754.

Thus, under *First Solar*, Plaintiffs need only plead that Defendants' fraud was causally connected to the loss. Plaintiffs have done so. The chain of proximate causation is clear: (1) the fraud concerned Mattel's misstatements of financial results and internal control deficiencies, which would foreseeably cause a loss; (2) this fraud unquestionably led to the whistleblower letter—indeed, it is undisputed that the whistleblower letter concerned the fraud at issue; and (3) when Mattel disclosed the receipt of the whistleblower letter, its stock price declined, resulting in Plaintiffs' loss. ¶¶436-37. Nothing more is required under *First Solar*.

The Ninth Circuit's decision in *Lloyd* is also supportive. *Lloyd* held that the announcement of an investigation can serve as a basis for loss causation if the plaintiff also alleges "something more"—specifically, a subsequent confirming event. 811 F.3d at 1210. This is what Plaintiffs have alleged here: the announcement of an investigation combined with a significant stock price decline, followed by a subsequent confirming event—Mattel's Audit Committee findings announcing the need for a restatement and the existence of material weaknesses in Mattel's internal controls. In

sum, Plaintiffs have adequately pled loss causation.

## 2. Defendants' Arguments Fail

Defendants' loss causation arguments misapprehend governing Ninth Circuit law. *First*, Defendants make a series of arguments contending that Plaintiffs' loss causation allegations fail as a matter of law because no revelation of the accounting misstatement preceded Mattel's stock price decline. MB 2-3, 20-22. They argue, for instance, that the August 9, 2019 disclosure "said nothing about the substance of the [whistleblower] letter or the investigation," and rely on analyst commentary noting that the August 9 disclosure did not specify the letter's contents. MB 21-22; *see also* PB 7, 9-11. (They ignore that, ironically, this was only because Mattel chose to omit those facts from its August 9 disclosure when it knew the whistleblower letter had merit.) PwC argues for an even tighter "mirror image" disclosure, requiring that the disclosure reveal the falsity of the audit opinion itself. *See* PB 10-11.

In essence, Defendants contend that pleading loss causation requires a corrective disclosure of the fraud itself, or something close to it. However, *First Solar* flatly rejected Defendants' argument and held that loss causation requires only a causal connection between the fraud and the loss, which Plaintiffs have pled.

To support their position, the Mattel Defendants mischaracterize a tiny soundbite from *First Solar*, claiming that *First Solar* requires revelation of the "very facts about which defendants allegedly lied" prior to the stock price decline. MB 21-22. That is dead wrong. As explained above, *First Solar* held that "[t]o prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." 881 F.3d at 753. The Mattel Defendants attempt to torture this soundbite into a holding requiring revelation of the fraud, but *First Solar* rejected that argument, holding that "[d]isclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id*.

The court recognized this in *Mauss v. NuVasive, Inc.*, 2018 WL 656036, at *4

- 44 -

(S.D. Cal. Feb. 1, 2018). There, Defendants argued that "because there is no evidence that the market ever learned of the practices that Plaintiffs allege underlies their claim of securities fraud," the plaintiffs cannot meet the revelation of fraud standard, and thus cannot establish loss causation. The court denied defendants' summary judgment motion because all *First Solar* requires is "proximate cause." *Id.*

The cases on which Defendant rely for this argument, including *Oracle*, *Metzler*, and *Loos*, are inapposite. These cases pre-date *First Solar*, embody the restrictive approach that *First Solar* rejected, are confined to their facts, and do not state the rule.

*Second*, Defendants attempt to evade *First Solar* by contending that the Complaint is somehow locked into a theory of revelation of the fraud, necessarily excludes a theory of proximate cause, and thus must satisfy the "revelation of the fraud" standard that *First Solar* obliterated. PB 9. To start, *First Solar*—not the Complaint—determines the governing legal standard; no pleading can alter the governing legal standard. Further, Defendants mischaracterize the Complaint. Nowhere does the Complaint limit itself to a revelation of the fraud theory to the exclusion of proximate cause. Rather, the Complaint sets forth the chain of events that gave rise to the loss and shows that those events—set in motion by Defendants' fraud—proximately caused the loss. ¶¶161-68; 434-39; ¶461 ("As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages[.]"). Further, on a Rule 12(b)(6) motion to dismiss, Plaintiffs are entitled to benefit from all inferences, and there is no basis for the Court to read the Complaint in a way that contradicts governing Ninth Circuit law.

