JOHN W. SPIEGEL (SBN 78935)
john.spiegel@mto.com
JOHN M. GILDERSLEEVE (SBN 284618)
john.gildersleeve@mto.com
LAUREN C. BARNETT (SBN 304301)
lauren.barnett@mto.com
ROWLEY J. RICE (SBN 313737)
rowley.rice@mto.com
BRIAN R. BOESSENECKER (SBN 331409)
brian.boessenecker@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for MATTEL, INC.,
MARGARET H. GEORGIADIS,
JOSEPH J. EUTENEUER,
and KEVIN FARR

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MATTEL, INC. SECURITIES LITIGATION | Case No. 19-CV-10860-MCS (PLAx) |
| | **MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION** |
| | Date:   September 20, 2021<br>Time:   9:00 a.m.<br>Ctrm:   7C<br>Judge:  Hon. Mark C. Scarsi |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................... 1

II.   BACKGROUND ................................................................................... 4

III.  ARGUMENT .......................................................................................... 6

    A.    A Showing of Lack of Price Impact, Through Any Form of Evidence, Suffices to Rebut *Basic*'s Presumption of Reliance .............. 6

    B.    Fundamental Valuation Principles Show No Price Impact .................... 9

        1.    Stock Prices Reflect Expected Future Cash Flows........................ 9

        2.    Mattel's Tax Accounting Error Did Not Affect Investor Expectations of Future Cash Flows............................. 10

        3.    Lead Plaintiffs' Own Investment Manager Agrees That the Error Had No Impact on Mattel's Value....................... 13

    C.    Analyst Reaction Shows No Price Impact............................................. 14

        1.    Analyst Reaction in 2017 Shows No Price Impact .................... 15

        2.    Analyst Reaction in 2019 Shows No Price Impact .................... 16

    D.    Stock Returns Show No Price Impact.................................................... 18

        1.    The August 8 Announcement Cannot Show the Alleged Misrepresentations Had a Price Impact When Made ................. 19

        2.    The October 29 Corrective Disclosure Cannot Show a Price Impact Because Mattel's Stock Price Rose .................... 20

    E.    Lead Plaintiffs Face Unique Defenses Based on Their Investment Manager's Finding of No Impact on Value ...................... 23

IV.  CONCLUSION ................................................................................... 25

MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1972) ...............................................................................................25

*In re AIG Inc. Sec. Litig.*,
   265 F.R.D. 157 (S.D.N.Y. 2010), *vacated on other grounds*,
   689 F.3d 229 (2d Cir. 2012) ..................................................................................21

*In re Allstate Corp. Sec. Litig.*,
   966 F.3d 595 (7th Cir. 2020) ........................................................................ *passim*

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .......................................................................... 1, 6, 7, 13

*In re CitX Corp., Inc.*,
   448 F.3d 672 (3d Cir. 2006) .....................................................................................2

*City of Cape Coral Mun. Firefighters' Ret. Plan v.
   Emergent Biosolutions, Inc., HQ*,
   322 F. Supp. 3d 676 (D. Md. 2018) .......................................................................21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015)........................................................................8, 22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) .................................................................................................7

*In re Finisar Corp. Sec. Litig.*,
   2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ...........................................................8

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015).................................................................................21

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
   141 S. Ct. 1951 (2021)................................................................................. *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) .................................................................................... *passim*

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992)............................................................................23, 24

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
    818 F.3d 775 (8th Cir. 2016) ............................................................................8

*In re Intuitive Surgical Sec. Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ...............................................20, 21

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ............................................................................6

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011)....................................................................8, 21

*Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ..............................................8, 20

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017) .......................................................................2, 9, 23

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019)........................................................................21

*USA Trouser, S.A. de C.V. v. Andrews*,
    612 F. App'x 158 (4th Cir. 2015)........................................................................2

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    2018 WL 2958361 (S.D.N.Y. June 13, 2018).....................................................24

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    __ F.4th __, 2021 WL 2621171 (9th Cir. June 25, 2021) ...................................25

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021)...........................................................................24

**FEDERAL RULES**

Fed. R. Civ. P. 23(a) ...............................................................................23, 24

Fed. R. Civ. P. 23(b)(3) ..........................................................................1, 6, 7

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**OTHER AUTHORITIES**

A. Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 583 (2015)............................................................................................................2

J.B. Heaton, *Kill* Cammer*: Securities Litigation Without Junk Science*, 11 Wm. & Mary Bus. L. Rev. 417 (2020)..............................................2

T. Dove, D. Heath, & J.B. Heaton, *Bias-Corrected Estimation of Price Impact in Securities Litigation*, 21 Am. L. & Econ. Rev. 184 (2019) ...................2

## I.    **INTRODUCTION**

This case involves a non-cash error of tax accounting that, by its nature, made no difference to investors.  For a securities case, that is a fatal defect that precludes class certification.  The error not only was arcane and fleeting—it had no impact on Mattel's expected future cash flows, and therefore no impact on how investors in an efficient market assessed Mattel's value.   Fundamental principles of corporate valuation, the uniform reaction of market analysts covering Mattel, and actual stock returns all show the same thing: that when the alleged misrepresentations were made, they had no impact on Mattel's stock price.

Now that Plaintiffs seek to certify a class, the Court's "task" is to "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021).  Absent price impact, a class may not be certified because Plaintiffs cannot invoke the presumption of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to prove reliance on a classwide basis.  *See Goldman*, 141 S. Ct. at 1959 ("If a misrepresentation had no price impact, then *Basic*'s fundamental premise 'completely collapses, rendering class certification inappropriate.'") (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283 (2014) ("*Halliburton II*")); *Halliburton II*, 573 U.S. at 281-82 ("[W]ithout the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3).").

In *Goldman*, issued last month, the Supreme Court reaffirmed that certifying a class is inappropriate when defendants show lack of price impact, and emphasized that the price impact inquiry must be holistic.  The Court held: "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common

sense."  141 S. Ct. at 1960 (internal quotations omitted).  The Court also made clear that price impact means "front-end price inflation"—that is, not merely a stock price decline at the end of a putative class period, which is a feature common to most securities cases, but an impact on the company's stock price at the time the alleged misrepresentations are made. *Id.* at 1961.

