Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Richard D. Gluck (Bar No. 151675)
rich.gluck@blbglaw.com
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
2121 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 819-3470

John Rizio-Hamilton (*pro hac vice*)
johnr@blbglaw.com
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1448

*Lead Counsel for Lead Plaintiffs and the Class*

Jacob A. Walker (Bar No. 271217)
jake@blockleviton.com
**BLOCK & LEVITON LLP**
260 Franklin Street Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600

*Additional Counsel for Additional Named Plaintiff Houston Municipal Employees Pension System*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| *In re Mattel, Inc. Securities Litigation* | Case No. 2:19-cv-10860-MCS (PLAx) |
| | **PLAINTIFFS' REPLY IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| | Judge: Hon. Mark C. Scarsi<br>Courtroom: 7C, 7th Floor<br>Date: September 20, 2021<br>Time: 9:00 a.m. |
| | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................1

II.   DEFENDANTS HAVE FAILED TO PROVE NO PRICE IMPACT .................................................................................4

    A.   Defendants Have Not Proven That the Court Must Disregard the August 9 Decline ..................................4

    B.   The October 30 Increase Does Not Disprove Price Impact ................................................................................6

        1.   Defendants Failed to Disaggregate the October 30 Increase .................................................7

        2.   Disaggregation Shows Price Impact ...........................8

        3.   Assuming That the Entire October 30 Increase Was Caused by the Audit Committee Findings, Price Impact Still Exists ..................................................................9

    C.   Heaton's Remaining Arbitrary Comparisons Fail..............................................................................................10

    D.   Defendants' "Theory" Does Not Negate Price Impact ..............................................................................11

    E.   Market Commentary Does Not Disprove Price Impact ..............................................................................13

III.  LEAD PLAINTIFFS SATISFY THE TYPICALITY REQUIREMENT ...............................................16

IV.   THE CLASS SHOULD NOT BE DIVIDED INTO SUBCLASSES ................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agne v. Papa John's Int'l, Inc.*,
    286 F.R.D. 559 (W.D. Wash. 2012) ...................................................................19

*In re Allstate Corp. Sec. Litig.*,
    2020 WL 7490280 (N.D. Ill. Dec. 21, 2020)........................................................8

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) .................................................................................4

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013).......................................................................................15, 17

*Baker v. SeaWorld Ent., Inc.*,
    2017 WL 5885542 (S.D. Cal. Nov. 29, 2017).......................................................5

*In re Banc of Cal. Sec. Litig.*,
    326 F.R.D. 640 (C.D. Cal. 2018).........................................................................20

*In re Barclays Bank PLC Sec. Litig.*,
    2016 WL 3235290 (S.D.N.Y. June 9, 2016) .......................................................17

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................8, 17

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ...........................................................................20

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
    853 F. Supp. 2d 181 (D. Mass. 2012)....................................................................7

*Brown v. China Integrated Energy Inc.*,
    2015 WL 12720322 (C.D. Cal. Feb. 17, 2015) ...................................................18

*Buttonwood Tree Value Partners, LP v. Sweeney*,
    2013 WL 12125980 (C.D. Cal. Sept. 12, 2013) ............................................17, 18

*In re Century Link Sales Pracs. & Sec. Litig.*,
    337 F.R.D. 193 (D. Minn. 2020) ...........................................................................4

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosol.,*
 *Inc., HQ,*
 322 F. Supp. 3d 676 (D. Md. 2018)...............................................................6, 7

*Clevenger v. Welch Foods*,
 2021 WL 3616109 (C.D. Cal. Apr. 1, 2021) .....................................................19

*In re Countrywide Fin. Corp. Sec. Litig.*,
 273 F.R.D. 586 (C.D. Cal. 2009).......................................................................20

*Di Donato v. Insys Therapeutics, Inc.*,
 333 F.R.D. 427 (D. Ariz. 2019) .........................................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 309 F.R.D. 251 (N.D. Tex. 2015) (*Halliburton III*) ............................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011) (*Halliburton I*)....................................................................5

*In re Finisar Corp. Sec. Litig.*,
 2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)........................................................6

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
 141 S. Ct. 1951 (2021).................................................................................1, 5, 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014) (*Halliburton II*) ...........................................................4, 18

*Hatamian v. Advanced Micro Devices, Inc.*,
 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) .....................................................9

*In re Heritage Bond Litig.*,
 2004 WL 1638201 (C.D. Cal. July 12, 2004)......................................................16

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
 818 F.3d 775 (8th Cir. 2016) ...............................................................................6

*Lloyd v. CVB Fin. Corp.*,
 811 F.3d 1200 (9th Cir. 2016) ..............................................................................8

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions*
 *Fin. Corp.*,
 2014 WL 6661918 (N.D. Ala. Nov. 19, 2014).....................................................11

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
MOTION FOR CLASS CERTIFICATION
CASE NO. 19-cv-10860-MCS (PLAx)

*In re Mattel, Inc. Sec. Litig.*,
  2021 WL 1259405 (C.D. Cal. Jan. 26, 2021)...............................................3, 5, 8

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ...................................................................................19

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) .....................................................................................5

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) ...............................................................................6

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  5 F.4th 950 (9th Cir. 2021) ......................................................................................19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  993 F.3d 774 (9th Cir. 2021) ...................................................................................19

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..................................................................................................15

*Pelletier v. Endo Int'l PLC*,
  2021 WL 2023608 (E.D. Pa. May 20, 2021)..............................................................8

