JOHN W. SPIEGEL (SBN 78935)
john.spiegel@mto.com
JOHN M. GILDERSLEEVE (SBN 284618)
john.gildersleeve@mto.com
LAUREN C. BARNETT (SBN 304301)
lauren.barnett@mto.com
ROWLEY J. RICE (SBN 313737)
rowley.rice@mto.com
BRIAN R. BOESSENECKER (SBN 331409)
brian.boessenecker@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for MATTEL, INC.,
MARGARET H. GEORGIADIS,
JOSEPH J. EUTENEUER,
and KEVIN FARR

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MATTEL, INC. SECURITIES LITIGATION | Case No. 19-CV-10860-MCS (PLAx)<br><br>**DECLARATION OF LAUREN C. BARNETT** |

DECLARATION OF LAUREN C. BARNETT

I, Lauren C. Barnett, declare:

1.    I am counsel for Defendants Mattel, Inc., Margaret H. Georgiadis, Joseph J. Euteneuer, and Kevin Farr ("Mattel Defendants") in this action.  I make this declaration in support of the Mattel Defendants' Ex Parte Application for Leave to File Surreply to Address New Argument and Evidence Regarding Price Impact and [Proposed] Surreply in Opposition to Plaintiffs' Motion for Class Certification.

2.    Attached as **Exhibit A** is a true and correct copy of the Reply Report of J.B. Heaton, dated September 1, 2021.

3.    Pursuant to Local Civil Rule 7-19, counsel for the Mattel Defendants advised counsel for Plaintiffs by email at approximately 8:20 a.m. PT on September 1, 2021 of the date and substance of the ex parte application, and, at the request of counsel for Plaintiffs, shared the proposed Surreply and Reply Report of J.B. Heaton by email at approximately 10:00 a.m. PT that day.  Counsel for Plaintiffs stated that Plaintiffs do not consent to the application.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on September 2, 2021, at Los Angeles, California.

        /s/ Lauren C. Barnett
        Lauren C. Barnett

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | |
| Mattel, Inc. Securities Litigation | ) ) ) ) | Case No. 19-CV-10860-MCS (PLAx) |

## <u>REPLY REPORT OF J.B. HEATON, J.D., M.B.A., PH.D.</u>

**September 1, 2021**

## I.    INTRODUCTION

### A.    Scope

1.    I have been retained by Munger Tolles & Olson LLP in its capacity as counsel for Mattel, Inc. ("Mattel"), Margaret H. Georgiadis, Joseph J. Euteneuer, and Kevin Farr to provide my opinions in response to the Reply Report of Professor S.P. Kothari dated August 23, 2021 (the "Kothari Reply Report").

### B.    Summary of Opinions

2.    Professor Kothari's Reply Report fails to document a price impact by any reliable means. Mattel's stock performed better after the corrective disclosure than before it. Professor Kothari purports to adjust Mattel's returns statistically to tease out a price impact otherwise hidden in Mattel's strong stock performance. But the methodologies Professor Kothari applies are unreliable. His confounding effects analysis applies statistical methods to a single stock that are applied in the academic literature only to large samples. There is no peer-reviewed, generally accepted method in the academic literature for parsing the causes of a single firm's returns in the way Professor Kothari claims to do, a fact now recognized in case law and legal commentary, including commentary that Professor Kothari cites in his Reply Report.

3.    Professor Kothari also fails to isolate any price impact in his review of documents produced in discovery, his review of analyst reports and conference call transcripts, and his review of academic literature. Professor Kothari does not dispute that price impact in an efficient market requires a change to either expected future cash flows or the discount rate. Yet his Reply Report fails to establish any such changes. His appeal to selected findings in academic literature cannot establish a price impact on the facts of this case where market evidence and fundamental analysis have established a lack of price impact.

