UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE MATTEL, INC. SECURITIES LITIGATION

Case No. 2:19-cv-10860-MCS-PLA

**ORDER GRANTING MOTION FOR CLASS CERTIFICATION [90]**

Lead Plaintiffs Dekalb County Employees Retirement System ("DeKalb") and New Orleans Employees' Retirement System Employees ("New Orleans"), and additional named Plaintiff Houston Municipal Employees Pension System (collectively, "Plaintiffs") move under Federal Rule of Civil Procedure ("Rule") 23(a), (b)(3), and (g) to certify a class of investors (the "Class") defined, with exclusions, as: "All persons and entities who purchased or otherwise acquired common stock of Mattel, Inc. ('Mattel') from August 2, 2017 to August 8, 2019, inclusive, who were damaged thereby." Mot., ECF No. 90. Plaintiffs also move to appoint Lead Plaintiffs New Orleans and Dekalb as Class Representatives, and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein") as Class Counsel. *Id.*; Decl. of John Rizio-Hamilton ("Rizio-Hamilton Decl."), ECF No. 90-1.

1

Defendants Mattel, Margaret H. Georgiadis, Joseph J. Euteneuer, and Kevin Farr; Defendant PricewaterhouseCoopers LLC ("PwC"); and Defendant Joshua Abrahams oppose. Mattel Opp'n, ECF No. 93; PwC Opp'n, ECF No. 94; Abrahams Joinder; ECF No. 95. Plaintiffs replied. Reply, ECF No. 122-1. Mattel filed a Surreply and Plaintiffs responded to the Surreply. Mattel Surreply, ECF No. 134; Pls.' Surreply, ECF No. 135.

The Court deemed the matter appropriate for decision without oral argument and vacated the hearing. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

## I. BACKGROUND

This securities fraud action stems from a "cover-up of known, material misstatements in Mattel's financial results and known, severe weaknesses in its internal controls" as recounted in large part by Mattel's former tax director, Brett Whitaker. Am. Compl. ¶¶ 1, 66, ECF No. 34. Plaintiffs bring claims under Sections 10(b) and 20(a) of the Exchange Act against Mattel, its top executives, its registered accounting firm (PwC), and PwC's lead audit partner (Abrahams). The Court appointed DeKalb and New Orleans as Lead Plaintiffs, approved their selection of Bernstein as Lead Counsel, and consolidated related actions. *See* ECF No. 27. The Court detailed Plaintiffs' allegations in its Order Denying Motions to Dismiss ("MTD Order") and incorporates that discussion here. *See* MTD Order 2–8, ECF No. 74. Germane expert and factual evidence aside from Plaintiffs' allegations is discussed below where appropriate.

## II. LEGAL STANDARD

Rule 23 requires a plaintiff seeking class certification to "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 339 (2011) (emphasis in original). "In determining whether certification is proper, a district court must take the substantive allegations of the complaint as true, and may also consider extrinsic evidence submitted by the parties." *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 633 (C.D. Cal. 2009) (citations omitted). A trial court has broad discretion in deciding whether to grant or

deny a class certification motion. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). A plaintiff must first demonstrate that Rule 23(a)'s requirements are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). The court then must consider whether the class is maintainable under one of Rule 23(b)'s three alternatives. *Dukes*, 564 U.S. at 339. Plaintiffs seek certification under Rule 23(b)(3), which requires "that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### III.   DISCUSSION

#### A. Rule 23(a)

Plaintiffs first argue that the numerosity requirement is satisfied because the Class consists of similarly situated investors who bought millions of shares of Mattel stock during the Class Period. Second, Plaintiffs assert that numerous legal and factual questions are common to all Class members. Third, Plaintiffs contend that their claims are typical of the proposed Class. Fourth, Plaintiffs represent that they are sophisticated institutional investors with a significant financial interest in the case and have overseen and managed the litigation fairly and adequately to protect the Class's interests.

