# Exhibit 12



ORIGINAL
FILED

MAR 0 9 2001

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| In re 3COM SECURITIES LITIGATION, | Master File No. C 97-21083 EAI |
|---|---|
| This Document Relates to:  ALL ACTIONS | CLASS ACTION |
| | ORDER AWARDING ATTORNEYS FEES AND REIMBURSEMENT OF EXPENSES |
| | [Regarding Docket No. 162] |

## I. INTRODUCTION

The settlement of this consolidated securities class action created an all-cash $259 million fund for distribution to the class members. Plaintiffs' counsel now seeks an award of attorneys fees in the amount of 25% of the common fund and reimbursement of expenses.[1] Notice was given to members of the class, both by direct mailing to 165,807 class members and by publication in *The Wall Street Journal*. The motion came on for hearing before the court on February 23, 2001. Having considered the moving papers submitted by plaintiffs' counsel, the supplemental papers submitted by plaintiffs' counsel in response to the court's January 29, 2001 order, the objection and

---

[1] Plaintiffs' counsel also filed a motion for approval of the settlement and a motion for approval of the plan of allocation of the settlement proceeds, and all three motions came on for hearing on February 23, 2001. The court approved the settlement and plan of allocation at the February 23 hearing and took the motion for attorneys fees and reimbursement of expenses under submission.

memorandum of points and authorities of class member John H. Morrow, and the arguments of counsel and Mr. Morrow at the hearing, and for good cause appearing, the motion for an award of attorneys fees and reimbursement of expenses is granted in part, as set forth below.

## II. BACKGROUND

This is a consolidated securities class action arising out of the merger between 3Com and U.S. Robotics ("USR") in June of 1997. The certified class includes all persons who purchased the common stock of 3Com on the open market from April 23, 1997 through November 5, 1997.[2] The core of plaintiffs' case was 3Com's failure to disclose USR's loss of $160.3 million in the two months preceding the June 1997 merger. There were also allegations that defendants had falsely reported the market demand for 56kbps (x2) modems.

There were substantial liability questions raised and strong defenses presented. It was by no means certain that plaintiffs would have established liability at trial or that any damages were caused by the alleged misrepresentations. Thus, there was a significant risk that plaintiffs could recover nothing at all. Assuming that liability was established, however, the estimates of recoverable damages ranged from $60-750 million.

The settlement was reached in an arms-length negotiation that spanned several sessions. It resulted in an all-cash, interest bearing, settlement fund in the amount of $259 million to be distributed to the class under the approved plan of allocation, after fees and expenses are deducted. Class counsel seeks an award of attorneys fees in the amount of 25% of the fund (nearly $65 million), plus reimbursement of expenses in the amount of $1,189,767.15, plus reimbursement of expenses to the two institutional lead plaintiffs in the amount of $38,461.09, plus interest.

## III. ANALYSIS AND DISCUSSION

A.   **Attorneys Fee Award**

The district court has the discretion to use either the percentage-of-the-fund or the

---

[2] The class excluded the defendants, members of the individual defendants' immediate families, any entity in which any defendant has or had a controlling interest, current and former directors and officers of 3Com and USR and members of their immediate families, and the legal representatives, heirs, successors or assigns of any such excluded person or entity. Additionally, the shares of 3Com common stock that were acquired by shareholders of USR in connection with the merger were also excluded from the class.

lodestar/multiplier method for determining an attorneys fee award in a common fund case. In re Washington Public Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1296 (9th Cir. 1994). "[N]o presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other." Id. However, when determining attorneys fees, a district court must ensure that the fee awards out of common funds be reasonable under the circumstances. Id. Regardless of which approach is used, the district court "must assume the role of fiduciary for the class plaintiffs" because "the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage." Washington Public Power, 19 F.3d at 1302. Every dollar awarded to the attorneys out of the settlement fund is a dollar removed from distribution to the class.

