UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MARK C. SCARSI, U.S. DISTRICT JUDGE

*In re Mattel, Inc. Securities* )
*Litigation* )
) CASE NO.
) 19-CV-10860-MCS
)
)
)
)
)
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MONDAY, MAY 2, 2022

9:10 A.M.

LOS ANGELES, CALIFORNIA

_____

MAREA WOOLRICH, CSR 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA 90012
mareawoolrich@aol.com

**UNITED STATES DISTRICT COURT**

2

**APPEARANCES OF COUNSEL:**


**FOR PLAINTIFFS:**

    BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
    By:  Jonathan D. Uslaner
    By:  Laura Cruz
    2121 Avenue of the Stars
    Los Angeles, CA 90067
    Telephone: (310) 819-3470

    BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
    By:  John Rizio-Hamilton (pro hac vice)
    1251 Avenue of the Americas
    New York, NY 10020
    Telephone: (212) 554-1400

**FOR DEFENDANT PRICEWATERHOUSECOOPERS:**

    WILMER CUTLER PICKERING HALE & DORR LLP
    By:  Timothy J. Perla (pro hac vice)
    60 State Street
    Boston, MA 02109
    Telephone:  (617) 526-6000

    WILMER CUTLER PICKERING HALE & DORR LLP
    By:  Joshua Vittor
    350 South Grand Avenue, Suite 2400
    Los Angeles, CA 90071
    Telephone:  (213) 443-5300

**FOR DEFENDANT JOSHUA ABRAHAMS:**

    PAUL HASTINGS LLP
    By:  Thomas A. Zaccaro
    515 South Flower Street
    Twenty-Fifth Floor
    Los Angeles, CA 90071-2228
    Telephone: (213) 683-6000

**FOR DEFENDANT MATTEL:**

    MUNGER TOLLES & OLSON LLP
    By:  Lauren Barnett
    By:  Brian Boessenecker
    350 South Grand Avenue, 50th Floor
    Los Angeles, CA 90071-3426
    Telephone:  (213) 683-9100


**UNITED STATES DISTRICT COURT**

3

LOS ANGELES, CALIFORNIA; MONDAY, MAY 2, 2022

9:10 A.M.

-oOo-

THE COURTROOM DEPUTY:  Calling Item No. 2, CV 19-10860, in re Mattel Inc. Securities Litigation.

Counsel, state your appearances, please.

MR. RIZIO-HAMILTON:  Good morning, Your Honor. John Rizio-Hamilton, Bernstein Litowitz Berger & Grossman, for lead plaintiffs in the class.  With me today are my colleagues Jon Uslaner and Lauren Cruz.

THE COURT:  Good morning.

MR. USLANER:  Good morning, Your Honor.

MR. PERLA:  Good morning, Your Honor.  Timothy Perla for PricewaterhouseCoopers, and with me is Joshua Vittor.

MR. VITTOR:  Good morning, Your Honor.

THE COURT:  Good morning.

Okay.  Let me ask you, were there any untimely requests for exclusion from the class or objections to the settlement?

THE COURTROOM DEPUTY:  There are additional --

THE COURT:  Oh, sorry about that.  Please.

MR. ZACCARO:  Your Honor, Thomas Zaccaro for Defendant Joshua Abrahams.

MS. BARNETT:  Good morning, Your Honor.  Lauren

**UNITED STATES DISTRICT COURT**

Barnett along with my colleague Brian Boessenecker for the Mattel defendants.

THE COURT:  Good morning.

Okay.  Any untimely requests for exclusion from the class or objections to the settlement?

MR. RIZIO-HAMILTON:  No, Your Honor.

THE COURT:  Any objectors present today?

Okay.  Let me ask class counsel.  Your request for attorneys' fees, I know it's 25 percent of the settlement, but it represents a 2.7 times multiplier of the lodestar calculation.  Why is this significant upward deviation from the lodestar reasonable in this case?

MR. RIZIO-HAMILTON:  For a few reasons, Your Honor.

First of all, the request itself is for a benchmark request on a percentage basis, and the lodestar operates as a cross-check.  So in that regard, the starting point of the analysis I think shows that the request is ordinary in the sense that it comports with the benchmark.  And if anything, it's a touch less because we are requesting the 25 percent on the settlement amount net of litigation expenses.  That's big picture point one.

Big picture point two is that the lodestar cross-check, you are correct, does yield a 2.7 multiplier, but that is in the middle range of the band of multipliers that the Ninth Circuit has recognized as commonly awarded in these

cases.

The *Vizcaino* case, for instance, tells us that typically multipliers between 1 and 4 are awarded in cases such as this one, and we are right in that middle band between 2 and 3 within the commonly accepted multiplier range.