*Third*, Defendants argue that, as matter of law, the announcement of an investigation cannot plead loss causation. *See* MB 22-24; PB 11-12. This argument largely relies on irrelevant, pre-*First Solar* case law. As *First Solar* held, a "causal connection" is all that is necessary to plead loss causation, and there are an "infinite variety" of ways to do so. Again, here, the causal connection is clear: the fraud concerned Defendants' misstatements of financial results and misrepresentations about

- 45 -

Mattel's internal controls; this fraud led to the whistleblower letter; and when Mattel disclosed the receipt of the whistleblower letter, its stock price fell.

Defendants' primary reliance on *Loos*, 762 F.3d at 880 is misplaced. *Loos*—decided <u>before</u> both *First Solar* and *Lloyd*—held that the announcement of an investigation, <u>without more</u>, cannot satisfy loss causation. Because the plaintiff in *Loos* failed to allege a subsequent confirming event—the "something more" in *Lloyd*—the court found that the share price decline could be attributed to nothing more than speculation about whether fraud occurred. *Id*. at 890. *Loos* is inapposite because: (1) here, Plaintiffs have alleged subsequent confirming disclosures, including the restatement; and (2) *Loos* relied on the very cases that *First Solar* held were confined to their facts when it set forth the simple proximate cause rule.

Although Plaintiffs allege a "subsequent corrective disclosure" per *Lloyd*, Defendants nonetheless argue that the facts here do not fit within the *Lloyd* framework because, in *Lloyd*, the market understood that the SEC subpoena concerned the underlying misstatements. MB 23-24; PB 12-13. Significantly, however, *First Solar* considered and rejected the argument that *Lloyd* stands for the proposition that the market must understand the investigation to concern the alleged fraud. *First Solar* held that "[i]n *Lloyd*, though the plaintiffs pleaded that the market understood the subpoena to be a revelation of fraud, <u>we did not suggest that this path is the only way to satisfy loss causation. Indeed, we affirmed the opposite: the plaintiffs simply 'adequately pleaded a causal connection between the material misrepresentation and the loss.'"</u> *First Solar*, 881 F.3d at 753 (citing *Dura*, 544 U.S. at 342).

The other cases on which Defendants rely fare no better. *Rok v. Identiv, Inc.*, 2017 WL 35496, at *18 (N.D. Cal. Jan. 4, 2017) pre-dates *First Solar* and found loss causation not adequately pled under *Lloyd* where the plaintiff did not allege an appropriate subsequent confirming event. Further, while Defendants suggest the need for a "bombshell revelation" as the subsequent confirming event (MB 24), this contradicts *First Solar* and *Rok*, which stated merely that the events that plaintiff

alleged (a resignation and the adjustment of certain executive compensation) did not reveal "even the outcome of the . . . investigation" and were far too attenuated to satisfy *Lloyd*. *See id.* at \*19. The court similarly found in *Huang v. Higgins*, 2019 WL 1245136, at \*17 (N.D. Cal. Mar. 18, 2019) that the plaintiffs' alleged subsequent confirming event did not relate to the investigations. That is not the case here, where the confirming event is the findings of the investigation itself and the admission of a material misstatement of financial results and internal control deficiencies. The plaintiff in *N.Y. Hotel Trades Council & Hotel Ass'n of N.Y., Inc. Pension Fund v. Impax Labs. Inc.*, 2019 WL 3779262, at \*3 (N.D. Cal. Aug. 12, 2019) pled only an investigation as a corrective disclosure with no subsequent confirming event at all.