Considered from three different angles, the evidence in this case shows that the alleged misrepresentations had no impact on Mattel's stock price when made.

*First*, fundamental valuation principles dictate that the tax accounting error had no bearing on how investors assessed Mattel's value.  As explained in the expert report of J.B. Heaton, whose work the Second and Seventh Circuits and many district courts have cited on price impact matters (and other circuits have cited on solvency matters),[1] a company's stock price reflects the discounted present value of its expected future cash flows.  *See* Barnett Decl. Ex. 1 ("Heaton Rpt.").  The error in this case had no consequences for expected future cash flows, as it involved only the assumptions used for non-cash accounting for deferred taxes.  In an efficient market that incorporates all publicly available information, investors understood that.  *See id.* ¶¶ 26-49.  Even the investment management firm that bought Mattel stock *for Lead Plaintiffs* agreed that the alleged misrepresentations had no impact on value.  It advised clients that the "historical accounting errors" were "non-material" and "did not impact the long-term value of the company."  *Id.* ¶ 71.  That contemporaneous assessment, by the investment manager on whose expertise Lead

---

[1] *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595 (7th Cir. 2020); *In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017); *USA Trouser, S.A. de C.V. v. Andrews*, 612 F. App'x 158 (4th Cir. 2015); *In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006).  Dr. Heaton has published often on price impact.  *See, e.g.*, J.B. Heaton, *Kill* Cammer*: Securities Litigation Without Junk Science*, 11 Wm. & Mary Bus. L. Rev. 417 (2020); T. Dove, D. Heath, & J.B. Heaton, *Bias-Corrected Estimation of Price Impact in Securities Litigation*, 21 Am. L. & Econ. Rev. 184 (2019); A. Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 583 (2015).

MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Plaintiffs relied, was completely correct.

*Second*, the uniform reaction of market analysts confirms what valuation principles dictate: the error did not impact expected future cash flows.  The error involved misstating the amount of an allowance recorded against Mattel's deferred tax assets.  When, in 2017, Mattel first recorded that $562 million allowance, *none* of the many analysts covering Mattel asked questions about it or even mentioned it in their reports—naturally, because they understood it did not affect expected future cash flows.  Analysts even assessed Mattel using an earnings-per-share figure that was adjusted to *exclude* the allowance, further demonstrating its lack of price impact.  And when, in 2019, Mattel disclosed the alleged misrepresentations, none of the analysts indicated that the error or the related control weaknesses impacted how they valued Mattel.  Rather, analysts reacted positively. *See id.* ¶¶ 50-64.  The "good dose of common sense" prescribed by the Supreme Court instructs that when analysts do not care about the subject matter of a case, the alleged misrepresentations had no price impact. *Goldman*, 141 S. Ct. at 1960.

*Third*, stock returns also show no price impact.  As the Supreme Court held, "price impact" means an effect on Mattel's stock price at the time the alleged misrepresentations were made—in this case, starting in late 2017. *Id.* at 1961.  That "front-end price inflation" sometimes can be inferred from a later stock price decline when there is "a negative disclosure about a company and an associated drop in its stock price." *Id.*  But here, when the alleged misrepresentations were disclosed, Mattel's stock price *increased*.  Plaintiffs therefore point to a stock price decline that *did not* follow any disclosure of alleged misrepresentations, and which therefore cannot support the inference—necessary for price impact—that the alleged misrepresentations affected Mattel's stock price when made. *See* Heaton Rpt. ¶¶ 72-90.  As the Supreme Court put it, "when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," any inference of price impact derived from a later stock price decline "starts to break down."

-3-

MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

*Goldman*, 141 S. Ct. at 1961.  The lack of price impact here is no anomaly or quirk of how the error happened to be disclosed; rather, it is consistent with fundamental valuation principles and the uniform reaction of market analysts.

The Supreme Court set a clear legal framework.  It held in *Halliburton II* that "defendants must be afforded an opportunity before class certification to defeat the [*Basic*] presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock."  573 U.S. at 284.  It then held in *Goldman* that when assessing price impact or lack thereof, courts must consider "*all* probative evidence … qualitative as well as quantitative," and apply common sense. 141 S. Ct. at 1960 (quotation omitted).  Here, the evidence validates common sense: alleged misrepresentations about a value-irrelevant error did not affect Mattel's stock price when made.  *Id.* at 1963.  It follows that *Basic*'s presumption of reliance is rebutted, common questions do not predominate, and a class may not be certified. *See id.* at 1959.

## II.    BACKGROUND

Plaintiffs allege "a cover-up of known, material misstatements in Mattel's financial results and known severe weaknesses in its internal controls."  Am. Compl. ¶ 1.  Specifically, a non-cash valuation allowance recorded against Mattel's deferred tax assets was *under*stated by $109 million in the third quarter of 2017 and then *over*stated by $109 million in the fourth quarter of 2017—a one-quarter shift with no effect on Mattel's operating income, cash flows, or full-year financial results.  *Id.* ¶¶ 173, 175.  Plaintiffs also allege that Defendants misrepresented that Mattel's internal controls were effective, because the error in calculating the valuation allowance reflected material weaknesses in internal controls.  *Id.* ¶¶ 174, 178.

Plaintiffs claim that the alleged misrepresentations were later revealed to the market on October 29, 2019.  "On October 29, 2019, Mattel finally admitted what it should have long before—that its financial results for the third and fourth quarters of 2017 had been materially misstated, its internal controls suffered from multiple

-4-

material weaknesses, and it would restate its financial results to admit and correct these errors." *Id.* ¶ 23. Nonetheless, the next day, Mattel's stock price rose 14%. *See* Heaton Rpt. ¶¶ 15, 84; Am. Compl. ¶ 439 (conceding "lack of statistically significant negative price movement in Mattel's stock price in response to the … announcements on October 29, 2019").