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015)..................................................................18, 19, 20

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) .....................................................................4, 10, 18

*Monroe Cty. Emps. Ret. Sys. v. S. Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ..............................................................................10

*Rooney v. EZCORP, Inc.*,
  330 F.R.D. 439 (W.D. Tex. 2019) ........................................................................4, 10

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
  335 F.R.D. 276 (N.D. Cal. 2020)............................................................................4, 8

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019)........................................................9, 11

*Siqueiros v. Gen. Motors LLC*,
  2021 WL 2115400 (N.D. Cal. May 25, 2021)...........................................................19

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) ..........................................................................20

*Tinsley v. Snyder*,
    922 F.3d 957 (9th Cir. 2019) ..............................................................................19

*In re Tyco Int'l, Ltd.*,
    236 F.R.D. 62 (D.N.H. 2006) ..............................................................................18

*Utesch v. Lannett Co., Inc.*,
    2021 WL 3560949 (E.D. Pa. Aug. 12, 2021) ......................................................18

*In re VeriSign, Inc. Sec. Litig.*,
    2005 WL 7877645 (N.D. Cal. Jan. 13, 2005)......................................................16

*In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*,
    2010 WL 4272567 (W.D. Wash. Oct. 12, 2010)..................................................18

*In re Willis Towers Watson PLC Proxy Litig.*,
    2020 WL 5361582 (E.D. Va. Sept. 4, 2020) .................................................15, 17

*In re WorldCom, Inc. Sec. Litig.*,
    2004 WL 602678 (S.D.N.Y. Mar. 25, 2004)........................................................18

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 408137 (S.D.N.Y. Feb. 22, 2005) ........................................................15

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................20

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
                  MOTION FOR CLASS CERTIFICATION
                  CASE NO. 19-cv-10860-MCS (PLAx)

## I.    INTRODUCTION

Defendants fail to carry their heavy burden of proving a complete absence of price impact, which is shown by significant empirical and qualitative evidence.[1]

Empirical evidence. Empirical evidence—the cornerstone of any price impact analysis—shows price impact any way you cut it. The undisputed facts are: (1) Defendants' fraud triggered a whistleblower letter; (2) the letter concerned the fraud; and (3) in response to the disclosure concerning the letter, Mattel's stock price declined nearly 15% on August 9, which is statistically significant at the 99% confidence level. Where a disclosure directly related to the fraud causes a statistically significant price decline, there is price impact. *See infra* at 4.

Knowing this, Defendants wrongly assert that *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021), "preclude[s]" this Court from "any" consideration of the August 9 decline because *Goldman* "requires an actual corrective disclosure"—i.e., a disclosure that reveals the fraud—to show price impact. Mattel Defs.' Opp'n to Mot. for Class Cert. (ECF No. 93) ("MB") at 20. *Goldman* did not remotely consider, let alone decide, what sort of "corrective disclosure" may count for price impact purposes. Nothing in *Goldman* authorizes ignoring the August 9 decline. And doing so would violate binding Ninth Circuit law holding that loss causation exists where there is a "causal connection" between the fraud and the decline, as well as this Court's holding that the stock price decline here was causally connected to the fraud. *See infra* at 2-3, 5.

Defendants also contend that price impact does not exist because the August 9 decline was caused by uncertainty, and when the Audit Committee findings were disclosed on October 29, the uncertainty was dispelled and Mattel's stock price rose. If Defendants were correct that the August 9 decline was solely attributable to

---

[1] Capitalized terms used herein have the same meaning as in the Complaint (ECF No. 34). References to "Ex. _" are to exhibits to the Declaration of John Rizio-Hamilton. Emphasis is added and internal quotations are omitted.

uncertainty and the false statements had no impact on Mattel's stock price, then when the uncertainty was resolved on October 29, the ensuing stock price increase would have fully compensated for the August 9 decline. But that is not what happened. Even considering the October 30 increase, price impact remains.

As Defendants' expert admits, the October 29 disclosure was heavily confounded by Mattel's positive earnings news. Yet Defendants' expert declined to disaggregate the portion of the increase caused by the Audit Committee findings from that caused by the earnings news. This failure leaves the Court with no basis to determine what portion of the October 30 increase was caused by the Audit Committee findings resolving any "uncertainty"—much less to conclude that this portion of the increase fully negates price impact. Defendants' expert has elsewhere called the failure to disaggregate "fatal," and it is. Courts hold that defendants fail to disprove price impact where, as here, they rely on a confounded disclosure but do not disaggregate it. *See infra* at 7-8.

A proper disaggregation analysis shows price impact. As set forth in the Reply Report of Professor S.P. Kothari (Ex. A) ("¶¶"), the vast majority of the October 30 increase was driven by Mattel's surprisingly good earnings news, and a small portion by the Audit Committee findings. ¶¶27-36, 63-75. When the relevant portion is netted against the August 9 decline, at least -$1.46 of price impact remains. ¶¶74-75. Thus, even considering any offsetting increase when Defendants' "corrective" information was released, there is clear evidence of "front-end" impact.

Further, as Dr. Kothari explains, there is still price impact even assuming (incorrectly) that all of the October 30 increase is due to the Audit Committee findings. ¶¶63-66. In short, price impact exists under every reasonable scenario.