1

4.      Overall, Professor Kothari's inability (and mine) to identify a price impact from the alleged misrepresentations is logical given the facts of this case. The amount of Mattel's valuation allowance was correct as of the fiscal year ended December 31, 2017 and every subsequent reporting period.  Even when made, the alleged accounting error had no impact on expected future cash flows or the discount rate. It necessarily follows that corrective disclosure of that error – long since corrected – would not have a price impact. The absence of price impact resulting from corrective disclosure of the alleged internal control weaknesses – also corrected by Mattel – is consistent with the market's view that the events of 2017 implicating internal control weaknesses had no material effect on expected future cash flows or the discount rate.

### C.      Qualifications and Compensation

5.      My qualifications and other recent testimony are set out in my expert report dated July 12, 2021. I am being compensated at the rate of $1,000 per hour. I have no financial interest in the outcome of this litigation. I was assisted by Cornell/Gerger Consulting. My compensation and the compensation of Cornell/Gerger Consulting is not contingent on the opinions I express or the outcome of this matter. For this report, I have relied on Professor Kothari's reports and the documents cited therein, as well as the documents already disclosed in my opening report or cited in the body of this report.

## II.    PROFESSOR KOTHARI'S PARSING OF POTENTIALLY CONFOUNDING EVENTS DOES NOT REST ON RELIABLE METHODS.

### A.      There is no evidence of price impact before Professor Kothari applies unreliable methods.

6.      While Lead Plaintiffs assert that Mattel's stock price was inflated before August 9, 2019, the stock price was consistently <u>higher</u> after the corrective disclosure on October 29,

2

2019 than before the August 8, 2019 whistleblower letter announcement, as illustrated by the following chart contained in my opening report at paragraph 82:



7.    Professor Kothari picks two price points – the closing prices on August 8, 2019 and October 30, 2019 – and asserts that the difference of $1.415 is evidence of price impact.[1] But comparing one price point – the result of a single transaction in shares at the end of the day on August 8, 2019 – to another single price point 11 weeks later on October 30, 2019 – again, reflecting a single transaction at the end of a full trading day – does not demonstrate a price impact. That comparison ignores interday and intraday movement in Mattel's stock prices caused by company specific, industry specific, and macroeconomic events. The range of prices on October 30, 2019 alone – from a low of $11.365 to a high of $13.22 – is $1.855, larger than the entire difference in closing prices from August 8, 2019 to October 30, 2019 that Professor Kothari relies upon.  Market efficiency implies that where information is disclosed after the

---

[1] Kothari Reply Report, p. 3, ¶ 13.

3

close of a trading day, the appropriate comparison is between the closing stock price and the opening stock price on the next trading day. Comparing a closing price to the next trading day's closing price conflates information from the next trading day unrelated to the announcement. Here, the increase in Mattel's stock price between the closing price on October 29, 2019 and the opening price on October 30, 2019 is $2.19, $0.67 more than the decrease from the closing price on August 8, 2019 and the opening price on August 9, 2019.

8.      The lack of detectable price impact is evident no matter what statistic one uses. Professor Kothari refers to minimum and maximum statistics as "ad-hoc." They are not. Maximum and minimum are among the most basic statistics in empirical research and data science. Professor Kothari routinely reports them in his non-litigation work.[2] In any event, those statistics are only two of the four – along with median and mean – that I set out in my opening report at paragraph 82, reproduced below, demonstrating that Mattel's closing stock prices in the 60-day period before August 9, 2019 were lower than after the corrective disclosure on October 29, 2019 (and the same relations hold for the 90-day period):

| MAT Stock Price | 60 days prior to August 9, 2019 | 60 days after October 29, 2019 |
|---|---|---|
| Minimum | $9.65 | $11.16 |
| Median | $11.41 | $12.56 |
| Mean | $11.69 | $12.84 |
| Maximum | $14.60 | $14.68 |