Defendants only contest the typicality prong, arguing that Lead Plaintiffs face unique defenses to certification and to their section 10(b) claim. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (elements of section 10(b) claim include: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; and (4) reliance upon the misrepresentation or omission). Defendants contend that January 2020 commentary from Lead Plaintiffs' former investment manager, Southeastern, is far more problematic for Lead Plaintiffs than the Class generally:

> Mattel [], the classic toy company, was another top contributor in the quarter and the year, after ***the company resolved a nonmaterial***

***whistleblower complaint over historical accounting errors***, which delayed a debt offering that the company subsequently completed in November. Like GE, ***the headline fears and uncertainty surrounding the complaint weighed heavily on the stock price in the short term but did not impact the long-term value of the company***. Sales increased in the quarter, while management took further necessary steps towards decreasing operating costs and improving gross margins. Barbie, Hot Wheels, action figures and games all sold well during the last quarter, while American Girl and Fisher Price declined moderately. Earnings before interest, taxes, depreciation and amortization (EBITDA) appears on track to have exceeded expectations in 2019 at $400 million or better and is expected to approach or exceed $600 million in 2020, which would meaningfully reduce the company's leverage ratios, thereby addressing one of the key issues that has depressed the stock price for the last several years. We believe that CEO Ynon Kreiz has done a wonderful job with the turnaround after inheriting a difficult situation, while actively pursuing the substantial upside presented by streaming and film demand for Mattel's brands.

*See* Expert Rpt. of J.B. Heaton, J.D., M.B.A., P.H.D. ("Heaton Rpt.") ¶ 17 (emphasis is Defendants'), ECF No. 93-2; *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("Several courts have held that 'class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.'") (citations omitted).

The Court cannot conclude at this stage that Southeastern's actions will become a disruptive "focus of this litigation" at the Class's expense so as to make Lead Plaintiffs' appointment as Class Representatives inappropriate. *Buttonwood Tree Value Partners, LP v. Sweeney*, 2013 WL 12125980, at *5 (C.D. Cal. Sept. 12, 2013) ("The defense of reliance on non-market information may or may not prove successful, but that is not what matters. What matters here is that the defense identified by Defendants does not threaten to be a major focus of the litigation so as to harm the interests of absent class members.") (citing *Hanon*, 976 F.2d at 508–09). There is no genuine dispute that Lead Plaintiffs' claims arise from the same events as other Class members and that the liability theory is identical. *In re Heritage Bond Litig.*, 2004 WL 1638201, at *7 (C.D.

Cal. July 12, 2004) ("Courts have held that if the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of the factual differences.") (collecting cases). As the parties' briefing and expert opinions make clear, the Class would need to counter evidence that Defendants' alleged misrepresentations did not affect Mattel's valuation, irrespective of whether Southeastern advised a particular Class member or purchased stock on its behalf. Stated differently, even if other potential Class representatives obtained advice contrary to Lead Plaintiffs (and favorable to Plaintiffs' claims), Defendants would presumably proffer the same January 2020 commentary to emphasize that a prominent investment manager to an institutional Class member advised that "the headline fears and uncertainty surrounding the complaint weighed heavily on the stock price in the short term but did not impact the long-term value of the company." Heaton Rpt. ¶ 17. Southeastern's views in January 2020 therefore do not sufficiently undercut the typicality of Lead Plaintiffs' claims to disqualify them from acting as Class Representatives. *See, e.g.*, *Utesch v. Lannett Co., Inc.*, 2021 WL 3560949, at *10 (E.D. Pa. Aug. 12, 2021) (investment advisor's view that market overreacted to fraud revelations did not render plaintiff "subject to a unique or atypical defense that is likely to become a major focus of the litigation"); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *13–14 (E.D. Va. Sept. 4, 2020) ("When and on what advice Plaintiff purchased Towers shares after the initial Merger announcement, or the views of its investment advisors concerning the Merger, bears little on the materiality of the alleged misrepresentations or omissions, loss causation, or how to measure damages—the common class-wide issues.").

The Court finds that Plaintiffs' proposed Class satisfies all requirements to maintain a class action under Rule 23(a). *In re NetSol Techs., Inc. Sec. Litig.*, 2016 WL 7496724, at *3 (C.D. Cal. July 1, 2016) ("[T]he law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws.") (citation omitted).