Under the lodestar/multiplier method, the court first calculates a lodestar figure representing the number of hours reasonably incurred in the action multiplied by a reasonable hourly rate. After conducting a searching inquiry of the reasonableness of the hours expended and determining that the claimed rates are reasonable within the appropriate legal community, the court may then consider a variety of factors to establish the appropriate multiplier to apply to the lodestar in order to arrive at an enhanced, or decreased, award. The factors that may be relevant to a lodestar/multiplier analysis include: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the requisite legal skill necessary; 4) the preclusion of other employment due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) the time limitations imposed by the client or circumstances; 8) the amount in controversy and the result obtained; 9) the experience, reputation and ability of the attorneys; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. Kerr v. Screen Extras Guild, 526 F.2d 67, 70 (9th Cir. 1975), cert. denied, 425 U.S. 951 (1976).

Under the percentage of the fund method, by contrast, "the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th Cir. 1998). "This approach allow[s] for the cost of litigation to be spread proportionately among each of the beneficiaries, prevent[s] unjust enrichment by class counsel at the expense of the class, and yet provide[s] an incentive to the bar to pursue cases where the prospect of compensation is uncertain and remote in time." In re NASDAQ Market-Makers

Antitrust Litigation, 187 F.R.D. 465, 483 (S.D.N.Y. 1998).

The trend in common fund cases has been to move away from the lodestar/multiplier approach and towards the percentage of the fund method. See In re NASDAQ Market-Makers Antitrust Litigation, 187 F.R.D. 465, 483-85 (S.D.N.Y. 1998) (tracing the history of attorney fee awards in common fund cases). Courts and commentators have recognized the drawbacks imposed by the lodestar method. Among other things, the lodestar method increases the workload of an already overtaxed judicial system, encourages inefficiency and protracted law and motion practice and otherwise unjustified legal work, creates a disincentive for early settlement, and creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law. See Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 246-49 (1986); accord; In re Activision Securities Litigation, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989); NASDAQ, 187 F.R.D. at 485. "The advantages of the percentage of the fund method over the lodestar method include ease of administration, permitting the judge to focus on 'a showing that the fund conferring a benefit on the class resulted from the lawyers' efforts' rather than collateral disputes over billing. This better respects the Supreme Court's admonition that '[a] request for attorney's fees should not result in a second major litigation.'" NASDAQ, 187 F.R.D. at 485 (citations omitted).

The percentage-of-the-fund method is the superior method for awarding attorneys fees in common fund cases. Accordingly, the court will exercise its discretion to award attorneys fees under the percentage-of-the-fund method in this case. The question remains, however, what percentage is appropriate under the circumstances. In the Ninth Circuit, the benchmark for a percentage award of attorneys fees is 25% of the settlement fund. Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 273 (9th cir. 1989); Powers v. Eichen, 229 F.3d 1249, 1256 (9th Cir. 2000). This benchmark may be adjusted "upward or downward to fit the individual circumstances of [the] case. Such an adjustment, however, must be accompanied by a reasonable explanation of why the benchmark is unreasonable under the circumstances." Graulty, 886 F.2d at 273. Circumstances warranting adjustment of the benchmark include situations where the percentage of the recovery would be too large or too small in light of the hours devoted to the case or other relevant factors. Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990).

4

Adjustment may also be warranted where the shear size of the settlement fund may make a benchmark percentage award unreasonable. "Reasonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion. A 25% benchmark might be reasonable in some cases, but arbitrary if the fund were extremely large." In re Coordinated Pretrial Proceedings In Petroleum Products Antitrust Litigation, 109 F.3d 602, 607 (9th Cir. 1997). There is no necessary correlation between a particular percentage and a reasonable fee, and particularly where the fund is large, "picking a percentage without reference to all the circumstances, including the size of the fund, would be like picking a number out of the air." WPPSS, 19 F.3d at 1297. Thus, while 25% is the benchmark, the court cannot award 25% as a matter of course. Instead, because the court assumes the role of fiduciary for the class at the fee setting stage, the court must carefully consider all of the relevant factors and circumstances in order to ensure that a the fee awarded is reasonable under the circumstances.

1.    The Percentage Method

In this case, the benchmark 25% sought by plaintiffs' counsel would result in a fee award of $64,750,000. The objector argues that the fee award should be much smaller, in the 6-10% range, primarily because the benchmark percentage is simply too high where the settlement fund is so large. Because of the large size of the settlement—which may be in part due to the large size of the class—a 25% benchmark percentage award results in an astoundingly high legal fee.