Third, Your Honor, it does comport with multipliers awarded in other similarly sized securities class action settlements within the circuit.  In that regard, I would point to the *Vizcaino* case again where there was a settlement of $97 million and the fee award was 28 percent, and it represented a 3.65 multiplier that was affirmed by the Ninth Circuit.

In addition, in the *Brocade Securities Litigation* case in the Northern District of California, there was a 25 percent award net of litigation expenses on a $160 million settlement that represented a 3.5 multiplier.  The multiplier number is set forth not in the fee order but rather in counsel's brief at ECF No. 486, page 23.

In addition, in the *Rectifier* case from this district, there was a 25 percent settlement, again, net of litigation; 25 percent fee granted, again, net of litigation expenses on a $90 million settlement.  The order doesn't include the multiplier, but counsel's papers indicate and state that it was 2.4.

So we think it's consistent not only with the

benchmark request and the midrange of the commonly awarded multipliers in the circuit but also it's consistent with precedent in those particular cases.

In addition, we think that the multiplier is justified by the quality of the result achieved here.  This is a case where we achieved recovery of approximately 18 percent of our absolute maximum damages and 31 percent of our damages on a disaggregated basis.  Judged against either benchmark, that percentage recovery meaningfully exceeds what's typically recovered in securities class action litigation.

In addition, Your Honor, we were able to obtain that recovery in a case of significant complexity and risk.  This is a case that's centered on the accounting treatment of a valuation allowance on deferred tax asset.  It's not the kind of case where it was a brazen or obvious alleged fraud.  The company was not making up sales or booking phantom revenue. This case centered on a subject that was highly technical and esoteric and one that doesn't easily lend itself to a fraud claim.

And in addition to that complexity, there were meaningful risks we faced with respect to scienter, loss causation, and damages.  Those were detailed in our papers, and I'm happy to recount them here.  But I think it's fair to say that the risks were real and they could have materialized at any time, not just on a motion to dismiss early in the case but

later at summary judgment, at trial, or even on appeal.

And had they materialized at of any those points in time, the class could have recovered nothing and certainly less than the settlement amount.  And in the face of that risk and that complexity, we litigated the case for over two years, and we invested significant time and expenses into the case.

We dedicated almost 19,000 hours to the case.  We invested over $1.1 million of expenses into the case, most of which was for the payment of expert fees that were necessary and that demonstrated we were willing to invest whatever we needed to in this case to compete with a very well-funded opposition.  And we made that investment over the course of two years without any payment whatsoever and the in the case of complexity and risk that were inherent in the case.

In addition, we were able to achieve a recovery that exceeds what's typical in securities class actions.  Not only in a case that was complex and risky but also in a case where the defense group was represented by some of the finest lawyers in the country.  We are talking about Munger Tolles, WilmerHale, Paul Hastings.  That's an A Team over there of securities class action defense litigators, and I think the quality of the opposition is something that the Court should also consider when evaluating the fee request in addition to the quality of the result, the risk of the case, and whether the fee request comports with law on a percentage basis and a

multiplier basis which we respectfully submit that it does.

The fee request has also been endorsed by the lead plaintiffs who were two institutional investors, precisely the sort that Congress intended to lead these actions.  And importantly, Your Honor, it wasn't just at the beginning of the litigation that they endorsed the fee request.  They did.  We entered into written retainers with them pursuant to which this request was made.

But at the end of the case, after the settlement had been agreed to, they reviewed the results and compared it to the typical recovery in a securities class action and they reviewed the quality and amount of work that we did and they, again, endorsed the fee request that we are making to Your Honor here today.

And finally I would say the reaction of the class to the fee request has been very favorable, and that's another factor that supports the request.  The claims administrator disseminated over 194,000 copies of the notice.  And importantly, in response to that, no institutional objector -- no institutional investor has objected to the fee request.  And that's really meaningful because Mattel common stock was widely held by institutions.  It's hard to get the exact precise figure, but it's fair to say the vast majority of Mattel common stock was held by institutions.

These are investors who have the sophistication, the

incentive given the amounts at stake for them, and the resources to object if they find anything unreasonable about a fee request.  And not one of them has objected to this fee request.

We did receive an objection from one investor, an individual, Mr. Hayes.  We respectfully submit that objection is without merit.  He has not provided any reason why he claims the fee request is supposedly excessive, and we respectfully submit it is not.

He does recycle certain arguments that he makes with respect to the plan of allocation in support of his objection that the fee request is excessive.  But those arguments, as set forth in our papers, don't even provide any basis to conclude that the plan of allocation is unreasonable, and they certainly provide no reason to conclude that the fee request is unreasonable.