*Fourth*, Defendants argue that Mattel's stock price fell by "happenstance" of timing, because the real reason for the decline was the cancellation of Mattel's debt offering. MB 24-25. Once again, Defendants conveniently ignore what is required under *First Solar*. Under *First Solar*, even assuming *arguendo* that Mattel's stock price decline was in response to pulling the bond offering, loss causation is still adequately pled. Defendants do not dispute that Mattel pulled the bond offering because it received the whistleblower letter concerning the underlying fraud. Thus, the chain of causation exists even viewing the termination of the bond offering as the triggering event. Further, Defendants are inappropriately asking this Court to pinpoint the cause of the stock price decline, which requires detailed fact and expert evidence to resolve and is thus inappropriate for resolution at the motion to dismiss stage. *See, e.g.*, *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1033 (N.D. Cal. 2016) ("Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.").

## D. Defendants' Remaining Arguments Fail

Defendants make a series of assertions suggesting that their misconduct was "no big deal," and somehow there is "no harm, no foul." For example, Defendants state that Mattel's misstated financial results had no impact on its 2017 year-end results; the

misstatements involved a "non-cash" item; and the market supposedly cheered when the internal investigation results were announced, and Mattel's stock price rose.

These assertions are merely atmospheric, do not actually negate any element of Plaintiffs' claims, and provide no grounds for dismissal—and Defendants do not contend otherwise. To the extent that they vaguely relate to any element of the claim, it is materiality, as they are meant to suggest that the misconduct was not important. Even if the Court were to consider these assertions, they fall woefully short of showing that Defendants' misconduct was immaterial as a matter of law.

Materiality is an intensely fact-specific inquiry inappropriate for resolution on a motion to dismiss. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (materiality "determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact"); *accord Merkamerica Inc. v. Glover*, 2019 WL 8989833, at *8 (C.D. Cal. Dec. 3, 2019).

On these facts, the Court cannot conclude, as a matter of law, that Defendants' misconduct was immaterial. Defendants essentially suggest that it is unimportant to investors whether publicly-traded companies have severe internal control deficiencies, know of material errors in their public financial statements, and conspire with an outside auditor to bury those errors instead of disclosing them. That proposition is absurd; such misconduct plainly would be "viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Prodanova v. H.C. Wainwright & Co., LLC*, 2018 WL 8017791, at *11 (C.D. Cal. Dec. 11, 2018).

Further, by restating its financial results, Mattel has <u>admitted</u> that the misstatements at issue <u>were</u> material—quite regardless of whether the item at issue was "non-cash" or whether it impacted "year-end results." *See* ¶172. This is because restatements are material <u>by definition</u>, as they are required only when there is a material accounting error. 17 C.F.R. § 211.108; *see In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("[T]he mere fact

that financial results were restated is sufficient basis for pleading that those statements were false when made.").

Moreover, Defendants' argument that their misstatements had no impact on Mattel's 2017 year-end results is oblivious as to why. *See* MB 13-14; PB 17. Defendants ignore the fact that the only reason the misstatement did not impact year-end results is because they concealed the misstatement of third quarter results by intentionally misstating fourth quarter results in the opposite direction. There is no "all's well that ends well" defense to securities fraud.

Defendants incorrectly assert that Mattel's stock price increased months <u>after</u> the Class Period, on October 30, 2019, when Mattel disclosed the Audit Committee investigation findings, and that this stock price increase means the market concluded their misconduct was "inconsequential." *See* MB 1. First, the Complaint alleges that the post-Class Period stock price increase on October 30 occurred because Mattel issued positive earnings. ¶¶170-72. Defendants' argument that the investigation results caused this increase contradicts the Complaint and improperly asks the Court to resolve highly disputed and complex fact issues in their favor. Second, even assuming that the October 30 stock price increase was due solely to the announcement of investigation results (which it was not), when one offsets this post-Class Period increase against the large August 2019 decline, there was still a net <u>decline</u> in Mattel's stock price.

Finally, the Complaint alleges several facts that further demonstrate materiality, which Defendants ignore, including that: (1) Mattel and PwC conspired to cover up the misstatement and material weaknesses precisely because they dreaded that disclosure would be a "kiss of death" given then-prevailing investor concerns (¶130); (2) Mattel and PwC's contemporaneous internal reaction to discovering the misstatement, including Martin's remark, "there goes my *** job" and Whitaker's statement that "alarm bells started going off" (¶¶120-22); and (3) Mattel took the highly unusual step of pulling an already-priced bond offering as a result of the whistleblower letter (¶167).