Although the alleged misrepresentations were revealed on October 29, 2019, Plaintiffs seek to recover damages from a decline in Mattel's stock price on August 9, 2019. On August 8, 2019, Mattel announced it would investigate a whistleblower letter about unspecified "matters" and that it had terminated a debt offering set to close that day. The disclosure read in full:

> On August 6, 2019, Mattel, Inc. (the "Company") was made aware of an anonymous whistleblower letter. To provide the Company with an opportunity to investigate the matters set forth in the letter, the offering of the Company's 6.00% Senior Notes due 2027 that was scheduled to close on August 8, 2019 has been terminated. The Company intends to refinance its 4.350% Senior Notes due October 2020 prior to maturity.

Heaton Rpt. ¶ 11. The next day, Mattel's stock price fell 16%. *See id.* ¶ 12; Am. Compl. ¶ 168.

On January 26, 2021, the Court denied Defendants' motions to dismiss the Amended Complaint, holding that Plaintiffs had adequately pleaded the elements of scienter and loss causation. *See* ECF No. 74.

On April 30, 2021, Plaintiffs moved to certify a class of "[a]ll persons and entities who purchased or otherwise acquired the common stock of Mattel, Inc. [] from August 2, 2017 to August 8, 2019, inclusive, and who were damaged thereby." Mot. at 1. Citing "Plaintiffs' efficiency expert, Professor Kothari," Plaintiffs argue that "the market for Mattel's common stock was efficient, and the presumption of reliance therefore applies." *Id.* at 3, 18; *see id.* at 17 ("Reliance is established here through the presumption of class-wide reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 [(1988)].").

## III.   ARGUMENT

"Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).  Plaintiffs must establish, among other things, that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).

Plaintiffs cannot establish that common questions predominate, as required by Rule 23(b)(3), without *Basic*'s presumption of reliance.  That presumption, in turn, requires that the alleged misrepresentations affected Mattel's stock price at the time they were made—that is, that they caused "front-end price inflation." *Goldman*, 141 S. Ct. at 1961.

As explained below, the alleged misrepresentations "more likely than not" did not affect Mattel's stock price when made.  *Id.* at 1963.  *First*, because they had no bearing on expected future cash flows, they did not affect Mattel's stock price.  That is a matter of fundamental valuation principles, and is compelling quantitative evidence.  *Second*, the many analysts covering Mattel were indifferent to the subject matter of the alleged misrepresentations and reacted positively when they were corrected.  That is compelling qualitative evidence.  *Third*, the market data also fails to show price impact.  When the alleged misrepresentations were corrected, Mattel's stock price rose.  And *Goldman* makes clear that the stock price decline on August 9, 2019 cannot show that the alleged misrepresentations caused front-end price inflation because, indisputably, nothing about the alleged misrepresentations was disclosed.  That too is compelling quantitative evidence of no price impact.

### A.   A Showing of Lack of Price Impact, Through Any Form of Evidence, Suffices to Rebut *Basic*'s Presumption of Reliance

To prevail on their claim under Section 10(b) and Rule 10b-5, Plaintiffs must prove they *relied* on the alleged misrepresentations.  *See Halliburton II*, 573 U.S. at

-6-

267.  As is typical in securities cases, Plaintiffs "invoke a rebuttable presumption of reliance based on the fraud-on-the-market theory." *Goldman*, 141 S. Ct. at 1958. "The 'fundamental premise' of the fraud-on-the-market theory underlying *Basic*'s presumption is 'that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011)).

"*Basic* emphasized that the presumption of reliance was rebuttable rather than conclusive." *Halliburton II*, 573 U.S. at 268. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. "So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, ... then the presumption of reliance would not apply." *Halliburton II*, 573 U.S. at 269. "[W]ithout the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Id.* at 281-82.

Recently, in *Goldman*, the Supreme Court stressed that the price impact inquiry is flexible and holistic. "[C]ourts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." 141 S. Ct. at 1960 (quoting *Allstate*, 966 F.3d at 613 n.6); *see id.* at 1963 (Sotomayor, J., concurring) ("So-called 'price impact' may be disproved with a variety of evidence, alone or in combination."). Qualitative evidence—which, in *Goldman*, was evidence of the "generic nature" of Goldman's statements—"often is important evidence of price impact." *Id.* at 1960.

Overlap with merits issues, such as materiality and loss causation, is no basis to disregard evidence of lack of price impact. Courts "must take into account *all* record evidence relevant to price impact, regardless whether that evidence overlaps

MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

with materiality or any other merits issue," and "may not use the overlap to refuse to consider the evidence.'" *Id.* at 1960-61 & n.2 (quoting *Allstate*, 966 F.3d at 608-09); *see Allstate*, 966 F.3d at 611 (courts "must assess evidence that may speak directly to the forbidden merits inquiries of materiality and loss causation").

Multiple courts have denied class certification based on lack of price impact. *See IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (reversing class certification because "evidence of no 'front-end' price impact rebutted the *Basic* presumption"); *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) ("*Freddie Mac*") (denying class certification because "alleged misstatements … did not impact Freddie Mac's stock price"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *9 (N.D. Cal. Dec. 5, 2017) (denying class certification because "statement had no price impact"); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269-76 (N.D. Tex. 2015) ("*Halliburton III*") (on remand, declining to certify class as to five of six disclosures based on lack of price impact); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (denying class certification because "allegedly false information … was not causing the stock price to artificially inflate").

Courts also anticipated *Goldman*'s directive that price impact is more than a matter of market data. In securities cases, parties often conduct "'event studies'— regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 573 U.S. at 280. But event studies should be considered only alongside other qualitative and quantitative evidence. On this point, two Courts of Appeals recently have relied on Dr. Heaton's work. In *Allstate*, an opinion cited approvingly by the Supreme Court throughout *Goldman*, the Seventh Circuit wrote:

> Event studies may help, but there is no reason in the class certification inquiry to limit evidence to those, especially in 'confirmatory lie' cases. … Econometrics, finance, and securities law experts have criticized the methods used in event studies prepared for litigation, and they caution courts to think carefully about how such study designs and findings often do a

-8-

poor job of answering the legal questions at stake. *See, e.g.,* Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 583, 585-87 (2015); Jill E. Fisch, Jonah B. Gelbach, & Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553, 616 (2018).

966 F.3d at 613 n.6; *see id.* at 609 ("[t]he *Basic* line of cases imposes few if any limits" on "scope of the evidence"). In *Petrobras*, the Second Circuit wrote:

> Event studies offer the seductive promise of hard numbers and dispassionate truth, but methodological constraints limit their utility in the context of single-firm analyses. *See generally* Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U. L. Rev. 583 (2015); *see also id.* at 588 n.11 (collecting academic criticism of single-firm event studies). Notably, small sample sizes may limit statistical power, meaning that only very large-impact events will be detectable. *See id.* at 589-605. In addition, it can be extremely difficult to isolate the price impact of any one piece of information in the presence of confounding factors, such as other simultaneously released news about the company, the industry, or the geographic region. *See id.* at 605-08.

862 F.3d at 278-79. Echoing these decisions, the Supreme Court held that courts "cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact." *Goldman*, 141 S. Ct. at 1961.

## B.      Fundamental Valuation Principles Show No Price Impact

Basic principles of corporate valuation show that Mattel's tax accounting error was value-irrelevant by nature because it did not affect investor expectations of future cash flows. Alleged misrepresentations relating to the error therefore did not affect Mattel's stock price at the time they were made.

### 1.      Stock Prices Reflect Expected Future Cash Flows

As an initial matter, well-established principles of financial economics hold that, in an efficient market, a company's stock price reflects its "fundamental valuation," which equates to the discounted present value of investor expectations of future cash flows. *See* Heaton Rpt. ¶¶ 26-28. Plaintiffs agree, and their expert Dr. Kothari opines, that Mattel's stock traded in an efficient market during the

-9-

putative class period.  *See* Mot. at 18-22; Rizio-Hamilton Decl. Ex. A ("Kothari Rpt.") ¶ 15 ("During the Class Period, the market for Mattel's stock was efficient.").

As Dr. Heaton explains, a basic principle of financial economics is that in an efficient market, a company's stock price accurately reflects its fundamental valuation at any given instant.  Stock price movement occurs, therefore, when new information causes investors to revise their expectations about the company's future cash flows.  By contrast, new company-specific information that does *not* affect investor expectations about future cash flows does *not* cause stock price movement. *See* Heaton Rpt. ¶¶ 26-28.  Put differently, information with no consequences for expected future cash flows does not change a company's fundamental valuation and therefore has no impact on its stock price.  *See id.*

### 2.    Mattel's Tax Accounting Error Did Not Affect Investor Expectations of Future Cash Flows

Mattel's tax accounting error had no implications for expected future cash flows.  Therefore, as explained above, the alleged misrepresentations relating to it had no impact on Mattel's stock price at the time they were made.

Dr. Heaton details in his report why Mattel's tax accounting error did not affect expected future cash flows and, as a matter of financial economics, did not affect its stock price.  *See* Heaton Rpt. ¶¶ 26-49.  The key points to understanding why the error was value-irrelevant are as follows:

***Deferred tax assets and liabilities generally.***  As an initial matter, how taxes are accounted for under Generally Accepted Accounting Principles ("GAAP") for purposes of financial reporting does not always match when taxes are paid under the Internal Revenue Code.  These differences can require a company to record deferred tax assets and liabilities in its financial statements under GAAP.  *See id.* ¶¶ 30-35. As Mattel explained in its 2017 10-K: "[T]iming differences create deferred income tax assets and liabilities.  Deferred income tax assets generally represent items that can be used as a tax deduction or credit in Mattel's tax returns in future years for

-10-
MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

which Mattel has already recorded a tax benefit in its consolidated statement of operations." *Id.* ¶ 33.

*Mattel's valuation allowance.* Under GAAP, if a company determines that it more likely than not will be unable to use deferred tax assets, it must record an allowance against them, known as a valuation allowance. In the third quarter of 2017, Mattel recorded a new valuation allowance of $562 million against its balance of deferred tax assets. The allowance was purely a function of GAAP accounting that did not affect, and revealed no new information about, Mattel's current or expected future cash flows. *See id.* ¶¶ 37, 46-49. Mattel recorded the allowance because GAAP dictated that Mattel should *assume* that its cumulative losses over the *prior* three years meant that it likely would not earn sufficient income to use the deferred tax assets in the future. As Mattel explained in its third-quarter 10-Q, under GAAP, "[t]he 36-month cumulative U.S. loss from operations is considered strong negative evidence and outweighs other positive subjective evidence, such as projections of future income." *Id.* ¶ 46; *see id.* ¶ 47 (explaining that ASC 740-10-30-23, which codifies GAAP, provides that "[a] cumulative loss in recent years is a significant piece of negative evidence that is difficult to overcome").

Importantly, the new valuation allowance did *not* mean that Mattel would not actually use its deferred tax assets, or would earn less future income, or would pay more in taxes. Mattel retained all of its deferred tax assets, and the allowance did not prevent Mattel from using them to offset future tax obligations. It meant only that Mattel's accumulation of *past* losses—which already were known to investors—had triggered a new assumption dictated by GAAP for use in financial reporting. *See id.* ¶¶ 46-49. Investors understood that, and Mattel explained it in its 10-Q: "The valuation allowance does not impact Mattel's actual ability under applicable tax laws to utilize deferred tax assets … to reduce future cash tax payments …." *Id.* ¶ 9. That is why the new valuation allowance provided no new information about Mattel's expected future cash flows. It was dictated by existing

data about past performance that already was incorporated into Mattel's stock price.

***Misstating the allowance.*** Because, as shown above, the valuation allowance itself had no consequences for future cash flows, temporarily misstating its amount had no consequences for future cash flows, either. That is, the entire $562 million allowance was value-irrelevant, so understating it in the third quarter, and overstating it in the fourth quarter by the same amount, also was value-irrelevant. *See id.* ¶¶ 43, 48. The $109 million shift between quarters did not affect operating income for those quarters or subsequent periods, and provided no new information about Mattel's current or expected future cash flows, for the same reasons that the allowance itself provided no such information.[2]

The efficient market hypothesis, which is the premise of *Basic*'s presumption, establishes that the market understood that the error did not affect expected future cash flows even though it impacted Mattel's quarterly net income. Under GAAP, a valuation allowance on deferred tax assets flows on the financial statements through income tax expense to reduce net income. Investors in an efficient market understood GAAP and therefore that these particular changes to net income had no cash flow consequences. *See* Heaton Rpt. ¶¶ 43, 48-49; *see also* Kothari Rpt. ¶ 15 ("the price of Mattel's stock could be relied upon to reflect publicly available information"). In other words, the publicly available information reflected in Mattel's stock price included awareness of how GAAP accounting works. *See*

---

[2] The error related to a deferred tax liability (the "Thomas DTL") that Mattel had recorded in 2012 upon acquiring the Thomas & Friends intellectual property asset (the "Thomas IP"). In the third quarter of 2017, Mattel inadvertently reduced the allowance by the amount of the Thomas DTL, even though the Thomas IP then was classified as *indefinite*-lived and typically only deferred tax liabilities associated with *definite*-lived assets can reduce an allowance. The Thomas IP later was reclassified as definite-lived, and the allowance appropriately was reduced by the amount of the Thomas DTL. Plaintiffs do not allege that the substance or timing of the reclassification of the Thomas IP was incorrect under GAAP, and Mattel has not restated its financials as to the reclassification. *See* Heaton Rpt. ¶¶ 36, 42-45.

MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

*Basic*, 485 U.S. at 246 ("the market price of shares traded on well-developed markets reflects all publicly available information").

In sum, the subject matter of the misrepresentations alleged by Plaintiffs was value-irrelevant in an efficient market. The alleged misrepresentations concerned a valuation allowance that was an artifice dictated by GAAP accounting with no cash flow consequences. Investors in an efficient market understood that these vagaries of tax accounting did not affect current or expected future cash flows. Fundamental valuation principles therefore show that alleged misrepresentations on this subject had no impact on Mattel's stock price when made.

### 3. Lead Plaintiffs' Own Investment Manager Agrees That the Error Had No Impact on Mattel's Value

The investment manager for both Lead Plaintiffs during the putative class period, Southeastern Asset Management ("Southeastern"), agreed that the alleged misrepresentations were value-irrelevant, adding to the ample other evidence of no price impact. Southeastern told its clients exactly what the valuation principles discussed above indicate: that the alleged misrepresentations that Mattel disclosed on October 29, 2019 were "non-material" and "did not impact the long-term value of the company." Heaton Rpt. ¶¶ 65-71.

Southeastern is the asset management firm that purchased Mattel stock during the putative class period on behalf of both New Orleans Employees' Retirement System and DeKalb County Employees Retirement System. *See* Barnett Decl. Ex. 2 at 46:24-47:8; *id.* Ex. 3 at 23:19-24:10. Representatives of both Lead Plaintiffs testified that Southeastern was responsible for making investment decisions on their behalf—including whether and when to buy and sell Mattel stock—and that they relied on Southeastern's investment expertise and assessment of Mattel's value. *See* Barnett Decl. Ex. 2 at 47:9-24; *id.* Ex. 3 at 32:3-15.

In January 2020, Southeastern published on its website client commentary about its investments in the fourth quarter of 2019. Regarding Mattel, Southeastern

wrote:

> Mattel [], the classic toy company, was another top contributor in the quarter and the year, after ***the company resolved a non-material whistleblower complaint over historical accounting errors***, which delayed a debt offering that the company subsequently completed in November.  Like GE, ***the headline fears and uncertainty surrounding the complaint weighed heavily on the stock price in the short term but did not impact the long-term value of the company***.  Sales increased in the quarter, while management took further necessary steps towards decreasing operating costs and improving gross margins.  Barbie, Hot Wheels, action figures and games all sold well during the last quarter, while American Girl and Fisher Price declined moderately.  Earnings before interest, taxes, depreciation and amortization (EBITDA) appears on track to have exceeded expectations in 2019 at $400 million or better and is expected to approach or exceed $600 million in 2020, which would meaningfully reduce the company's leverage ratios, thereby addressing one of the key issues that has depressed the stock price for the last several years.  We believe that CEO Ynon Kreiz has done a wonderful job with the turnaround after inheriting a difficult situation, while actively pursuing the substantial upside presented by streaming and film demand for Mattel's brands.

Heaton Rpt. ¶ 71 (emphasis added).

As Dr. Heaton explains, Southeastern's assessment of Mattel's disclosures perfectly matches the fundamental valuation analysis described above.  After noting that the whistleblower letter about "historical accounting errors" was "non-material" and "did not impact [] long-term value," Southeastern focused on other information that *was* value-relevant because it *did* affect expected future cash flows: Mattel's sales, operating costs, EBITDA, leverage ratios, and overall strategic turnaround effort.  *Id.* ¶¶ 70-71.

In short, the contemporaneous view of Lead Plaintiffs' investment manager, unburdened by the need for any litigation contortions, was that the alleged misrepresentations did not affect Mattel's fundamental valuation.  That is further confirming evidence of lack of price impact.

## C.    Analyst Reaction Shows No Price Impact

The uniform reaction of market analysts covering Mattel also shows that the alleged misrepresentations did not affect Mattel's stock price.  As Plaintiffs note,

Mattel had a "robust and significant analyst following" that "exceeded the number of analysts following other companies on the Nasdaq."  Mot. at 19; *see* Kothari Rpt. ¶¶ 43, 48 (listing "over a dozen different security analysts following Mattel's stock" who "were employed by major firms," such that "information about Mattel was closely followed, analyzed, and disseminated by investment professionals").  How those analysts reacted to information about the alleged misrepresentations, in both 2017 and 2019, is strong qualitative evidence of lack of price impact.

### 1.    Analyst Reaction in 2017 Shows No Price Impact

*First*, on earnings calls for both the third and fourth quarters of 2017, analysts asked Mattel's management *no questions* about the valuation allowance on deferred tax assets—demonstrating that investors understood that the allowance did not affect Mattel's expected future cash flows.  *See* Heaton Rpt. ¶¶ 50-53; *cf.* Kothari Rpt. ¶ 46 ("The intensive coverage of Mattel's stock by analysts can also be seen in analysts' participation in conference calls held by Mattel.").  The analysts asked no questions about the allowance despite its novelty, having appeared for the first time in the third quarter, and its magnitude of $562 million.  Even though the allowance reduced the recorded balance of Mattel's U.S.-based net deferred tax assets to *zero*, analysts understood that it was the product of a GAAP assumption that, for the reasons described above, did not affect Mattel's fundamental valuation.  *See* Heaton Rpt. ¶¶ 50-53.

On both calls, the valuation allowance was mentioned at the outset.  On the third-quarter call, Mattel's investor relations representative noted that Mattel would discuss "non-GAAP financial measures" including "adjusted earnings or loss per share from which we exclude the impact of a $562 million noncash charge related to the establishment of a valuation allowance."  *Id.* ¶ 50.  On the fourth-quarter call, Mattel's CFO reminded analysts that Mattel had recorded an allowance that was "noncash" and "does not impact Mattel's ability to utilize these deferred tax assets."  *Id.* ¶ 52.  Although Mattel flagged the allowance at the outset of each call, analysts

still asked no questions about it, and asked instead about subjects that *were* relevant to Mattel's fundamental valuation, such as its turnaround effort and related cost savings. *See id.* ¶¶ 51, 53.

*Second*, the written reports issued by analysts for the third and fourth quarters of 2017 also did not discuss the valuation allowance. *See id.* ¶ 61 & Ex. C. That total lack of discussion is consistent with the widely-accepted corporate valuation principles discussed above. Even though Mattel had announced a net loss in the third quarter of $603 million, driven by the $562 million allowance, analysts understood that the loss was mostly attributable to an artifice of GAAP accounting with no implications for expected future cash flows. As on the earnings calls, analysts focused their written reports on the information that *did* affect expected future cash flows, namely, Mattel's operating performance and turnaround plans. *See id.*

*Third*, in evaluating Mattel's performance and prospects, the analysts chose to use a non-GAAP, *adjusted* earnings-per-share figure that they knew (since Mattel's investor relations representative highlighted it) *excluded* the effect of the valuation allowance. *See id.* ¶¶ 61-62. As Dr. Heaton explains, that choice illustrates that the amount of the allowance had no impact on investors' appraisal of Mattel's fundamental valuation. Indeed, in comparing Mattel's earnings to analyst forecasts, Plaintiffs' expert Dr. Kothari also uses adjusted earnings-per-share figures that *exclude* the effect of the non-cash valuation allowance, and even refers to those adjusted figures as Mattel's "Actual EPS." Kothari Rpt. Ex. 8.

### 2.   Analyst Reaction in 2019 Shows No Price Impact

The reaction of analysts after October 29, 2019, when Mattel corrected the alleged misrepresentations and "finally admitted what it should have long before," Am. Compl. ¶ 23, is consistent and also shows that the alleged misrepresentations did not affect Mattel's stock price when made.

*First*, analysts reacted positively to Mattel's disclosure that it had made the

-16-

tax accounting error in 2017, that it had related control weaknesses, and that it would issue restated financials. *See* Heaton Rpt. ¶¶ 63-64 & Ex. D. For example, Barclays wrote that the error was "benign" and that the disclosure removed an "overhang" from Mattel's stock. *Id.* ¶ 64. Several analysts observed that the disclosure meant that Mattel's stock price would increase, as it resolved the uncertainty of the internal investigation in a way that did not implicate Mattel's value. One analyst wrote: "[L]ast night's 20% increase in Mattel's shares in after-hours trading was a direct result of the company resolving its outstanding whistleblower complaint." *Id.* ¶ 63. Another wrote: "We expect a relief rally that whistleblower claims of accounting errors & weak internal controls have been disclosed and addressed." *Id.* ¶ 64. No analyst lowered its price target (that is, its prediction of Mattel's future stock price) due to the disclosure of the alleged misrepresentations. *See id.*

Analyst reaction also shows that the alleged misrepresentations about internal controls did not affect Mattel's stock price any more than the underlying error did. Analysts did not express concern or suggest that the disclosure of related control weaknesses changed their expectations of Mattel's future cash flows. *See id.* ¶¶ 63-64. That lack of reaction is consistent with the academic literature. As Dr. Heaton explains, disclosures of control weaknesses yield positive stock returns in a large percentage of cases because a host of case-specific factors—including whether, as here, remedial actions are announced—influence the ultimate question, which is whether investor expectations of future cash flows change. *See id.* ¶¶ 91-95.

*Second*, the behavior of analysts on Mattel's conference calls in late 2019 was consistent with their written reports. At the outset of the October 29, 2019 earnings call, Mattel's CEO described the results of the investigation, including the error, the control weaknesses and remedial actions, and the departure of Mattel's CFO. Analysts then were told that Mattel would host a separate call, after the restatement, to answer any "detailed accounting questions." *Id.* ¶¶ 54-55. Analysts asked no

MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

questions, detailed or general, on the first call about Mattel's disclosures relating to the investigation.  And even though Mattel solicited questions before the second call, it received few of them and compiled only three answers—one on the progress of remedial actions, and two on PwC's relationship with Mattel—none of which reflected market concern about valuation or future cash flows.  That second call was short, and analysts issued no reports on it.  *See id.* ¶¶ 56-60.

In sum, the uniform reaction of the many analysts covering Mattel shows that the alleged misrepresentations were value-irrelevant and did not affect Mattel's stock price when made.  This compelling qualitative evidence adds to the ample other evidence of lack of price impact.

**D.    Stock Returns Show No Price Impact**

Finally, Mattel's stock returns are consistent with what fundamental valuation principles and the analyst reaction show: that the alleged misrepresentations did not affect Mattel's stock price when made.

When the alleged misrepresentations were corrected on October 29, 2019, Mattel's stock price did not fall—instead, it rose significantly.  That inescapable fact leaves Plaintiffs to contend that the corrective disclosure really occurred on August 8, 2019, when *no information* about the alleged misrepresentations was disclosed.  But the stock price decline that followed the August 8 announcement is, by definition, not the sort that permits an inference that the alleged misrepresentations affected Mattel's stock price at the time they were made.  Under *Goldman*, there is a "mismatch" between the August 8 "disclosure" and the alleged misrepresentations because the purported "disclosure" provided no information about them at all, let alone "corrected an earlier misrepresentation."  141 S. Ct. at 1961.  The result is that nothing in the alleged "back-end" decline in Mattel's stock price in August 2019 permits the required inference of "front-end price inflation—that is, price impact." *Id.*

**1.    The August 8 Announcement Cannot Show the Alleged Misrepresentations Had a Price Impact When Made**

Unable to cite any stock price decline following the sole corrective disclosure on October 29, 2019, Plaintiffs misdirect the Court to what they call "the corrective disclosure on August 8, 2019." Mot. at 21. While the Court previously held that the August 8 "disclosure" plausibly could support the element of loss causation, the Supreme Court has made clear that questions of price impact are distinct. *See Goldman*, 141 S. Ct. at 1960-61 & n.2. Mattel's announcement of the whistleblower letter and cancelled debt offering did not correct the alleged misrepresentations or even disclose anything about them. *See* Heaton Rpt. ¶¶ 75-77. As this Court held, "[i]t is undisputed that Mattel's August 8, 2019 announcement did not reveal the substance of the whistleblower letter" and left "the market to guess why Mattel pulled an already-priced bond offering." ECF No. 74 at 25-26.[3] As a matter of both law and common sense, the decline in the stock price the next day therefore cannot show price impact.

In *Goldman*, the Supreme Court explained that price impact, for purposes of rebutting *Basic*'s presumption, is "front-end price inflation"—that is, an effect on the stock price at the time alleged misrepresentations are made, *not* any later decline they might or might not proximately cause. 141 S. Ct. at 1961. Price impact sometimes may be inferred from back-end price movement in the form of "a negative disclosure about a company and an associated drop in its stock price." *Id.* But that inference is possible only insofar as the negative disclosure *matches* the alleged misrepresentations. "[W]hen there is a mismatch between the contents of the misrepresentation and the corrective disclosure," there is "less reason to infer front-end price inflation—that is, price impact—from the back-end price drop"

---

[3] Plaintiffs admit the August 8, 2019 "disclosure" did not mention the subject of the whistleblower letter, tax accounting, internal controls, or Mattel's 2017 SEC filings. *See* Barnett Decl. Ex. 4 at 130-32.

MATTEL DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION

because the "inference—that the back-end price drop equals front-end inflation—starts to break down." *Id.*

In other words, the question in assessing price impact is not whether alleged misrepresentations proximately caused *some* stock price decline—that would be loss causation—but whether they caused "front-end price inflation." *Id.* For inferential evidence of a later decline to show that alleged misrepresentations caused front-end price inflation, that later decline must be the market's reaction to the actual alleged misrepresentations. *Cf. Halliburton II*, 573 U.S. at 281-82 (certifying a class "is inconsistent with *Basic*'s own logic" if "the evidence shows no price impact with respect to the *specific misrepresentation* challenged in the suit") (emphasis added).

Under *Goldman*, any reliance on the August 9, 2019 stock price decline is precluded. There is no doubt that Mattel's August 8 "disclosure" was followed by a stock price decline. But *Goldman* confirms that inferring "front-end price inflation—that is, price impact" requires an *actual corrective disclosure* (which did not occur until October 29), 141 S. Ct. at 1961, and not what analysts called a "wide range of speculation" (which occurred on August 8, and which is the very opposite). Heaton Rpt. ¶ 77 (Wells Fargo); *see also id.* (Barclays: "list of hypotheticals ranges from the benign to the extreme"). That does not suffice, as courts held even before *Goldman*. *See Freddie Mac*, 2018 WL 3861840, at *18 (denying class certification based on lack of price impact as "there was no evidence to suggest that the Company's disclosures were disclosures linked to the alleged misrepresentations"); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016) (finding lack of price impact with respect to two stock price declines that did not follow corrective disclosures of alleged misrepresentations).

### 2. The October 29 Corrective Disclosure Cannot Show a Price Impact Because Mattel's Stock Price Rose

The only corrective disclosure of the alleged misrepresentations occurred on October 29, 2019, when, according to Plaintiffs, "Mattel finally admitted what it

should have long before—that its financial results for the third and fourth quarters of 2017 had been materially misstated, its internal controls suffered from multiple material weaknesses, and it would restate its financial results to admit and correct these errors."  Am. Compl. ¶ 23; *see* Mot. at 8 (listing ways in which October 29 disclosure "directly contradicted Defendants' public statements to investors throughout the Class Period"); *see also* Kothari Rpt. ¶ 23 (similar).

A stock price decline after alleged misrepresentations are corrected can be clear evidence of price impact.  *See Allstate*, 966 F.3d at 612 (discussing "simplified model of price impact" in which "[t]he March 1 statement [corrective disclosure] and ensuing price drop are the best evidence available of the impact of the January 31 statement [alleged misrepresentation] on the price"); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward …."); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 690 (D. Md. 2018) ("*Halliburton II* made clear that a corrective disclosure is an appropriate landmark from which to determine price impact"); *Intuitive Surgical*, 2016 WL 7425926, at *13 ("the court will focus on changes in the stock price with respect to the corrective disclosure dates … because this method more accurately captures the impact, if any").

On the other hand, "any evidence that a claimed disclosure did not result in a drop to company share price … would tend to show that the claimed misrepresentation did not affect the market's valuation of the stock."  *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 136 (S.D.N.Y. 2019); *see also, e.g.*, *Moody's*, 274 F.R.D. at 490 ("no price decrease when the misrepresentations were disclosed is evidence that the stock price was not artificially inflated by the introduction of the misrepresentation"); *In re AIG Inc. Sec. Litig.*, 265 F.R.D. 157, 182 (S.D.N.Y. 2010) ("no price decrease … on the date a misrepresentation was

-21-

disclosed" is "strong evidence that there was no price change on the date of the misrepresentation"), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012).

Here, Plaintiffs cannot identify any decline in Mattel's stock price when the alleged misrepresentations were corrected on October 29, 2019. The next day, the stock price rose. Indeed, as Dr. Heaton explains, Mattel's stock price rose by so much that it was virtually unchanged between August 8, 2019, the last day on which it purportedly was artificially inflated, and October 30, 2019, the first day *after* Plaintiffs say that "Mattel finally admitted what it should have long before." Am. Compl. ¶ 23; *see* Heaton Rpt. ¶¶ 79-83. Looked at differently, an investor who invested $1 in each of Mattel and its close competitor Hasbro over that period would not have done worse on her investment in Mattel, despite the corrective disclosure of the alleged misrepresentations. *See* Heaton Rpt. ¶¶ 86-90.

*Halliburton II* is instructive. The Supreme Court held that the presumption of reliance can be "rebutted by appropriate evidence, including evidence that the asserted misrepresentation (or its correction) did not affect the market price." 573 U.S. at 279-80. On remand, the district court examined the market reaction to six alleged corrective disclosures and found, as to five of them, that the associated misrepresentations had no price impact. *See Halliburton III*, 309 F.R.D. at 270 ("The Court agrees with Halliburton that there was no price impact on December 21, 2000, and finds that Defendants have rebutted the *Basic* presumption as to the allegedly corrective disclosure made on that date."); *see also id.* at 269-76 (finding "no statistically significant price reaction" on other dates). Here, too, the market's reaction to the sole corrective disclosure of the alleged misrepresentations does not permit an inference of "front-end price inflation—that is, price impact." *Goldman*, 141 S. Ct. at 1961.

Any speculation by Plaintiffs that Mattel's stock price would have dropped on October 30, 2019 had Mattel not released earnings the prior day is contrary to the compelling evidence of analyst reaction discussed at pages 14-18 above. The

-22-

reaction of analysts to Mattel's disclosure of the alleged misrepresentations was positive, and some analysts attributed a price increase to it.  Moreover, the presence of potentially confounding news about earnings on October 29 underscores the importance of assessing evidence beyond market data, namely, valuation principles and analyst reaction.  As the Second Circuit observed, citing Dr. Heaton at length, quantitative event studies may not "entirely resolve" price impact questions because "it can be extremely difficult to isolate the price impact of any one piece of information in the presence of confounding factors, such as other simultaneously released news about the company." *Petrobras*, 862 F.3d at 278-79.  That is why the Supreme Court stressed that "courts should be open to *all* probative evidence," and should apply "a good dose of common sense."  *Goldman*, 141 S. Ct. at 1960 (quotation omitted).

### E.    Lead Plaintiffs Face Unique Defenses Based on Their Investment Manager's Finding of No Impact on Value

As discussed at pages 13-14 above, the investment manager for both Lead Plaintiffs agrees that the alleged misrepresentations did not affect Mattel's fundamental valuation.  Three weeks after this case was filed, Southeastern advised its clients that Mattel's corrective disclosure was "non-material" and "did not impact the long-term value of the company."  Heaton Rpt. ¶ 71.  That evidence not only contributes to rebutting *Basic*'s presumption, but it also subjects Lead Plaintiffs to unique defenses, making them atypical class representatives.

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted).  "[A] named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied

-23-

with defenses unique to it." *Id.* (internal quotation omitted).

Lead Plaintiffs face unique defenses on multiple elements of their claim. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) ("plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation"). While Lead Plaintiffs must prove that any misrepresentations were material, their own agent deemed the whistleblower's complaint "non-material" and believed it "did not impact [] long-term value." Heaton Rpt. ¶ 71; *see Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 WL 2958361, at *5 (S.D.N.Y. June 13, 2018) ("Where, as here, a plaintiff wholly outsources their decision making to an investment adviser who acts as their agent, that agent's decision-making calculus is relevant to the reliance inquiry."). Lead Plaintiffs also intend to prove reliance using *Basic*'s presumption, but Southeastern's view undercuts their effort to show predominance and obtain class certification. (Both Lead Plaintiffs abruptly ended decades-long relationships with Southeastern in late 2019, just after the putative class period. *See* Barnett Decl. Ex. 2 at 69:18-70:3, 72:10-73:8; *id.* Ex. 3 at 31:24-32:2, 46:21-47:5.) And, while Lead Plaintiffs must prove that the alleged misrepresentations proximately caused their loss, Southeastern's view strongly suggests that it would have bought Mattel stock for both Lead Plaintiffs regardless of the alleged misrepresentations—meaning that they could not have caused Lead Plaintiffs' losses.

That Lead Plaintiffs are atypical representatives precludes certification under Rule 23(a), which makes typicality a "prerequisite" for certifying a class. *See Hanon*, 976 F.2d at 509 (affirming denial of class certification because named plaintiff "fails to meet the typicality requirement of Rule 23(a)").

## IV.   CONCLUSION

The preponderance of the evidence, both qualitative and quantitative, shows that the alleged misrepresentations did not affect Mattel's stock price when made. Accordingly, under *Halliburton II* and *Goldman*, *Basic*'s presumption of reliance is rebutted, common questions do not predominate, and Plaintiffs' motion for class certification should be denied.[4]

Dated:  July 12, 2021                                                   Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By:    _____/s/ John W. Spiegel_____
                        JOHN W. SPIEGEL

Attorneys for MATTEL, INC.,
MARGARET H. GEORGIADIS,
JOSEPH J. EUTENEUER,
and KEVIN FARR

---

[4] Plaintiffs' motion does not invoke a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), which makes sense because that presumption "is limited to cases that primarily allege omissions." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*, __ F.4th __, 2021 WL 2621171, at *3 (9th Cir. June 25, 2021).  Here, Plaintiffs claim that Defendants *affirmatively* misstated Mattel's net income and that internal controls were effective. *See id.* at *5 (complaint's heading "false and misleading statements and omissions'" is inconsistent with *Affiliated Ute* presumption); *compare* Am. Compl. ¶ 324 (same heading).