Finally, Defendants' price impact arguments are insidious. Defendants intentionally withheld the contents of the whistleblower letter from their August 8 disclosure, and now use their omission to argue that the market overreacted to "uncertainty." Defendants then intentionally bundled the announcement of the Audit

Committee findings with positive, unexpected news about Mattel's financial performance—and now point to the ensuing stock price increase as purported proof that the market did not care about their fraud. In rejecting these tactics when assessing loss causation, this Court recognized them for what they are: "manipulating disclosure of non-public whistleblower complaints." *See In re Mattel, Inc. Sec. Litig.*, 2021 WL 1259405, at *12 (C.D. Cal. Jan. 26, 2021). Other courts and scholars have criticized these tactics too. ¶70; *infra* at 8. The Court should not reward Defendants' behavior by effectively immunizing them from liability.

Valuation "theory." Defendants advance a categorical rule that a misstatement cannot have price impact unless it affects "expected future cash flows." No court has ever accepted this argument—and for good reason. This rule would allow companies to manipulate key financial metrics including, as here, net income. Further, Dr. Heaton is wrong: a misstated allowance on deferred tax assets does impact investors' expectation of future cash flows. ¶¶133-70. Research also demonstrates that the other kinds of misconduct at issue—financial deception requiring a restatement, and material weaknesses in controls—impact expected future cashflows. ¶¶171-86.

Market commentary. Defendants attempt to show an absence of price impact by cherry-picking market commentary. But market commentary shows that Mattel's positive financial results—not the Audit Committee findings—drove the October 30 stock price increase. ¶¶33-36. Defendants also wrongly assert that investors were unconcerned by their admitted misstatements after October 30. In reality, there was continuing concern about Mattel's restatement. ¶¶37-54.

"Common Sense." This case arises from the cover-up of admitted "material misstatements" of Mattel's financial results, including net income. These are precisely the sort of misstatements and misconduct one would expect to impact Mattel's stock price. And if the misstatements were truly "value-irrelevant," why did Defendants cover them up? Defendants have not cited any case based on a restatement of financial results where a court has held that there was no price impact.

3    PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
MOTION FOR CLASS CERTIFICATION
CASE NO. 19-cv-10860-MCS (PLAx)

There is no basis for this Court to do the unprecedented.

## II.    DEFENDANTS HAVE FAILED TO PROVE NO PRICE IMPACT

It is Defendants' "burden to show no price impact." *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 287 (N.D. Cal. 2020). Price impact is shown through "event studies." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 280 (2014) (*Halliburton II*). ("[P]laintiffs [] can and do introduce evidence of the existence of price impact in connection with 'event studies'…."); *see also In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 (7th Cir. 2020) ("[E]vent studies have come to be treated as the sine qua non for proving or disproving price impact.").

Here, the evidence shows that: (1) the market for Mattel stock was efficient; (2) the whistleblower letter concerned the fraud; (3) the August 8 disclosure related to the whistleblower letter caused Mattel's stock price to plunge nearly 15%; and (4) that decline was statistically significant at the 99% confidence level. ¶¶55-56. Price impact exists where, as here, there is a statistically significant stock price decline caused by a disclosure connected to the fraud. *See, e.g.*, *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019) ("A statistically significant price adjustment following a corrective disclosure is evidence the original misrepresentation did, in fact, affect the stock price."); *In re Century Link Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 210-11 (D. Minn. 2020) (same); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018) (same).

### A.    Defendants Have Not Proven That the Court Must <u>Disregard the August 9 Decline</u>

Defendants assert that the Court must ignore the August 9 decline because the precipitating disclosure did not reveal the fraud, and thus, is not "corrective." MB at 20-23. This is a regurgitation of the same loss causation argument Defendants made and lost at the motion to dismiss stage. This recycled argument fails.

<u>First</u>, the Supreme Court has held that whether a disclosure is "corrective" is a question of loss causation, which is a common merits issue that is not to be decided

at class certification. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) (*Halliburton I*); *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at *12 (S.D. Cal. Nov. 29, 2017) (whether disclosure "cannot be considered to be a corrective disclosure" is a "loss causation argument that is premature"). *Goldman* did not overturn this law.

Second, even if it were appropriate to consider loss causation now, the undisputed facts establish loss causation. The Ninth Circuit has held that: (1) loss causation does not require that the disclosure reveal the fraud, and (2) all a plaintiff must show is "a causal connection" between the fraud and the loss. *Mattel*, 2021 WL 1259405, at *11-12 (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018)). This Court held that the "causal connection" requirement was satisfied because: (1) the whistleblower letter concerned the fraud, and (2) Mattel's stock price declined on disclosure of the receipt of the letter. *Id.*

Discovery has corroborated the Court's reasoning. ██████████████ ████████████████████████████████ *See* Ex. B. Further, expert discovery has established that the stock price decline triggered by the August 8 disclosure was statistically significant. Thus, both loss causation and price impact exist. It would make zero sense for a stock price decline to count for loss causation and damages purposes, but not price impact purposes. Defendants have not cited any case holding that a disclosure that satisfied loss causation requirements must nevertheless be ignored for price impact. Such a holding would be unprecedented and irreconcilable.

Defendants argue that *Goldman* requires the Court to fully disregard the August 9 decline because *Goldman* supposedly "requires an actual corrective disclosure"—that is, a disclosure that reveals the fraud—to show price impact. MB at 20. *Goldman* did not analyze whether a disclosure must "reveal the fraud" to count for price impact purposes. Nothing in *Goldman* authorizes, let alone requires, wholesale ignoring the August 9 decline.

In *Goldman*, the plaintiff alleged that extremely generic false statements—

i.e., "[o]ur clients' interests always come first"—had substantial price impact. 141 S. Ct. at 1959. The Court merely held that the "generic nature of an alleged misrepresentation" is one factor in assessing price impact (*id.* at 1960), which has no bearing here because Mattel's fraudulent financial statements were quite specific.

Defendants' reliance on *Goldman*'s general observations about a potential "mismatch" between the statement and the disclosure is misplaced. *Goldman* observed that "when the earlier misrepresentation is generic," it is "less likely" that a later specific disclosure shows price impact. *Id.* at 1961. That observation is not applicable here for two reasons. First, again, this case concerns misstated financial statements, which are specific, not generic. Second—and significantly—here, there is a direct and causal connection between the alleged misstatements and the ensuing stock price decline: Defendants' fraud triggered the whistleblower letter; the letter concerned the fraud; and the disclosure concerning the whistleblower letter triggered the statistically significant stock price decline. There is no "mismatch"—the stock price decline is directly traceable to the misstatements.[2]

### B.    The October 30 Increase Does Not Disprove Price Impact

Defendants also contend that the August 9 decline must be ignored because it was the product of uncertainty, and when the Audit Committee findings were disclosed, the uncertainty ended, and the decline reversed. Defendants have not cited any case holding that a stock price increase months after the Class Period fully negated price impact during the Class Period. *See City of Cape Coral Mun.*

---

[2] Defendants' other cases are also inapposite. *See* MB at 8. They largely rely on concessions in plaintiffs' expert reports (*see, e.g.*, *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480 (S.D.N.Y. 2011)), or a failure to disaggregate confounding news (*see, e.g.*, *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017)). *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 260 (N.D. Tex. 2015) (*Halliburton III*) held that "class certification is not the proper procedural stage for the Court to determine … whether the relevant disclosures were corrective."

*Firefighters' Ret. Plan v. Emergent Biosol., Inc., HQ*, 322 F. Supp. 3d 676, 690 (D. Md. 2018) (rejecting argument that "plaintiffs failed to show price impact because the price of [defendant's] Common Stock, although initially declining after the [] corrective disclosure, ultimately made a 'full rebound'" following further disclosures months later). In any event, if Defendants' theory were true, then the portion of the October 30 increase caused by the Audit Committee findings would have fully compensated for the August 9 decline. But that did not occur. To the contrary, price impact remains even after Mattel's stock price impounded the Audit Committee findings. This provides ample basis for an inference of front-end impact.

### 1. Defendants Failed to Disaggregate the October 30 Increase

Defendants and their expert admit that the October 29 disclosure is heavily confounded by factors unrelated to the Audit Committee findings. On October 29, Mattel simultaneously disclosed: (1) financial results that exceeded market expectations by more than 50%; (2) guidance for future results that also exceeded expectations; and (3) the results of the Audit Committee findings. Thus, there were multiple factors driving the October 30 stock price reaction, only one of which was related to the fraud. ¶¶28-36.

Because Defendants are relying on this stock price movement to prove a lack of price impact, it is their burden to disaggregate it. Without disaggregation, Defendants cannot prove what portion, if any, of the increase was driven by the Audit Committee findings, and what portion was driven by the positive financial information. Yet their expert admits that he did not attempt to disaggregate. ¶67.

By itself, this failure is dispositive. It is black-letter law that where, as here, a stock price movement is triggered by a confounded disclosure, one must disaggregate the impact of the fraud-related elements. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 190 (D. Mass. 2012) ("An event study that fails to disaggregate the effects of confounding factors must be excluded."). Defendants fail to carry their burden of showing no

price impact when they rely on a price movement following a confounded disclosure, but do not disaggregate—exactly as occurred here. *See Pelletier v. Endo Int'l PLC*, 2021 WL 2023608, at \*35 (E.D. Pa. May 20, 2021) ("Defendants bear the burden of showing the lack of price impact, and, without specific evidence or expert testimony isolating out the two different price effects, the Court cannot determine" lack of price impact); *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at \*5 (N.D. Ill. Dec. 21, 2020) ("[Defendants' expert] conceded … that she did not perform any … disaggregation analysis …. This failure is fatal ….");*Symantec*, 335 F.R.D. at 287 (defendants failed to prove no price impact because they failed to "[d]isaggregat[e] the effect of the May 10 disclosure"). Defendants' expert has admitted that the failure to disaggregate the causes of stock price movement is "fatal, especially where there are obvious confounding events," as there are here. *See* J.B. Heaton & Alon Brav, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 WASH. U. L. REV. 583, 606 (2015) (Ex. C).

This point resonates here because Mattel intentionally confounded the October 29 disclosure with positive financial results and the Audit Committee findings. *See* Ex. D. As *Endo* reasoned, Defendants must disaggregate in such a situation; otherwise, "it would functionally defang *Basic* if a defendant-company could always rebut [the reliance presumption] by waiting to announce corrective information until it had offsetting good news." *Endo*, 2021 WL 2023608, at \*35. This Court and the Ninth Circuit have expressed similar concerns. *See Mattel*, 2021 WL 1259405, at \*12; *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) ("[A]ny other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false.").

### 2. Disaggregation Shows Price Impact

Defendants' expert incorrectly speculates that disaggregation "may be futile" because "there is no fully reliable, mathematically precise way to decompose a

single-firm stock-price return into components related to different news." Courts have rejected Defendants' assertion that disaggregation cannot be done reliably. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) (noting that "an event study [is] the generally accepted method for measuring damages in a securities fraud class action," and "reject[ing] the suggestion that an event study is incapable of disaggregating the effects of confounding information"); *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) (rejecting argument that "methodology would not be able to 'disaggregate the price inflation' attributable to particular theories of liability").

Using a disaggregation analysis, Dr. Kothari isolated the portion of the October 30 increase caused by the positive earnings information. Of the $1.44 increase on October 30, <u>at least</u> $0.95 is due to the positive earnings information, while <u>at most</u> $0.49 is due to the Audit Committee findings. ¶¶73-75. When one nets the $0.49 increase on October 30 against the -$1.95 price decline on August 9, there is -$1.46 of net price impact, which is statistically significant to the 99% confidence level. ¶74. Even if one waits to fully assess price impact until the Audit Committee findings were impounded into Mattel's stock price, price impact exists.

> 3. <u>Assuming That the Entire October 30 Increase Was Caused by the Audit Committee Findings, Price Impact Still Exists</u>

Dr. Kothari calculates a net price impact of -$0.51 per share even if one: (1) incorrectly assumes that <u>all</u> of the October 30 increase was caused by the Audit Committee findings, and <u>none</u> was caused by the surprisingly good financial results and guidance—which is implausible, and (2) nets the full October 30 increase against the August 9 decline. ¶¶63-66. This decline of -$0.51 per share is statistically significant at the 89% confidence level. ¶66.

Even Heaton admits that such an analysis still yields -$0.21 of price impact. While he attempts to dismiss this decline as not statistically significant at the 95% confidence level, such statistical significance is <u>not</u> required to show price impact.

*See Monroe Cty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 394 (N.D. Ga. 2019) ("[C]ourts routinely reject the argument that a non-statistically significant stock price decline proves an absence of price impact.") (collecting cases); *EZCORP*, 330 F.R.D. at 450; *Pirnik*, 327 F.R.D. at 46-47; *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 444 (D. Ariz. 2019). Heaton has admitted this: "As courts have become more aware of the games defendants play in such situations, they have begun more frequently rejecting the junk science requirement of statistical significance proffered by defense experts." J.B. Heaton, *Kill Cammer: Securities Litigation Without Junk Science*, 11 WM. & MARY BUS. L. REV. 417, 467 (2020) (Ex. E).

### C.     Heaton's Remaining Arbitrary Comparisons Fail

Heaton's observation that Mattel's stock price was lower in the 60-day period before August 9 than it was in the 60-day period after October 29 does not demonstrate a lack of price impact. Heaton provides no support for this arbitrary comparison. No court has ever found an absence of price impact based on this kind of comparison. The reason is obvious: this arbitrary snapshot of two moments says nothing about what impacted the stock price during the Class Period. Nor does this approach seek to control for confounding effects unrelated to the fraud.

As Dr. Kothari explains, even using this sort of "naïve" comparison, price impact still exists. ¶¶58-62. Mattel's stock price was approximately 11% <u>higher</u> on August 8 (just before disclosure of the letter) than it was on October 30 (just after disclosure of the Audit Committee findings). This, too, shows "front-end" impact.

Heaton also makes the irrelevant observation that Mattel's stock price did "not underperform" the stock price of another company, Hasbro, as of October 29 (months after the end of the Class Period). Once again, no court has ever found that defendants proved no price impact based on a comparison to the stock price of a different company. Again, the reason why is clear: comparing Mattel's stock price to that of a company not at issue in this case says nothing about what impacted Mattel's stock price during the Class Period. Further, as Dr. Kothari explains, this

comparison is meaningless because it does not control for multiple confounding impacts unrelated to the fraud. Once these effects are properly considered, Mattel stock did "underperform" Hasbro stock by 13.7%. ¶¶76-80.

### D.      Defendants' "Theory" Does Not Negate Price Impact

Despite the overwhelming economic evidence, Defendants argue that their false statements could not have any price impact because, in "theory," they did not have any implications for Mattel's expected "future cash flows." Defendants essentially argue for a blanket rule under which only false statements that directly impact a company's expected future cash flows can impact a stock price. No court has ever accepted this rule. In fact, courts around the country have rejected price-impact challenges in cases involving false statements that had no direct impact on a company's cash flows. *See, e.g.*, *Signet Jewelers*, 2019 WL 3001084, at *18 (rejecting price-impact challenge based on "code of conduct" statements); *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2014 WL 6661918, at *7 (N.D. Ala. Nov. 19, 2014) (rejecting price impact challenge to statements about non-cash accounting charge for impairment of goodwill).

In any event, Defendants are wrong on the facts. The false statements and misconduct at issue here did have implications for expected future cash flows.

Mattel's Misstated DTA Allowance. As detailed in Dr. Kothari's report, valuation allowances for DTAs affect market expectations of future cash flows. ¶¶133-70. A company is required to record a valuation allowance when, after weighing all positive and negative evidence, it concludes it will not have sufficient future income against which it can offset the DTAs. ¶¶146-51. While cumulative losses over the preceding years is evidence of the need to record a valuation allowance, that evidence is relevant only insofar as it indicates continuing future losses. ¶¶146-47. Thus, in recording the valuation allowance, "Mattel signaled to the market that they do not have objectively verifiable evidence of future profitability that is significant enough to overcome the evidence of cumulative losses." ¶150.

Contrary to what Heaton suggests, Mattel's valuation allowance was <u>not</u> based only on past losses over the prior three years—it was based in significant part on Mattel's "expected future cash flows." ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████ Ex. F at -6537 ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ *Id*. at -541. ████████████████████████ ████████████████████████████████████████████████ ████████████████ *Id*. ██████████████████████████ its own Head of Tax, Brett Whitaker—who was responsible for calculating the allowance—reported that the valuation allowance communicated to investors that Mattel "would likely not make money in the near term," as it "<u>tells investors that you do not see the ship turning around any time soon. It is very indicative of the future state of things, and you want to avoid that at all costs</u>." Ex. G at ¶86. These facts contradict Heaton's assertions, and comport with the literature cited by Dr. Kothari concerning what investors understand valuation allowances to signify.

<u>Mattel's Restatement and Material Weaknesses</u>. Mattel issued a restatement admitting to materially misstated financial results and material weakness in internal controls. As Dr. Kothari explains, such financial reporting misconduct impacts expectations of future cash flows, and has many other negative consequences, including loss of reputation and trust and stock price declines. ¶¶171-78.

Academic research also corroborates that "announcements of internal control deficiencies lead to reductions in investors' expectations of future cash flows." ¶183. PwC also has publicly stated that "[w]hen a public company first identifies and discloses material weaknesses (MWs) in its Internal Control over Financial

Reporting (ICFR), consequences may include negative press, loss of investor confidence, lower analyst ratings and increased costs, which may lead to declines in share price and, potentially, company value." Ex. H.

In addition, any suggestion that the information about which Defendants lied was not material to investors is conclusively belied by their contemporaneous admissions. Mattel and PwC both admitted that Mattel's previously issued financial statements "should no longer be relied upon due to material misstatements," and that "material weaknesses" rendered Mattel's internal control over financial reporting ineffective. Ex. D at 2. Having admitted that their accounting errors and internal control weaknesses were material and impacted important financial metrics, Defendants cannot now credibly claim they were "value irrelevant." Indeed, as Whitaker reported, when Mattel executives considered disclosing the accounting misstatement and control weaknesses, Mattel's senior accounting executive stated, "We cannot have a material weakness. That would be the kiss of death"—a remark Whitaker "understood … to mean that the market would react very poorly to Mattel admitting that its financial statements were materially misstated and that it had a material weakness in its internal controls." Ex. G at ¶¶130-31.

Defendants appeal to "common sense," but does common sense really dictate that investors do not care about a company inaccurately reporting its financial results, including net income, and then conspiring with its auditor to cover-up the misstatement? Nowhere do Defendants address these common-sense facts.

**E.   Market Commentary Does Not Disprove Price Impact**

Defendants also argue that analyst reaction shows lack of materiality and thus lack of price impact. It does not. First, the subjective reactions of analysts are no substitute for the type of empirical evidence necessary to demonstrate an absence of price impact. Second, whether a particular analyst subjectively considered something important, and whether it impacted Mattel's stock price, are two very different questions. No analyst even considered, let alone opined on, whether

Mattel's materially misstated financials and PwC's false audit opinions impacted Mattel's stock price. Nor did any of the analysts suggest that anything other than the announcement of the whistleblower letter—which Defendants later confirmed contained allegations of misconduct that related directly to their false statements—caused the decline in Mattel's stock price on August 9, 2019.

Contemporaneous reaction shows that market participants did consider the issues important. For example, UBS reported on August 9 that "for Mattel management and the company's bankers to make a decision to pull out of the bond market, the issue at hand must have been important." ¶25. ███████████████ ███████████████████████████████████████████████ █████████████████████████████████████████████ Ex. I.

Commentary also shows that analysts understood that the stock price increase on October 30 was largely driven by the unexpected positive earnings news. ¶¶33-35. Analysts attributed the increase to a "3Q19 upside surprise and increase in 2019 EBITDA guidance." Ex. J. MarketWatch attributed the surge to third-quarter results that "breezed past Wall Street analysts' estimates" in an article headlined "Mattel Shares Surge 20% On Big Revenue, Earnings Beat." Ex. K.

Further undermining Heaton's theory, after October 30, investors remained concerned about the whistleblower's allegations and Mattel's efforts to address them. Thus, Mattel decided to hold a conference call on November 15, 2019. ████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████ Ex. L at -1456-57. ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████ *Id.* at -456. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

¶¶46-54.

Defendants also argue that a comment from Lead Plaintiffs' former investment advisor several months after the Class Period shows that the false statements were not "material" and did not harm Mattel's "long-term value." There are several flaws in this argument. <u>First</u>, materiality presents exclusively "a question common to all members of the class" and thus provides no basis to deny class certification. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). <u>Second</u>, even if materiality were at issue now, the subjective opinion of Lead Plaintiffs' former investment advisor provides little evidence of a lack of materiality. The test is whether the information would be important to a <u>reasonable investor</u>, not to a single investment advisor. *See id.*; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015) (materiality turns on the "significance of an omitted or misrepresented fact to a reasonable investor"); *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 408137, at *2, *4-5 (S.D.N.Y. Feb. 22, 2005) (granting motion to exclude evidence of financial advisor's view on materiality); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *14 (E.D. Va. Sept. 4, 2020) (investment advisors' views have little bearing "on the materiality of the alleged misrepresentations or omissions, loss causation, or … damages").

<u>Third</u>, regardless of Southeastern's view, Defendants admitted that Mattel's accounting misstatements and internal control weaknesses <u>were</u> material.

<u>Fourth</u>, the opinion of Lead Plaintiffs' former investment advisor has no bearing on the key issue: price impact. Nowhere did Southeastern opine on whether Defendants' false statements <u>impacted Mattel's stock price during the Class Period</u>. Rather, it merely referred to the impact of the whistleblower letter on Mattel's "long-

term value" several months <u>after</u> the Class Period. Whatever that undefined phrase means, it says nothing about the impact Defendants' fraud had on Mattel's past stock price during the Class Period. To be clear, Plaintiffs are suing for harm that they and Class Members suffered during the Class Period, not for "long term value."

<u>Fifth</u>, Southeastern noted that the whistleblower letter "weighed heavily" on Mattel's stock price during the Class Period. If anything, it opined that Defendants' misconduct <u>did</u> negatively impact Mattel's stock price at the relevant time.

<u>Sixth</u>, Southeastern made its statement in January 2020—when Mattel's stock price had increased for reasons <u>unrelated</u> to the fraud, namely, strong financial results. Indeed, Southeastern attributed the increase in Mattel's stock price to Mattel's improved economic performance, including increased sales, decreased operating costs, and improving gross margins. *See* ECF No. 93-2 ¶71. That view is <u>inconsistent</u> with Defendants' contention that the increase in Mattel's stock price was solely attributable to resolution of the whistleblower's allegations.

## III.    LEAD PLAINTIFFS SATISFY THE TYPICALITY REQUIREMENT

Defendants incorrectly assert that Lead Plaintiffs are not typical because of the same irrelevant characterization of the whistleblower letter by their former investment advisor. This argument fails for several reasons.

<u>First</u>, Defendants ignore the governing legal standard. In the securities context, "the typicality requirement is not demanding." *In re Heritage Bond Litig.*, 2004 WL 1638201, at *4 (C.D. Cal. July 12, 2004). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *In re VeriSign, Inc. Sec. Litig.*, 2005 WL 7877645, at *6 (N.D. Cal. Jan. 13, 2005). "[I]f the claims of the named plaintiffs and putative class members <u>involve the same conduct by the defendant, typicality is established</u> …." *Heritage Bond*, 2004 WL 1638201, at *7.

<u>Second</u>, Lead Plaintiffs are not subject to a "unique" materiality defense that renders them atypical. Defendants have asserted <u>an identical</u> materiality challenge

against all class members. *See* ECF No. 82 at 94. And, as a matter of law, "materiality" cannot give rise to a "unique" defense. This is because, again, materiality "is judged according to an objective standard" and presents "a question common to all members of the class." *Amgen*, 568 U.S. at 459. The Supreme Court emphasized that "[i]n no event will the individual circumstances of particular class members bear on the [materiality] inquiry." *Id*. at 459-60. Thus, courts have repeatedly rejected challenges to typicality based on a supposed "unique" materiality defense. *See, e.g.*, *Willis Towers Watson*, 2020 WL 5361582, at *14 ("[V]iews of [plaintiffs'] investment advisors … bears little on [] materiality."); *In re Barclays Bank PLC Sec. Litig.*, 2016 WL 3235290, at *7 (S.D.N.Y. June 9, 2016) (rejecting assertion that plaintiff was "subject to a unique materiality defense").

Third, for a "unique defense" to render a plaintiff "atypical," it must "threaten to be a major focus of the litigation so as to harm the interests of absent class members." *Buttonwood Tree Value Partners, LP v. Sweeney*, 2013 WL 12125980, at *5 (C.D. Cal. Sept. 12, 2013). Defendants have not made such a showing—nor could they. Defendants already admitted that their misstatements were material and, thus, Southeastern's musings are irrelevant (*see infra* at 18); Southeastern had been terminated as Lead Plaintiffs' investment advisor at the time of its after-the-fact statement (*see* Exs. M, N); and Southeastern did not know that Defendants had engaged in an intentional cover-up at the time of its statement. It is doubtful that evidence about Southeastern will ever be admitted (*see supra* at 15), and it is certain that its two-word characterization will not be a "major focus of the litigation."

Fourth, Lead Plaintiffs are not subject to a unique "non-reliance" defense. "[T]he Ninth Circuit has 'emphasize[d] that the defense of non-reliance is not a basis for denial of class certification.'" *Id.* at *4. This is particularly true where, as here, the *Basic* presumption applies and "reliance on [the] material misrepresentations [] may be presumed." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). To demonstrate "non-reliance," Defendants must show that Plaintiffs were

"indifferent to the integrity of market prices." *Halliburton II*, 573 U.S. at 273; *see also Utesch v. Lannett Co., Inc.*, 2021 WL 3560949, at *10 (E.D. Pa. Aug. 12, 2021) (investment advisor's view that market overreacted to fraud revelations did not render plaintiff "subject to a unique or atypical defense that is likely to become a major focus of the litigation").

Defendants have not attempted to show—nor could they—that Lead Plaintiffs or Southeastern were indifferent to Mattel's stock price. Southeastern has nowhere stated that it knew of the fraud beforehand or was indifferent to Mattel's stock price or the integrity of Mattel's market price. Defendants' claimed "suggest[ion]" of non-reliance based on a two-word description of the whistleblower letter is hardly enough to show that a meritorious "non-reliance" defense exists, let alone is a "unique" defense that would be a "major focus of the litigation." *Sweeney*, 2013 WL 12125980, at *5; *see also Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 348 (C.D. Cal. 2015) ("This non-reliance defense is not unique to [plaintiff]. Other class members may have reacted the same way.").

## IV.   THE CLASS SHOULD NOT BE DIVIDED INTO SUBCLASSES

PwC's attempt to fragment the Class should be rejected. In securities class cases, "[t]here is every reason to believe that the creation of subclasses would cause confusion, and lead to inefficiencies." *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 602678, at *1 (S.D.N.Y. Mar. 25, 2004); *Pirnik*, 327 F.R.D. at 48. Courts in this District have rejected requests to subclass. *See Petrie*, 308 F.R.D. at 359 ("Creating subclasses would create needless confusion."); *Brown v. China Integrated Energy Inc.*, 2015 WL 12720322, at *13 (C.D. Cal. Feb. 17, 2015) (same); *Sweeney*, 2013 WL 12125980, at *16 (same). Meanwhile, courts routinely certify <u>single</u> investor classes that include both company and auditor defendants. *See, e.g.*, *China Integrated*, 2015 WL 12720322, at *13; *In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*, 2010 WL 4272567, at *1 (W.D. Wash. Oct. 12, 2010); *In re Tyco Int'l, Ltd.*, 236 F.R.D. 62, 70 (D.N.H. 2006). Tellingly, PwC does not cite any

decision granting an auditor-defendant's request to create subclasses. PwC's arguments why this Court should take this unprecedented step fail.

First, PwC asserts that Article III obligates the Court to create subclasses. Not so. PwC does not contest Plaintiffs' standing to assert their claims. At the class certification stage, "once the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites. . . have been met." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019); *see also Siqueiros v. Gen. Motors LLC*, 2021 WL 2115400, at *18 (N.D. Cal. May 25, 2021) (same).

Further, PwC does not dispute—nor could it—that every class member was injured by Defendants' fraud and has viable claims against one or more Defendant. PwC does not cite any cases holding that Article III requires every class member to not only have an injury-in-fact and a viable claim, <u>but also have the same claim against every named defendant</u>. Just the opposite: courts routinely find Article III's standing requirement satisfied where, as here, class members all have claims against at least one of the multiple defendants. *See e.g.*, *Petrie*, 308 F.R.D. at 359; *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 565 (W.D. Wash. 2012).

PwC's reliance upon *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774 (9th Cir. 2021), is misplaced. The Ninth Circuit <u>vacated</u> the decision *en banc*. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 5 F.4th 950 (9th Cir. 2021). PwC's reliance upon *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) is equally misguided, as that opinion was subsequently <u>clarified</u> on the very point for which PwC attempts to rely upon it. *See Clevenger v. Welch Foods*, Inc. 2021 WL 3616109, at *3 (C.D. Cal. Apr. 1, 2021).

Accepting PwC's novel assertion that Article III requires every putative class member to have a claim against every defendant would work a sea change in class action jurisprudence. It is rarely the case that defendants make their misstatements at precisely the same time. Thus, if PwC's view were adopted, courts would need

to create defendant-specific subclasses in the vast majority of securities class actions, resulting in needless burdens, inefficiencies, and costs.

Second, PwC incorrectly asserts that a single class would yield intractable "manageability problems" because PwC made its first misstatement a few months into the Class Period. Courts have rejected this precise "concern." *See Petrie*, 308 F.R.D. at 359 (court was "not persuaded" that "creating subclasses to accommodate [the two defendants'] later involvement with [the company] would be the best way to manage this action").

PwC's run-of-the-mill concerns about "manageability" are incorrect, could be made in nearly all multi-defendant securities class actions, and do not warrant the creation of subclasses. For example, PwC speculates that the notice will "breed confusion." Not so. Pursuant to FRCP 23(c)(2)(B), the notice will clearly describe, inter alia, the case, defendants, and each of their roles and scope of liability. Before issuing the notice, Plaintiffs will submit it to the Court for approval, and PwC can object if it is not clear. And in the unlikely event that any of PwC's purported "manageability problems" materialize, the Court may always create subclasses then. *See In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 651 (C.D. Cal. 2018).

PwC's cases do not support its position. For example, in *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586 (C.D. Cal. 2009), the court found that claims were "best tried in a single class," even though they involved "different defendants." *Id.* at 597. A court in this District rejected *In re Blech Sec. Litig.*, 187 F.R.D. 97 (S.D.N.Y. 1999), as not "persua[sive]." *Petrie*, 308 F.R.D. at 359. And *Blech* is easily distinguishable, as there was "[n]o interrelationship" among the parties, and no "participation [by some defendants] in the overall scheme." 187 F.R.D. at 105. Similarly, *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 133 (S.D.N.Y. 2019), "[wa]s not a case where the ... misstatements or omissions [we]re factually intertwined." Here, Mattel and PwC executed a factually interwoven fraud.

Dated:  August 23, 2021                     Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

/s/ *John Rizio-Hamilton*
John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
Nicholas R. Gersh  (admitted *pro hac vice*)
nicholas.gersh@blbglaw.com
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Richard D. Gluck (Bar No. 151675)
rich.gluck@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (370) 819-3480

*Lead Counsel for Lead Plaintiffs and the Class*

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
260 Franklin Street
Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile: (617) 507-6020
jake@blockleviton.com

*Additional Counsel for Additional Named Plaintiff Houston Municipal Employees Pension System*

21      PLAINTIFFS' REPLY IN FURTHER SUPPORT OF
MOTION FOR CLASS CERTIFICATION
CASE NO. 19-cv-10860-MCS (PLAx)