---

[2] See, for example, Sudarshan Jayaraman, S.P. Kothari, and Karthik Ramanna, Capture and Competition, Proceedings. Annual Conference on Taxation and Minutes of the Annual Meeting of the National Tax Association, 110 (2017), pp. 1-55 (reporting minimum and maximum of variation in tax rates at p. 16); John E. Core, Wayne R. Guay, and S.P. Kothari, The Economic Dilution of Employee Stock Options: Diluted EPS for Valuation and Financial Reporting, Accounting Review, 77(3) (2002), pp. 627-652 (reporting minimum and maximum of five variables under study at p. 38); and S.P. Kothari and Jerold B. Warner, Evaluating Mutual Fund Performance, Journal of Finance, 56(5) (2001), pp. 1985-2010 (reporting minimum and maximum values for measures on 50 mutual funds at p. 1989).

4

**B.      Professor Kothari applies methods that have not been demonstrated to be reliable for the study of a single stock's returns.**

9.      Professor Kothari argues that my "market reaction analysis commits a fatal flaw by not properly accounting for the impact of confounding news disclosed by Mattel on October 29, 2019 as well as bad news disclosed by Hasbro on October 22, 2019."[3] Professor Kothari is correct that I do not parse confounding events, but that is no "fatal flaw" when assessing price impact. To the contrary, I am constrained by the fact that there is no reliable methodology for doing what Professor Kothari claims to do. As I write in my opening report at paragraph 85 (emphasis added):

> Given the limitations of the event study methodology to parse same-day firm-specific news, attempting to use this methodology to demonstrate a detectable price impact from the alleged misrepresentations based on Mattel's stock price movement on October 30, 2019 may be futile because Mattel also released earnings on October 29, 2019. Financial economists have long recognized that there is no fully reliable, mathematically precise way to decompose a single-firm stock-price return into components related to different news. Given that limited utility, the most reliable way to determine price impact or lack thereof is to use whatever reliable stock price return evidence is available alongside the other available evidence relevant to price impact, including fundamental valuation principles and the analyst reactions discussed above.

10.      Professor Kothari ignores this methodological constraint. He claims that "for decades the academic literature has used econometric techniques such as (i) event studies to isolate firm-specific news and (ii) price-earnings regressions to attribute a portion of the observed firm-specific stock price variation on an event date, e.g., an earnings announcement, to earnings news."[4] This is false.

---

[3] Kothari Reply Report, p. 2, ¶ 7.

[4] Kothari Reply Report, p. 3, ¶ 15.

5

11.　　　There is no "extensive literature in accounting, finance and economics that uses the market reaction to unexpected earnings to isolate the effect of earnings news" for a <u>single</u> firm like Mattel or Hasbro. In appealing to an academic literature using large-sample event studies to justify his sample-of-one studies of Mattel and Hasbro, Professor Kothari engages in a practice that Duke University finance professor Alon Brav and I criticized in our now-influential 2015 article:

> [L]itigants have not been shy in asserting the event study's impressive academic pedigree. But the methodology that litigants use in court differs from the methodology used in academic research. In particular, securities litigation event studies are almost always single-firm event studies ("SFESs") that examine the price moves of the security of the single firm involved in the litigation, while almost all academic research event studies are multi-firm event studies ("MFESs") that examine large samples of securities from multiple firms. Importing a methodology that economists developed for use with multiple firms into a single-firm context creates three substantial difficulties: low statistical power, confounding effects, and bias.[5]

12.　　　Rather than be forthcoming about the lack of any peer-reviewed, generally accepted methods for the study of single firms, Professor Kothari quotes from an article for the propositions that

> [e]xperts <u>might</u> be able to use historical price and earnings data for the firm to estimate the relationship between earnings news and the firm's stock price. <u>If this study controlled appropriately</u> for market expectations concerning the firm's earnings (say, using analysts' predictions), it <u>might</u> provide a plausible way to separate out the component of the event date's estimated excess return that could reasonably be attributed to the earnings news, with the rest being due to the alleged corrective disclosure related to regulatory news.[6]

---

[5] Alon Brav & J.B. Heaton, Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias, 93 Wash. U.L. Rev. 583, 586 (2015). The extended discussion of this point is contained at pp. 605-608.

[6] Kothari Reply Report, p. 19, ¶ 69 (quoting Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick, The Logic and Limits of Event Studies in Securities Fraud Litigation, 96 Tex. L. Rev. 553, 614 (2018)). While the Kothari Reply Report cites the source of the quote at page 616, page 614 is the correct cite. The emphasis is mine.

6

13.     While this article suggests a research agenda for future work, no such methods currently exist for parsing the effects of different news on the return of a single stock. To the contrary, on the same page of the article from which Professor Kothari quotes, the authors (two of whom hold PhDs in economics) state, in their own words, the heart of my objection to Professor Kothari's analysis:

> When multiple sources of news are released at exactly the same time, however, no event study can by itself separate out the effects of the different news. The event study can only tell us whether the net effect of all the news was associated with an unusually large price drop or rise.[7]

14.     This is the important point. A variety of events undoubtedly contributed to movements in Mattel's stock price between August 8, 2019 and October 29, 2019. The question is whether any movement occurred that reflected a price impact from the alleged misrepresentations. Professor Kothari's claim that he is "[u]sing established event study methodologies in the academic literature" to answer that question is false. I am unaware of any peer-reviewed research that has ever claimed an ability to parse the components of a one-day return for a single firm the way Professor Kothari does, and Professor Kothari fails to identify any such support in his report.

15.     Professor Kothari's litigation use of large-sample methods to study the returns of a single firm pretends the existence of a tool that does not exist. I accept and endorse the conclusion that the event study methodology can do a good job controlling for confounding events in large-sample event studies. But that is not because there is a way of parsing price effects firm-by-firm. That is not how large-sample event studies deal with confounding events. Rather, with a large sample the confounding events are (mostly) averaged away. Professor

---

[7] Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick, The Logic and Limits of Event Studies in Securities Fraud Litigation, 96 Tex. L. Rev. 553, 614 (2018).

7

Kothari's academic work illustrates the point. In his review of event study methodology, Kothari and Warner (2007),[8] Professor Kothari and his co-author state: "An event study typically tries to examine return behavior for a <u>sample</u> of firms experiencing a common type of event (e.g., a stock split)."[9] The large samples in such studies mean that whatever else is announced at or around the time of the event under examination (e.g., a stock split) may average away in a large-enough sample.  In Kothari, Shu, and Wysocki (2009),[10] for example, the Professor and his co-authors perform event studies with from 424 to 5,803 dividend changes and management forecasts.

16.    By contrast, there is no reliable methodology for averaging away effects unrelated to the event at issue in a single-firm event study. This is a point for which the United States Court of Appeals for the Second Circuit cited my 2015 article with Professor Brav, writing, "In addition, it can be extremely difficult to isolate the price impact of any one piece of information in the presence of confounding factors, such as other simultaneously released news about the company, the industry, or the geographic region."[11] Professor Kothari cites an article in his Reply Report that also states the point: "the event study methodology favored post-*Dura* is generally unable to discern the independent price impacts of bundled news."[12]

---

[8] S.P. Kothari and Jerold B. Warner, Econometrics of Event Studies, in B. Espen Eckbo, editor, Handbook of Corporate Finance, Empirical Corporate Finance, Volume 1 (2007), pp. 3-36.

[9] Id. at p. 8. The emphasis is added.

[10] S.P. Kothari, Susan Shu, and Peter D. Wysocki, Do Managers Withhold Bad News? Journal of Accounting Research, 47(1) (2009), pp. 241-276.

[11] In re Petrobras Sec., 862 F.3d 250, 279 (2d Cir. 2017) (citing Brav and Heaton, 605-608).

[12] Charles R. Korsmo, Information Bundling, Disclosure Timing, and Judicial Deference to Market Valuations, 62 B.C. L. Rev. 571, 592 (2021). Professor Kothari discusses this article at Kothari Reply Report, p. 19, ¶ 70.

8

17.     Untethered from any generally accepted methodology, Professor Kothari's resulting analysis is largely haphazard. Ignoring the standard t-statistic for the difference in returns between August 9, 2019 and October 30, 2019, which shows the two-day difference to be statistically insignificant, Professor Kothari uses a "bootstrap" methodology to calculate a different t-statistic for the difference between the -14.54% abnormal return he calculates for August 9, 2019 and the +13.61% abnormal return he calculates for October 30, 2019.[13] He cites no peer-reviewed literature presenting his simulation method in use to calculate a t-statistic for a single-firm event study, and I am not aware of any such study in the literature. Even then, Mattel's stock gain after the corrective disclosure renders his calculated t-statistic insignificant at even the 10% significance level. His 10.7% significance level result would be considered a "negative result" – that is, a lack of significant effect – in most peer reviewed studies, which in any case never involve a single firm. This is consistent with my finding of an insignificant difference between these two returns in my report at paragraph 84.

18.     Professor Kothari then sets off on a series of statistical calculations unmoored from generally accepted methodology. These analyses rest on his subjective choices about the number of Mattel earnings announcements to examine ("40 Mattel's earnings announcements during the 10-year period"),[14] his decision to use a "rolling" single-firm event study ("abnormal return estimated from the 120-day rolling window"),[15] and various other adjustments. None of the methods that Professor Kothari uses have ever been shown to be reliable for the study of single firms.

---

[13] Kothari Reply Report, p. 18, ¶¶ 64-66, fn 53.

[14] Kothari Reply Report, p. 20, ¶ 71.

[15] Id.

19.     Professor Kothari's use of the same unreliable methods renders his criticism of my comparison with Hasbro unreliable as well. That there are differences between Hasbro and Mattel is obvious; the two are different firms. The point of my analysis is more modest than Professor Kothari contends. My point is that across a number of analyses, one of which is comparison with its most comparable publicly-traded firm, Hasbro, there is no detectable evidence of price impact.

## III.   PROFESSOR KOTHARI'S DOCUMENT AND LITERATURE REVIEWS FAIL TO DEMONSTRATE A PRICE IMPACT.

20.     Professor Kothari does not deny that a price impact in an efficient market must trace either to a change in expected future cash flows, a change in the discount rate, or both. As Professor Kothari has written with respect to the relation between fundamental analysis and market price, the core of my opening report:

> Since market value is the discounted present value of expected future net cash flows, forecasts of future revenues, expenses, earnings, and cash flows are the crux of valuation.[16]

21.     It follows from this basic valuation principle that, in an efficient market, anything that impacts expected future cash flows and/or the discount rate will impact stock price. The question Professor Kothari and I must answer is whether any such impacts occurred for Mattel stock during the relevant times. As discussed above, Professor Kothari's statistical analysis fails to show such impacts. His "conceptual" analyses fail to do so as well.

22.     Professor Kothari sets out to "investigate whether, conceptually, the alleged misrepresentations were material and impacted Mattel's share price." After doing so, he asserts

---

[16] S.P. Kothari, Capital Markets Research in Accounting, Journal of Accounting and Economics, 31 (2001), pp. 105-231. Professor Kothari cites to this article in the Kothari Reply Report at p. 19, ¶ 68.

that his "review of the scientific literature on accounting for deferred taxes, internal control weaknesses, and related restatements"[17] justifies his opinion that "non-cash accounting charges such as valuation allowances and disclosures of the presence of internal control deficiencies and restatements affect investors' expectations of future cash flows and discount rates, even if these are non-cash charges/disclosures that do not affect current cash flow."[18]

23.     But in every case, Professor Kothari only speculates on possibilities without providing reliable qualitative or quantitative application of those possibilities to demonstrate an impact on Mattel's stock price. Professor Kothari contemplates "the importance of valuation allowances and internal controls" and posits "a direct link between the alleged misrepresentations and investors' expectations of future cash flows, which would affect Mattel's stock price,"[19] claims that valuation allowances and internal control issues "can impact a firm's share prices via an increase in a firm's cost of capital,"[20] and states his "belief that the valuation allowances are likely to affect a firm's stock price."[21] But, like me, he is unable to identify any actual way in which the alleged misrepresentations impacted expected future cash flows or discount rates in this matter.

24.     Professor Kothari walks through a number of internal and external documents, but none support an opinion that the alleged misrepresentations impacted the stock price. Analyst reports can suggest where to look for actual price impact, and what is apparent from

---

[17] Kothari Reply Report, p. 2, ¶ 8.

[18] Kothari Reply Report, p. 2, ¶ 9.

[19] Id.

[20] Kothari Reply Report, p. 26, ¶ 138.

[21] Kothari Reply Report, p. 30, ¶ 153.

11

all of the analyst reports is that none adjusted expected future cash flows or the discount rate to reflect a change in the value of Mattel's stock as a result of the alleged misrepresentations. Professor Kothari also fails to square his discussion of Mattel's November 15, 2019 conference call with the lack of analyst reports following that call, much less reports expressing any discontent about how the call was conducted or what questions were answered.

25.     The same is true of Professor Kothari's discussion of academic literature. Academic literature can also suggest where to look for actual price impact, but it cannot on its own counter case-specific evidence of no price impact. Professor Kothari also relies on academic work that is purely theoretical, such as his reliance on Lambert, Leuz, and Verrecchia (2007) for his claim that the alleged misrepresentations might have impacted Mattel's discount rate.[22] Not surprisingly, that model's assumptions – including an assumed structure for returns and investor preferences – drive all of its conclusions, none of which the paper verifies by empirical testing. Its speculations on discount rates cannot establish anything here.

26.     Instead, we can empirically test Professor Kothari's assertion that the corrective disclosure might have raised Mattel's discount rate by looking at whether Mattel's capital asset pricing model (CAPM)[23] beta increased in the year after the corrective disclosure compared to the year before. The CAPM is generally accepted for determining the cost of equity capital and Professor Kothari's own research has provided support for the role of beta in predicting

---

[22] Kothari Reply Report, pp. 26-27, ¶¶ 139-140 (discussing Richard Lambert, Christian Leuz, and Robert E. Verecchia, Accounting Information, Disclosure, and the Cost of Capital, Journal of Accounting Research, 45(2) (2007), pp. 385-420.

[23] See William F. Sharpe, Capital Asset Prices: A Theory of Market Equilibrium under Conditions of Risk, Journal of Finance, 19(3) (1964), pp. 425-442.

expected returns.[24] In the CAPM, a stock's "beta" – the covariance of the stock's returns and the market return, scaled by the variance of the market return – determines the risk of a particular stock.

27.     I used Bloomberg Terminal to estimate Mattel's beta for the 360-day period before August 9, 2019. The estimation uses daily returns on the S&P 500 as the market proxy. The estimated beta (raw beta)[25] is 1.432 with a standard error of 0.190. I then estimate Mattel's beta for the 360-day period after October 29, 2019 using the same S&P 500 benchmark and daily returns. The estimated beta (raw beta) for that period is 1.016 with a standard error of 0.078. Mattel's beta risk is actually lower in the post-disclosure period, which is empirically inconsistent with Professor Kothari's speculation that Mattel's risk could have increased. The following screen captures from Bloomberg Terminal present these results (calculations performed August 27, 2021):

---

[24] See S.P. Kothari, Jay Shanken, and Richard G. Sloan, Another Look at the Cross-Section of Expected Stock Returns, Journal of Finance, 50(1) (1995), pp. 185-224 ("We have presented evidence that average returns do indeed reflect substantial compensation for beta risk, provided that betas are measured at the annual interval. Of course, this does not mean that beta alone accounts for all the cross-sectional variation in expected returns, as implied by the capital asset pricing model.").

[25] Bloomberg's "Raw beta" is the beta used in financial economic research, as opposed to Bloomberg's "Adjusted beta" which is weighted toward a market beta of 1.0.

## Mattel Beta for the 360-Day Period Before August 9, 2019



**Mattel Beta for the 360-Day Period After October 29, 2019**



28.    Returning to Professor Kothari's appeal to academic literature, the overall problem is that everything Professor Kothari says about that literature could have been said before the occurrence of any events in this matter. Literature review cannot answer the question here: was there any price inflation <u>for Mattel in the class period</u>? Professor Kothari misstates my opinion, stating "Dr. Heaton argues that because valuation allowances represent non-cash charges, they should not affect investors' expectations of future cash flows." He cites no source for that assertion and it is inconsistent with my detailed explanation at paragraph 48 of why the allegedly incorrect accounting treatment regarding the size of the valuation allowances <u>in this case</u> "provided no new information regarding Mattel's expectations for future U.S. taxable

15

income, its operations, or cash flows and had no implications for expected future cash flows available to Mattel's equity holders."

29. Nor can analysis of "the proportion of words devoted to tax issues and valuation allowance relative to the total number of words spoken by [Mattel's] CFO"[26] on conference calls evidence a change to expected future cash flows or the discount rate. Professor Kothari cites no basis for connecting his arbitrary word-count methodology to a price impact. The same is true of Professor Kothari's claim that a 2017 debt downgrade that occurred before the corrective disclosure impacted Mattel's borrowing costs.[27] Professor Kothari provides no evidence that Mattel did experience an increase in borrowing costs, nor does he attempt to trace any increase in the cost of Mattel's debt to an impact on Mattel's stock price. His claim is mere speculation.

30. Overall, Dr. Kothari's arguments regarding whether valuation allowances <u>might</u> provide information to investors regarding a firm's expectations cannot answer the relevant question here. As I stated in my opening report, there are circumstances where allowances can provide information regarding a firm's expectations, and if those expectations are different from market expectations, and if the market adopts those expectations in whole or in part, a price impact might result.

31. However, <u>in this case</u>, as I explained in my opening report, Mattel provided robust information regarding its decision to record a valuation allowance, including that Mattel's forecasts did not provide sufficiently reliable evidence to overcome negative evidence resulting from a 36-month cumulative U.S. loss from operations. Furthermore, investors were

---

[26] Kothari Reply Report, p. 30, ¶ 154.

[27] Kothari Reply Report, pp. 31-32, ¶¶ 157-163.

well aware of Mattel's justification for recording the valuation allowance in the 3rd quarter of 2017 and Mattel's expectations.  Mattel's 10-Q for the period ended September 30, 2017 disclosed that it was taking an allowance equal to the balance of its net U.S. federal and state deferred tax assets and that it provided zero tax benefit in the year-to-date tax expense for items such as the year-to-date U.S. operating loss and other effects occurring in the current year, and during the investor call for the 3rd quarter of 2017, Mattel answered numerous questions regarding expectations for its turnaround and future financial performance.  Notably, Dr. Kothari does not quantify how investor expectations regarding Mattel's cash flows would have changed but for the accounting error.

32.    Based on the facts of this case, Mattel's accounting error did not change investors' expectations of future cash flows or the discount rate.  This explains Professor Kothari's inability (and mine) to quantify any such changes and is consistent with the fact that Mattel's stock performed better after the corrective disclosure on October 29, 2019 than before the August 8, 2019 Form 8-K, a period in which Lead Plaintiffs allege price inflation.

## IV.   CONCLUSION

33.    As I stated in my opening report, not all alleged misrepresentations impact stock prices. Price impact in an efficient market depends on a misrepresentation having implications for expected future cash flows or the discount rate. The alleged misrepresentations in this case did not have implications for expected future cash flows and the discount rate and, consequently, did not impact Mattel's stock price.

17

34.    I declare under penalty of perjury that the foregoing is true to the best of my knowledge.

Signed: September 1, 2021

_____
J.B. Heaton, J.D., M.B.A., Ph.D.

18