**B. Rule 23(b)**

"To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). "Most of these elements are clearly susceptible to classwide proof, particularly the alleged misrepresentations made by the defendants, scienter, and loss. Furthermore, a plaintiff is not required to prove materiality or loss causation at the class certification stage." *Milbeck v. TrueCar, Inc.*, 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019) (cleaned up).

Plaintiffs contend that questions regarding whether misleading conduct occurred, whether that conduct occurred with the required scienter, whether Mattel's stock price was artificially inflated or maintained during the Class Period, and whether misleading conduct caused investors losses predominate over individual questions. Plaintiffs claim they are entitled to the presumption of class-wide reliance based on their fraud-on-the-market theory. Finally, Plaintiffs argue that a class action is superior to any other means of resolving this controversy. Defendants seek only to rebut the presumption of reliance by showing that the alleged misrepresentations did not impact Mattel's stock price.

The fraud-on-the-market theory "facilitates class certification by recognizing a rebuttable presumption of class wide reliance on public, material misrepresentations when shares are traded in an efficient market." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 463 (2013). "Absent the fraud-on-the market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." *Id.* at 462–63. To invoke the presumption of reliance based on the fraud-on-the-market theory, a plaintiff seeking

class certification must show: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded stock between the time the representations were made and when the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 268 (2014) ("*Halliburton II*") (citing *Basic v. Levinson*, 485 U.S. 224, 248, n.27 (1988)). The first three requirements "are directed at price impact—'whether the alleged misrepresentations affected the market price in the first place.'" *Id.* at 278. "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse." *Id.*

Plaintiffs make a sufficient showing to invoke the fraud-on-the-market presumption of reliance. Plaintiffs' expert, Professor S.P. Kothari, demonstrates that the Mattel stock traded on an open, well-developed, and efficient market during the Class Period. *See* Kothari Report, Rizio-Hamilton Decl. Ex. A. Instead of disputing the sufficiency of Plaintiffs' showing, Defendants seek to rebut the presumption of reliance based on evidence that Defendants' alleged misrepresentations did not impact how investors assessed Mattel's value. *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *6–7 (N.D. Cal. Mar. 16, 2016) ("If Defendants show that the alleged misrepresentations did not in fact affect the stock's price, then the *Basic* presumption will not apply. Critically, the Supreme Court's recent *Halliburton II* decision held that Defendants are entitled to introduce evidence to rebut the presumption of reliance at the class certification stage to defeat Plaintiffs' efforts to certify a class.") (cleaned up).

"To rebut the *Basic* presumption of reliance, Defendants must introduce evidence showing the alleged 'misrepresentation[s] in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false.'" *Id.* (quoting *Basic*, 488 U.S. at 248). "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price

impact." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021); *see id.* at 1959 ("If a misrepresentation had no price impact, then *Basic*'s fundamental premise 'completely collapses, rendering class certification inappropriate.'") (quoting *Halliburton II*, 573 U.S. at 283). "In assessing price impact at class certification, courts should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 1960 (cleaned up).

Defendants argue that certification is inappropriate because they have established no price impact to rebut the presumption. *Halliburton II*, 573 U.S. at 283 (Defendants bear burden of proving no price impact in this context). Relying on Dr. Heaton's Report and Reply Report, ECF No. 134-1, Defendants advance three grounds to support that the alleged misrepresentation did not impact Mattel's stock price: (1) fundamental valuation principles show that the tax accounting error did not impact how investors assessed Mattel's value; (2) market analysts confirmed that the error did not impact Mattel's value; and (3) stock returns show no price impact.

However, Dr. Heaton's reports focus on the October 29, 2019 disclosure of the Audit Committee findings. The parties have a more fundamental disagreement: whether the August 8, 2019 disclosure that Mattel received an anonymous whistleblower letter, would investigate the letter's undisclosed contents, and thus was terminating a bond offering are a "corrective disclosure." The Court previously determined that Plaintiffs' allegations concerning the stock price drop following the August 8 disclosure plausibly supported loss causation, stating in relevant part:

> It is undisputed that Mattel's August 8, 2019 announcement did not reveal the substance of the whistleblower letter, but also that the letter recounted the fraud at issue in this lawsuit. According to the Mattel Defendants and PwC, that the disclosure did not reveal the letter's contents or the audit opinion's falsity, respectively, means the market reacted to conjecture, not fraud, and loss causation is therefore absent as a matter of law. Defendants thus advocate for a categorical rule whereby companies may announce the *fact* of a whistleblower letter (the accuracy of which is later confirmed),

but not its contents, and avoid liability if the market's immediate reaction overestimates the eventual impact of the letter's then-withheld details.

MTD Order 25. The Court rejected Defendants' proposed rule and continued:

> To be sure, announcing an investigation or disclosing uncorroborated allegations that precede a stock price drop do not establish loss causation. But allegations here exceed non-actionable speculation: Defendants engaged in fraud they did not disclose until a whistleblower letter— quickly corroborated by Defendants—forced their hand, resulting in the decline. It is not dispositive that Defendants withheld the letter's contents, leaving the market to guess why Mattel pulled an already-priced bond offering. The market's apparent deduction that Mattel's drastic response stemmed from something more than accounting fraud does not cancel liability for that fraud, nor is it logical to suggest a company could foreclose loss causation by manipulating disclosure of non-public whistleblower complaints.

*Id.* at 26–27 (citations omitted).

Defendants contend that the MTD Order's determinations do not bear on the price impact inquiry at the class certification stage, arguing that "the August 9 decline after disclosure of the whistleblower letter (but not its contents) cannot support an inference of *price impact* because that disclosure did not *match the contents* of the alleged misrepresentations made years earlier." *See* Mattel Surreply 1 (citing *Goldman*, 141 S. Ct. at 1961) ("Plaintiffs typically . . . point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation. But that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure.") (cleaned up). As the August 9 stock price drop allegedly stemmed from speculation instead of a "corrective disclosure," Defendants aver that *Goldman* "preclude[s]" all "reliance on the August 9, 2019 stock price decline." *See* Mattel Opp'n 20.

Even though price impact and loss causation are distinct, *Goldman*, 141 S. Ct. at 1960–61 & 1961 n.2, *Goldman* does not "preclude" the conclusion that the August 8 disclosure is a "corrective disclosure" for loss causation *and* price impact purposes. The plaintiff in *Goldman* alleged that "Goldman maintained an artificially inflated stock price by repeatedly making false and misleading generic statements about its ability to manage conflicts." *Goldman*, 141 S. Ct. at 1955. The Court held that "the generic nature of a misrepresentation often will be important evidence of a lack of price impact." *Id.* at 1961. The generic representations in *Goldman*—e.g., "Integrity and honesty are at the heart of our business"—are nothing like highly specific financial statements that, by PwC's and Mattel's admission, contained material misstatements. *See* Am. Compl. ¶¶ 172, 174 (quoting Form 8-K's announcement that financial statements "should no longer be relied upon due to material misstatements" and "that certain material weaknesses existed as of December 31, 2017 and subsequently, and therefore the Company has concluded that its internal control over financial reporting as of December 31, 2018 was not effective and that Management's Report on Internal Control on Financial Reporting as of December 31, 2018 should also no longer be relied upon.").

This Court does not read *Goldman* to contradict that a "corrective disclosure need not be a 'mirror image' disclosure—a direct admission that a previous statement is untrue." *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018) (citations omitted). While Defendants suggest that for a "back-end decline" to "imply front-end price inflation," "the contents of the alleged misrepresentation and the 'corrective disclosure' must match," Mattel Surreply 2, they do not grapple with alleged manipulations discussed in the MTD Order that make this case distinguishable and led the Court to conclude that "the market's apparent deduction that Mattel's drastic response stemmed from something more than accounting fraud does not cancel liability for that fraud, nor is it logical to suggest a company could foreclose [liability] by manipulating disclosure of non-public whistleblower

complaints." *See* MTD Order 27. It bears repeating that Mattel decided to disclose the whistleblower letter's receipt, but not its contents (for months), causing Mattel's stock to drop precipitously. Plaintiffs' unrebutted expert testimony shows that this decline is statistically significant at the 99% confidence level. *See, e.g.*, Kothari Rpt. ¶ 86, Ex. 10; *see also Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019) ("A statistically significant price adjustment following a corrective disclosure is evidence that the original misrepresentation did, in fact, affect the stock price.").

The Supreme Court in *Goldman* observing that it is "less likely" that a specific disclosure shows price impact "when the earlier misrepresentation is generic" does not prohibit the Court from considering the impact of a concealed whistleblower letter about substantiated fraud for purposes of evaluating price impact. *Goldman*, 141 S. Ct. at 1961. If the Court accepted Defendants' exceptional position, it would ostensibly be the first to hold that a disclosure which meets loss causation requirements cannot even be considered with respect to price impact. It would further incentivize companies to—as Mattel arguably did here—belatedly disclose fraud findings with positive financial results, and cite the resulting stock price increase as evidence that the fraud did not matter to investors. *Pelletier v. Endo Int'l PLC*, 2021 WL 2023608, at *35 (E.D. Pa. May 20, 2021) ("Indeed, it would functionally defang *Basic* if a defendant-company could always rebut it by waiting to announce corrective information until it had offsetting good news."); *see also* Kothari Reply Rpt. ¶¶ 30–36 (opining that financial results released on October 29 exceeded market expectations by more than 50% and that guidance for future results exceeded expectations), ECF No. 127-2. The "good dose of common sense" counseled by *Goldman* further belies that the Court must disregard a stock price plunge following announcement of a whistleblower letter and cancelling of an already-priced bond offering, particularly in light of manifest incentive to keep the letter's contents non-public to avoid adverse market reactions. *See, e.g.*, Am. Compl. ¶¶ 130–31 (alleging Mattel executive's statement that "We cannot have a material

weakness. That would be the kiss of death" was understood "to mean that the market would react very poorly to Mattel admitting that its financial statements were materially misstated and that it had a material weakness in its internal controls.").

Like at the pleading stage, Defendants overextend inapposite principles from distinguishable cases in an attempt to restrict what the Court can consider a "corrective disclosure." *Goldman* did not, as Defendants suggest, hold that any "corrective disclosure" must fully reveal the actionable fraud to support price impact at the class certification stage, let alone does *Goldman* "preclude" the Court from considering the decline upon which the putative Class claims primarily depend. The present record supports that the August 8 disclosure can constitute a "corrective disclosure" with respect to price impact for class certification purposes.

Given this determination—and undisputed evidence that the August 8 disclosure resulted in a stock price decline—Defendants do not carry their burden of proving no price impact and therefore fail to rebut the presumption of reliance. At this stage, the Court cannot conclude Mattel's stock rebounding months after the Class Period completely negates undisputed price impact during the Class Period. *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosol., Inc., HQ*, 322 F. Supp. 3d 676, 690 n.4 (D. Md. 2018) (rejecting argument that no price impact exists when a stock price fully rebounded after initial decline because a court need not "look so far beyond the identified corrective disclosure to" assess price impact, and finding "that a demonstration of price impact after the corrective disclosure, as the Supreme Court explained in *Halliburton II*, is sufficient."). Because Defendants do not rebut the *Basic* presumption of reliance, reliance is a question "common to all class members" and introduces no "questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

As Defendants advance no predominance argument aside from their failed rebuttal, and after careful examination of the record, the Court finds that the predominance requirement is satisfied.

Defendants also do not contest that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy," which requires consideration of: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). Class members would likely have little interest in prosecuting separate actions because each putative Class member's claims are probably insufficient to justify litigation's high risks and costs. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."). Second, there appears to be no other pending litigation brought on behalf of Mattel common stock investors seeking recovery for damages stemming from the alleged fraud at issue here. Third, concentrating the litigation in this Court would eliminate the risk of inconsistent adjudication and promote the fair and efficient use of the judicial system. Fourth, aside from issues discussed below that are cured by creation of the PwC subclass, no discernible management difficulties will prevent this case from proceeding as a class action. The superiority requirement is therefore satisfied.

### C. The PwC Subclass

PwC asks the Court to create a PwC subclass of investors who purchased Mattel stock between February 27, 2018 and August 8, 2019, arguing that the Class includes investors who lack standing to sue PwC and presents manageability issues because PwC made its first alleged misrepresentation on February 27, 2018, well after the Class Period's August 2, 2017 commencement. *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1071–72 (N.D. Cal. 2005) ("Under Federal Rule of Civil Procedure 23(c)(4)(B), a class may be divided into subclasses when appropriate. A court may certify subclasses after

initial class certification. A court may divide a class into subclasses on motion of either party, or *sua sponte.*") (citations omitted). Although Plaintiffs dispute PwC's standing argument, they do not and cannot argue that PwC is liable for shares purchased before PwC's alleged fraud. *Binder v. Gillespie*, 184 F.3d 1059, 1066–67 (9th Cir. 1999) ("As a matter of law, 'conduct actionable under Rule 10b-5 must occur before investors purchase the securities.'") (quoting *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1487 (9th Cir. 1991)). Considering the substantial time between the beginning of the Class Period and PwC's misrepresentations—and without convincing evidence of prejudice or confusion stemming from a subclass—the ample benefits of creating a PwC subclass seemingly outweigh possible inefficiencies. *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 624 (C.D. Cal. 2009) (creating subclasses to "help divide the issues[,]" "enhance manageability and avoid confusion"). Investors receiving notice, for example, will be better informed of their rights, potential recovery, and ability to opt out with respect to each defendant if the notice delineates between the Class and the PwC subclass. A PwC subclass avoids complications sure to arise if Mattel (but not PwC) is dismissed before trial. It averts similar avoidable difficulties—such as proper apportionment—the parties and the Court will encounter if Defendants settle or have a judgment entered against them. Finally, it prevents ambiguity at trial concerning the period for which PwC can be held liable. *In re Blech Sec. Litig.*, 187 F.R.D. 97, 105 (S.D.N.Y. 1999) (approving subclass, noting that "although a single overall scheme did exist, the proof of the scheme will relate to different methods and different periods" because one defendant did "not have any alleged or demonstrated participation in the overall scheme" until a later date). The Court can revise class definitions if the PwC subclass impairs manageability, but the current record suggests an opposite outcome is far more likely. *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 133 (S.D.N.Y. 2019) (exercising "broad discretion over class definition" and "flexibility to certify subclasses" to conclude "that a single class of shareholders . . . would be overbroad" and to "divide the proposed class into two sub-classes").

## IV.   CONCLUSION

The Motion is **GRANTED**.

The Court finds the following class appropriate for class certification: All persons and entities who purchased or otherwise acquired the common stock of Mattel, Inc. from August 2, 2017 to August 8, 2019, inclusive, and who were damaged thereby.

The Court further finds the following subclass (the "PwC Subclass") appropriate for class certification: All persons and entities who purchased or otherwise acquired the common stock of Mattel, Inc. from February 27, 2018 to August 8, 2019, inclusive, and who were damaged thereby.

Excluded from the Class and the PwC Subclass are (i) Defendants Mattel, Inc. ("Mattel"), Joseph J. Euteneuer, Margaret H. Georgiadis, Kevin Farr, PricewaterhouseCoopers ("PwC"), and Joshua Abrahams (together, "Defendants")); (ii) Mattel's and PwC's affiliates and subsidiaries; (iii) the officers and directors of Mattel and PwC and their subsidiaries and affiliates at all relevant times; (iv) members of the immediate family of any excluded person; (v) heirs, successors, and assigns of any excluded person or entity; and (vi) any entity in which any excluded person has or had a controlling interest.

Lead Plaintiffs New Orleans and DeKalb are appointed as Class Representatives. Bernstein is appointed as Class Counsel.

**IT IS SO ORDERED.**

Dated: October 6, 2021

_____

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

15