Both the objector and plaintiffs' counsel have cited legal authorities to justify their respective arguments that an appropriate fee under the circumstances should be either 6-10% or 25%, respectively. The authorities cited by plaintiffs' counsel involving cases where the settlement funds are greater than $75 million reflect attorney fee awards ranging from 14-37%. The cases cited by the objector suggest that in such megafund situations, the attorney fee awards are typically in the 6-10% range. The rationale for the lower percentage in larger fund cases may in part be explained by economies of scale, recognizing that it generally is not 150 times more difficult to prepare, try, or settle a $150 million case than it is to prepare, try or settle a $1 million case. The plethora of legal authorities cited, however, serves more to confirm the court's wide discretion in this area than to establish a guiding rule for decision.

5

The court has considered all of the circumstances of the litigation and the resulting settlement, including the risks of the litigation, the strengths and weaknesses of plaintiffs' case, the substantial result obtained by counsel, the skill of counsel, the arms length nature of the settlement, the predominant response of the class members to the settlement (no objection) and to the proposed fee (one objection), the contingent nature of the case, and the financial burden carried by counsel during the litigation. All of these factors justify a substantial attorneys fee award. When the size of the settlement is also considered, however, along with the hours expended by counsel, a 25% award amounting to nearly $65 million may be unreasonable. The Ninth Circuit has cautioned that the benchmark 25% award may be unreasonable where the settlement fund is extremely large. Petroleum Products,109 F.3d at 607. This is such a case. The court finds that while 25% is unreasonable under the circumstances, an 18% award would be both reasonable and appropriate.

2.      The Lodestar Cross-Check

As a further check on the reasonableness of the fee award, the court considers a thumbnail lodestar analysis in order to ensure that the percentage awarded is reasonable under the circumstances. See In re Coordinated Pretrial Proceedings In Petroleum Products Antitrust Litigation, 109 F.3d 602, 607 (9th Cir. 1997) (it is reasonable for the court to compare the lodestar fee to the 25% benchmark as one measure of the reasonableness of the fee); Brooktree, 915 F. Supp. at 199-200; Van Vranken v. Atlantic Richfield Co., 901 F. Supp. 294, 298 (N.D. Cal. 1995).

In response to the court's January 29, 2001 order, plaintiffs' counsel submitted additional information identifying the attorneys and paralegals who performed work on the litigation and summarizing the number of hours worked by each and their associated hourly rates. The time expended on the litigation by counsel and professional staff amounted to 21,651.06 hours.[3]  At their ordinary billing rates, the resulting lodestar is $6,987,729.10.

Under the lodestar approach, courts consider a series of factors and then adopt a multiplier to

---

[3] Thirty law firms participated on behalf of the plaintiffs and 278 legal professionals performed services in the course of the representation. On a per-firm basis, the hours ranged from 12 to 5,292 total hours; on a per-attorney basis, the hours ranged from .1 to 2,016.75. The billing rates for attorneys ranged from $190-535 per hour, and the mean hourly rate was $362.50. The hourly rate for professional staff ranged from $25-180, and the mean rate was $102.50. Overall, the blended rate, calculated by dividing the total lodestar by the total number of hours is $322.74 per hour.

apply to the lodestar figure to determine the ultimate fee to be awarded. The requested fee in this case reflects a multiplier of approximately 9.27, which, while not unprecedented, is at the higher end of the scale. See Van Vranken, 901 F. Supp. at 298 (noting that multipliers in the 3-4 range are common in lengthy and complex class action litigation). Thus, the lodestar cross-check is an indication that the 25% benchmark sought by counsel is too high under all of the circumstances. However, the same lodestar cross-check demonstrates that an award of 18%—reflecting a multiplier of 6.7—is more reasonable. While still a high multiplier, the overall circumstances of this case, particularly the risks of the litigation and the superb results achieved by class counsel in settlement, justify a multiplier greater than the common range.

### a. The Results Obtained

The result achieved is a significant factor to consider in making a fee award. Hensley v. Eckerhart, 461 U.S. 424, 436 (1983) (the most critical factor is the degree of success obtained). In the present action, the settlement is an extraordinary result for the members of the class. The damage estimates ranged from $60-$750 million, assuming liability was established, but the risk of a zero recovery was not insignificant. Thus, the $259 million all-cash settlement allows the class members to recover a substantial amount of the damages that they would recover if successful at trial. Additionally, the settlement appears to be the third largest recovery ever obtained in a securities class action, and it is the largest settlement in the Ninth Circuit since the enactment of the Private Securities Litigation Reform Act of 1995. Thus, this factor weighs in favor of a substantial award of fees, and under the lodestar analysis, would command a high multiplier.

### b. Risks of Litigation

The risk of the litigation is also an important factor to consider in determining an appropriate fee award. WPPSS, 19 F.3d at 1299-1301. In this case, there were substantial risks that plaintiffs would be unable to establish liability, loss causation or damages.

### 1) The Liability Risks

In order to prevail in this securities fraud action, plaintiffs would have had to prove that the defendants made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not

7

misleading. 15 U.S.C. § 78u-4(b)(1). Plaintiffs would also have had to establish that defendants acted with scienter, which in the context of securities fraud, is a "mental state embracing intent to deceive, manipulate, or defraud." See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12, 96 S. Ct. 1375, 1381 n.12, 47 L.Ed.2d 668 (1976). There was a significant risk that plaintiffs would have been unable to prove scienter.

First, defendants vigorously contested liability throughout the litigation and appeared to be prepared to defend on the basis that their merger accounting fully complied with SEC regulations setting forth the procedure to follow for combining fiscal periods when the two companies being merged had different, non-contiguous fiscal years. Moreover, according to defendants, the decision not to include USR's April and May results in 3Com's financial statements was approved by 3Com's auditors and had been made long before USR's April and May 1997 results were known.

Plaintiffs also faced substantial risks with respect to the alleged accounting improprieties that occurred during USR's March Quarter, in particular with respect to USR's pre-merger revenue recognition practices. USR's auditors had approved a number of the practices which plaintiffs alleged were improper, and after the merger, 3Com's auditors concluded that any accounting errors that occurred during the March Quarter were not material when measured by the combined results of 3Com and USR. Thus, at trial, 3Com would have argued that it was entitled to rely on the advice of its independent auditors that the USR March Quarter results did not need to be restated. Defendants also appear to have been prepared to defend each of the challenged transactions on a case-by-case basis, which would have required plaintiffs to overcome serious obstacles to establish that each defendant had knowledge of each of the particular transactions. Thus, there was a significant risk that a jury could determine that the 3Com merger accounting complied with Generally Accepted Accounting Principles and that the defendants were entitled to rely on the advice of their accountants when making these accounting decisions.

Finally, plaintiffs faced substantial challenges to establish liability on their allegations that defendants had misrepresented the demand for and sales of one of their key products, the 56kbps (x2) modem. While plaintiffs alleged that defendants had "stuffed the channel" with x2 modems during the March Quarter, defendants forcefully argued that stuffing the channel was USR's regular

business practice and was the strategy USR had used to become the world's dominant modem manufacturer.

The risks of failing to establish liability, and in particular that the defendants acted with the requisite scienter, were significant.

2)      Loss Causation and Damages Risks

Even if plaintiffs were to prevail and establish liability, plaintiffs nevertheless faced significant risks relating to their ability to establish damages, materiality and loss causation. First, there was a substantial chance that plaintiffs would not be able to recover for the non-disclosure of the $160 million loss that formed the core of plaintiffs' case. Defendants contended that the April and May loss was disclosed in a September 1997 conference call, following the release of 3Com's quarterly results. However, there was no statistically significant decline in the price of 3Com stock following the conference call. The $160 million loss was also disclosed on October 14, 1997 upon the filing of 3Com's Form 10-Q, followed less than a week later by articles in the *San Francisco Chronicle* and *The New York Times* reporting on the defendants had engaged in "accounting alchemy" and had manipulated USR's financial results by stuffing the channel with inventory. Once again, however, there was no statistically significant decline in the price of 3Com stock after these disclosures; to the contrary, the price of 3Com stock actually increased following the publication of one of the articles. Thus, there was a substantial risk that a jury could find that USR's April and May 1997 results were not material to 3Com's investors and that the failure to disclose the $160 million loss did not cause any damages.

There were also substantial questions raised regarding the extent to which modem sales had declined during the class period. There was evidence that modem sales did not decline until late in the class period, in October 1997, after a standard for the 56kbps technology unexpectedly failed to be set in late September. Thus, defendants could have presented strong defensive arguments at trial.

Finally, to the extent there was a decline in the price of 3Com stock towards the end of the class period, there were substantial questions raised regarding what portion of the overall stock decline was attributable to the alleged fraud rather than to general market conditions that existed, including the Asian economic crisis, increased competition from others, and the lack of an industry

9

standard.

Thus, there was a very real and substantial risk that plaintiffs would not prevail at trial, in which case plaintiffs would have recovered nothing and counsel would not receive any compensation for their services. Nonetheless, counsel successfully negotiated a substantial favorable settlement for the class, meriting an award of significant attorneys fees.

Taken together, the results achieved in view of the risks associated with the litigation justify a lodestar multiplier of between 6 and 7. In this case, that multiplier would result in fees in the range of $42-49 million.

### 3. The Fee Award

Having considered all of the foregoing, the court is persuaded that the 25% benchmark is unreasonable under the circumstances and that a lower percentage should be awarded. Considering the outstanding results achieved, however, the court is not inclined to award a percentage fee as low as that suggested by the objector. Instead, under the totality of the circumstances and mindful of its role as fiduciary guardian of the interests of the class, the court finds that a reasonable and appropriate fee is 18% of the fund, or $46,620,000. An 18% award is also reasonable in consideration of the lodestar, reflecting a multiplier of 6.67. This multiplier is admittedly higher than the typical range, but it would be appropriate here where counsel's efforts have achieved extraordinary results for the class at considerable risk.

The downward departure from the benchmark should not be read or understood to imply any criticism of plaintiffs' counsel, nor should a percentage award below the benchmark be considered as punishment rather than as reward to counsel. To the contrary, counsel's representation was excellent, and as discussed above, the results they achieved were substantial and extraordinary. Counsel deserves to be amply rewarded. However, after carefully weighing the relevant factors in the court's capacity as fiduciary for the class members, the court finds that an award of $46,620,000 reasonable and appropriate.

### B. Reimbursement of Expenses

#### 1. Costs and Expenses Actually Incurred by Plaintiffs' Counsel

Plaintiffs' counsel also seeks reimbursement of the expenses incurred in an aggregate amount

of $1,189,767.15. It is appropriate to reimburse counsel for reasonable expenses that were incurred in the course of representing the class, provided that the expenses are of a type that ordinarily would be billed by attorneys to paying clients. Harris v. Marhoefer, 24 F.3d 16, 19 (9th Cir. 1994). Counsel has submitted declarations from each of the law firms identifying the expenses and attesting that the expenses were actually incurred. The court has reviewed the declarations and finds that the expenses should be reimbursed in full out of the settlement fund.

2.      Costs and Expenses of Lead Plaintiffs

The lead institutional plaintiffs, the Louisiana School Employees Retirement System ("LSERS") and the Louisiana Municipal Police Employees Retirement System ("LMPERS"), have also submitted a request for reimbursement of expenses under 15 U.S.C. §78u-4(a)(4). That section of the PSLRA allows for representative parties to be awarded reimbursement of their reasonable costs and expenses, including lost wages, that were directly related to the representation of the class. Specifically, LMPERS and LSERS seek an award of $38,461.09, of which $10,161.09 constitutes litigation related travel expenses of their General Counsel, Mr. Roche, and $28,300 constitutes that portion of Mr. Roche's salary corresponding to the time he spent on matters associated with the litigation. Roche Decl. ¶ 3, 5. The lead plaintiffs characterize the salary reimbursement as "lost wages" that are recoverable under the act, but cite no case law in support of their interpretation.

The court has not discovered any case law construing "lost wages" as used in the statute. However, the plain meaning of the statutory phrase connotes income that was lost or foregone as a direct result of attending to the litigation as a representative party. The phrase does not embrace reimbursement of salary that would have been paid anyway, regardless of the nature of the work performed by Mr. Roche on behalf of his employers. Thus, the statute does not authorize the partial reimbursement of in-house counsel's salary.

Therefore, the court will award to LMPERS and LSERS only the $10,161.09 in out-of-pocket expenses and will disallow the $28,300 in claimed wages.

3.      Expenses of Objector John Morrow

Finally, the court considers the reimbursement of the expenses incurred by the objector, Mr. Morrow. Mr. Morrow himself has not affirmatively sought reimbursement of his expenses or an

11

award of fees for his participation. The court, however, raised the issue <u>sua sponte</u> at the February 23, 2001 hearing and authorized Mr. Morrow to submit a declaration to substantiate the expenses he incurred. Mr. Morrow's declaration establishes that he incurred $1,339.63 in expenses in connection with objecting to the motion for attorneys fees, primarily for traveling to San Jose, California to attend the hearing. The expenses are reasonable and are approved.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT:

1.  The court hereby awards Representative Plaintiffs' Counsel attorneys' fees of 18% of the settlement fund and reimbursement of litigation expenses in the amount of $1,189,767.15, together with interest earned thereon for the same time period and at the same rate as that earned on the settlement fund until paid. Said fees and expenses shall be allocated among the Representative Plaintiffs' Counsel in a manner which, in Plaintiffs' Lead Counsel's good faith judgment, reflects each such Representative Plaintiff's Counsel's contribution toward the institution, prosecution, and resolution of the litigation. The awarded attorneys' fees and expenses shall be paid to Plaintiffs' Lead Counsel immediately after the date this Order is executed subject to the terms, conditions, and obligations of the Stipulation of Settlement, and in particular, ¶7.2 thereof, which terms, conditions and obligations are incorporated herein.

2.  The court finds that an award of attorneys' fees of 18% of the Settlement Fund is fair and reasonable under the percentage-of-the-fund method. The settlement was obtained largely through the efforts of plaintiffs' counsel. Plaintiffs' counsel diligently prosecuted this litigation for approximately three years with a substantial risk of no recovery for the class, and obtained an excellent result. Representative Plaintiffs' counsel have received no compensation during the three years of the litigation, and any fee award has always been at risk and completely contingent on the result achieved. The litigation was complex, and involved substantial issues of law, including the uncertain interpretation and application of the Private Securities Litigation Reform Act of 1995. Additionally, the litigation presented difficult questions of proof on issues including liability, materiality, loss causation, and damages.

3.  Objector Morrow is awarded $1,339,63, to be paid out of the settlement fund to

reimburse him for the reasonable costs and expenses he incurred in objecting to the motion for an award of attorneys fees.

4.	LMPERS and LSERS, the two institutional lead plaintiffs, are awarded $10,161.09, to be paid out of the settlement fund, to reimburse them for the reasonable costs and expenses they incurred in representing the class.

Lead counsel for the plaintiffs shall serve a copy of this order on counsel of record for the parties.

IT IS SO ORDERED.

DATED: MAR 0 9 2001

EDWARD A. INFANTE

Edward A. Infante
United States Magistrate Judge

13

Copy of Order Mailed on ___MAR 0 9 2001___ .

**Counsel for Plaintiff:**

Milberg Weiss Bershad Hynes & Lerach LLP
William S. Lerach
Keith F. Park
600 West Broadway, Suite 1800
San Diego, CA 92101

Milberg Weiss Bershad Hynes & Lerach LLP
Patrick J. Coughlin
100 Pine Street, Suite 2600
San Francisco, CA 94111

Bernstein Litowitz Berger & Grossman LLP
Max W. Berger
1285 Avenue of the Americas, 33rd Floor
New York, NY 10019

Barrack, Rodos & Bacine
Edward M. Gergosian
402 West Broadway, Suite 850
San Diego, CA 92101

Kaplan Kilsheimer & Fox LLP
Robert N. Kaplan
805 Third Avenue, 22nd Floor
New York, NY 10022

Kaplan Kilsheimer & Fox LLP
Laurence D. King
100 Pine Street, Suite 2600
San Francisco, CA 94111

**Counsel for Defendant**
Wilson Sonsini Goodrich & Rosati PC
Boris Feldman
650 Page Mill Road
Palo Alto, CA 94304

**Objector**
John H. Morrow
Bradley Arant Rose & White LLP
2001 Park Place, Suite 1400
Birmingham, AL 35203-2736

14