So for all those reasons, Your Honor, this is a request that we think is fair and reasonable under the law, fair and reasonable under the particular circumstances of this case, consistent with the benchmark on a percentage basis and the midrange of multipliers commonly awarded.  And we respectfully request that the Court grant it.

I'm happy to answer any questions or provide more detail on those reasons.

THE COURT:  Well, let me just ask you about a few

factual matters.  One, in looking over some of the billing rates, I'm just wondering about whether you've got anything to support the reasonableness of these rates.

You are charging a rate of $275 an hour for a summer associate.  Why isn't that excessive?

MR. RIZIO-HAMILTON:  Well -- so which associate are you referring to?

THE COURT:  You know, I don't have that information with me, but I know that's the rate for summer associates, I believe, in your bills.

MR. RIZIO-HAMILTON:  I don't think we had any summer associates on the case.  I'm just looking at our lodestar chart.  Our rates -- I don't think we had any summer associates on the case at all, no.

THE COURT:  Okay.  There's also rates in the range of $300 to $425 for non-attorney litigation staff.

MR. RIZIO-HAMILTON:  Yeah.

THE COURT:  Why aren't those high?

MR. RIZIO-HAMILTON:  So a couple of points here on the rates, Your Honor.  So first, these rates have been repeatedly accepted by Courts in connection with the applications that our firm has made including in this district in the *Merit Medical Systems* case, for example, and in districts across the country, including in the *Cognizant Securities Litigation* case out of the Southern -- out of the

UNITED STATES DISTRICT COURT

District of New Jersey; *Baxter International*, the Northern District of Illinois; and *CenturyLink* out of the District of Minnesota; and *Willis Towers Watson* in the Eastern District of Virginia.

So in connection with our fee applications and in performing lodestar cross-checks, Courts have repeatedly relied upon these rates and found them to be reasonable.

They are also consistent with rates of attorneys working on comparable class action cases in this district and others. For example, in the *Hope Medical Enterprises* case out of this district, the Court found that rates of about $900 to $1,300 per hour for partners and counsel and $565 and $985 an hour for associates to be reasonable. Those are higher than ours.

The same thing with the *Volkswagen Clean Diesel* litigation in the Northern District California where the Court found hourly rates were substantially higher that ours to be reasonable including a rate of up to $490 for non-lawyer paralegals. So that's another example.

I would also say, Your Honor, that these rates are consistent with rates charged by other firms litigating in the area of national securities litigation including the defense counsel firms that we faced in this case. You know, we know that because we look at bankruptcy fee applications that they submit. And I can give you detail on it. But suffice it to

say that the rates that they have submitted to bankruptcy courts are meaningful higher than the rates we submit here.

On the question of non-lawyer paralegals, for instance, Munger Tolles -- and I don't mean to single them out -- have submitted rates of between $405 and $490 in 2020 for paralegals in the *PG&E* bankruptcy case out of the Northern District of California, and there are other examples of that I can give.

But the bottom line is that our rates are the same as or lower than rates that have been submitted by the firms we are litigating against and that have been accepted by Courts in this district and others for the purposes of performing lodestar cross-checks and securities litigation.

We set our rates periodically based on a survey of other plaintiffs' firms and national defense firms that we litigate against in these cases. So it's not something we pluck out of the air. It's based on an annual or semiannual rate survey that we conduct.

And that's really the gist of it on the rates, Your Honor.

THE COURT: The summer associate rate came from Block & --

MR. RIZIO-HAMILTON: Block & Leviton, okay, yeah.

THE COURT: So that's a firm you were using --

MR. RIZIO-HAMILTON: Yeah, that's a firm that we

were working with on the case.

The last point I will make on the rates is that overall, when you look at the blended hourly rate, it's $486 per hour on a full blended basis.  And we submit that for the extent and quality of work that we've performed, that is a reasonable hourly rate for the case as a whole.

THE COURT:  In the discussion we had earlier, you were talking about a case from this district that you said worked out to a 2.5 multiplier.  Can you give me the name of that case again?

MR. RIZIO-HAMILTON:  Sure.  It is the *in re International Rectifier Corp. Securities Litigation*.  The case number is 07-CV-02544.  That's a 2010 fee order from the Central District of California.  And it's ECF No. 316 is the slip opinion awarding 25 percent of a $90 million settlement.

The order itself does not include the multiplier, but counsel's papers submitted in support of the fee application states that it was 2.4.

THE COURT:  Okay.

MR. RIZIO-HAMILTON:  And the *Brocade* case the multiplier was 3.5, and in the *Vizcaino* case from the Ninth Circuit, 290 F.3d 1043 at page 1051, the multiplier was 3.65.  And that's a helpful case because it does say that the commonly awarded range of multipliers is 1 to 4.  And as I mentioned, we are right in the middle of the midrange band of that range.

**UNITED STATES DISTRICT COURT**

14

THE COURT:  If the Court was inclined to take your rates as they've been presented and apply a 1.5 multiple, I guess you would argue that that's too low based on the cases that you cite; correct?

MR. RIZIO-HAMILTON:  I would argue that that's too low under the law.  I would argue that it results in a fee award that's below the benchmark fee award, and I would respectfully submit that that's not appropriate for a case like this one where we achieved a recovery that's meaningfully greater than what is typically achieved in these cases.

You know, if we had come in here and asking for something more than the benchmark on a percentage basis which is where the analysis begins, I could understand that.  But what we're -- but we achieved a result that is outsized when compared to what's commonly achieved in these cases, and we are only asking for the benchmark fee, and I -- you know, I think that that's fair and reasonable under the circumstances.

And I think the absence of any meaningful objection to that, Mr. Hayes aside, is further proof of the reasonableness of the request.

And it's confirmed by the multipliers that are -- that are typically awarded in these circumstances understand the law.  And that's even in an average case.  In an average recovery -- and this is an above average recovery.  In an average recovery, you know, we'd be talking about multiplier in

**UNITED STATES DISTRICT COURT**

15

the low range of the band between 1 and 2.

If we had gotten a below average recovery and Your Honor was saying, you know, I'm going to give you a multiplier because I understand the risk inherent in the business, but I'm not -- but I'm going to give you the low end of the range, that low band between 1 and 2, that I would understand.  This is not a below average recovery.  It's not an average recovery.  It's an above average recovery.

THE COURT:  What can you tell me about the law here with respect to the Court's discretion?  You'll agree the Court has wide discretion here; right?

MR. RIZIO-HAMILTON:  I agree the Court does have discretion.

THE COURT:  What's the boundaries of abuse of discretion?  What are the standards there?

MR. RIZIO-HAMILTON:  Well, I don't think there's any clearly set boundary for abuse of discretion.  There's no, you know, numerical foul lines.

I think Your Honor has to look at all the facts and circumstances before you and, you know, exercise your discretion in the way that you think is appropriate.  But in doing that, I would really ask you to consider the quality of the result we achieved which is outsized, the fact that the case was meaningfully complex.  This was not -- again, this was not a case where they are, you know, booking phantom revenue.

16

This is a case about a valuation allowance for a deferred tax asset.

I would ask you to consider, you know, the other very serious risks we faced on scienter, loss causation, and damages which could have materialized at any point in the litigation, the amount of time and work and the quality of the work that we put into the case for two-plus years without any payment, and the law which sets forth a benchmark that we are -- and we are asking only for that and not a penny more.

THE COURT:  I do remember the loss causation briefing.  It was a lot of fun to chew through.

Thanks, guys.  I do appreciate all the arguments.  As you understand, I'm just trying to do the best thing for the class which is why I'm focusing on the attorney award, and I'll give that a little bit more thought based on the arguments here today.

MR. RIZIO-HAMILTON:  Thank you very much.

THE COURT:  So the Court will approve the settlement.  We'll issue an order.  And, you know, the attorneys' fees may not be the 2.7 multiple.  So we'll see.

Anybody on this side of the table have anything to say about the issues we've been discussing?

MR. PERLA:  Not PWC.  Thank you.

MR. ZACCARO:  No, Your Honor.

MS. BARNETT:  No, Your Honor.  Thank you.

UNITED STATES DISTRICT COURT

THE COURT:  Anything else we need to discuss this morning?

MR. RIZIO-HAMILTON:  No, I think that's it, Your Honor.

THE COURT:  Okay.  So the Court will issue an order, and I will take your arguments into account.

MR. RIZIO-HAMILTON:  I very much appreciate it, Your Honor.

The only other thing I would like to add is to thank the Court for the time it devoted to the case and the careful attention throughout.  From Your Honor, your clerks, and your staff, we really appreciated your stewardship of this action, and it helped us bring it to a conclusion.

THE COURT:  Thank you.  The Court is very lucky to have such a dedicated set of clerks and courtroom deputy.  So it's been a pleasure to work with them.  So thanks for bringing that up.

Thank you, Counsel.

THE COURTROOM DEPUTY:  This court is in recess.

(At 9:31 a.m. the proceedings adjourned.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  18TH  DAY OF MAY, 2022.


/S/ MAREA WOOLRICH
_____
MAREA WOOLRICH, CSR NO. 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**