- 49 -

### E.   The Complaint Alleges Control Person Liability

The Mattel Defendants do not dispute the element of control for Plaintiffs' Section 20(a) claims. They argue only that the Section 20(a) claims against them fail for lack of an underlying primary violation. As explained above, that argument is incorrect. Only Defendant Abrahams challenges the control person allegations against him. His argument also fails.

Section 20(a) provides for "control person" liability when a person or entity "directly or indirectly controlled the person or entity committing the primary violation." *In re Allergan, Inc. Proxy Violation Sec. Litig.*, 2018 WL 3912934, at \*38 (C.D. Cal. Aug. 14, 2018). Whether someone is a control person is an "intensely factual question." *Middlesex Ret. Sys. v. Quest Software, Inc.*, 2008 WL 7084629, at \*13 (C.D. Cal. July 10, 2008). Accordingly, courts in the Ninth Circuit regularly find "allegations concerning an individual's title and responsibilities to be sufficient to establish control[.]" *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1205 (N.D. Cal. 2012); *see also Adaptive*, 2002 WL 989478, at \*19 (same).

Abrahams incorrectly asserts that, to allege his control, the Complaint must allege that he controlled PwC as an entity overall. AB 2-3. However, the Complaint need allege only that he exercised <u>control over PwC's false and misleading audit opinions</u>. *See In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1031 (S.D. Cal. 2005) ("To establish control, Plaintiffs must allege that Defendants . . . were active in the day-to-day affairs of IRC <u>or that they exercised specific control over the preparation and release of the alleged statements.</u>"). The Complaint pleads multiple facts that adequately allege Abraham's control over the false statements: (1) as the lead audit partner on Mattel's PwC audit team, Abrahams reviewed and approved PwC's false unqualified audit opinions; (2) he directed Mattel's senior executives and PwC personnel to improperly reclassify the HiT IP asset, in violation of PCAOB Rule 3502 (¶202); (3) he did so as a contrivance to avoid the required restatement and disclosure of material weaknesses (*id*.); and (4) Mattel's disclosures stated that the accounting

- 50 -

error was due to "lapses in judgment by management" and the so-called "advice" of "the lead audit engagement partner of Mattel's outside auditor," *i.e.*, Abrahams. ¶¶23, 177, 181. Abrahams' removal from the Mattel audit team and subsequent dismissal from PwC buttresses his responsibility for the false statements here. ¶208. Taken together, all these allegations plead that he exercised control over PwC's misstatements. *See, e.g.*, *Quest Software*, 2008 WL 7084629 at \*13 ("Because he was directly involved in the alleged misstatements, his control has been properly alleged.").

Abrahams also argues that he is "not alleged to have signed or specifically approved any allegedly misleading information." AB 4. This argument is incorrect because: (1) as the lead audit partner, he approved PwC's false audit opinions, and (2) he played a lead role in directing the cover-up of the known misstatement.

## IV.    **CONCLUSION**

The Court should entirely deny Defendants' Motions to Dismiss. However, should the Court grant those motions in whole or part, Plaintiffs request leave to amend.

- 51 -

Dated: September 25, 2020

/s/ *John Rizio-Hamilton*

John Rizio-Hamilton (admitted *pro hac vice*)
Brenna D. Nelinson (admitted *pro hac vice*)
Matthew Traylor (admitted *pro hac vice*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com

Jonathan D. Uslaner (SBN 256898)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
2121 Avenue of the Stars
Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470
jonathanu@blbglaw.com

*Lead Counsel for Lead Plaintiffs and the Class*

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
260 Franklin Street
Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jake@blockleviton.com

*Additional Counsel for Additional Named Plaintiff Houston Municipal Employees Pension System*

- 52 -

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I HEREBY CERTIFY that, on September 25, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 25, 2020.

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton